# 24-2481(L) 24-2630(CON)

## United States Court of Appeals
## for the Second Circuit

SUMMIT LIFE CENTER, INC., a New York not-for-profit corporation, THE EVERGREEN ASSOCIATION, INC., a New York not-for-profit corporation doing business as Expectant Mother Care, EMC FRONTLINE PREGNANCY CENTERS,

*Plaintiffs-Appellees,*

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, GIANNA'S HOUSE, INC., CHOOSE LIFE OF JAMESTOWN, INC., doing business as Options Care Center,

*Plaintiffs-Appellees / Cross-Appellees,*

v.

LETITIA JAMES,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of New York

---

### JOINT APPENDIX
### Volume III (pages 572-871)

| | |
|---|---|
| Jonathan Caleb Dalton, Esq. | LETITIA JAMES |
| ALLIANCE DEFENDING FREEDOM | *Attorney General* |
| 44180 Riverside Parkway | *State of New York* |
| Lansdowne, Virginia 20176 | The Capitol |
| (571) 707-4655 | Albany, New York 12224 |
| cdalton@adflegal.org | (518) 776-2044 |
| | Jonathan.Hitsous@ag.ny.gov |
| | |
| *Attorney for Appellees* | *Attorney for Appellant* |

# TABLE OF CONTENTS

**PAGE**

**Volume I**

Docket Sheet ................................................................................ 1

Verified Complaint for Declaratory Judgment and Injunctive Relief,
  filed May 24, 2024 ................................................................. 10

  Exhibit A – OAG Notice of Intention to File Lawsuit ..................... 80

  Exhibit B – Article by Vinekar et al. ........................................ 83

  Exhibit C – Article by Kolatorova et al. ................................... 90

  Exhibit D – Article by Cable & Grider, May 2023 ....................... 127

  Exhibit E – Article by Coomarasamy et al., May 2016 ................ 135

  Exhibit F – Article by Simons et al., November 2020 ................. 258

  Exhibit G – Article by Di Renzo et al., 2020 ............................ 270

**Volume II**

  Exhibit H – CRS Report, Off-Label Use of Prescription Drugs,
    February 2021 ................................................................... 282

  Exhibit I – NICE Guideline, November 2019 ............................. 304

  Exhibit J – NICE Guideline, November 2021 ............................. 346

  Exhibit K – Article by Coomarasamy et al, May 2019 ................. 389

  Exhibit L – Article by Baulieu & Segal .................................... 400

  Exhibit M – Article by Davenport & Delgado, April 2017 ............. 416

  Exhibit N – Article by Pleuvry, 2004 ...................................... 434

  Exhibit O – Article by Yamabe et al ....................................... 438

  Exhibit P – Article by Delgado et al. ...................................... 454

  Exhibit Q – Article by Delgado & Davenport, December 2012 ....... 466

i

**TABLE OF CONTENTS**

**PAGE**

Exhibit R – Article by Camilleri & Sammut, 2023 ........................................ 471

Exhibit S – Article by Paul DeBeasi, 2023 ................................................... 482

Exhibit T – HBI Complaint, filed May 6, 2024 ............................................. 496

Exhibit U – NIFLA Policy ............................................................................ 568

**Volume III**

Exhibit V – Gianna's House, Information Page ............................................. 572

Exhibit W – Options Care Center post on APR ............................................ 585

Notice of Motion for Preliminary Injunction, filed May 24, 2024 .......................... 587

Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction,
        filed May 24, 2024 ............................................................................ 590

Exhibit A – Declaration of Christina Francis, M.D. ...................................... 624

Exhibit B – Declaration and Affirmation of Maranda Halstead ................... 644

Exhibit C – Complaint in Supreme Court, Monroe County,
        filed April 30, 2024 ........................................................................... 653

Proposed Order granting Plaintiffs' Motion for Preliminary Injunction ................. 720

Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary
        Injunction, filed July 29, 2024 ........................................................... 721

Declaration of Assistant Attorney General Louisa Irving in Opposition to
        Plaintiffs' Motion for a Preliminary Injunction, filed July 29, 2024 ............. 770

Expert Declaration of Courtney A. Schreiber, M.D., M.P.H.,
        filed July 29, 2024 ............................................................................ 780

Exhibit A – Schreiber Resume ..................................................................... 825

Exhibit B – Article by Grossman et al., 2015 .............................................. 844

# TABLE OF CONTENTS

**PAGE**

Exhibit C – Article by Creinin & Chen, 2019 ................................................ 851

Exhibit D – Article by Delgado et al., 2018.................................................... 855

Exhibit E – Article by Grossman & White, October 2018 ............................ 868

**Volume IV**

Exhibit F – Article by Creinin et al., January 2020 ..................................... 872

Exhibit G – Article by Stifani & Lavelanet, October 2023............................ 881

Reply in Support of Plaintiffs' Motion for Preliminary Injunction,
    filed August 12, 2024 ........................................................................ 898

Exhibit D – Table ........................................................................ 932

Exhibit E – Rebuttal Expert Declaration of Christina Francis, M.D. .......... 945

Exhibit A – Article by Wright et al., September, 2011 ...................... 957

Exhibit F – Supplemental Declaration of Thomas A. Glessner, J.D., in
    Support of Plaintiffs' Motion for Preliminary Injunction .................. 966

Exhibit G – Supplemental Declaration of Jessie Andersen in Support of
    Plaintiffs' Motion for Preliminary Injunction .................................... 969

Exhibit H – Supplemental Declaration of Juliann Noce in Support of
    Plaintiffs' Motion for Preliminary Injunction .................................... 975

Transcript of Preliminary Injunction Hearing, held on August 15, 2024 .............. 978

Consolidation Order, filed August 26, 2024 ........................................................ 1025

Notice of Appeal, filed September 18, 2024 ........................................................ 1029

Order Staying Proceedings, September 24, 2024 ................................................. 1030

Notice of Cross-Appeal, filed October 1, 2024 .................................................... 1032

iii

# EXHIBIT V

(845) 279-8165 | Phone (tel:(845) 279-8165)

468 N Main St, Brewster, NY 10509
(https://www.google.com/maps/place/468+N+Main+St,+Brewster,+NY+10509/@41.3963
73.6194709!16s%2Fg%2F11c5bxfg2y)



(/)

# Abortion Information

## Before an Abortion

If you think you might be pregnant and are trying to make a
pregnancy decision, there are many choices facing you. It
can be overwhelming. You might be considering options such     Chat

Chat

as abortion that you have not previously thought about. At
Gianna's House, we are here to help you weigh those options
and offer you the support you might need. There are some
important things to think about if you are considering abortion
and we are here to help you regardless of your situation.

Before having an abortion, it is important to have your
pregnancy confirmed. There are many reasons that you
could have missed your period or that you are experiencing
other symptoms of pregnancy. Taking a pregnancy test is a
good first step. Visit us or contact us at <u>(845) 279-8165 (tel:
(845) 279-8165)</u> and you will be able to schedule an
appointment. During your appointment, we will perform a
pregnancy test for you, help you with any questions you
might have, and support you as you move forward.

If you have had a positive pregnancy test, it is important to
have an ultrasound  to confirm your pregnancy and give you
important information you need before you make a
pregnancy decision. An ultrasound will provide information
such as, if your pregnancy is viable (a living baby with
heartbeat), the gestational age of your pregnancy, and if the
pregnancy is growing inside your uterus. All of this
information affects the choices available to you.

Contact us today. We would be glad to talk with you about
your options and schedule your ultrasound. We take the
confidentiality of our client's information very seriously and
will never disclose your information without your permission
or as required by law.

# The Abortion Pill, Medication Abortion, RU-486, Medical Abortion, Chemical Abortion

## The abortion pill – Approved by the FDA through 10 weeks of pregnancy but availability is often extended beyond that limit.

Chat

The abortion pill goes by many names, including medication abortion, early medical abortion, RU-486, Mifeprex (mifepristone) and misoprostol, and chemical abortion. When used beyond the first trimester, laminaria (small rods) may be used to dilate the cervix and sometimes digoxin is injected into the baby during the abortion process.

*Note: Mifepristone is approved by the FDA for use up to 10 weeks after your last menstrual period, but abortion providers may choose to offer the procedure later than that. Misoprostol has not been approved for use in pregnancy.*

**The abortion pill regimen typically requires taking two drugs; the most common drugs used are mifepristone and misoprostol. Progesterone is a hormone naturally produced by a pregnant woman's body that plays an important role in sustaining pregnancy and aiding the development of the unborn child. Mifepristone is a chemical that prevents the lining of the uterus from receiving progesterone, usually resulting in the unborn child's death. In a chemical abortion, mifepristone is followed by misoprostol, which is meant to cause uterine contractions with symptoms of severe cramping and bleeding. When and how these medications are administered may vary based on the laws in your area, and the procedures of the clinic you choose. Women who choose the abortion pill are often responsible for self-managing some (or all) of the procedure, so it's important to gather as much information as possible as you make a decision about your pregnancy.**

Chat

In order to make sure you're safe, here are a few things you can do ahead of time:

1. Make sure that you are pregnant. Have you had a pregnancy test yet? If so, have you had an ultrasound? Some women seek abortion unnecessarily before confirming they are pregnant.
2. Did your ultrasound confirm that your pregnancy is growing inside your uterus? The abortion pill will not typically end an ectopic pregnancy, and your life could be in danger if you do not receive immediate treatment for an ectopic pregnancy. .

*If you're not sure whether you are pregnant, we offer free pregnancy testing.*

3. Know how far along you are. The FDA has not approved Mifepristone for pregnancies older than 10 weeks, so it is important to ask your doctor or other qualified healthcare provider to do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

*Not sure where to get an ultrasound? Call us today. We can help.*

4. Learn about the procedure. Ask the abortion provider what their procedure is for chemical abortion.

*Our center can offer education about abortion.*

5. Know your options. Making an abortion decision is not easy, and you do have alternatives. Educating yourself on all options is empowering.

*Whenever you need us, we can help.*

6. Stay Safe. Seek medical attention after an abortion if you have any of these symptoms:

- Heavy bleeding     soaking two or more pads an hour for two hours

576

Chat

- Severe abdominal or back pain
- Fever lasting more than 24 hours
- Foul-smelling vaginal discharge

7. If you have recently taken the abortion pill and changed your mind about completing the abortion, it may be possible to stop the effects of the abortion drug and continue your pregnancy. Learn more here. (https://abortionpillreversal.com)

# Surgical Abortion (Aspiration Abortion, Dilation & Evacuation Abortion)

A surgical procedure removes the fetus from the uterus through the vagina. The procedure is typically done using suction or an instrument called a curet. Different processes are used depending on the gestational age of your pregnancy. If you are unsure how far along you are, contact us for a free ultrasound to confirm your dates.

The type of surgical abortion you have will depend on how far along you are. Suction abortion (also called vacuum aspiration) is the most common while Dilation and Evacuation (D&E) is another kind of in-clinic abortion procedure often used for pregnancies late in the second trimester.

Here are some steps to a typical surgical abortion:

- Depending on how far along you are, dilators (rods) might be used to open the cervix prior to the abortion.
- You will be on the exam table in the same position used for a pelvic exam, with your feet on stirrups while lying on your back.
- The abortion provider will insert a speculum into the vagina.
- The vagina and cervix will be cleaned with an antiseptic solution.
- A numbing medicine (local anesthetic) will often be injected in the cervix.

577

Chat

- Sometimes other medicines for pain or sedation will be given by mouth or through a vein.
- The abortion provider will grasp the cervix with an instrument to hold the uterus in place.
- Your cervix will then be opened (dilated) with a small instrument.
- A tube (cannula) will be inserted into the cervical canal, and suction will be used to remove the baby and pregnancy tissue from the uterus. During this process, the uterus will contract which will cause cramping. Some women also may have nausea or sweating or feel faint.
- Sometimes a dilation and curettage (D&C) procedure is needed after a vacuum aspiration if all of the tissue has not been removed. D&C uses a sharp surgical instrument to clear tissue from the uterus.

In order to make sure you're safe, here are a few things you can do ahead of time:

1. Make sure that you are pregnant. Have you had a pregnancy test yet? If so, have you had an ultrasound? Some women seek abortion unnecessarily before finding out that they are pregnant.
2. Know how far along you are. Always ask for a doctor or other qualified medical professional (registered nurse or sonographer) to provide an ultrasound to confirm your dates.

*Not sure where to get an ultrasound? Call us today. We can help.*

3. Learn about the procedure. Ask the abortion provider what procedure will be used for your abortion. You can ask as many questions as needed to understand the process.

*Our center can offer education about abortion. Please contact us today for an appointment.*

4. Know your options. Making an abortion decision is not easy, and you do have alternatives. Educating yourself on all options is empowering.

5. Stay Safe. Seek medical attention after an abortion if
    you have any of these symptoms:

- Heavy bleeding - soaking two or more pads an hour for
  two hours
- Signs of infection such as headache, muscle aches,
  dizziness, or a general feeling of illness. Severe infection
  is possible without fever.
- Severe pain in the abdomen
- Hot flushes or a fever
- Vomiting lasting more than 4 to 6 hours
- Sudden abdominal swelling or rapid heart rate
- Vaginal discharge that has increased in amount or smells
  bad
- Pain, swelling, or redness in the genital area
- Bleeding lasting longer than 2 weeks
- New, unexplained symptoms
- No menstrual period within 6 weeks
- Signs and symptoms of depression.

*Whenever you need us, we can help.*

# Next Steps

If you are thinking about your pregnancy decision, you are not
alone. There are many options available to you. At [center
name] we are here to talk with you about any choices you
would like to discuss including abortion, adoption, or
parenting. As with any medical procedure, it is important to
understand what the abortion entails, side effects, possible
risks, complications, and alternatives. If you are ready to talk
to someone about your situation, contact us and we can
provide you with confidential help.

## References

American Association of Pro-Life Obstetricians and
Gynecologists. (n.d.). *AAPLOG statement on
dismemberment abortion bans.* https://aaplog.org/wp-
content/uploads/2019/02/AAPLOG-Statement-on-DE-

Chat

bans.pdf (https://aaplog.org/wp-content/uploads/2019/02/AAPLOG-Statement-on-DE-bans.pdf)

American Association of Pro-Life Obstetricians and Gynecologists. (n.d.). *AAPLOG statement on the necessity for informed consent before elective procedures on the pregnant woman.* https://aaplog.org/aaplog-statement-on-the-necessity-for-informed-consent-before-elective-procedures-on-the-pregnant-woman/ (https://aaplog.org/aaplog-statement-on-the-necessity-for-informed-consent-before-elective-procedures-on-the-pregnant-woman/)

American Association of Pro-Life Obstetricians and Gynecologists. (n.d.). *AAPLOG statement on the necessity for ultrasound before elective procedures on the pregnant woman.* https://aaplog.org/aaplog-statement-on-the-necessity-for-ultrasound-before-elective-procedures-on-the-pregnant-woman/ (https://aaplog.org/aaplog-statement-on-the-necessity-for-ultrasound-before-elective-procedures-on-the-pregnant-woman/)

American Association of Pro-Life Obstetricians and Gynecologists. (2020, February). Medication abortion. *AAPLOG Practice Guideline, 8*, 1-17. https://aaplog.org/wp-content/uploads/2023/01/PG-8-Medication-Abortion.pdf (https://aaplog.org/wp-content/uploads/2023/01/PG-8-Medication-Abortion.pdf)

American Association of Pro-Life Obstetricians and Gynecologists. (2022, November). The reversal of the effects of mifepristone by progesterone. *AAPLOG Practice Guideline, 6*, 1-5. https://aaplog.org/wp-content/uploads/2023/01/PG-6-Reversal-of-the-Effects-of-Mifepristone-by-Progesterone.pdf (https://aaplog.org/wp-content/uploads/2023/01/PG-6-Reversal-of-the-Effects-of-Mifepristone-by-Progesterone.pdf)

American Pregnancy Association. (n.d.). *Fetal development: How to calculate gestational age.* https://americanpregnancy.org/healthy-pregnancy/while-

pregnant/fetal-development/
(https://americanpregnancy.org/healthy-pregnancy/while-
pregnant/fetal-development/)

American Pregnancy Association. (n.d.). *I need help with an
unplanned pregnancy.*
https://americanpregnancy.org/unplanned-
pregnancy/getting-help/
(https://americanpregnancy.org/unplanned-
pregnancy/getting-help/)

American Pregnancy Association. (n.d.). *What is hcg?.*
https://americanpregnancy.org/getting-pregnant/hcg-levels/
(https://americanpregnancy.org/getting-pregnant/hcg-
levels/)

Chasen, S. T., Kalish, R. B., Gupta, M., Kaufman, J. E.,
Rashbaum, W. K., & Chervenak, F. A. (2004). Dilation and
evacuation at 20 weeks: Comparison of operative
techniques. *American Journal of Obstetrics & Gynecology,
190*(5), 1180-1183.
https://doi.org/10.1016/j.ajog.2003.12.034
(https://doi.org/10.1016/j.ajog.2003.12.034).

Cleveland Clinic. (2022, September 28). *Ultrasound in
pregnancy.*
https://my.clevelandclinic.org/health/diagnostics/9704-
ultrasound-in-pregnancy
(https://my.clevelandclinic.org/health/diagnostics/9704-
ultrasound-in-pregnancy)

Healthwise Staff. (2021, November 22). *Dilation and
evacuation (D&E).* C.S. Mott Children's Hospital: University
of Michigan Health. https://www.mottchildren.org/health-
library/tw2462 (https://www.mottchildren.org/health-
library/tw2462)

Healthwise Staff. (2021, November 22). *Vacuum aspiration
for abortion.* University of Michigan Health.
https://www.uofmhealth.org/health-library/tw1078
(https://www.uofmhealth.org/health-library/tw1078)

Mayo Clinic. (2021, October 19). *Dilation and curettage (D&C).* https://www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910#std120864-sec (https://www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910#std120864-sec)

Mayo Clinic. (2022, March 12). *Ectopic pregnancy.* https://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/symptoms-causes/syc-20372088 (https://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/symptoms-causes/syc-20372088)

Mayo Clinic. (2022, July 29). *Medical abortion.* https://www.mayoclinic.org/tests-procedures/medical-abortion/about/pac-20394687 (https://www.mayoclinic.org/tests-procedures/medical-abortion/about/pac-20394687)

Mayo Clinic. (2021, December 03). *Symptoms of pregnancy: What happens first.* https://www.mayoclinic.org/healthy-lifestyle/getting-pregnant/in-depth/symptoms-of-pregnancy/art-20043853 (https://www.mayoclinic.org/healthy-lifestyle/getting-pregnant/in-depth/symptoms-of-pregnancy/art-20043853)

Substance Abuse and Mental Health Services Administration. (2023, April 24). *Depression.* https://www.samhsa.gov/mental-health/depression (https://www.samhsa.gov/mental-health/depression)

Tufa, T. H., Prager, S., Lavelanet, A. F., & Kim, C. (2020). Drugs used to induce fetal demise prior to abortion: A systematic review. *Contracept X*, 2, 100046. doi: 10.1016/j.conx.2020.100046

U.S. Food and Drug Administration. (n.d.). *Questions and answers on mifepristone for medical termination of pregnancy through ten weeks gestation.* https://www.fda.gov/drugs/postmarket-drug-safety-

information-patients-and-providers/questions-and-answers-
mifepristone-medical-termination-pregnancy-through-ten-
weeks-gestation (https://www.fda.gov/drugs/postmarket-
drug-safety-information-patients-and-providers/questions-
and-answers-mifepristone-medical-termination-pregnancy-
through-ten-weeks-gestation)

Villines, Z. (2023, February 21). *Signs of womb damage after
abortion.* Medical News Today.
https://www.medicalnewstoday.com/articles/signs-of-womb-
damage-after-abortion#is-it-possible
(https://www.medicalnewstoday.com/articles/signs-of-
womb-damage-after-abortion#is-it-possible)

---



## Reach Out

(tel:(845)%20279-8165)Phone | 845-279-8165 (tel:
(845)%20279-8165)

Text | 845-279-8165 (sms:845 279 8165)



## Visit Us

468 N Main St, Brewster, NY 10509
(https://www.google.com/maps/place/468+N+Main+St,+Brewster,+NY+1050
73.6194709!16s%2Fg%2F11c5bxfg2y)



## Our Hours

Monday | 10am-4pm (/../contact)

Tuesday | 10am-4pm (/../contact)

Wednesday | 10am-4pm (/../contact)

Thursday | 10am-4pm (/../contact)

**583**                                      Chat

Friday | 10am-4pm (.../contact)

Chat

Gianna's House provides a safe environment with a warm, comfortable setting where privacy and confidentiality are top priorities. We offer a holistic approach to helping women.  Our services are available at no cost to you because we are a 501(c)(3) tax-exempt non-profit organization. This facility is not a licensed medical facility.  We do not offer, recommend or refer for abortions or abortifacients; therefore, we receive no financial gain from your decision. We are committed to provide accurate information about pregnancy options, abortion procedure risks and alternatives, and post-abortion support. All of our advertising and communications are truthful, honest, and accurately describe the services we offer.

© 2024

**f** (https://www.facebook.com/people/Giannas-House/100094697947733/)

⌾ (https://www.instagram.com/giannashouse/?hl=en)

Web Design and Development by Extend Web Services (http://www.extendwebservices.com)

Chat

# EXHIBIT W



## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

NATIONAL INSTITUTE OF FAMILY
AND LIFE ADVOCATES, GIANNA'S
HOUSE, INC., and CHOOSE LIFE OF
JAMESTOWN, INC. d/b/a OPTIONS
CARE CENTER,

                *Plaintiffs*,

      v.

LETITIA JAMES, in her official
capacity as Attorney General of the
State of New York,

                *Defendant*.

Case No.: 1:24-cv-00514

## NOTICE OF MOTION FOR PRELIMINARY INJUNCTION

### TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

**PLEASE TAKE NOTICE** that Plaintiffs National Institute for Family and Life Advocates (NIFLA), Gianna's House, Inc., and Choose Life of Jamestown, Inc. d/b/a Options Care Center, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 65(a) of the Local Rules of Civil Procedure for the United States District Court for the Western District of New York, seek a preliminary injunction barring Defendant Letitia James, her agents, officials, servants, employees, and any other persons acting on her behalf from enforcing New York General Business Law Article 22-A, §§ 349 and 350 and New York Executive Law § 63(12) against Plaintiffs and their members for speaking about the use of progesterone for abortion pill reversal.

The Attorney General recently sued similar organizations under New York General Business Law Article 22-A, §§ 349 and 350 and New York Executive Law § 63(12) for making statements identical or similar to those Plaintiffs have made

and would like to make. This enforcement chills Plaintiffs' constitutionally protected and religiously motivated speech, causing irreparable harm that will continue absent an injunction.

Pursuant to Local Rule 7, this Motion is supported by the Verified Complaint with exhibits filed May 24, 2024, the Memorandum of Law with exhibits dated May 24, 2024, a list of exhibits and witnesses Plaintiffs may present at the preliminary injunction hearing, and a proposed order granting the injunctive relief.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Rule 7 of the Local Rules of Civil Procedure for the United States District Court for the Western District of New York, Plaintiffs request oral argument and state their intention to file and serve reply papers.

Respectfully submitted this 24th day of May, 2024.

J. Caleb Dalton*  
Gabriella M. McIntyre*  
Allison H. Pope*  
Alliance Defending Freedom  
44180 Riverside Pkwy  
Lansdowne, VA 20176  
Tel: (571) 707-4655  
cdalton@adflegal.org  
apope@adflegal.org  
gmcintyre@adflegal.org  

*Pro hac vice to be filed.  
**Application for admission to be filed

*/s/ Michael G. McCartin*  
Michael G. McCartin  
Michael G. McCartin Law PLLC  
38 Mall Way #513  
West Sand Lake, New York 12196-9998  
WDNY Bar Roll No. 2447712  
Tel: (518) 953-3333  
mccartinlaw@gmail.com  

Erin M. Hawley*  
Lincoln Davis Wilson**  
Timothy A. Garrison*  
Alliance Defending Freedom  
440 First Street NW, Suite 600  
Washington, DC 20001  
Tel: (202) 393-8690  
ehawley@adflegal.org  
lwilson@adflegal.org  
tgarrison@adflegal.org  

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a true and correct copy of the foregoing document along with the initial case documents, the Memorandum of Law in Support of the Motion for Preliminary Injunction and accompanying exhibits, the Exhibit and Witness List, and the Proposed Order to be served via process server upon the following:

> Attorney General of New York Letitia James
> Managing Attorney's Office
> Empire State Plaza
> Justice Building, 2nd Floor
> Albany, NY 12224

Date: May 24, 2024

*/s/ Michael G. McCartin*
Michael G. McCartin

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, GIANNA'S HOUSE, INC., and CHOOSE LIFE OF JAMESTOWN, INC. d/b/a OPTIONS CARE CENTER,<br><br>                              *Plaintiffs*,<br><br>              v.<br><br>LETITIA JAMES, in her official capacity as Attorney General of New York,<br><br>                              *Defendant*. | Case No.: 1:24-cv-00514 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Introduction ........................................................................................... 1

Factual Background ............................................................................... 2

    A.    Scientific research supports using progesterone for APR. ................... 3

    B.    The Attorney General invokes New York's Business Fraud
        Statutes against pregnancy centers speaking about APR. ................... 6

    C.    Plaintiffs sue to stop the threat they face from an unconstitutional
        enforcement action. .................................................................... 7

Argument ............................................................................................... 8

I.    Plaintiffs are likely to succeed on their First Amendment claims................... 8

    A.    Applying the Business Fraud Statutes against pregnancy centers'
        speech about APR is unlawful content and viewpoint
        discrimination................................................................................ 8

        1.    The First Amendment entitles Plaintiffs to speak truthfully
            about off-label uses of prescription medicines............................. 9

        2.    The Attorney General is trying to censor speech she dislikes
            without traditional showings of knowledge, reliance, loss, or
            materiality to a victim or consumers. ...................................... 11

        3.    The Attorney General's actions fail heightened scrutiny. ......... 14

    B.    The Attorney General's selective enforcement against pregnancy
        centers is unlawful. ..................................................................... 18

    C.    The Attorney General's enforcement of the Business Fraud
        Statutes against pregnancy centers violates religious freedom. .......... 21

II.    The other preliminary-injunction factors favor Plaintiffs.............................. 24

Conclusion............................................................................................ 25

i

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. American Civil Liberties Union,*
    535 U.S. 564 (2002) ............................................................................ 8

*Ashcroft v. American Civil Liberties Union,*
    542 U.S. 656 (2004) ............................................................................ 9

*Bella Health & Wellness v. Weiser,*
    No. 1:23-cv-00939, 2023 WL 6996860 (D. Colo. Oct. 21, 2023) ............ 10

*Bery v. City of New York,*
    97 F.3d 689 (2d Cir. 1996) ................................................................ 24

*Bigelow v. Virginia,*
    421 U.S. 809 (1975) .......................................................................... 25

*Boy Scouts of America v. Wyman,*
    335 F.3d 80 (2d Cir. 2003) ................................................................ 18

*Buckman Company v. Plaintiffs' Legal Committee,*
    531 U.S. 341 (2001) ............................................................................ 9

*Central Hudson Gas & Electric Corporation v. Public Service Commission of New
    York,*
    447 U.S. 557 (1980) .......................................................................... 25

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................ 21, 22, 23

*City of Austin v. Reagan National Advertising of Austin, LLC,*
    596 U.S. 61 (2022) .............................................................................. 8

*Donaldson v. Read Magazine,*
    333 U.S. 178 (1948) .......................................................................... 11

*Elrod v. Burns,*
    427 U.S. 347 (1976) .......................................................................... 24

*Fink v. Time Warner Cable,*
    714 F.3d 739 (2d Cir. 2013) .............................................................. 12

*First National Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) .......................................................................... 21

*Frederick Douglass Foundation, Inc. v. District of Columbia,*
    82 F.4th 1122 (D.C. Cir. 2023) .......................................................... 18

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) .......................................................................... 24

*Goshen v. Mutual Life Insurance Company of New York*,
    98 N.Y.2d 314 (2002) .................................................. 11

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*,
    538 U.S. 600 (2003) ............................................. 12, 13, 16

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) .................................................. 21

*M.A. on behalf of H.R. v. Rockland County Department of Health*,
    53 F.4th 29 (2d Cir. 2022) ....................................... 21, 22

*MacNoughton v. Young Living Essential Oils, LC*,
    67 F.4th 89 (2d Cir. 2023) ........................................... 6

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
    584 U.S. 617 (2018) ............................................. 21, 22, 24

*National Institute of Family & Life Advocates v. Becerra*,
    585 U.S. 755 (2018) ........................................ 8, 14, 15, 17

*New York Public Interest Research Group v. Insurance Information Institute*,
    161 A.D.2d 204 (N.Y. App. Div. 1990) ............................... 11

*New York Times Company v. Sullivan*,
    376 U.S. 254 (1964) .................................................. 17

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
    85 N.Y.2d 20 (1995) ................................................... 6

*Porzecanski v. Azar*,
    943 F.3d 472 (D.C. Cir. 2019) ........................................ 10

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .................................................... 8

*Resource Group International Limited v. Chishti*,
    91 F.4th 107 (2d Cir. 2024) ............................................ 8

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ................................................... 15

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ............................................. 8, 18, 21

*Schlaifer Nance & Company v. Estate of Warhol*,
    119 F.3d 91 (2d Cir. 1997) ........................................ 12, 16

*Small v. Lorillard Tobacco Company*,
    252 A.D.2d 1 (App. Div. 1998), *aff'd*, 94 N.Y.2d 43 (1999) ..................... 12

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) .................................................... 8

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ........................................................................... 24

*Thompson v. Western States Medical Center,*
   535 U.S. 357 (2002) ......................................................................... 16

*Transportation Alternatives, Inc. v. New York,*
   340 F.3d 72 (2d Cir. 2003) ............................................................... 15

*United States v. Alvarez,*
   567 U.S. 709 (2012) .......................................................... 11, 13, 14, 17

*United States v. Caronia,*
   703 F.3d 149 (2d Cir. 2012) ...................................................... passim

*United States v. Johnson,*
   945 F.3d 606 (2d Cir. 2019) ............................................................. 12

*United States v. United Foods, Inc.,*
   533 U.S. 405 (2001) ......................................................................... 14

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976) ......................................................................... 25

*Wandering Dago, Inc. v. Destito,*
   879 F.3d 20 (2d Cir. 2018) ............................................................... 18

*Wayte v. United States,*
   470 U.S. 598 (1985) ......................................................................... 18

**Statutes**

N.Y. Educ. Law § 6530 (McKinney 2021) ............................................. 16

N.Y. Exec. Law § 63 (McKinney 2022) .......................................... 1, 7, 11, 14

N.Y. Gen. Bus. Law Art. 22-A, § 349 (McKinney 2014) ..................... 1, 6, 11

N.Y. Gen. Bus. Law Art. 22-A, § 350 (McKinney 1963) ..................... 1, 6, 11

N.Y. Pub. Health Law § 230 (McKinney 2023) ................................... 16

**Other Authorities**

Abortion Pill Reversal / Abortion Pill Rescue Network, *Abortion Pill Reversal*,
   abortionpillreversal.com ................................................................. 19

Attorney General Letitia James, *How New York protects your right to
reproductive health care*, N.Y STATE ATTORNEY GENERAL,
   https://perma.cc/KFU6-MYAS ........................................................ 7

Attorney General Rob Bonta, *Open Letter from Attorneys General Regarding CPC Misinformation and Harm*, STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL 8 (Oct. 23, 2023), https://perma.cc/4SA5-9FXD .............. 7, 23

Christina Camilleri & Stephen Sammut, *Progesterone-mediated reversal of mifepristone-induced pregnancy termination a rat model: an exploratory investigation*, 13 SCIENTIFIC REPORTS 10942 (2023), https://perma.cc/4SAL-DDP3 ................................................................................................................ 4, 10

*Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE) (updated Nov. 24, 2021), https://perma.cc/Y9TE-KCY5 ........................................................ 5

*Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE), 16 (November 2021), https://perma.cc/4W4X-Q95Y ............................................... 5, 10

EMILY OSTER, EXPECTING BETTER, 169 (Penguin Books, 1st Ed. 2014) ...................... 5

Food and Drug Administration, *Mifeprex (mifepristone) Label,* (Jan. 2023), https://perma.cc/4895-X457 ................................................................... 19

Food and Drug Administration, *Prometrium Label*, https://perma.cc/CR46-2FTS .... 5

George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 ISSUES L. & MED. 21, 24-25 (2018), https://perma.cc/ZR33-UJWF*e*. ................................................................ 4, 5

Gian Carlo Di Renzo et al., *Progesterone: History, facts, and artifacts*, 69 BEST PRACTICE & RSCH. CLINICAL OBSTETRICS & GYNAECOLOGY 2 (2020) ...................... 4

Jessica C. Leek & Hasan Arif, *Pregnancy Medications*, NIH STATPEARLS (Jul. 24, 2023), https://perma.cc/K52A-GUPQ ......................................................................... 5

Jillian Jorgensen, *AG candidate Letitia James would seek broad authority to prosecute those who block abortion clinics* (Jul. 26, 2018), NEW YORK DAILY NEWS, https://perma.cc/3QE7-EYQC ................................................................... 22

Letitia James & Andrea Miller, *With Fake Clinics Proliferating, New Yorkers Should Know Their Reproductive Health Care Rights* (Sep. 24, 2018), GOTHAM GAZETTE, https://perma.cc/6AMY-82DQ ............................................... 22

Letter from Lisa Rarick M.D., Food and Drug Admin. to Joseph Lamendola, Ph.D, Schering Corp. (Dec. 16, 1998), https://perma.cc/M7T7-VSDL .................... 4

Lucie Kolatorova et al., *Progesterone: A Steroid with Wide Range of Effects in Physiology as Well as Human Medicine*, 23 INT'L J. MOLECULAR SCIS. 14, July 2022 .......................................................................................................................... 4

Mary L. Davenport et al.*, Embryo Survival After Mifepristone: A Systematic Review of the Literature,* 32 ISSUES L. & MED. 1 (2017) .......................................... 4

New York Attorney General James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/H9JC-KNCH ................................................................... 22

v

New York Attorney General James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/M59B-NJDZ ...................................................................... 22

New York Attorney General James (@NewYorkStateAG), X (Jun. 29, 2022, 2:50 PM), https://perma.cc/5FAS-MQ3K ......................................................................... 7

New York Attorney General James, @NewYorkStateAG, https://perma.cc/3XEH-TZQ2 ...................................................................................................................... 20

Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion: A Scoping Review*, THE LINACRE QUARTERLY (July 2023), https://perma.cc/AR8M-U474 ............................................................... 5, 10

Planned Parenthood of Greater New York, *Our Services*, https://perma.cc/BG3X-MMHL ...................................................................................................................... 18

Planned Parenthood of Greater New York, *Pregnancy Testing and Planning*, https://perma.cc/5DKF-G28K .................................................................................... 19

Planned Parenthood of Greater New York, *The Abortion Pill*, https://perma.cc/6GE8-49RF ..................................................................................... 19

Planned Parenthood, *Abortion*, https://perma.cc/MGR6-FA4V ................................ 20

Planned Parenthood, *How much does the abortion pill cost?*, https://perma.cc/XS4J-LHVU .................................................................................... 20

Planned Parenthood, *How Safe Is the Abortion Pill?*, https://perma.cc/PWW2-Q4AY ......................................................................................................................... 19

Planned Parenthood, *Mission*, https://perma.cc/MT96-N5K3 .................................... 19

Press Release, Office of the New York State Attorney General, Attorney General James Applauds Google for Improving Search Results for Individuals Seeking Abortion Care (Aug. 25, 2022) https://perma.cc/LB65-QD2G............................... 22

Press Release, Office of the New York State Attorney General, Attorney General James Sues Anti-Abortion Group and 11 New York Crisis Pregnancy Centers for Promoting Unproven Abortion Reversal Treatment (May 6, 2024), https://perma.cc/U572-Z6FR .................................................................... 15, 20, 23

*Prometrium Prescribing Information*, Drugs.com, https://perma.cc/RDN3-WNQ8 .... 5

*Reproductive Rights*, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, https://perma.cc/6RCA-Q4NU.................................................................................... 23

Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion-Pill Reversal'*, N.Y. TIMES (July 18, 2017), https://perma.cc/CN75-8YEU ................... 1

Shingo Yamabe et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 FOLIA ENDOCRINOLOGICA JAPONICA 497 (1989), https://perma.cc/FY3C-ADAD ............................................................................. 3, 10

vi

**Rules**

Fed. R. Civ. P. 9 ......................................................................................... 16

## INTRODUCTION

New York's Attorney General, Letitia James, is seeking to punish and silence the speech of religious nonprofits regarding certain uses of progesterone. The nonprofits receive no economic benefit from speaking about progesterone or from referring women to the physicians who prescribe it. The challenged use of progesterone is perfectly legal under state and federal law, and numerous studies have shown it is both safe and effective. Yet the Attorney General has sought to leverage her authority under New York's Business Fraud Statutes[1] to sue and silence nearly a dozen religious nonprofits because she says their speech about this use of progesterone is misleading.

The Attorney General's unprecedented use of these statutes to silence noncommercial speech flows from her animus towards the viewpoint the religious nonprofits express: the use of progesterone to stop the effects of an initiated chemical abortion. The chemical-abortion process begins when a pregnant woman takes mifepristone, a drug that works by blocking progesterone receptors, preventing the development of her unborn child. If a woman changes her mind and decides to continue her pregnancy, administering progesterone within 72 hours can inhibit mifepristone's effects. As Yale's pro-choice Dr. Harvey Kliman has explained, if one of his daughters accidentally took mifepristone during pregnancy, "he would tell her to take 200 milligrams of progesterone three times a day for several days," and "'I bet you it would work.'"[2] Scientific research supports Dr. Kliman's intuition.

The Attorney General, a staunch pro-abortion advocate, discards this science. She says that statements suggesting that progesterone can be used for this purpose—called "abortion pill reversal" or "APR"—are false and misleading. That's

---

[1] N.Y. Exec. Law § 63(12); N.Y. Gen. Bus. Law Art. 22-A, §§ 349, 350.
[2] Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion-Pill Reversal'*, N.Y. TIMES (July 18, 2017), https://perma.cc/CN75-8YEU.

wrong. But she claims that by invoking statutes about business fraud to punish noncommercial speech, she can sanction anyone who speaks truthfully about the lawful use of this medication with penalties, attorney's fees, and other relief up to and including dissolution of their organizations.

That Orwellian theory threatens Plaintiffs here. Plaintiffs are also religious, pro-life nonprofits that have spoken and wish to continue speaking about progesterone for APR, but their speech has been chilled by the Attorney General's enforcement actions. The Court should grant them a preliminary injunction for three reasons. *First*, Plaintiffs have a First Amendment right to speak truthfully, including about off-label uses of prescription medicines, and the Attorney General's attempt to silence speech based solely on her objection to its viewpoint cannot survive constitutional scrutiny. *Second*, the Attorney General's actions are unlawful viewpoint discrimination that selectively enforce the statutes against pro-life pregnancy centers while promoting the misleading speech of pro-abortion clinics. And *third*, the Attorney General's actions violate the Free Exercise Clause through her hostility to the pregnancy centers' pro-life, Christian viewpoint. The Court should therefore enjoin her from enforcing the Business Fraud Statutes against Plaintiffs' speech about progesterone for APR.

## FACTUAL BACKGROUND

Plaintiff National Institute of Family and Life Advocates ("NIFLA") is a Christian, nonprofit association of life-affirming pregnancy centers. Verified Complaint ("Compl.") ¶¶ 22–24. It empowers women and families to choose life for their unborn children by providing legal counsel, education, and training to its member centers. Compl. ¶ 27. Plaintiffs Gianna's House and Options Care Center are two of NIFLA's pro-life, faith-based, nonprofit member centers in New York. *Id.* ¶¶ 45–47, 58–60. NIFLA pregnancy centers provide their life-affirming services to

clients for free, as part of their Christian mission to protect unborn life. *Id.* ¶¶ 31–32. New York members provide no-cost referrals to physicians for progesterone treatment and do not receive any remuneration for those referrals. *Id.* ¶¶ 34–35. Plaintiffs all have spoken and wish to continue speaking about progesterone for APR. *Id.* ¶¶ 28, 56, 71, 168–236.

### A.    Scientific research supports using progesterone for APR.

In a typical chemical abortion, a woman takes two drugs. Decl. of Christina Francis, M.D. ¶ 11, attached as Exhibit A. First mifepristone, a progesterone-receptor antagonist, which blocks receptors for progesterone, a hormone that is necessary to maintain pregnancy. *Id.* Second misoprostol, which induces contractions to expel the embryo or fetus and pregnancy tissue. *Id.* ¶ 12. But if a woman changes her mind after taking mifepristone but before taking misoprostol, studies have shown she may take supplemental progesterone to counteract or "reverse" the effects of the mifepristone and deliver a healthy baby. *Id.* ¶ 20. This process is supported by a biochemical principle called "reversible competitive inhibition." *Id.* ¶¶ 16–17.

Multiple scientific studies have shown progesterone can counter the effects of mifepristone. *Id.* ¶¶ 20–31. In 1989, researchers investigated progesterone's role in in pregnancy in rats, known for their physiological similarity to humans.[3] *Id.* ¶¶ 26, 28. The study found that four days after receiving mifepristone, only 33.3% of the rats who were not given progesterone were still pregnant, but 100% of the rats who were given progesterone remained pregnant.[4] *Id.* ¶ 26. A 2023 study found 81% of fetuses survived in rats given progesterone after mifepristone, but none survived in

---

[3] Shingo Yamabe et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 FOLIA ENDOCRINOLOGICA JAPONICA 497 (1989), https://perma.cc/FY3C-ADAD, Verified Compl. Ex. O, ECF No. 2-3.
[4] *Id.*

3

rats given mifepristone without progesterone.[5] *Id.* ¶ 27. The authors concluded this was evidence of "a clear progesterone-mediated reversal of an initiated mifepristone-induced termination ... at first-trimester human equivalent."[6]

An observational case series of pregnant women published in 2018 found a similar effectiveness result. Of 547 women who underwent progesterone therapy within 72 hours of taking mifepristone, nearly half maintained their pregnancies through birth.[7] *Id.* ¶ 20. Where progesterone was delivered intramuscularly or orally at a high dose and then taken daily through the first trimester, unborn children survived at rates of 64% and 68%, respectively.[8] *Id.* By comparison, if mifepristone alone is taken, they survive only about 25% of the time.[9] *Id.* ¶ 22.

Using progesterone for APR is also safe. *Id.* ¶¶ 32–38. The FDA approved progesterone as a prescription medication in 1998[10] and doctors have legally prescribed it off label for various uses for decades, including to prevent miscarriages and preterm births.[11] "Natural progesterone has been safely used during pregnancy

---

[5] Christina Camilleri & Stephen Sammut, *Progesterone-mediated reversal of mifepristone-induced pregnancy termination a rat model: an exploratory investigation*, 13 SCIENTIFIC REPORTS 10942 (2023), https://perma.cc/4SAL-DDP3, Verified Compl. Ex. R, ECF No. 2-6.

[6] *Id.*

[7] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 ISSUES L. & MED. 21, 24-25 (2018), https://perma.cc/ZR33-UJWF*e*, Verified Compl. Ex. P, ECF No. 2-4.

[8] *Id.* at 26.

[9] *Id.*; *see also* Mary L. Davenport et al*., Embryo Survival After Mifepristone: A Systematic Review of the Literature,* 32 ISSUES L. & MED. 1 (2017), Verified Compl. Ex. M, ECF No. 2-1.

[10] Letter from Lisa Rarick M.D., Food and Drug Admin. to Joseph Lamendola, Ph.D, Schering Corp. (Dec. 16, 1998), https://perma.cc/M7T7-VSDL.

[11] *See* Gian Carlo Di Renzo et al., *Progesterone: History, facts, and artifacts*, 69 BEST PRACTICE & RSCH. CLINICAL OBSTETRICS & GYNAECOLOGY 2, 9 (2020), Verified Compl. Ex. G, ECF No. 1-9; Lucie Kolatorova et al., *Progesterone: A Steroid with Wide Range of Effects in Physiology as Well as Human Medicine*, 23 INT'L J. MOLECULAR SCIS. 14, July 2022, Verified Compl. Ex. C, ECF No. 1-5.

4

**601**

for over 50 years, notably to support IVF pregnancies and in women who have a history of pregnancy loss." *Id.* ¶ 34. Indeed, the FDA classifies supplemental progesterone as a "Category B" drug for pregnant women—the same category as Tylenol, the most common pain reliever used during pregnancy.[12] Category B drugs have been shown to pose no risk in animal studies, including no risk to the fetus.[13]

The United Kingdom's public health authority recommends progesterone therapy for women with early pregnancy bleeding and a previous miscarriage.[14] *Id.* ¶ 37. In 2021, it specifically noted "there was no evidence of harms for women or babies" from the use of progesterone, including "no increase in risk of ... congenital abnormalities or adverse drug reactions."[15] The 2018 case series also found no increased risk of birth defects after supplemental progesterone, and the rate of preterm delivery was 2.7%, much lower than the 10% average in the United States.[16] *Id.* ¶ 33. And a 2023 review of 16 studies found "no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy."[17]

---

[12] FDA, *Prometrium Label*, at 19, https://perma.cc/CR46-2FTS; *Prometrium Prescribing Information*, Drugs.com, https://perma.cc/RDN3-WNQ8; *see also* EMILY OSTER, EXPECTING BETTER, 169 (Penguin Books, 1st Ed. 2014).

[13] Jessica C. Leek & Hasan Arif, *Pregnancy Medications*, NIH STATPEARLS (Jul. 24, 2023), https://perma.cc/K52A-GUPQ.

[14] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE) (updated Nov. 24, 2021), https://perma.cc/Y9TE-KCY5 (Guideline NG126, Recommendation 1.5.2), Verified Compl. Ex. I, ECF No. 1-11.

[15] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE), 16 (November 2021), https://perma.cc/4W4X-Q95Y (Guideline NG126 Update), Verified Compl. Ex. J, ECF No. 1-12.

[16] Delgado at 26, ECF No. 2-4, *supra* note 7.

[17] Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion: A Scoping Review*, THE LINACRE QUARTERLY (July 2023), https://perma.cc/AR8M-U474, Verified Compl. Ex. S, ECF No. 2-7.

**B.    The Attorney General invokes New York's Business Fraud Statutes against pregnancy centers speaking about APR.**

Last month, the Attorney General served Heartbeat International and 11 of its pro-life pregnancy centers with notices that she intended to sue them for making statements about progesterone for APR. Notice of Intention to Sue (Apr. 22, 2024), Verified Compl. Ex. A, ECF No. 1-3. Like Plaintiffs, none of these centers provide APR themselves, but rather refer women to physicians. Compl. ¶ 34. Yet the Attorney General threatened to sue them under New York's Business Fraud Statutes for "statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol." Notice, ECF No. 1-3. She quickly followed through. Compl., *People v. Heartbeat Int'l, Inc.*, No. 451314/2024 (N.Y. Sup. Ct. May 6, 2024), Verified Compl. Ex. T, ECF No. 2-8 ("James Compl.").

This use of the Business Fraud Statutes against nonprofits' statements about services for which they receive no money goes far beyond the traditional and textual moorings of these laws, which are confined to the commercial context. New York's General Business Law prohibits "[d]eceptive acts or practices" and "[f]alse advertising" "in the conduct of any business, trade, or commerce or in the furnishing of any service" in the state. N.Y. Gen. Bus. Law §§ 349(a), 350. "Deceptive acts or practices" include "representations or omissions" that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25–26 (1995). "False advertising" includes advertising of a "commodity" that is "misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1). It must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *MacNoughton v. Young Living Essential Oils, LC,* 67 F.4th 89, 96 (2d Cir. 2023) (citation omitted). Likewise, New York Executive Law § 63(12) allows the attorney general to sue any person who "engage[s] in repeated fraudulent or illegal acts or otherwise

6

**603**

demonstrate[s] persistent fraud or illegality in *the carrying on, conducting, or transaction of business*[.]" N.Y. Exec. Law § 63(12) (emphasis added).

This twisting of New York's business laws to punish pregnancy centers is all the more concerning given the Attorney General's long and open history of public animus against them. She describes pregnancy centers, which are almost uniformly Christian organizations, as "[f]ake clinics."[18] Compl. ¶ 79. She pressured Google to discriminate against pregnancy centers because they "exist to discourage people from having an abortion."[19] And she joined an open letter from state attorneys general criticizing pregnancy centers and pledging to use her consumer protection authority to "take numerous actions aiming to mitigate [their] harmful effects."[20]

### C. Plaintiffs sue to stop the threat they face from an unconstitutional enforcement action.

Plaintiffs have made and would like to make statements about APR, some of which are identical to, and others of which are substantially similar to, those targeted by the Attorney General in her lawsuit. Compl. ¶¶ 168–236. But the Attorney General's suit, coupled with her open hostility to pregnancy centers writ large, has caused them to stop making this speech, for fear they will be prosecuted, too. *Id.* ¶¶ 171, 183, 187, 212, 230, 234. To protect their right to resume making that protected speech, Plaintiffs filed this lawsuit, and now move for a preliminary injunction.

---

[18] Attorney General Letitia James, *How New York protects your right to reproductive health care*, N.Y STATE ATTORNEY GENERAL, https://perma.cc/KFU6-MYAS.

[19] NY AG James (@NewYorkStateAG), X (Jun. 29, 2022, 2:50 PM), https://perma.cc/5FAS-MQ3K.

[20] Attorney General Rob Bonta, *Open Letter from Attorneys General Regarding CPC Misinformation and Harm*, STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL 8 (Oct. 23, 2023), https://perma.cc/4SA5-9FXD.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that [the plaintiff] is likely to suffer irreparable injury ...; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved" by the injunction. *Res. Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024) (cleaned up). Plaintiffs meet all of these elements.

### I.  Plaintiffs are likely to succeed on their First Amendment claims.

#### A.  Applying the Business Fraud Statutes against pregnancy centers' speech about APR is unlawful content and viewpoint discrimination.

The First Amendment "prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). This "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotation omitted). Government action is content-based if it "discriminate[s] based on 'the topic discussed or the idea or message expressed,'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73–74 (2022), and viewpoint-based if it targets "particular views taken by speakers on a subject," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "In the ordinary case, it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011). Both are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Like all fraud statutes, the Business Fraud Statutes are content-based, and the Attorney General's unique enforcement of those statutes against pregnancy centers is also viewpoint-based, since she seeks to punish statements supporting the safety and efficacy "of the Abortion Pill Reversal ('APR') protocol" but not statements criticizing that protocol. Notice, ECF No. 1-3; *see also* James Compl.

8

**605**

¶¶ 9–11, ECF No. 2-8. She thus bears "the burden of showing [the] constitutionality" of her actions. *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

Plaintiffs are entitled to make truthful speech about progesterone for APR, and the Attorney General's claim of authority to proceed against any statement she says is false—without showing the other traditional elements of fraud or consumer harm—deeply offends the First Amendment. Even assuming New York law gave her such extravagant enforcement power, the Constitution would restrain it.

### 1. The First Amendment entitles Plaintiffs to speak truthfully about off-label uses of prescription medicines.

Plaintiffs are entitled to speak truthfully about the use of progesterone for APR. In *United States v. Caronia*, the Second Circuit rejected the government's attempt to punish truthful speech about an off-label use of a medication, even in the commercial context. 703 F.3d 149, 152 (2d Cir. 2012). That ruling controls here.

*Caronia* overturned the conviction of a pharmaceutical sales representative prosecuted for the truthful promotion of off-label uses of a prescription medication. Critical to the court's ruling was that the FDA permits off-label uses of approved medications. *Id.* at 153. "[C]ourts and the FDA" recognize the "propriety and potential public value of unapproved or off-label drug use," which "is an 'accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine.'" *Id.* (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001)). Off-label use may even be a medically recognized standard of care, and it is ultimately up to physicians to evaluate all information and decide appropriate treatment. *Id.* at 167. Thus, even in a case of commercial speech to doctors, the First Amendment prohibited the government from restricting truthful statements about off-label uses. *Id.* at 164.

That conclusion applies with all the more force to this case, which does not concern commercial speech—that is, speech "solely related to the economic interests

of the speaker and its audience." *Id.* at 163. Nothing in New York or federal law forbids doctors from prescribing progesterone off label for APR. In fact, when Colorado enacted a law to disallow that treatment, it was invalidated under the First Amendment and the State did not appeal. *Bella Health & Wellness v. Weiser*, No. 1:23-cv-00939, 2023 WL 6996860 (D. Colo. Oct. 21, 2023). The First Amendment permits Christian nonprofits like Plaintiffs to speak truthfully about this service that they do not charge for and that doctors perform. Compl. ¶¶ 34–36.

APR has a sound basis in theory, scientific research, and clinical practice. Mifepristone acts by blocking the binding sites of progesterone, so introducing more progesterone to "compete" with the mifepristone helps reverse its effects. Ex. A, Francis Decl. ¶¶ 16–17, 25. Animal studies have shown "a clear progesterone-mediated reversal of an initiated mifepristone-induced termination,"[21] and studies of pregnant women have shown the same.[22] *Id.* ¶¶ 20–28. Moreover, there is no evidence that supplemental progesterone harms pregnant women or babies.[23] *Id.* ¶¶ 32–36. Progesterone "has been safely used during pregnancy for over 50 years." *Id.* ¶ 34. And pregnancy centers have witnessed countless APR success stories, including that of Maranda Halstead and her now-17-month-old daughter Myli'anna. Compl. ¶¶ 1–5; Decl. of Maranda Halstead, attached as Exhibit B. Physicians have recommended other drugs off label based on much thinner records consisting mostly of anecdotal evidence, particularly in situations like this where the circumstances make "clinical trials virtually impossible." *Porzecanski v. Azar*, 943 F.3d 472, 476 (D.C. Cir. 2019); *see* Ex. A, Francis Decl. ¶¶ 23, 39. The scientific record here amply shows that progesterone for APR works, and Plaintiffs are entitled to say so.

---

[21] Camilleri, ECF No. 2-6, *supra* note 5*;* Yamabe, ECF No. 2-3, *supra* note 3.
[22] Delgado, ECF No. 2-4, *supra* note 7.
[23] Guideline NG126 Update (Nov. 2021), ECF No. 1-12, *supra* note 15; DeBeasi, ECF No. 2-7, *supra* note 17.

**2. The Attorney General is trying to censor speech she dislikes without traditional showings of knowledge, reliance, loss, or materiality to a victim or consumers.**

The Attorney General disagrees, claiming that pregnancy centers' speech about using progesterone for APR is false. Of course, this is the perennial answer of any censor who seeks to silence protected speech—that someone must be stopped from saying what the censor insists is false. So the Attorney General invokes laws that let *her* decide what is true and false. N.Y. Gen. Bus. Law § 349(b) ("Whenever the attorney general shall believe, from evidence satisfactory to [her] ...."); N.Y. Exec. Law § 63(12) ("[T]he attorney general is authorized to take proof and make a determination of the relevant facts."). As the statutory arbiter of truth, she seeks to expand these laws far beyond their ordinary reach over business transactions to cover speech by Christian nonprofits about free aid. Compl. ¶¶ 22, 36, 45, 58.

Setting aside the problems of state law,[24] this theory runs headlong into the First Amendment's presumptive invalidation of content-based speech regulations. That presumption is subject to carve-outs for "the few 'historic and traditional categories [of content-based laws] long familiar to the bar,'" *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quotation omitted), which include prohibitions of fraud, *Donaldson v. Read Mag.*, 333 U.S. 178, 190 (1948). But the Attorney General's expansive enforcement theory lacks any of the guardrails of that

---

[24] These statutes do not apply here as a matter of state law. Executive Law § 63(12) applies only to statements "in the carrying on, conducting or transaction of business," not to speech by nonprofits about physician referrals. And because pregnancy centers charge nothing and receive nothing for those referrals, statements about it are not "directed to consumers" as required by General Business Law §§ 349 and 350. *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 326 (2002); *see also* Oxford Languages, Consumer ("a person who purchases goods and services for personal use"); *N.Y. Pub. Int. Rsch. Grp. v. Ins. Info. Inst.*, 161 A.D.2d 204, 205 (N.Y. App. Div. 1990) (holding statute applies only to "frauds or other deceptive practices arising out of commercial transactions ... and not to general expressions of opinion about public matters").

11

**608**

historic claim. She attempts to police speech that *she* decides is "fraudulent" without showing intent, reliance, loss, or materiality to a specific victim or to consumers in general. That violates the First Amendment.

Laws against fraud share a common core of elements that revolves around harm to specific victims. New York's civil fraud claim typifies these elements: it requires "clear and convincing evidence" of "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). Federal criminal fraud prohibitions closely track these elements, requiring an intent to defraud to obtain the victim's money or property through "material misrepresentations—that is, misrepresentations that would naturally tend to influence, or are capable of influencing, [the victim's] decisionmaking." *United States v. Johnson*, 945 F.3d 606, 612 (2d Cir. 2019). And even if these requirements might be relaxed under the state's authority to protect consumers, they still ultimately center on harm—harm to reasonable consumers "likely to be deceived" by the representation. *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). At minimum, this demands "a causal connection between some injury to [consumers] and some misrepresentation made by defendants." *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 15 (App. Div. 1998), *aff'd*, 94 N.Y.2d 43 (1999).

The Supreme Court has recognized these safeguards as essential to upholding other state fraud statutes under First Amendment challenges. For example, in *Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003), the Court upheld an Illinois law preventing misrepresentations by telemarketers. The law there did not impose liability based on a "[f]alse statement alone," but rather required materiality, "the intent to mislead the listener, and succe[ss] in doing so"—that is, an injury to a victim. *Id.* at 620. And these showings

12

**609**

had to "be made by clear and convincing evidence." *Id.* Because "[e]xacting proof requirements of this order, in other contexts, have been held to provide sufficient breathing room for protected speech," the Supreme Court held that the First Amendment did not require an "exemption from fraud liability for a fundraiser who intentionally misleads in calls for donations." *Id.* at 620–21.

In contrast, the Attorney General has invoked the Business Fraud Statutes against pregnancy centers while ignoring these critical First Amendment limits. Her lawsuit seeks to punish allegedly false statements, but she does not allege knowledge of falsity. She identifies no fraud injury—neither a loss to a victim nor a corresponding benefit to the perpetrator. She makes conclusory allegations of representations to consumers, James Compl. ¶ 7, ECF No. 2-8, but there can be no consumers or monetary benefit when no client pays pregnancy centers any money for APR, which is prescribed by physicians, Compl. ¶¶ 35–36. Thus, she cannot allege materiality to consumers and she does not allege it for any specific person either. Nor anyone's reasonable reliance. And no specific resulting harm.

The only element of a traditional fraud claim the Attorney General alleges to support liability is false statements: "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol." [25] Notice, ECF No. 1-3; James Compl. ¶¶ 259–91, ECF No. 2-8. Not so. The statements Plaintiffs have made and wish to make about progesterone for APR are accurate and supported by science. Compl. ¶ 166. Further, there is no "general exception to the First Amendment for false statements." *Alvarez*, 567 U.S. at 718 (plurality op.). The government may punish false statements "made to effect a fraud or secure moneys or other valuable considerations ... without affronting the First

---

[25] The Attorney General does not allege materiality as to any specific victim, but only for consumers in general (who are not present here). *See* James Compl. ¶ 264, ECF No. 2-8.

Amendment," but the Attorney General's theory here is "not so limited in its reach." *Id.* Instead, she says the law allows her to impose massive civil liability, including penalties, injunctive relief, costs, attorney's fees and more, for noncommercial speech she thinks is wrong. By statute, penalties may include dissolution of Plaintiffs as functioning organizations. *See* N.Y. Exec. Law § 63(12).

As the Supreme Court has held, if the government's objection to the truth of a speaker's message were enough "to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition." *Alvarez*, 567 U.S. at 723 (plurality op.). "The *mere potential* for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id.* (emphasis added). Especially so here where the consequences on the table are existential for pregnancy centers. Even if the centers the Attorney General has sued ultimately prevail in showing that their message about APR is well-grounded, Plaintiffs will experience the chilling of their protected, truthful speech for the whole duration of the proceeding. The process is part of the punishment.

### 3. The Attorney General's actions fail heightened scrutiny.

Against this background, the Attorney General's enforcement theory cannot survive constitutional scrutiny. Here, that standard is strict scrutiny because this speech is not commercial. *Caronia*, 703 F.3d at 163; *see also Becerra*, 585 U.S. at 768. Commercial speech is "speech that does no more than propose a commercial transaction," *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001), or is "solely related to the economic interests of the speaker and its audience," *Caronia*, 703 F.3d at 163. That is simply not the case here. Pregnancy centers' speech about progesterone for APR—a service that physicians provide—proposes no transaction

14

**611**

and comes free of charge. Compl. ¶¶ 34–36. Even "the solicitation of charitable contributions" is not "purely commercial speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 788–89 (1988); *see also Transp. Alternatives, Inc. v. New York*, 340 F.3d 72, 78 (2d Cir. 2003). No commercial speech is at issue here.

As a result, the Attorney General must show that her enforcement is narrowly tailored to serve a compelling state interest in the least restrictive manner. *Caronia*, 703 F.3d at 163, 167. She cannot do so. Her draconian theory is so flawed that it "cannot survive even intermediate scrutiny." *Becerra*, 585 U.S. at 773. That standard demands both that the government action advance its asserted interest "to a material degree," rather than providing "only ineffective or remote support," and that it be "narrowly drawn"—that is, no "more extensive than necessary to serve the interest." *Caronia*, 703 F.3d at 164 (quotation omitted). The Attorney General cannot show either element.

First, the Attorney General's theory does not advance her asserted purpose. *Id.* In her lawsuit, she advocates not for protecting consumers from economic injury, but for preventing alleged *medical* harm to women from speech about a free service.[26] James Compl. ¶¶ 15–18, ECF No. 2-8. But progesterone treatment for APR is safe and effective, Ex. A, Francis Decl. ¶¶ 20–38, and the Attorney General has not identified anyone who has been medically harmed by pregnancy centers' speech about it. So attacking the pregnancy centers for this speech does nothing to protect women's health. Prescribing progesterone is entirely lawful, so "it does not follow that prohibiting the truthful promotion of off-label drug usage ... directly further[s] the government's goal[]" of protecting public health. *Caronia*, 703 F.3d at 166.

---

[26] Press Release, Off. of the N.Y. State Att'y Gen., Att'y Gen. James Sues Anti-Abortion Group and 11 New York Crisis Pregnancy Centers for Promoting Unproven Abortion Reversal Treatment (May 6, 2024), https://perma.cc/U572-Z6FR.

Second, the Attorney General's enforcement theory is not "narrowly drawn." *Id.* at 164. "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). New York has other statutes specifically directed to policing advertisements and other medical practices that lead to medical harm. N.Y. Educ. Law § 6530 (McKinney 2021); N.Y. Pub. Health Law § 230 (McKinney 2023). Of course, the Attorney General has not brought proceedings under those statutes— they lie outside her authority and are enforced by the board of professional medical conduct and department of health. So she has tried to police conduct committed to a different branch of state government by regulating pregnancy centers' speech. This underscores both the poor fit with her purpose and her overt animus in seeking any means available to punish pregnancy centers.

Plus, even assuming some regulation of speech here might be appropriate, a traditional fraud action would provide a narrowly drawn remedy. By including elements of knowledge, loss, reliance, materiality to the victim, and others, *Telemarketing Assocs., Inc.*, 538 U.S. at 620–21, often to be pled with particularity, *see* Fed. R. Civ. P. 9(b), and proven by clear and convincing evidence, *Schlaifer*, 119 F.3d at 98, traditional fraud claims regulate no more speech than is necessary. By forgoing these restraints, the Attorney General's aggressive enforcement strategy chills protected speech.

*Caronia* illustrates how particularly harmful this chill is in the medical context, where the loss of information that the Attorney General "paternalistically" deems false "interferes with the ability of physicians and patients to receive potentially relevant treatment information." 703 F.3d at 166. This "could inhibit, to the public's detriment, informed and intelligent treatment decisions." *Id.* The Attorney General has fashioned what is in effect a strict-liability "false statements" claim that threatens to quash the "open and vigorous expression of views in public

16

**613**

and private conversation [that] the First Amendment seeks to guarantee." *Alvarez*, 567 U.S. at 718 (plurality op.). She lacks a "reasonable fit" between her asserted government interests in women's health and her claim to be able to regulate any speech about it based on her view of its truth. *Caronia*, 703 F.3d at 168.

As the Supreme Court held in vindicating the First Amendment rights of pregnancy centers in *Becerra*, "the best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is the one deciding which ideas should prevail." 585 U.S. at 772 (quotation omitted). That risk is particularly acute here given the long history of governments "manipulat[ing] the content of doctor-patient discourse to increase state power and suppress minorities." *Id.* at 771 (quotation omitted). That is why the Supreme Court has "consistently refused to recognize an exception [to the First Amendment] for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964).

Empowering the state to threaten false statements with crippling sanctions, up to dissolution of an organization, without showing economic injury or speech directed to consumers, would confer unlimited discretion to silence disfavored speech. It would permit the state to quash speech on "a host of good-faith disagreements" in the medical area on anything from "the ethics of assisted suicide" to "the benefits of medical marijuana." *Becerra*, 585 U.S. at 771. "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Alvarez*, 567 U.S. at 723 (plurality op.) (citing G. Orwell, Nineteen Eighty-Four (1949)). The Court should enjoin the Attorney General's exercise of that power here against nonprofits that seek to serve, not exploit, New Yorkers.

**B. The Attorney General's selective enforcement against pregnancy centers is unlawful.**

The Attorney General's selective enforcement of New York's Business Fraud Statutes here is also unlawful. As mentioned, viewpoint discrimination occurs when the government regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829. Because it is a "blatant" and "egregious" form of content discrimination, *id.*, "viewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context," *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018).

Here, the Attorney General "violates the First Amendment" by applying the law "in a viewpoint discriminatory manner." *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 95 n.9 (2d Cir. 2003). And while her "prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up). The Constitution forbids her from selectively enforcing the Business Fraud Statutes against the pro-life views of Christian pregnancy centers while leaving actually misleading statements by similarly situated abortion advocates untouched. A plaintiff shows selective enforcement by establishing two elements: (1) the plaintiff "was similarly situated in material respects to other individuals against whom the law was not enforced," and (2) "the selective enforcement infringed on a constitutional right." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023); *Wandering Dago,* 879 F.3d at 40. Both are met.

The pro-life pregnancy centers targeted by the Attorney General are similarly situated to Planned Parenthood affiliates. They serve the same relevant clientele—women seeking pregnancy-related services.[27] Compl., *Heartbeat Int'l, Inc. v. James*, No. E2024007242 (N.Y. Sup. Ct., Monroe Cnty, Apr. 30, 2024) ¶ 8, attached as Exhibit C; Compl. ¶ 292. They provide or refer for many of the same services—*e.g.,*

---

[27] Planned Parenthood Greater N.Y., *Our Services*, https://perma.cc/BG3X-MMHL.

18

**615**

pregnancy testing and options counseling, STI testing, medical examinations, and adoption referrals.[28] Ex. C, Heartbeat Compl. ¶¶ 85–87; Compl. ¶¶ 76, 293. Heartbeat International and NIFLA are similarly situated to the national Planned Parenthood organization, as all provide resources and support to their affiliates to further their respective missions.[29] Ex. C, Heartbeat Compl. ¶¶ 28–31; Compl. ¶¶ 27, 290. And they all speak about the safety and effectiveness of the services they promote: Planned Parenthood and its affiliates about chemical abortion;[30] and Heartbeat, NIFLA, and their affiliates about APR.[31] Ex. C, Heartbeat Compl. ¶¶ 34, 62, 96; Compl. ¶¶ 28, 165.

Planned Parenthood touts chemical abortion as "really safe and effective."[32] But mifepristone poses well-known serious risks. Ex. A, Francis Decl. ¶¶ 13–15. Its label includes a black-box warning—"the most serious warning placed on prescription medication labels," *Caronia*, 703 F.3d at 155—that "serious and sometimes fatal infections or bleeding" may occur.[33] The label also cites evidence that roughly 1 in 25 women who take the drug end up in the emergency room.[34] That is why the FDA determined that mifepristone may not be used without special safeguards known as REMS.[35] Planned Parenthood does not mention these facts.

---

[28] *Id.*; Planned Parenthood of Greater New York, *Pregnancy Testing and Planning*, https://perma.cc/5DKF-G28K.
[29] Planned Parenthood, *Mission*, https://perma.cc/MT96-N5K3.
[30] Planned Parenthood, *How Safe Is the Abortion Pill?*, https://perma.cc/PWW2-Q4AY; Planned Parenthood of Greater N.Y., *The Abortion Pill*, https://perma.cc/6GE8-49RF.
[31] Abortion Pill Reversal / Abortion Pill Rescue Network, *Abortion Pill Reversal*, abortionpillreversal.com.
[32] *How Safe Is the Abortion Pill?, supra* note 30.
[33] Food and Drug Administration, *Mifeprex (mifepristone) Label* (Jan. 2023), https://perma.cc/4895-X457.
[34] *Id.*
[35] *Id.*

19

Pregnancy centers are a stark comparison. Rather than extolling the safety of mifepristone, a drug with a black-box warning and stringent safety protocols, they speak about progesterone, a naturally occurring hormone safely administered to pregnant women for over 50 years. Ex. A, Francis Decl. ¶ 34. And rather than charging for their services, as Planned Parenthood does,[36] they offer them for free. Ex. C, Heartbeat Compl. ¶¶ 63, 66, 88; Compl. ¶¶ 35–36, 80. Indeed, under state law, pregnancy care centers in New York cannot provide progesterone treatments but may only refer to physicians who may prescribe it in their independent judgment. Yet the Attorney General has sued pregnancy centers, not Planned Parenthood. Compl. ¶ 301.

The Attorney General attacks pro-life organizations because of their pro-life views. She has echoed Planned Parenthood's claim that "mifepristone is safe and effective" over 20 times in the past two years,[37] and she begins her Complaint against Heartbeat by declaring her stance that "[m]edication abortion is ... safe and effective." James Compl. ¶ 1, ECF No. 2-8. In her own words, she targets "opponents of abortion" who "seek to deter pregnant individuals who have begun the process of a medical abortion from completing that process." *Id.* ¶ 4. She recognizes that the primary difference between Planned Parenthood affiliates and pregnancy centers is that Planned Parenthood affiliates provide abortions,[38] whereas pregnancy centers "do not provide abortion counseling or referrals"[39] in accord with their Christian beliefs. *Id.* ¶ 5; Compl. ¶¶ 30–31, 294. But when government "suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First*

---

[36] Planned Parenthood, *How much does the abortion pill cost?*, https://perma.cc/XS4J-LHVU.
[37] NY AG James, @NewYorkStateAG, https://perma.cc/3XEH-TZQ2.
[38] Planned Parenthood, *Abortion*, https://perma.cc/MGR6-FA4V.
[39] Press Release, *supra* note 26.

*Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86 (1978). Just as she cannot justify applying the Business Fraud Statutes against Plaintiffs, *see* Section I.A.3, she cannot justify her selective enforcement against pregnancy centers.

Plaintiffs' religiously motivated and constitutionally protected pro-life speech has been chilled by the Attorney General's unlawful selective enforcement. Compl. ¶¶ 165–236; *Rosenberger*, 515 U.S. at 829. The Court should enter the requested injunction to lift this chill on Plaintiffs' speech.

### C. The Attorney General's enforcement of the Business Fraud Statutes against pregnancy centers violates religious freedom.

The Attorney General's actions against faith-based pregnancy centers also violates the First Amendment's Free Exercise Clause, which "work[s] in tandem" with the Free Speech Clause. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). Like the organizations the Attorney General has already sued, Plaintiffs are all Christian organizations whose statements about APR are rooted in their sincere religious beliefs. Ex. C, Heartbeat Compl. ¶ 8; Compl. ¶¶ 23, 47, 68, 196, 296, 377. The Attorney General is violating the Free Exercise Clause by singling out these religious beliefs and targeting these statements for unfavorable treatment.

The Free Exercise clause forbids "governmental hostility" to religion, whether it be "overt" or "masked." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). So if state action "targets religious conduct for distinctive treatment," it is not "shielded by mere compliance with the requirement of facial neutrality." *Id.* State action may not be based "on hostility to a religion or religious viewpoint." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Action that is not neutral or not generally applicable will be upheld only if it satisfies strict scrutiny. *M.A. on behalf of H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 36 (2d Cir. 2022).

21

**618**

The Attorney General has shown such hostility. The hostility inquiry turns on the "historical background of the decision," "contemporaneous statements" made by the decisionmaker, and "the effect of" government action "in its real operation." *Lukumi*, 508 U.S. at 535, 540; *Masterpiece Cakeshop*, 584 U.S. at 638. Here, the Attorney General has expressed hostility toward pregnancy centers' faith-based, pro-life message and activities for many years. In 2018, she described them as "fake clinics" and accused them of lying and "actively trick[ing] and lur[ing]" women into using their services.[40] *Cf. M.A.*, 53 F.4th at 37–38 (finding derogatory comments about "anti-vaxxers" could be evidence of religious targeting). She publicized her intent to attack those who share pro-life views, including sidewalk counselors and pregnancy centers who "counsel women against terminating their pregnancies."[41]

The Attorney General's harassment of pro-life pregnancy centers continued in 2022, when she successfully pressured Google to discriminate against those centers because they "exist to discourage people from having an abortion."[42] She boasted on Twitter, "I called on @Google to fix its @googlemaps search results to stop directing people to anti-abortion clinics known as crisis pregnancy centers, and today Google is doing just that."[43] Then in 2023, she signed an open letter with 15 other attorneys general decrying the proliferation of "anti-abortion crisis pregnancy

---

[40] Letitia James & Andrea Miller, *With Fake Clinics Proliferating, New Yorkers Should Know Their Reproductive Health Care Rights* (Sep. 24, 2018), GOTHAM GAZETTE, https://perma.cc/6AMY-82DQ.

[41] Jillian Jorgensen, *AG candidate Letitia James would seek broad authority to prosecute those who block abortion clinics* (Jul. 26, 2018), NEW YORK DAILY NEWS, https://perma.cc/3QE7-EYQC.

[42] NY AG James (@NewYorkStateAG), X (Jun. 29, 2022, 2:50 PM), https://perma.cc/5FAS-MQ3K; Press Release, Off. of the N.Y. State Att'y Gen., Att'y Gen. James Applauds Google for Improving Search Results for Individuals Seeking Abortion Care (Aug. 25, 2022) https://perma.cc/LB65-QD2G; NY AG James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/M59B-NJDZ.

[43] NY AG James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/H9JC-KNCH.

22

**619**

centers."[44] Today, her official website as attorney general instructs readers to not "share any personal information" with a center that is not "a real health care facility that offers abortion services or referrals."[45]

This hostility toward pro-life centers culminated in the Attorney General's lawsuit against pregnancy centers for purported "false and misleading" statements promoting APR.[46] The weak merits of her legal claims show just how far she will go to suppress pregnancy centers' faith-based message: She tries to stretch New York's Business Fraud Statutes—designed to protect consumers from business fraud—to the speech of Christian nonprofits who provide lawful services *for free*.

That the Attorney General did not expressly mention the religious beliefs of these organizations in her lawsuit is immaterial. It is no coincidence that *all* the pregnancy centers she is now targeting are Christian. Ex. C, Heartbeat Compl. ¶ 8. The promotion of progesterone for APR is closely linked to their religious conviction that life begins at conception and great efforts should be made to save unborn lives. Compl. ¶¶ 31–32, 70, 195. The Attorney General knows the religious nature of pro-life pregnancy centers' activities: she admits that "[m]any are affiliated with religious organizations that oppose abortion"[47] and that they offer "religious-based programming."[48] This attack on pregnancy centers' APR messages is an obvious and unwarranted attack on Christian organizations.

The Attorney General's own statements show the object of her actions is to suppress the faith-based pro-life message promoting APR, and in "operation" they have their intended effect. *Lukumi*, 508 U.S. at 535. Her lawsuit has chilled the

---

[44] Att'y Gen. Rob Bonta, *supra* note 20.
[45] *Reproductive Rights*, OFF. OF THE N.Y. STATE ATT'Y GEN., https://perma.cc/6RCA-Q4NU.
[46] Press Release, *supra*, note 26.
[47] *Reproductive Rights*, *supra* note 45.
[48] Att'y Gen. Rob Bonta, *supra* note 20.

religious speech and exercise of not only the parties she has sued, Ex. C, Heartbeat Compl. ¶ 18, but also that of Plaintiffs here, Compl. ¶¶ 29, 39.

The Attorney General's actions are not neutral or generally applicable for two more reasons. First, her position that the Business Fraud Statutes allow her to sue to silence speech she thinks is false without the elements of fraud amounts to a system of individualized assessments. *Lukumi*, 508 U.S. at 537. Second, a state does not act neutrally when it "treat[s] *any* comparable secular activity"—here, Planned Parenthood's speech—"more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). This is another "indication of hostility," *Masterpiece Cakeshop*, 584 U.S. at 636, and it shows a lack of general applicability because "it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia,* 593 U.S. 522, 534 (2021). The Attorney General's actions are plainly subject to strict scrutiny and fail for the reasons in Section I.A.3.

## II.   The other preliminary-injunction factors favor Plaintiffs.

Plaintiffs are suffering irreparable harm due to the chilling effect of the Attorney General's enforcement of the Business Fraud Statutes against similar pro-life organizations. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996). Before the Attorney General sent her Notices of Intention to Sue, NIFLA encouraged its New York members to provide APR referrals. Compl. ¶¶ 177–79. Some of these New York centers, including Gianna's House and Options Care Center, made public statements promoting abortion pill reversal. *Id.* ¶¶ 199, 208, 216, 223–26. Options Care Center also referred for APR. *Id.* ¶ 65. But since the Attorney General issued her Notices, NIFLA has stopped urging New York centers who are not already offering APR to do so. *Id.* ¶ 187. And some of NIFLA's New York members, including Gianna's House and Options Care Center, have since removed statements about APR from their websites, despite

their firm belief that the statements are accurate and despite their desire to continue making those statements. *Id.* ¶¶ 170–71, 212, 230. The chilling of this protected speech is irreparable harm.

The balance of hardships also tips sharply in favor of Plaintiffs. Without an injunction, they will be harmed every day they are chilled from speaking about and offering APR. Against this present First Amendment harm, the Attorney General has no irreparable harm. In her lawsuit against Heartbeat, she has not alleged any actual harm caused by the speech she wishes to censor. Any allegations about any such harm would be utterly speculative and unsupported.

An injunction would also serve the public interest "in the fullest possible dissemination of information." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561–62 (1980). An individual's interest in the "free flow" of information—even commercial information—"may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 763 (1976). Just as "advertisements stating that referral services for legal abortions are available" are of general public interest, so too are the pregnancy centers' statements advertising the availability of referral services for abortion pill reversal. *Id.* at 764 (citing *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975)). Women who have taken mifepristone and regret it, like Maranda Halstead, have a priceless interest in information that could help them save their unborn child's life. The Court should reject the Attorney General's paternalism that would keep them in the dark about their options.

## CONCLUSION

The Court should issue a preliminary injunction prohibiting the Attorney General from enforcing the Business Fraud Statutes against Plaintiffs and their members for speaking about the use of progesterone for APR.

25

**622**

Dated: May 24, 2024                    Respectfully submitted,


J. Caleb Dalton*                       */s/ Michael G. McCartin*
Gabriella M. McIntyre*                 Michael G. McCartin
Allison H. Pope*                       Michael G. McCartin Law PLLC
Alliance Defending Freedom             38 Mall Way #513
44180 Riverside Pkwy                   West Sand Lake, New York 12196-9998
Lansdowne, VA 20176                    WDNY Bar Roll No. 2447712
Tel: (571) 707-4655                    Tel: (518) 953-3333
cdalton@adflegal.org                   mccartinlaw@gmail.com
apope@adflegal.org
gmcintyre@adflegal.org                 Erin M. Hawley*
                                       Lincoln Davis Wilson**
                                       Timothy A. Garrison*
                                       Alliance Defending Freedom
                                       440 First Street NW, Suite 600
                                       Washington, DC 20001
                                       Tel: (202) 393-8690
                                       ehawley@adflegal.org
                                       lwilson@adflegal.org
                                       tgarrison@adflegal.org


*Counsel for Plaintiffs*

*Pro hac vice to be filed

**Application for admission to be filed

26

**623**

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

NATIONAL INSTITUTE OF FAMILY
AND LIFE ADVOCATES, GIANNA'S
HOUSE, INC., and CHOOSE LIFE OF
JAMESTOWN, INC. d/b/a OPTIONS
CARE CENTER,

           *Plaintiffs,*

      v.

LETITIA JAMES, in her official
capacity as Attorney General of the
State of New York,

           *Defendant.*

Case No.: 1:24-cv-00514

## EXPERT DECLARATION OF CHRISTINA FRANCIS, M.D.

I, Christina Francis, M.D., pursuant to 28 U.S.C. section 1746, do hereby declare as follows:

1.      I am at least 18 years of age and am competent to testify. I have personal knowledge of the statements contained in this declaration. The opinions expressed in this report are my own and do not represent the views of any organization with which I am associated.

## I.    Background and Qualifications

2.      I have been a practicing obstetrician and gynecologist for fifteen years, board-certified for twelve years, and currently practice in Fort Wayne, Indiana. I work as an OB/GYN Hospitalist, which entails caring for pregnant women and their babies ranging from routine to high-risk pregnancies in the inpatient setting, as well as managing inpatient gynecological consults and emergencies. I am also CEO of the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG), a national professional organization of more than 7,000 pro-life medical practitioners.

3.      I graduated from medical school at Indiana University in 2005 and completed my obstetrician and gynecologist residency at St. Vincent Hospital in Indianapolis in 2009.

4.      The opinions I express in this declaration are based on my education, training, experience, and ongoing familiarity with medical literature. These opinions are my own and do not represent the opinion of my employer or of any professional or other group.

## II.    Expert Opinions and Bases for Them

5.      I have reviewed the statements on Plaintiffs' websites concerning the safety and efficacy of abortion pill reversal/rescue (APR), and it is my professional opinion that they are accurate and non-misleading.

6.      NY Attorney General James states in her filing (paragraph 120) that the APR network website states that the APR protocol is effective after 72 hours. This is false. The website states that it may not be too late even if it's been more than 72 hours since a woman has taken mifepristone and that she can still call. It is possible that the embryo or fetus could still be living and in that case it would not be too late. They make no claims of efficacy after that point on their website. However, if a woman wants to save her baby she should call. They can get her connected to ultrasound. If her baby is still alive, progesterone would not be contraindicated. It is used for early pregnancy support by Reproductive Endocrinology and Infertility (REI) specialists quite frequently for pregnancy support in the first trimester.

### A.    My APR Practice.

7.      I have been providing APR through the Abortion Pill Rescue Network since 2015. The APR network is a network of medical practitioners who are readily available to administer the APR protocol to women who regret their abortion decision and desire to save their preborn child. Women are connected to those practitioners through the network hotline, which is manned 24/7 by a trained nurse.

2

8. In the fall of 2015, I assisted a patient who began an abortion at a Planned Parenthood clinic and then immediately regretted her decision. She knew the very minute she left the clinic that she made the wrong choice. She found out about APR by Google web search. The patient was connected to me through the APR hotline. By administering progesterone according to the APR protocol (explained in more detail below), that patient was able to successfully continue her pregnancy and delivered a healthy baby with no medical issues in 2016.

9. Since then, I have spoken with more women who called the network and chose to start APR and with some who haven't. No woman is ever pressured to start the progesterone protocol but rather is counseled on her options and the risks and benefits of each of those options. She is then provided support through her decision. AG James' claim in paragraph 125 that Heartbeat International's statements that APR increases the chances of a woman's pregnancy continuing "are likely to mislead a consumer considering APR treatment because they address an issue that is at the heart of that consumer's decision-making—will APR increase the likelihood that my pregnancy will continue?" is nonsensical. Every consumer considers prior to taking a medication whether what it is for is something they desire or need and whether it is going to be effective.

10. Since my first successful chemical abortion rescue, I have helped other women save their children's lives by taking progesterone after they regretted taking mifepristone.

**B. Chemical Abortions and How They Can Be Reversed.**

11. Chemical abortions typically involve a two-drug regimen: mifepristone followed by misoprostol. Mifepristone is a progesterone receptor antagonist, which inhibits the effect of progesterone, a crucial hormone for normal fetal development. Progesterone is essential to achieve and maintain a healthy pregnancy. It prepares the uterine lining to allow implantation and stimulates glands in the lining to secrete

nutrients for the early embryo. During the first 8 weeks of pregnancy, progesterone is produced by the corpus luteum (a cyst on the ovary during pregnancy), but between 8 and 12 weeks the placenta takes over this role and maintains the pregnancy thereafter.[1] Mifepristone binds with high affinity to progesterone receptors,[2] thereby blocking the action of progesterone, resulting in fetal death in most cases.

12.     Misoprostol, a prostaglandin analogue, is then given 24–48 hours after mifepristone. It leads to uterine contractions to expel the fetus and gestational sac. Chemical abortions of this type are approved by the FDA for use through the 10th week of gestation.

13.     When we consider the risks and benefits of counteracting this kind of abortion, it is important to understand the risks of completing it. While 97.4% of women did not have viable (ongoing) pregnancies after taking both drugs at up to 10 weeks gestation,[3] that same study showed that, at that same gestational age, nearly 8% of women did not fully expel the fetus and other pregnancy tissue, which means that those patients would require a surgical procedure to complete their abortion.[4]

14.     That study also showed that nearly 14% of women who took this drug combination from 10–11 weeks required surgical intervention.[5] This is consistent with larger studies, which show that the farther along in pregnancy a woman is when

---

[1] Coomarasamy A, Williams H, Truchanowicz E, et al. PROMISE: first-trimester progesterone therapy in women with a history of unexplained recurrent miscarriages – a randomized, double-blind, placebo-controlled, international multicenter trial and economic evaluation. Southampton (UK): NIHR Journals Library; 2016 May. (Health Technology Assessment, No. 20.41.) Chapter 1, Introduction. Available from: https://www.ncbi.nlm.nih.gov/books/NBK362730/.

[2] Heikinheimo O, Kekkonen R, Lähteenmäki P. The pharmacokinetics of mifepristone in humans reveal insights into differential mechanisms of antiprogestin action. Contraception. 2003 Dec;68(6):421-6. doi: 10.1016/s0010-7824(03)00077-5. PMID: 14698071.

[3] Ilana G. Dzuba et al., A Non-Inferiority Study of Outpatient Mifepristone-Misoprostol Medical Abortion at 64-70 Days and 71-77 Days of Gestation, 101(5) Contraception 302-308 (2020).

[4] *Id.*

[5] *Id.*

she takes these drugs, the higher her risk of complications.[6] In fact, a large registry-based study out of Finland (more robust and reliable than relying on self-reporting of patients or by abortion providers) that evaluated all women undergoing chemical and surgical abortions from 2000–06 (over 42,000 women total) showed that chemical abortions had a four times higher overall complication rate than surgical abortions.[7] The chemical abortion regimen is far from safe.

15.    Claims that mifepristone is "safer than Tylenol" have no basis in reality. First, acetaminophen (Tylenol) toxicity is nearly exclusively caused by overdose—not taking the FDA-approved dose.[8] Mifepristone- and misoprostol-induced abortion has a four times higher complication rate than surgical abortion (see above) at the dosages approved by the FDA and prescribed to patients.[9] Second, mifepristone still has a black box warning attached to it due to the risk of hemorrhage and infection (specifically sepsis from Clostridium sordellii which causes an insidious sepsis picture and has caused the deaths of several women who took mifepristone).[10] Tylenol has no such warning. Finally, the FDA's own data shows that approximately 1 in 25 women who take mifepristone for an induced abortion will end up seeking care for complications in the emergency department—and this was when women were still being evaluated in person prior to receiving this[11].

---

[6] Maarit J. Mentula, Maarit Niinimäki, Satu Suhonen, Elina Hemminki, Mika Gissler, Oskari Heikinheimo, Immediate adverse events after second trimester medical termination of pregnancy: results of a nationwide registry study, Human Reproduction, Volume 26, Issue 4, April 2011, Pages 927–932, https://doi.org/10.1093/humrep/der016.

[7] Niinimäki M, Pouta A, Bloigu A, Gissler M, Hemminki E, Suhonen S, Heikinheimo O. Immediate complications after medical compared with surgical termination of pregnancy. Obstet Gynecol. 2009 Oct;114(4):795-804. doi: 10.1097/AOG.0b013e3181b5ccf9. PMID: 19888037.

[8] Agrawal S, Khazaeni B. Acetaminophen Toxicity. [Updated 2023 Jun 9]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK441917/.

[9] Niinimäki *et al.*, *supra* n.7.

[10] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5429a3.htm.

[11] *Highlights of Prescribing Information, MIFEPREX (mifepristone) tablets, for oral use*, U.S. Food and Drug Administration (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf

16.    Abortion pill reversal (APR) is based on the scientific principle of reversible competitive inhibition. A brief explanation of this biochemical concept is warranted, as it undergirds the rationale behind APR:

> A competitive inhibition occurs when the drug, as 'mimic' of the normal substrate competes with the normal substrate for the active site on the enzyme. Concentration effects are important for competitive inhibition…A reversible inhibitor inactivates an enzyme through noncovalent, more easily reversed, interactions. Unlike an irreversible inhibitor, a reversible inhibitor can dissociate from the enzyme. Reversible inhibitors include competitive inhibitors and noncompetitive inhibitors…Probably the easiest type of enzyme inhibition to understand is competitive inhibition and it is the one most commonly exploited pharmaceutically. Molecules that are competitive inhibitors of enzymes resemble one of the normal substrates of an enzyme. An example is methotrexate, which resembles the folate substrate of the enzyme dihydrofolate reductase (DHFR). This enzyme normally catalyzes the reduction of folate, an important reaction in the metabolism of nucleotides. When the drug methotrexate is present, some of the enzyme binds to it instead of to folate and during the time methotrexate is bound, the enzyme is inactive and unable to bind folate. Thus, the enzyme is inhibited. Notably, the binding site on DHFR for methotrexate is the active site, the same place that folate would normally bind. As a result, methotrexate 'competes' with folate for binding to the enzyme. The more methotrexate there is, the more effectively it competes with folate for the enzyme's active site. Conversely, the more folate there is, the less of an effect methotrexate has on the enzyme because folate outcompetes it.[12]

17.    In the context of APR, mifepristone is analogous to methotrexate, and progesterone is analogous to folate. Specifically, APR seeks to displace mifepristone from progesterone receptors using natural progesterone, thus counteracting the effects of mifepristone. Because mifepristone and progesterone compete for the same receptors, high amounts of substrate (in this case, progesterone) can displace the introduced competitive inhibitors (mifepristone) and therefore allow for normal placental development and growth of the fetus.

---

[12]https://chem.libretexts.org/Courses/University_of_Arkansas_Little_Rock/CHEM_4320_5320%3A_Biochemistry_1/05%3A_Michaelis-Menten_Enzyme_Kinetics/5.4%3A_Enzyme_Inhibition.

18.    APR is suitable for pregnant women who have taken mifepristone but who have not yet taken the second drug, misoprostol. For women who have begun APR therapy and have a viable pregnancy, my practice is to continue progesterone through the end of the 12th week, at which time the placenta is developed and fully takes over progesterone production.

19.    Women typically access APR treatment by calling the hotline number, which is staffed around the clock by nurses who conduct an initial screening for the appropriateness of APR. If the patient is deemed suitable for APR and desires to proceed, the nurse connects her to a local APR provider.

### C.    There is scientific evidence that supports the clinical use of progesterone to counteract the effects of mifepristone.

20.    Empirical evidence supports that APR is effective in reversing the effects of mifepristone. A study by Das and Catt published in *Lancet* in 1987, when mifepristone was being developed, showed that the effect of mifepristone was reversed with the addition of exogenous progesterone.[13] In the largest direct study of APR to date, Dr. George Delgado and Dr. Mary Davenport examined 754 cases (547 women were included in the final analysis) where women attempted reversal of chemical abortion.[14] The study found an overall fetal survival rate following APR of 48%, with rates rising to 64% and 68% respectively for intramuscular and oral administration of progesterone.[15] The oral regimen involved women receiving a 400-

---

[13] Das C, Catt KJ. Antifertility actions of the progesterone antagonist RU 486 include direct inhibition of placental hormone secretion. Lancet. 1987 Sep 12;2(8559):599-601. doi: 10.1016/s0140-6736(87)92988-6. PMID: 2887889.

[14] George Delgado et al., A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone, 33 Issues L. & Med. 21, 26 (2018).

[15] *Id.* The latest version of the Delgado study clearly states that "[t]he study was reviewed and approved by an institutional review board." Although the Delgado study was briefly withdrawn over a

milligram dose of progesterone twice daily for three days, followed by 400 milligrams daily.[16] Because of its higher effectiveness rate and tolerability by patients, I use the oral regimen of progesterone.

21.    This probable causal relationship of progesterone on pregnancy continuation after mifepristone ingestion was also shown in a randomized controlled trial that evaluated women who were given depot medroxyprogesterone acetate (a progesterone injectable contraceptive) at the time of a mifepristone induced abortion.[17] This study showed a statistically significant increase in ongoing pregnancy in women given the progesterone injection at the time of their abortion.[18]

22.    When women took neither misoprostol nor progesterone after taking mifepristone, a 2017 study by Dr. Davenport found a fetal survival rate—not merely incomplete abortions—of 10–23%.[19] (Claims that fetal survival after mifepristone alone are as high as 50% are using data from studies that documented incomplete abortions, or retained tissue, not actual ongoing viable pregnancies.)[20] This study was used as a historical control group for the Delgado and Davenport 2018 study on APR,

---

[16] *Id.*

[17] Raymond EG, Weaver MA, Louie KS, Tan YL, Bousiéguez M, Aranguré-Peraza AG, Lugo-Hernández EM, Sanhueza P, Goldberg AB, Culwell KR, Kaplan C, Memmel L, Sonalkar S, Jamshidi R, Winikoff B. Effects of Depot Medroxyprogesterone Acetate Injection Timing on Medical Abortion Efficacy and Repeat Pregnancy: A Randomized Controlled Trial. Obstet Gynecol. 2016 Oct;128(4):739-45. doi: 10.1097/AOG.0000000000001627. PMID: 27607859.

[18] *Id.*

[19] Mary L. Davenport et al., Embryo Survival After Mifepristone: A Systematic Review of the Literature, 32 Issues L. & Med. 3, 3(2018). This result was also confirmed by a study in Contraception. *See* Mark A, Grossman D, Foster AM, Prager SW, Winikoff B. When patients change their minds after starting an abortion: Guidance from the National Abortion Federation's Clinical Policies Committee. Contraception. 2020 May;101(5):283-285. doi: 10.1016/j.contraception.2020.01.016. Epub 2020 Feb 5. PMID: 32035097.

[20] *Id.*

where it was shown that, so long as the progesterone is taken within 72 hours of the administration of mifepristone, the chances of fetal survival increases from 23% to as high as 68% (with the oral progesterone regimen).[21] This result is consistent with the pharmacokinetics of mifepristone—the drug does not immediately kill the fetus, instead starving it of nutrition over the course of days. It was also found that survival rates increased with gestational age, again consistent with the literature available on the efficacy of mifepristone for pregnancy termination by gestational age.[22]

23.      The Delgado 2018 study has been criticized because it uses a historical control group rather than a randomized controlled trial, but it is well established in medical research that there are situations in which a historical control group is not only acceptable but also preferable. An article in the September 2023 issue of the Journal of the American Medical Association (one of the most prestigious peer-reviewed medical journals in the United States) addressed this issue specifically and states:

> [T]here are situations in which randomizing participants to a control treatment or placebo within an RCT may not be practical or ethical, e.g., if a comparison with placebo is desired but an effective treatment already exists. In such cases, researchers might use data from participants who had received the intended control treatment in a prior study, termed historical controls, to estimate the benefit of the new treatment.[23]

---

[21] *Id.*

[22] Kapp N, Andersen K, Griffin R, Handayani AP, Schellekens M, Gomperts R. Medical abortion at 13 or more weeks gestation provided through telemedicine: A retrospective review of services. Contracept X. 2021 Jan 25;3:100057. doi: 10.1016/j.conx.2021.100057. PMID: 33615210; PMCID: PMC7881210.

[23] Marion JD, Althouse AD. The Use of Historical Controls in Clinical Trials. JAMA. 2023;330(15):1484–1485. doi:10.1001/jama.2023.16182.

It goes on to highlight why, in situations such as counteracting the effects of a mifepristone-induced abortion, a historical control group is particularly appropriate: "Historical controls are also used for diseases with particularly severe outcomes or that affect vulnerable populations such as children. Here, randomization may be viewed as unacceptable, even in the absence of a proven effective treatment."[24]

24.    Adding to the body of literature showing that progesterone can counteract the effects of mifepristone, a recent paper by Turner *et al.* in *The Journal of Obstetrics and Gynecology Research* reported the results of the PAMper trial.[25] While a small study, this prospective single-arm pilot trial evaluated six women who took progesterone to counteract mifepristone when they changed their mind about completing the abortion.[26] They were all between 40 and 70 days gestation when they took mifepristone and started progesterone between 5.7 and 72 hours after mifepristone ingestion.[27] Five out of the six women had viable pregnancies after 2 weeks of progesterone treatment and there were no significant adverse events noted.[28]

25.    Delgado's and Turner's findings are well-explained by biological theory. The principle behind these findings—that the effects of a competitive inhibitor can be undone by greater amounts of substrate—is firmly established. Even some pro-choice experts agree that this theory is sound. Dr. Harvey Kliman of the Yale School of

---

[24] *Id.*
[25] Turner, JV, Garratt, D, McLindon, LA, Barwick, A, Spark, MJ. Progesterone after mifepristone: A pilot prospective single arm clinical trial for women who have changed their mind after commencing medical abortion. J Obstet Gynaecol Res. 2023. https://doi.org/10.1111/jog.15826.
[26] *Id.*
[27] *Id.*
[28] *Id.*

Medicine, who has supported pro-choice causes, admits that mifepristone reversal makes "biological sense."[29] Accordingly, he said that if one of his daughters mistakenly ingested mifepristone, he would recommend 200 milligrams of progesterone three times a day until mifepristone is metabolized.[30]

26.     There are other studies that support the fact that mifepristone is a reversible inhibitor of progesterone. In a 1989 study by Yamabe, scientists separated pregnant rats into three groups.[31] The first group received no drugs; the second group received mifepristone; the third group received mifepristone followed by natural progesterone.[32] Of the no-drug group, 100% of the animals delivered live offspring.[33] The mifepristone group, as would be expected, had a significantly lower live birth rate, with only 33% delivering live offspring.[34] However, in the group that received progesterone after mifepristone, 100% delivered live offspring.[35]

27.     Recently (early 2023), Camilleri and Sammut published research on progesterone-mediated reversal of mifepristone in rats that specifically looked at survival of the fetus to term.[36] The results of this study showed that all fetuses survived in the normal pregnant group (no mifepristone administered), no fetuses

---

[29] Ruth Graham, A New Front in the War Over Reproductive Rights: 'Abortion Pill Reversal,' N.Y. Times Mag. (July 18, 2017), https://www.nytimes.com/2017/07/18/magazine/a-new-front-in-the-war-over-reproductive-rights-abortion-pill-reversal.html?auth=login-google1tap&login=google1tap.
[30] Id.
[31] Yamabe S, Katayama K, Mochizuki M. [The effect of RU486 and progesterone on luteal function during pregnancy]. Nihon Naibunpi Gakkai Zasshi. 1989 May 20;65(5):497-511. Japanese. doi: 10.1507/endocrine1927.65.5_497. PMID: 2776921.
[32] Id.
[33] Id.
[34] Id.
[35] Id.
[36] Camilleri, C., Sammut, S. Progesterone-mediated reversal of mifepristone-induced pregnancy termination in a rat model: an exploratory investigation. Sci Rep 13, 10942 (2023). https://doi.org/10.1038/s41598-023-38025-9.

survived in the abortion group (mifepristone administered but no progesterone), and 13 of 16 (81%) of the fetuses in the progesterone group survived (progesterone administered after mifepristone).[37] Of note, this occurred at the equivalent of 4–6 weeks gestation in humans—a time when mifepristone (as previously noted) is known to be highly effective in producing fetal death.[38]

28.     It is important to note that mice and rats have been used for decades in biomedical research due to their anatomical, physiological, and genetic similarity to humans.[39]

29.     Mifepristone binding to another hormonal receptor, glucocorticoid receptors, has also been shown to be reversible by the addition of glucocorticoids.[40]

30.     While mifepristone has a higher relative binding affinity (binds more tightly) to the progesterone receptor than progesterone,[41] just because a competitive inhibitor binds to a receptor with tight affinity does not mean it can't be displaced. The perfect example of this is carbon monoxide poisoning and its treatment. Carbon monoxide is a competitive inhibitor of oxygen at a hemoglobin binding site (like mifepristone is to progesterone at the progesterone receptor). It binds to this site with a 240 times greater affinity than oxygen (as compared to mifepristone which binds

---

[37] *Id.*

[38] *Id.*

[39] Bryda EC. The Mighty Mouse: the impact of rodents on advances in biomedical research. Mo Med. 2013 May-Jun;110(3):207-11. PMID: 23829104; PMCID: PMC3987984.

[40] JI Webster & EM Sternberg, Role of the hypothalamic-pituitary-adrenal axis, glucocorticoids and glucocorticoid receptors in toxic sequelae of exposure to bacterial and viral products, 181 J. ENDOCRINOLOGY 212 (2004).

[41] Heikinheimo O, Kekkonen R, Lähteenmäki P. The pharmacokinetics of mifepristone in humans reveal insights into differential mechanisms of antiprogestin action. Contraception. 2003 Dec;68(6):421-6. doi: 10.1016/s0010-7824(03)00077-5. PMID: 14698071.

with a 2.3 times greater affinity than progesterone).[42] However, it can be displaced from its binding site with the administration of high doses of oxygen. In fact, hyperbaric oxygen treatment is one of the mainstays of treatment for carbon monoxide toxicity.[43]

31.     It is a common practice in medicine to give an agent to counteract a lethal ingestion. Another example of this is administering Narcan to counteract the effects of a lethal overdose of fentanyl or other opioids. Narcan counteracts the effects of the opioid by displacing it from the opioid receptor.[44]

**D.     APR is Safe for Pregnant Women and Fetuses.**

32.     There is no documented risk that mifepristone exposure or APR leads to increased incidence of birth defects. Multiple studies have shown that neither progesterone nor mifepristone are associated with an increased risk of birth defects.

33.     A study published in the British Journal of Obstetrics and Gynaecology, an international journal of obstetrics and gynecologists, found that the incidence of birth defects in children exposed to mifepristone in the first trimester was equivalent to the incidence in the general population.[45] Delgado's 2018 study similarly found no increased risk of birth defects.[46] Further, according to the package insert for mifepristone, no teratogenic effects have been noted in experiments with rats and

---

[42] Manaker S, Perry H. Carbon monoxide poisoning. In: UpToDate, Topic 322 Version 51.0; UpToDate, Waltham MA. (Accessed on Nov. 12, 2023).

[43] Crawford Mechem C, Manaker S. Hyperbaric oxygen therapy. In: UpToDate, Topic 326 Version 30.0; UpToDate, Waltham MA. (Accessed on Nov. 12, 2023).

[44] Jordan MR, Morrisonponce D. Naloxone. [Updated 2023 Apr 29]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK441910/.

[45] N. Bernard et al., Continuation of Pregnancy After First-Trimester Exposure to Mifepristone: An Observational Prospective Study, 120 BJOG 568 (2013).

[46] Delgado *et al.*, *supra* n.15.

mice.[47] These are studies that AG James ignores in paragraphs 141–143 of her claim that HBI is misleading women when they state there is no increased risk of birth defects from the APR protocol. A birth defect—Mobius syndrome—is known to occur when fetuses are exposed to misoprostol[48] (the second drug in the two-drug regimen), but this is distinct from and unrelated to mifepristone exposure.

34.    Natural progesterone has been safely used during pregnancy for over 50 years, notably to support IVF pregnancies and in women who have a history of pregnancy loss.[49]

35.    In 1999, the FDA conducted a comprehensive review of relevant scientific literature and concluded that there was no increased risk of birth defects associated with the use of progesterone and that the "use of [progesterone] for luteal phase support in IVF cycles had become routine and that the agency had itself recently approved a [progesterone] gel for use in infertile women under treatment with ART."[50]

36.    The American Society for Reproductive Medicine (ASRM) concluded in a bulletin on progesterone supplementation during pregnancy: "The weight of

---

[47]    FDA,    MIFEPREX    Prescribing    Information,    at    9    (2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.

[48] A.L. Pastuszak, *Use of Misoprostol During Pregnancy and Möbius' Syndrome in Infants*, 338 N. Eng. J. Med. 1881, 1882–83 (1998).

[49] Coomarasamy A, Williams H, Truchanowicz E, et al. *PROMISE: first-trimester progesterone therapy in women with a history of unexplained recurrent miscarriages – a randomised, double-blind, placebo-controlled, international multicentre trial and economic evaluation.* Southampton (UK): NIHR Journals Library; 2016 May. (Health Technology Assessment, No. 20.41.) Chapter 1, Introduction. Available from: https://www.ncbi.nlm.nih.gov/books/NBK362730/.

[50] Prac. Comm. of the Am. Soc. for Reprod. Med., *Progesterone Supplementation During the Luteal Phase and in Early Pregnancy in the Treatment of Infertility: An Educational Bulletin*, 89 Fertility & Sterility 789, 791 (2008).

available evidence indicates that the most common forms of [progesterone] supplementation during early pregnancy pose no significant risk to mother or fetus."[51] This is in direct contradiction to AG James' claims in paragraphs 141–143 that HBI's claims that progesterone is safe and does not cause an increased risk of birth defects are misleading.

37.    The UK's National Institute of Health and Care Excellence (NICE) published new guidelines in 2021 recommending progesterone therapy for women with early pregnancy bleeding and at least one previous miscarriage.[52] This recommendation followed a Cochrane review of studies on progesterone use in early pregnancy.[53] NICE's chief executive, Gillian Leng, stated that "progesterone will not be able to prevent every miscarriage," but "will be of benefit to some women and, as an inexpensive treatment option, can be made available to women on the NHS from today."[54]

38.    Although the FDA has yet to approve the use of progesterone in the specific context of APR, off-label use of medications is common, even in pregnancy, when they have been safely used in clinical practice. One example is that the American College of Obstetricians and Gynecologists (ACOG) recommends off-label use of misoprostol as first-line therapy for cervical ripening for term induction of

---

[51] *Id.*
[52] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, National Institute for Health and Care Excellence (NICE) (updated Nov. 24, 2021), (Guideline NG126, Recommendation 1.5.2).
[53] *Id.*
[54] BMJ 2021;375:n2896 http://dx.doi.org/10.1136/bmj.n2896 Published: 24 November 2021.

labor.[55] Giving progesterone to women in the first trimester of pregnancy is not experimental and is backed by more than 50 years of clinical experience.

**E.      Addressing Common Criticisms of APR.**

39.      Critics of APR often focus on the lack of randomized placebo-controlled trials (RCT) on mifepristone reversal, but they overlook the fact that such studies would be unethical. It would be contrary to medical ethics to administer a placebo to a patient seeking to reverse the feticidal effects of mifepristone when we know through clinical experience, animal trials, and basic pharmacology that progesterone is safe and effective in this scenario.

40.      Where an RCT is not possible for ethical or other reasons, historical control groups, as were used in Delgado's study, are an acceptable alternative.[56]

41.      Tellingly, none of the trials relied on in the approval of mifepristone were RCTs—they either used a historical control group or were dose comparison studies. As the FDA's statistical review of the application for mifepristone approval stated: "In the absence of a concurrent control group in each of these studies, it is a matter of clinical judgment whether or not the sponsor's proposed therapeutic regimen is ... viable."[57]

---

[55] ACOG Practice Bulletin No. 107: Induction of Labor, 114 Obstetrics & Gynecology 386 (2009), https://journals.lww.com/greenjournal/citation/2009/08000/acog_practice_bulletin_no__107__inductio n_of_labor.30.aspx.

[56] *Marian et al.*, *supra* n.27.

[57] FDA, *Statistical Review and Evaluation of Mifepristone 7–8* (1996) quoted in Byron C. Calhoun & Donna J. Harrison, *Challenges to the FDA Approval of Mifepristone*, 38 Annals of Pharmacotherapy 163, 164 (2004).

42.     The one attempted RCT study on APR, conducted by Mitchell Creinin et al., was stopped at an early stage due to "safety concerns."[58] Creinin, an abortion provider from the pro-abortion Bixby Center at the University of California San Francisco, conducted an experiment where women were given mifepristone, followed by either progesterone or a placebo, but not given misoprostol. They were scheduled to follow up two weeks later for an ultrasound, where investigators would determine whether they had an ongoing, viable pregnancy. If they had an ongoing pregnancy, the fetus would then be surgically aborted.

43.     The study included five women in the final treatment group who were administered progesterone and five in the final control group who were not administered progesterone. The trial was halted after three women required emergency room visits.[59] Of these three women, only one woman was from the progesterone treatment group, and she was found to be completing her abortion and required no treatment.[60] The other two women were from the placebo group—both presented with heavy vaginal bleeding and required emergency dilation and curettage. One of the two received a blood transfusion.[61] Therefore, it cannot be said that the safety concerns that halted the study are related to the administration of progesterone following mifepristone without misoprostol.[62] In fact, the significant adverse effect of heavy bleeding and retained tissue almost certainly originated from

---

[58] Mitchell D. Creinin et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 Obstetrics & Gynecology 158, 158 (2020).
[59] *Id.* at 160–61.
[60] *Id.*
[61] *Id.*
[62] *Id.*

the administration of mifepristone, which is known to increase risk of hemorrhage due to its effect on the spiral arteries of the pregnant uterus.[63] It is thus misleading to cite the Creinin study to demonstrate that APR is dangerous.

44.    The Creinin study also does not disprove, but actually supports the effectiveness of APR. In the placebo group, two out of five women had ongoing pregnancy (40% survival). In the progesterone treatment group, however, four out of five women had ongoing pregnancies (80% survival).

45.    It is not surprising that ACOG has not endorsed APR. ACOG has a long history of promoting a pro-abortion agenda and opposing abortion safety regulations.[64] Even the most basic safety restriction, like requiring a physician who performs surgical abortions to have the ability to admit patients with complications to get additional care, has not been supported by ACOG.

46.    ACOG has ignored the wealth of evidence that progesterone can be used to counteract the effects of mifepristone and help women who regret beginning an abortion to potentially save their child.

47.    Truly informed consent to undergo a chemical abortion requires disclosure of APR. By denying information about APR to a woman who would otherwise seek it, opponents are essentially consigning that woman to completing an abortion she no longer desires and preventing her from trying to save her child. This

---

[63]  Miech RP. *Pathopharmacology of excessive hemorrhage in mifepristone abortions*. Ann Pharmacother. 2007 Dec;41(12):2002-7. doi: 10.1345/aph.1K351. Epub 2007 Oct 23. PMID: 17956963.
[64]  ACOG has filed amicus briefs on behalf of pro-abortion causes at the expense of sound medical judgment. *See, e.g.*, Brief of Amicus Curiae Am. Assoc. of Pro-Life Obstetricians and Gynecologists in Support of Rebekah Gee, Secretary, Louisiana Dep't. of Health and Hosps., *June Med. Services L.L.C. v. Gee*, 905 F.3d 787 (5th Cir. 2018).

is impermissible no matter how many women regret their abortion choice—whether it is only a few or many. Abortion proponents, such as the National Abortion Federation, currently state that if a woman changes her mind after taking mifepristone, she should do nothing[65] (rather than take progesterone). However, as noted in a recent systematic review of studies on reversal of medication abortion by progesterone[66] and highlighted by the Creinin study, there are "safety concerns with not taking misoprostol after mifepristone" in patients who do not take progesterone.

48.    The medical evidence demonstrates that not only is counteracting the effects of mifepristone with progesterone (APR) scientifically feasible, but it has also been supported by sound clinical experience and scientific testing. Accordingly, it is unethical to withhold this potentially life-saving treatment from women who are seeking it for the purposes of counteracting a mifepristone-induced abortion.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May ___24___, 2024.

Christina Francis, M.D.

---

[65] Mark A, Grossman D, Foster AM, Prager SW, Winikoff B. *When patients change their minds after starting an abortion: Guidance from the National Abortion Federation's Clinical Policies Committee.* Contraception. 2020 May;101(5):283-285. doi: 10.1016/j.contraception.2020.01.016. Epub 2020 Feb 5. PMID: 32035097.
[66] Stifani BM, Lavelanet AF *Reversal of medication abortion with progesterone: a systematic review.* BMJ Sexual & Reproductive Health Published Online First: 20 October 2023. doi: 10.1136/bmjsrh-2023-201875.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

NATIONAL INSTITUTE OF FAMILY
AND LIFE ADVOCATES, GIANNA'S
HOUSE, INC., and CHOOSE LIFE OF
JAMESTOWN, INC. d/b/a OPTIONS
CARE CENTER,

*Plaintiffs,*

v.

Case No.: 1:24-cv-00514

LETITIA JAMES, in her official
capacity as Attorney General of the
State of New York,

*Defendant.*

## DECLARATION AND AFFIRMATION OF MARANDA HALSTEAD

I, MARANDA HALSTEAD, declare and affirm as follows:

1.  I am a citizen of the United States of America and am over the age of eighteen.

2.  I am a resident of the state of New York.

3.  I make this declaration based on my personal knowledge.

4.  When I was 26 years old, I had an unplanned pregnancy.

5.  I wanted to have children someday but didn't know if I was ready and the baby's father also did not want me to keep the baby.

6.  At around eight or nine weeks into my pregnancy, I made an appointment with Planned Parenthood, and they prescribed the abortion drug mifepristone.

7.  I took the mifepristone as directed, but I quickly began having second thoughts.

1

**645**

8.      The next day, I was frantic and regretted having taken the drug. I was at my stepmom's house, and she searched online to see if there was anything I could do to save my baby after I had already taken the first drug.

9.      She found information online about the possibility of saving my baby through "Abortion Pill Reversal."

10.    I believe the information she found was from abortionpillreversal.com and/or New Hope Family Services website.

11.    Because of the information from the websites, I went in to New Hope Family Services center and they told me that it may be possible to save the baby. They didn't guarantee any outcome but said that taking progesterone orally within a short time after taking mifepristone had had up to a 68% success rate, and that other methods had a lower success rate.

12.    They performed an ultrasound, and I was able to see my baby still alive. I knew then for sure that I wanted to do everything I could to save her.

13.    New Hope was able to give me, free of charge, progesterone supplements that I took twice daily for the first three days and then once a day through the rest of my first trimester.

14.    They connected me with another resource center near my house that did weekly follow-ups with ultrasounds to check on my baby.

15.    My unborn daughter was doing great, and months later was born healthy and beautiful.

16.    Her name is Myli'anna, and she's almost seventeen months old. I've attached pictures of her to this declaration.

17.    Hearing about Abortion Pill Reversal from New Hope and abortionpillreversal.com truly gave me hope. I didn't want to continue the abortion, but I didn't know what to do.

2

**646**

18.   Planned Parenthood never told me that there was a possibility of saving my baby after taking the first pill.

19.   If it wasn't for the information about Abortion Pill Reversal online, I would have completed the abortion and Myli'anna would not be alive today.

20.   I am so thankful for New Hope and what they did for me and Myli'anna.

21.   I believe other women should have the same opportunity to change their minds like I did, but they can only do that if they are told about all their options.

3

## DECLARATION UNDER PENALTY OF PERJURY

I, MARANDA HALSTEAD, a citizen of the United States and a resident of the State of New York, hereby declare and affirm this 24 day of May, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Maranda Halstead
_____
MARANDA HALSTEAD

STATE OF NEW YORK          )
COUNTY OF Chemung )

4

648

# EXHIBIT 1







# EXHIBIT C

MONROE COUNTY CLERK'S OFFICE                    THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 3847314

Book    Page    CIVIL

Return To:                                      No. Pages: 66
ANJAN K. GANGULY
140 ALLENS CREEK RD STE 220                     Instrument: COMPLAINT
ROCHESTER, NY 14618
                                                Control #:        202404301654
                                                Index #:          E2024007242

                                                Date: 04/30/2024

HEARTBEAT INTERNATIONAL INC.                    Time: 5:13:43 PM
CRISIS PREGNANCY SERVICES INC. d/b/a
COMPASSCARE
CARING CHOICES PREGNANCY HELP COMMUNITY
INC.
STUDY THE OPTIONS PLEASE INC. d/b/a CARE NET

JAMES, LETITIA

Total Fees Paid:                        $0.00

                                                Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

        JAMIE ROMEO

    MONROE COUNTY CLERK



**SUPREME COURT OF THE STATE OF NEW YORK**
**MONROE COUNTY**

---

HEARTBEAT INTERNATIONAL INC., on behalf of itself and its members and clients, and

CRISIS PREGNANCY SERVICES INC. d/b/a COMPASSCARE, CARING CHOICES PREGNANCY HELP COMMUNITY INC., STUDY THE OPTIONS PLEASE INC. d/b/a CARE NET PREGNANCY CENTER OF WAYNE COUNTY, PREGNANCY CENTER OF PENN YAN, INC. d/b/a CARE NET PENN YAN, ADIRONDACK PREGNANCY CENTER d/b/a ASCENTCARE, THE BRIDGE TO LIFE INC. d/b/a BRIDGE WOMEN'S SUPPORT CENTER, ALTERNATIVE CRISIS PREGNANCY CENTER, INC. d/b/a CARE NET PREGNANCY CENTER OF THE HUDSON VALLEY, 1ST WAY LIFE CENTER INC., NEW HOPE FAMILY SERVICES, INC., THE CARE CENTER d/b/a SOUNDVIEW PREGNANCY SERVICES AND SOUNDVIEW, CARE NET PREGNANCY CENTER OF CENTRAL NEW YORK d/b/a WILLOW NETWORK, on behalf of themselves and their clients,

Plaintiffs,

v.

LETITIA JAMES, in her official capacity as Attorney General of the State of New York,

Defendant.

---

**VERIFIED COMPLAINT**

Plaintiffs herein complain of the Defendant as follows:

**NATURE OF ACTION**

1. This action seeks declaratory and injunctive relief from the latest threatened legal action by Defendant Attorney General Letitia James ("James") against plaintiff life-affirming pregnancy help organizations: HEARTBEAT INTERNATIONAL INC. ("Heartbeat"),

1

COMPASS CARE CRISIS PREGNANCY SERVICES, INC. d/b/a COMPASSCARE ( "CompassCare") and CARING CHOICES PREGNANCY HELP COMMUNITY INC., STUDY THE OPTIONS PLEASE INC. d/b/a CARE NET PREGNANCY CENTER OF WAYNE COUNTY, PREGNANCY CENTER OF PENN YAN, INC. d/b/a CARE NET PENN YAN, ADIRONDACK PREGNANCY CENTER d/b/a ASCENTCARE, THE BRIDGE TO LIFE INC. d/b/a BRIDGE WOMEN'S SUPPORT CENTER, ALTERNATIVE CRISIS PREGNANCY CENTER, INC. d/b/a CARE NET PREGNANCY CENTER OF THE HUDSON VALLEY, 1ST WAY LIFE CENTER INC., NEW HOPE FAMILY SERVICES, INC., THE CARE CENTER d/b/a SOUNDVIEW PREGNANCY SERVICES AND SOUNDVIEW, CARE NET PREGNANCY CENTER OF CENTRAL NEW YORK d/b/a WILLOW NETWORK, on behalf of themselves and their clients, (hereinafter referred to collectively as "the Pregnancy Help Collective").

2.   James' salvos against Plaintiffs are the latest development in her politically motivated campaign against pregnancy organizations in general. This time, James targets Plaintiffs' protected speech and activities engaged in for the sole benefit of pregnant women who have ingested—whether voluntarily or via trick or force—mifepristone, the first pill of the two-pill chemical abortion regimen, but wish to continue their pregnancies.

3.   These pregnant women are at serious and imminent risk of miscarriage because of the ingestion of mifepristone. They urgently seek information and assistance to continue their pregnancies. New York's pregnancy help organizations, including Plaintiffs, provide these women with necessary information, referrals, and even access to free medical care to empower them to save the lives of their *wanted* babies. Defendant James has no business butting into the intimate medical decision of an expectant mother, in consultation with the medical professional

of her choice, to carry her pregnancy to term and save her unborn baby from the disastrous effects of mifepristone while there is still time to undo the effects of that powerful chemical.

4.  With the rising popularity of chemical abortion in the late 2000's, OB/GYNs began seeing a small but increasing number of women who had ingested mifepristone but wanted to continue their pregnancies. Physicians administered supplemental progesterone, the naturally occurring "pregnancy hormone," to counteract and reverse the effects of the mifepristone. Supplemental progesterone is otherwise a well-accepted and harmless treatment for pregnant women at risk of miscarriage, which is the case with women who have regretted their decision to ingest mifepristone.

5.  Mifepristone acts by competitively binding to a pregnant woman's progesterone receptors. When progesterone binds to those receptors, the pregnant woman's body is signaled to help sustain the pregnancy. However, when mifepristone binds to those receptors instead of progesterone, the required signaling does not occur. The objective in administering supplemental progesterone is to "outcompete" the mifepristone at the progesterone receptor sites, blocking and reversing the effects of mifepristone. Indeed, the United States Food and Drug Administration concluded, in its pharmacology review for mifepristone, that "the abortifacient activity of RU486 [mifepristone] is antagonized by progesterone *allowing for normal pregnancy and delivery.*" Mifeprex Drug Approval Package, *Pharmacology Review(s)*, U.S. Food & Drug Admin. pp. 16-17 (Sept. 28, 2000) (emphasis added).

6.  In the years since those early treatments, thousands of pregnant women at risk for miscarriage, due to mifepristone ingestion, have been treated with supplemental progesterone by state-licensed healthcare professionals. This administration of supplemental progesterone has colloquially become known as Abortion Pill Reversal ("APR").

3

7.  Instead of celebrating the reproductive choice of these pregnant women who have decided to seek to preserve their pregnancies and bring their children to term—and celebrating the work of New York's pregnancy help organizations which empower them in the exercise of their rights—Defendant James has launched a public campaign of opprobrium against the organizations and the APR protocol. She is joined in that campaign by her political allies, Planned Parenthood and the abortion industry, in New York and nationally.

8.  Plaintiffs are Christian nonprofit, life-affirming, pregnancy help organizations that provide, or refer for, pregnancy help services for women who seek alternatives to abortion, including APR, as more particularly alleged below. Pregnancy help organizations include, but are not limited to, pregnancy resource centers, such as Plaintiff CompassCare, whose pregnancy help services are provided directly to women facing difficult or untimely pregnancies.

9.  In furtherance of her openly declared political agenda, James has issued to Heartbeat, CompassCare, and the Pregnancy Help Collective Plaintiffs, and still other pregnancy help organizations in the State of New York, a five-day Notice of Intention to Sue (NOI) under plainly inapplicable provisions of New York Executive Law § 63(12) and New York General Business Law Article 22-A, §§ 349, 350. A NOI was issued to CompassCare on April 25, 2024 and Heartbeat on April 26, 2024. (**Exhibits A** and **B** hereto). The Plaintiffs referred to collectively as the Pregnancy Help Collective received essentially identical NOIs to those received by Heartbeat and CompassCare, starting on April 24.

10. The NOIs do not allege any violation of New York laws governing private charities such as Plaintiffs, including Executive Law Article 7-A, the Estates Powers and Trusts Law, or the Not-for-Profit Corporation Law.

11. The NOIs give Plaintiffs five business days to explain why they should not be sued,

4

after which James threatens "to seek injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper." The threatened legal action would jeopardize the entire First Amendment-protected, Christian life-affirming missions of Heartbeat, CompassCare and all similarly situated pregnancy help organizations in the State of New York. Given the dates on which the Plaintiffs were served during James' barrage of evidence-free NOIs, all of the Plaintiffs now face the imminent prospect of *in terrorem* litigation designed to cripple or destroy their charitable mission to women in need who wish to exercise their reproductive choices in *favor* of life.

12. The sole pretext for issuance of the NOIs is the false claim, supported by no evidence, that Plaintiffs have made "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol."

13. No misleading statements or omissions are specified in the NOIs, nor have any been made by any of these Plaintiffs, as more particularly alleged below.

14. The NOIs further fail to allege that any consumer has been injured by a consumer-oriented service. Plaintiffs' free services, including referral or performance of APR, have injured no one.

15. As noted above, and as more particularly alleged below, APR is a proven medical protocol that involves the well-established medical regimen of administration of progesterone to women who decide against receiving the second pill of the chemical abortion regimen. A chemical abortion is completed by ingesting two separate drugs: first, mifepristone, which blocks the pregnancy hormone progesterone and deprives the developing child of nutrients. The woman is commonly directed to take misoprostol 24-48 hours later, which forces the uterus to contract

and expel the unborn child.

16. APR has a high success rate with no known serious side effects because it simply supplies the woman with a bioidentical form of a natural hormone widely administered during pregnancy to ensure its continuation, whereas the chemical abortion regimen, which employs powerful chemical agents, is fraught with medical risks, including serious hemorrhage, septic shock, ruptured ectopic pregnancies, and death—none of which is known ever to have happened, or even to have the possibility of happening, because of APR.

17.  As further alleged below, Defendant James has taken no action against patently false and misleading statements about the safety and efficacy of chemical abortion by pro-abortion providers who enjoy her favor, including Planned Parenthood, despite clear evidence of risks and actual serious harm from the chemical abortion regimen to *paying consumers*, while targeting life-affirming pregnancy help organizations for legal action with no evidence of false or misleading statements or injury to anyone from their charitable *free* services. (*See, e.g.,* Carole Novielli, *Lawsuit against Planned Parenthood: Abortion pill caused toilet delivery of 'fully formed' 30-week baby*, Live Action News, available at https://www.liveaction.org/news/planned-parenthood-lawsuit-abortion-pill-30-week/ [last accessed 4/29/24].)

18. James is thus threatening censorship, retaliation and viewpoint discrimination in violation of the free speech and free exercise clauses of the First Amendment, selective and arbitrary enforcement of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment; violation of freedom of speech and free exercise of religion under Art. 1, §§ 3 and 8 of the New York Constitution; and selective and arbitrary enforcement of the laws in violation of Art. 1, § 11 of the New York Constitution. This threat has already chilled and will continue to chill and suppress Plaintiffs' exercise of their state and federal constitutional rights and also

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 9 of 67

imminently threatens to cripple or destroy their operations via damages, civil penalties, and "auditing and compliance review"—meaning continuous government meddling by James and her subordinates in Plaintiffs' religiously motivated, First Amendment-protected speech and expressive association.

19. James is further threatening interference with protected rights in violation of NY Civil Rights Law, §70-b in that she intends to commence an action against Plaintiffs for the purpose of "harassing, intimidating, punishing or otherwise maliciously inhibiting the exercise" of their protected right under the New York Constitution to provide life-affirming "medical, counseling or referral services relating to pregnancy." N.Y. Civ. Rights Law § 70-b (McKinney).

20. Plaintiffs accordingly move this Court for declaratory, temporary, preliminary and final injunctive relief in view of the impending deadline for Defendant James' threatened baseless and unconstitutional legal action in furtherance of her political agenda.

## JURISDICTION AND VENUE

21. This action arises under Article 1, §§ 3 and 8 of the Constitution of the State of New York.

22. This action also arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983 for prospective declaratory and injunctive relief.

23. This Court has jurisdiction over the subject matter of this litigation pertaining to the Constitution of the State of New York and NY Civ. Rights Law § 70-b.

24. This Court also has concurrent jurisdiction over the federal claims under 42 U.S.C. § 1983.

25. Venue is proper in Monroe County pursuant to CPLR §§ 503(a) and 507 because lead

7

Plaintiff CompassCare was founded, and is located, in Monroe County, has served the pregnant women and children of Monroe County for over 40 years, and a substantial part of the events giving rise to this suit arose in Monroe County.

26. This Court is authorized to grant declaratory and injunctive relief under its equitable powers as to the state law claims herein and NY CPLR § 30001e.

27. This Court is authorized to grant Plaintiffs costs, including reasonable attorney fees, pursuant to 42 U.S.C. § 1988 as to the federal constitutional claims and, as to the state law claim for interference with protected rights, damages, costs and attorney fees under NY Civ. Rights Law § 70-b (3).

## FACTS

### HEARTBEAT INTERNATIONAL INC.

28.   Plaintiff Heartbeat International Inc. (Heartbeat) is an interdenominational Christian association of faith-based pregnancy help organizations, including pregnancy resource centers, medical clinics, maternity homes, and nonprofit adoption agencies endorsed by Christian leaders nationwide. (*See* https://www.heartbeatinternational.org/about-us).

29.   Heartbeat is a 501(c)(3) charitable organization that provides organizational representation for the world's most expansive network of pregnancy help organizations, including pregnancy resource centers ("PRCs") such as CompassCare. Heartbeat has over 3,000 affiliated locations, including over 2,000 locations throughout the United States.

30.   Heartbeat was founded in 1971 in Toledo, Ohio, as "Alternatives to Abortion International," with 75 original affiliates. By 1993, Alternatives to Abortion had grown to 200 affiliates and changed its name to Heartbeat International. Heartbeat is incorporated in Ohio and has its principal place of business in Columbus, Ohio.

8

FILED: MONROE COUNTY CLERK 04/30/2024 04:54 PM
NYSCEF DOC. NO. 2

INDEX NO. E2024007242
RECEIVED NYSCEF: 04/30/2024

Case 1:24-cv-00514-JLS Document 3-4 Filed 05/24/24 Page 96 of 304
Case 1:24-cv-00514-JLS Document 3-4 Filed 05/24/24 Page 11 of 67

31. Heartbeat itself neither owns nor operates any PRCs. Rather, Heartbeat creates and maintains resources, including but not limited to model policies and procedures for use by its members, including CompassCare.

32. Heartbeat operates "Option Line," which is a contact center for women seeking pregnancy-related help. Option Line offers support via a toll-free telephone number, e-mail, and live chat, 24 hours a day, 7 days a week. Option Line's call center is in Heartbeat's headquarters in Columbus, Ohio, and has been operating for 21 years. Option Line is staffed by specially trained consultants, who are equipped to respond to inquiries from women who think they may be pregnant and are unsure what to do. Option Line consultants receive approximately 1,000 inquiries a day.

33. As a purely charitable organization with a Christian mission, Heartbeat seeks to connect women in need of help with whoever can provide it. Heartbeat does not charge Option Line contacts for its services, nor does it receive any remuneration from the centers for connecting women to them.

34. As part of its Christian ministry, Heartbeat also operates the Abortion Pill Rescue Network ("APR Network") and the Abortion Pill Reversal ("APR") hotline, discussed below. Heartbeat brings suit here for itself, its clients, and the PRCs who are members of its APR Network.

**The "Abortion Pill"**

35. As noted above, the sole ground for Defendant James' threatened legal action is the claim that Plaintiffs (and similarly situated pregnancy help organizations) have made false statements and omissions regarding APR when advertising about the availability of this option for women who wish to continue their pregnancy. As shown by the following facts, the accusation is baseless and pretextual.

36. When a woman becomes pregnant, the corpus luteum is formed within her ovary to

9

secrete progesterone. "Progesterone is needed for the pregnancy to continue; it prepares and maintains the uterine lining and stimulates the production of nutrients." *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210, 224 (5th Cir. 2023) ("*Alliance II*"), *cert. granted*, 144 S. Ct. 537 (2023).

37.     In the 1980s, Roussel Uclaf S.A.—a French pharmaceutical firm—developed a drug named RU-486 which acts as an antiprogesterone by occupying a pregnant woman's progesterone receptors and thus preventing progesterone from binding to those receptors. It "blocks the hormone progesterone, halts nutrition, and ultimately starves the unborn human until death." *Alliance for Hippocratic Medicine v. FDA*, 668 F. Supp. 3d 507, 520 (N.D. Tex. 2023) ("*Alliance I*"), *aff'd in part, vacated in part*, *Alliance II*, 78 F.4th 210.

38.     In the mid-1990's the Clinton administration worked with Roussel Uclaf S.A. to bring RU-486 to the American market. *Alliance I*, 668 F. Supp. 3d at 554. It negotiated the donation of RU-486 by Roussel Uclaf S.A. to a nonprofit called "the Population Council," *Alliance II*, 78 F.4th at 224 n.1, so that the latter could sponsor it as a new drug for approval by the FDA—under the generic name mifepristone and the brand name Mifeprex. *Id*. at 223-24. Ultimately, "the Population Council applied for FDA to approve mifepristone as a new drug, as part of a two-drug regimen designed to cause abortion." *Id*. at 223.

39.     "Mifepristone alone, however, is not fully effective in aborting an embryo," with a scientific "dispute as to just how effective mifepristone is alone." *Bella Health and Wellness v. Weiser*, No. 1:23-cv-939, 2023 WL 6996860, at *2 (D. Colo., Oct. 21, 2023). "This is why patients also take the second drug—misoprostol—within a day or two of taking mifepristone to complete a medication abortion. Misoprostol dilates the cervix and induces muscle contractions, clearing the uterus of the embryo." *Id*. "The full, two-drug regimen is highly effective at ending a pregnancy,

10

FILED: MONROE COUNTY CLERK 04/30/2024 04:41 PM
NYSCEF DOC. NO. 2
INDEX NO. E2024007242
RECEIVED NYSCEF: 04/30/2024
Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 98 of 304
Page 13 of 67

causing 97% of early-term pregnancies to terminate." *Id.*

40.   In 2000, mifepristone was approved by the FDA for abortions up to seven weeks gestation (49 days), with misoprostol taken 48 hours after mifepristone. In undertaking this review, the FDA performed its own Pharmacology Review where it undertook various animal studies. As a result of those studies, the FDA concluded that "the abortifacient activity of RU 486 is antagonized by progesterone *allowing for normal pregnancy and delivery.*" Mifeprex Drug Approval Package, *Pharmacology Review(s)*, U.S. Food & Drug Admin. pp. 16-17 (Sept. 28, 2000) (emphasis added).[1]

41.   That is, the FDA itself recognized that progesterone can neutralize the effects of mifepristone/RU 486 and allow for normal pregnancy and delivery.

42.   Notably, the FDA has never added termination of pregnancy to the misoprostol label, meaning that the use of misoprostol in the chemical abortion context is "off-label." *See* Label for Cytotec (misoprostol) Tablets, U.S. Food & Drug Admin.[2]; x.23,*Misoprostol*, in StatPearls (2023).[3]

### "Abortion Pill Reversal"

43.   "Some women regret their decision to start the medication abortion regimen after taking the first pill . . . . And others may have been coerced to start the regimen against their will." *Bella Health and Wellness*, 2023 WL 6996860, at *2.

44.   Some "doctors and medical professionals, however, have investigated whether treatment with progesterone can reverse the effects of mifepristone, the first abortion pill, better than

---

[1] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_mifepristone.cfm; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_phrmr_P2.pdf.
[2] https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/019268s041lbl.pdf.
[3] https://www.ncbi.nlm.nih.gov/books/NBK539873/.

just watchful waiting and avoiding use of the second abortion pill. This is commonly called 'abortion pill reversal' or 'medication abortion reversal.'" *Id.*

45.    Supplemental progesterone itself is indubitably safe, and accordingly is classified as a "Category B" drug for pregnant women—the same category as Tylenol, the most commonly used pain reliever during pregnancy. *See* Label for Prometrium (progesterone) Capsules, U.S. Food & Drug Admin.[4]; Emily Oster, Expecting Better at 169 (2016) (discussing Tylenol use during pregnancy). Researchers estimate that "providers employ the use of progesterone in 5-12% of all pregnancies for a variety of reasons." *Bella Health and Wellness*, 2023 WL 6996860, at *2.

46.    The first known attempt to reverse the effects of mifepristone using progesterone occurred in 2006. In that year, Dr. Matthew Harrison, MD, was approached by a woman who had taken mifepristone and wanted to reverse the effects of it. He treated her with progesterone, and she went on to deliver a healthy baby.

47.    Based on his own experience, a few years later, Dr. George Delgado, MD, devised the APR protocol for reversing the effects of mifepristone and began to advise doctors on APR. And in May 2012, Dr. Delgado set up a website and hotline to connect women who seek to reverse the effects of mifepristone with licensed medical professionals—this effort became known as the APR Network.

48.    As stated above, the basic premise of APR is to counteract the effects of an antiprogesterone (mifepristone) with supplemental progesterone. Mifepristone is a progesterone receptor antagonist that binds twice as aggressively to the progesterone receptors in the uterus progesterone does, but not permanently. George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33(1) Issues L. Med. 21

---

[4] https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/019781s017,020843s011lbl.pdf

(2018).

49.   The basic biochemical premise of APR is that the effect of a competitive receptor *antagonist* may be "reversed" by increasing the amount of the receptor *agonist*. Barbara J. Pleuvry, *Receptors, Agonists and Antagonists*, 5 Neurosurgical Anaesthesia and Intensive Care, Pharmacology 350, 350 (2004). Stated differently, the effect of competitive inhibitors (*e.g.*, mifepristone) that block substrates (*e.g.*, progesterone) can be thwarted by adding more substrate. John W. Pelley, Elsevier's Integrated Review Biochemistry 33-34 (2d ed. 2011).

50.   APR is modeled on these basic principles of biochemistry and is supported by a long line of studies.

51.   For example, in 1989, Japanese researchers studied "the role of progesterone in the maintenance of pregnancy" using a population of pregnant rats. After four days, only 33.3% of the rats who received mifepristone remained pregnant—but 100% of the rats who received progesterone simultaneously with mifepristone remained pregnant. The Yamabe study therefore indicated that progesterone can counteract the effects of mifepristone's blocking of progesterone receptors. S. Yamabe, et al., *The Effect of RU486 and Progesterone on Luteal Function during Pregnancy*, 65(5) Nihon Naibunpi Gakkai Zasshi 497 (1989).

52.   This was later confirmed by both the FDA (discussed above), and another animal study published by Camilleri and Sammut in July 2023. Following up on the Yamabe study, researchers evaluated the "non-simultaneous, subsequent administration" of progesterone following mifepristone in rats. None of the rats who received mifepristone alone during the equivalent of the first trimester of a human pregnancy remained pregnant, while 81.3% of the rats who received mifepristone followed by progesterone at the same stage remained pregnant. The study concluded that "[t]he administration and actions of the national agonist, progesterone, in the presence of the

antagonist, mifepristone, appears to be in concordance with the literature and our understanding of the pharmacological functioning of reversible competitive antagonism, where *sufficient levels of the agonist [progesterone] can override a given concentration of an antagonist [mifepristone].*" See Christina Camilleri & Stephen Sammut, *Progesterone-Mediated Reversal of Mifepristone-Induced Pregnancy Termination in a Rat Model: An Exploratory Investigation*, 12 Sci. Rep. 10942 (2023) (italics added).

53.     In 2012 and 2017, two small human case studies were published. In 2012, Dr. Delgado and Dr. Mary Davenport published a small case series that followed seven women who had taken mifepristone and then received progesterone therapy after seeking medical assistance to maintain their pregnancies. Four of the six women (66%) who completed the study carried their pregnancies to term and delivered live infants, with no birth defects observed. George Delgado & Mary L. Davenport, *Progesterone Use to Reverse the Effects of Mifepristone*, 46(12) Ann. Pharmacother. e36 (2012).

54.     Then, in 2017, a similar small case series out of Australia (Garratt and Turner) was published. In that series, two out of three women (66%) who received progesterone therapy after ingesting mifepristone carried their pregnancies to term and delivered healthy live infants. *See* Deborah Garratt & Joseph V. Turner, *Progesterone for Preventing Pregnancy Termination after Initiation of Medical Abortion with Mifepristone*, 22(6) Eur. J. Contracept. Reprod. Health Care 472 (2017).

55.     In follow-up to his small 2012 case series, Dr. Delgado then engaged in a much larger case series. His 2018 study analyzed the charts of 547 women who had ingested mifepristone within the last 72-hours and then received progesterone therapy. (Two hundred and seven women from the initial 754 were excluded for control purposes.) The study found an overall fetal survival rate of

48%. The study showed even higher survival rates when the patients were divided into treatment subgroups. The subgroup that received progesterone intramuscularly showed fetal survival rates of 64%, and the subgroup that received a high dose of oral progesterone followed by daily oral progesterone until the end of the first trimester had survival rates of 68%. The study concluded that these two subgroups represented two viable APR protocols for use moving forward. *See* George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33(1) Issues L. & Med. 21 (2018).

56.     A scoping review was also published in July 2023, which reviewed the existing scientific literature and concluded that there was "*no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy*," and that "mifepristone antagonization with progesterone is a *safe and effective treatment*." Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90(4) Linacr. Q. 395 (2023) (emphasis added).

57.     Even Dr. Harvey Kliman, the director of the reproductive and placental research unit at the Yale School of Medicine, told the New York Times that using progesterone to reverse the effects of mifepristone "makes biological sense." Dr. Kliman further stated that "if one of his daughters came to him and said she had somehow accidentally taken mifepristone during pregnancy … he would tell her to take 200 milligrams of progesterone three times a day for several days, just long enough for the mifepristone to leave her system: 'I bet you it would work.'" Ruth Graham, *A New Front in the War over Reproductive Rights: 'Abortion-Pill Reversal'*, N.Y. Times Mag. (July 18, 2017).[5]

58.     In light of the above studies, over a decade of widespread successful use of APR by

---

[5] https://www.nytimes.com/2017/07/18/magazine/a-new-front-in-the-war-over-reproductive-rights-abortion-pill-reversal.html.

licensed healthcare professionals, and given the irrefutable evidence of its biochemistry, APR has been endorsed by the American Association of Pro-Life Obstetricians & Gynecologists, which has over 7,000 members, the Catholic Medical Association, and Canadian Physicians for Life, among others. *See, e.g.,* Am. Assoc. of Pro-Life Obstetricians & Gynecologists, 2019 AAPLOG Position Statement on Abortion Pill Reversal, https://perma.cc/6RRC-GE2K.

### The Abortion Pill Rescue Network

59.    Given the demonstrable life-saving potential of APR, Heartbeat maintains its APR Network consisting of physicians or other medical providers who are willing to assist a woman who wishes to try reversing the effects of mifepristone and prevent the death of her unborn child and pregnancy help organizations that inform pregnant women about the Network. The APR Network, which includes a 24/7 hotline for women who seek assistance, includes more than 1,400 medical professionals, across 18 countries, who are willing and able to administer the Abortion Pill Reversal protocol. One purpose of Heartbeat's APR Network is to associate persons who share its pro-life views in general, and its particular view that APR treatments should be considered by any woman who wishes to prevent the death of her unborn child by reversing the effects of mifepristone, to amplify their individual voices and broaden their capacity to reach women interested in this option.

60.    The APR Network and its hotline were founded by Dr. Delgado in 2012 and acquired by Heartbeat in April 2018.

61.    Plaintiff CompassCare is a member of Heartbeat's APR Network, along with numerous other pregnancy help organizations across the country.

62.    Heartbeat's 24/7 APR Network hotline is specifically for women who have begun a chemical abortion, regret that decision, and seek help to halt the abortion process to save their

unborn children from otherwise certain death. This hotline involves a website with basic information about the APR process, a toll-free telephone number that women can call, and a live chat internet feature through which women can speak with trained nurses and consultants.

63.   Through its APR hotline, Heartbeat works to connect these women with a medical professional in their area who can help, including those who work with Plaintiff CompassCare and other PRCs in the State of New York. Any woman in need of help, nationally or internationally, can call and seek a referral absolutely free of charge.

64.   Heartbeat receives approximately 170 mission critical contacts a month about APR through the APR hotline, including inquiries from the State of New York, which is presumably the reason Defendant James has issued her NOI threatening to sue Heartbeat.

65.   The APR Network is completely independent of Heartbeat's affiliate memberships and includes many medical professionals who are not associated with any pregnancy help organization.

66.   Heartbeat receives no payments or other remuneration from the licensed healthcare professionals in the APR Network for the referrals to them, including those professionals in New York State. And any pregnancy help organization can join the APR Network without cost. Nor is any payment made to or from Heartbeat when a medical professional joins the APR Network. Heartbeat's communications about and operation of the APR Network are entirely charitable and noncommercial.

67.   Of those women who voluntarily maintained contact or shared the outcome of their reversal attempt with the APR Network, Heartbeat is aware of more than 1,000 mothers who began chemical abortions but were able to continue their pregnancies and give birth to their babies through Abortion Pill Reversal, with the help of the APR Network.

17

FILED: MONROE COUNTY CLERK 04/30/2024 04:54 PM

INDEX NO. E2024007242

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 04/30/2024

Case 1:24-cv-00514-JLS  Document 3-4  Filed 05/24/24  Page 105 of 304

Case 1:24-cv-00514-JLS  Document 3-4  Filed 05/24/24  Page 20 of 67

68. Heartbeat maintains certain records of women who have received the APR protocol through APR Network. Based on records of other women who began the APR process, but whose ultimate result is unknown, Heartbeat believes that its APR Network has saved over 5,000 babies. This number is calculated by adding the number of APR Network successful reversals to the number of APR Network starts with unconfirmed outcomes multiplied by 64%—the percentage identified in the less successful of the two viable APR protocols identified by Dr. Delgado in his 2018 study.

69. Aside from the APR Network, there is no organized national program to connect women with Abortion Pill Reversal. Because of the extremely time-sensitive nature of the APR procedure, it is critical that women wishing to halt and reverse their in-progress chemical abortion are able to quickly obtain the appropriate life-saving treatment without government interference. Therefore, Defendant James' threatened interference with APR as provided, or referred for, by Plaintiffs and other pregnancy help organizations may well result in loss of life to unborn children who could have been saved—and severe and irreparable harm to the constitutional rights of Plaintiffs' pregnant clients to continue their pregnancies. James' agenda appears calculated to promote abortion, even of *wanted* babies.

### Heartbeat's APR Education

70. As part of its programs preparing model resources, Heartbeat has prepared an APR Healthcare Professional Kit which includes the APR protocol, model consent forms, listing of scientific studies, and endorsements by professional organizations. This kit is made available for free to any medical professional (whether affiliated with a pregnancy center or not) who joins the APR Network.

71. In addition, Heartbeat provides continuing education courses for nurses regarding

18

Abortion Pill Reversal. Heartbeat is a registered continuing education provider with the State of California (because it is industry practice for nursing continuing education providers to become registered by California). Most states accept California's continuing education credits for nurses.

### Heartbeat's Promotion of APR Is Not Misleading

72.   As noted, James has alleged in the NOIs that Plaintiffs have made "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol." There is no evidence for this claim.

73.   In fact, compared to the many studies supportive of APR, there is only one study critical of its efficacy. That study was funded by Danco Laboratories, the principal manufacturer of mifepristone. *See* Mitchell D. Creinin, et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135(1) Obstet. Gynecol. 158 (2020). All other criticisms of Abortion Pill Reversal come in the form of "policy statements" or articles merely seeking to undermine the statistical analyses or methods of the APR-supportive studies cited above. Those criticisms universally ignore the ethical concerns with giving a placebo to a woman who wishes to save her pregnancy, and the unremarkable and commonsensical biochemistry underlying Abortion Pill Reversal.

74.   The Danco/Creinin study was small, involving only twelve pregnant women, who were scheduled for abortions. All twelve took mifepristone, and then half received progesterone while half received a placebo. Two women, one from the progesterone group and one from the placebo group, left the study. Of the five women who took progesterone, four (80%) were recorded to have healthy pregnancies at the conclusion of the study period, with one who went to the hospital with "severe bleeding" that required no medical intervention. *Id.* at 160. Of the five women in the

placebo group, two women (40%) were recorded to have healthy pregnancies at the conclusion of

the study period, and *two* of the other women experienced severe bleeding, with one of the two

requiring a blood transfusion. *Id.* at 160-61.

75.    Thus, the Danco/Creinin study, if its size allows for any conclusions, stands for the

propositions that (1) administering progesterone after mifepristone (i.e., APR) gives a pregnant

woman a better chance of a healthy pregnancy over doing nothing (sometimes euphemistically

called "watchful waiting") and (2) administering progesterone after mifepristone (i.e., APR) gives

a pregnant woman a better chance of avoiding severe bleeding over doing nothing. Any enhanced

risk to a woman in this situation who wants to continue her pregnancy would arise from *not*

receiving APR treatment. This is borne out by the FDA's required warning labels. *Mifepristone*

*can cause severe bleeding.* Progesterone does not.[6]

76.    In sum, nothing Heartbeat states to the public regarding APR is false or misleading

in any way.

77.    Defendant James has no authority to pronounce on the scientific merits of APR or to

demand conformity to her view of what Heartbeat should say about it.

78.    Heartbeat's statements regarding APR are protected speech under the First

Amendment and Art. 1, § 8 of the Constitution of the State of New York.

79.    Moreover, Heartbeat's statements regarding APR are in conformity with the

advertising requirements of the Federal Trade Commission (FTC), which would be a complete

defense to Defendant James' unsupported claim under both General Business Law § 349 and

General Business Law 350-d, both of which are invoked in James' NOIs.

---

[6] Indeed, the recent scoping review performed by DeBeasi, discussed above, examined all the
literature on APR safety, including Dr. Creinin's study, and found *no evidence* that APR is
unsafe. See Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert*
*Medication Abortion*, 90(4) Linacr. Q. 395, at .8 (2023).

20

## COMPASSCARE

80.    CompassCare is one of the many PRC members of Heartbeat's APR Network.

81.    CompassCare is a tax-exempt 501(c)(3) nonprofit organization that has served the

people of New York State for more than forty years. *See* CompassCare Form 990 (2022).

82.    CompassCare's pro-life mission is explicitly and unreservedly Christian. As

its website declares:

> To be a Christian means that we believe every human being is equally valuable and
> must be treated with dignity and respect. To be a Christian means that we believe
> humans are made in the image of God and uniquely reflect that glorious image *at every
> stage of maturity from conception through natural death,* and beyond to the
> resurrection and life-everlasting. To be a Christian means we understand that humanity
> is fallen from grace into sin, and that we all have sinned.
>
> Further it means that Jesus Christ came to restore us to the fullness of our purpose to
> reflect God in all His glory. To be a Christian means that now we are joined with Christ
> in His Messianic mission, laboring with Him to help restore other lost souls, which we
> all once were before we were born anew. To be a Christian means that we now
> trust <u>all</u> to the sovereign power of God, who orchestrates sin-stained circumstances in
> such a way as to lead others to union with Him through Jesus Christ, including
> circumstances like unplanned pregnancy.
>
> So what makes CompassCare so effective? Christ-centered services. Christ died for us
> as an act of sacrificial love, and so we walk in that same love toward sinners, pointing
> all the while to the animating force driving the work, Jesus Christ Himself.
> *CompassCare is not just a Pregnancy Resource Center; it is a uniquely Christian one.*

*See* CompassCare, *Why is Christianity Key to CompassCare.*[7],

83.    CompassCare fields a team of 27 medical professionals—26 of them women—to

offer caring, confidential, and free services to pregnant women and their families across four

physical locations in New York State and via telehealth services. *See* CompassCare, *Our Team*.[8]

---

[7] https://www.compasscarecommunity.com/2016/08/why-is-christianity-key-to-compasscare/.
[8] https://www.compasscare.info/who-we-are/our-team/.

84.    CompassCare staff are specially trained to meet women's health needs in connection with unplanned pregnancies and sexual health. *Id.*

85.    CompassCare's facilities offer state-of-the-art exam rooms, STD labs that test for eleven diseases, and ultrasound equipment. *See* CompassCare, *State-of-the-Art Facilities*, https://www.compasscare.info/who-we-are/state-of-the-art-facility/.

86.    CompassCare offers same-day and next-day appointments for pregnancy testing and ultrasounds to assess pregnancy viability and gestational age. CompassCare, *Medical Services*, https://www.compasscare.info/medical-services/.

87.    If a pregnancy test and an ultrasound indicate a given patient is pregnant, CompassCare medical professionals review with her all her pregnancy options, including abortion and side effects identified in the relevant scientific literature. *See* CompassCare, *Pre-Termination Evaluation*, https://www.compasscare.info/medical-services/pre-termination-evaluation/.

88.    All CompassCare's services are offered completely free, and the organization is structured so as not to profit from any pregnancy decision a client makes. *See* CompassCare, *Who We Are: CompassCare or Planned Parenthood?*, https://www.compasscare.info/who-we-are/compasscare-or-planned-parenthood.

89.    More than 19 out of every 20 CompassCare patients give it the highest possible rating in anonymous surveys given after their visit. *See* CompassCare, *Who We Are: Patient Reviews*, https://www.compasscare.info/who-we-are/patient-reviews/.

90.    Only 1 in 200 patients gives CompassCare a below-average rating in response to those anonymous surveys. *See id.*

91.    The Buffalo location of CompassCare was firebombed in 2022 by the radical pro-abortion group Jane's Revenge, causing more than a half million dollars in damage. *See* Poppy

Noor, *Pro-Choice Militants Are Targeting "Pregnancy Help Centers" Across US*, The Guardian

(June 11, 2022).

92.    Undeterred by the attack, CompassCare continues to provide empathetic, non-

judgmental, scientifically sound, free community health care services and information to hundreds

of New York State women a year.

### CompassCare's Promotion of APR Is Not Misleading

93.    As part of its Christian mission, and as a member of Heartbeat's APR Network,

CompassCare's trained medical professionals offer women who seek to continue their pregnancies

after mifepristone ingestion the option of APR, to save their unborn children.

94.    Since 2015, CompassCare has provided APR to 66 patients. Of those, CompassCare was

unable to confirm the results of 19 APR patients. Of the 47 APR patients whose results are known,

42 continued with healthy pregnancies, while 5 were unsuccessful—an 89% success rate.[9]

95.    As noted respecting Heartbeat, Defendant James has alleged in her NOI issued to

CompassCare that CompassCare has made "repeated and persistent misleading statements and

omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not

limited to, statements and omissions relating to the safety and efficacy of the APR protocol." There

is no evidence for this false claim.

96.    Nothing CompassCare states regarding APR is in any way misleading or deceptive.

On the contrary, its website summary of the procedure is entirely consistent with the valid medical

science discussed above:

**Can the Abortion Pill Process Be Reversed?**
**Yes, it is *possible* to reverse a medical abortion.**

---

[9] And even if one assumes that every single unknown APR patient was unsuccessful in
continuing with a healthy pregnancy, that would still yield at minimum a success rate of 64% for
APR at CompassCare.

FILED: MONROE COUNTY CLERK 04/30/2024 04:54 PM
NYSCEF DOC. NO. 2

INDEX NO. E2024007242
RECEIVED NYSCEF: 04/30/2024

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 111 of 304
Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 26 of 67

If administered within 72 hours of taking the first pill (Mifepristone), pregnancy-sustaining progesterone therapy can help your body reverse the effects of a medical abortion.

Medical abortions are carried out using a regimen of two different drugs — mifepristone and misoprostol. The first pill, mifepristone, acts as progesterone blocker, intercepting your body's natural progesterone. Since progesterone is a necessary hormone for sustaining pregnancy, introducing a progesterone blocker makes the uterus inhospitable to pregnancy and the baby stops developing. The second pill in the regimen, misoprostol, is taken 24-48 hours after taking mifepristone. This drug causes the uterus to contract and the cervix to soften and dilate, pushing the baby out.

If progesterone therapy is administered within 72 hours of taking mifepristone and before taking misoprostol, it is *possible* to reverse the effects of the abortion.

Progesterone therapy floods the uterus with progesterone. By increasing the amount of progesterone present after taking mifepristone (the progesterone blocker), the baby *can* still receive pregnancy-sustaining progesterone and has *a greater chance* of continuing to develop.

**If you have taken mifepristone in the last 72 hours, have NOT taken misoprostol and want to continue with a healthy pregnancy, *it may be possible* to reverse the effects of a medical abortion.** Call CompassCare immediately. We will perform an ultrasound to confirm that your baby is alive. If your baby is viable, your medical abortion reversal will involve natural progesterone treatments for about two and a half weeks.

*See* https://www.compasscare.info/medical-services/abortion-pill-reversal/ (italics added).

97.     CompassCare's statement on APR links to the medical advice of APR developer George Delgado, M.D., FAAFP, whose advice reflects accepted medical practice regarding administration of APR and accurately describes the related biochemical process. *See* https://www.compasscare.info/wp-content/uploads/2022/08/The-Reversal-of-Mifepristone-with-Progesterone.pdf.

98.     CompassCare's website does not make, refer to, or link to claims about the safety of the APR protocol, even though, as shown above, APR is not known to have any major side effects as it simply involves administration of progesterone, a Class 2 drug in the same category as

24

Tylenol. *See* CompassCare, Abortion Pill Reversal: We Inform, You Decide, https://www.compasscare.info/medical-services/abortion-pill-reversal/.

99.   CompassCare's YouTube video on the APR protocol likewise does not make, refer to, or provide a link to any claims about the safety of the APR protocol, as to which there is no evidence of unsafety in any event. *See* CompassCare, Abortion Pill Reversal Information, https://www.youtube.com/watch?v=rPQNUxx0UD4.

100.   CompassCare's Twitter account does not make, refer to, or provide a link to any statement about safety of the APR protocol, *See* CompassCare, https://twitter.com /compasscare?ref_sr c=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor.

101.   CompassCare's Facebook account does not make, refer to, or provide a link to any statement about the safety of the APR protocol. *See* CompassCare Community, https://www.facebook.com/CompassCareCommunity.

102.   CompassCare's Instagram account does not make, refer to, or provide a link to any statement about the safety of the APR protocol. *See* CompassCare1980, https://www.instagram.com /compasscare1980/.

103.   CompassCare's LinkedIn account does not make, refer to, or provide a link to any statement about the safety of the APR protocol. *See* CompassCare Pregnancy Services, https://www.linkedin.com/company/compasscare-pregnancy-services/.

104.   CompassCare does not make any misleading statements about the efficacy of APR using any of the abovementioned or other modes of communication, noting only that APR "can" "possibly" help to save a pregnancy. Those statements are entirely truthful and indeed far more conservative than suggested by the evidence cited above, which demonstrates a very high success rate, including a success rate of nearly 90% at CompassCare itself for known APR results.

25

105.  Defendant James has no authority to pronounce on the scientific merits of APR or to demand conformity to her view of what CompassCare should say about it.

106.  CompassCare's statements regarding APR are protected speech under the First Amendment and Art. 1, §8 of the Constitution of the State of New York.

107.  Moreover, CompassCare's statements regarding APR are in conformity with the advertising requirements of the Federal Trade Commission (FTC), which would be a complete defense to Defendant James' unsupported claim under both General Business Law § 349 and General Business Law § 350-d, both of which are invoked in James' NOIs even though they are not applicable to CompassCare.

## THE PREGNANCY HELP COLLECTIVE PLAINTIFFS

108.  Plaintiffs ADIRONDACK PREGNANCY CENTER d/b/a ASCENTCARE, THE BRIDGE TO LIFE INC. d/b/a BRIDGE WOMEN'S SUPPORT CENTER, PREGNANCY CENTER OF PENN YAN, INC. d/b/a CARE NET PENN YAN, ALTERNATIVE CRISIS PREGNANCY CENTER, INC. d/b/a CARE NET PREGNANCY CENTER OF THE HUDSON VALLEY, STUDY THE OPTIONS PLEASE INC. d/b/a CARE NET PREGNANCY CENTER OF WAYNE COUNTY, CARING CHOICES PREGNANCY HELP COMMUNITY INC., 1ST WAY LIFE CENTER INC., NEW HOPE FAMILY SERVICES, INC., THE CARE CENTER d/b/a SOUNDVIEW PREGNANCY SERVICES AND SOUNDVIEW, CARE NET PREGNANCY CENTER OF CENTRAL NEW YORK d/b/a WILLOW NETWORK are pro-life pregnancy help centers operating throughout the State of New York, each of which has been served with one of Defendant James' "Notices of Intention to Sue." These Plaintiffs are referred to collectively here as the Pregnancy Help Collective informally for the sake of efficiency of pleading, given the

commonality of facts and issues among them, although there is no formal organizational relationship among them.

109. The following Plaintiffs in the Pregnancy Help Collective have faith-based Christian missions based on their religious conviction regarding the sanctity of life and the evil of legalized abortion, including chemical abortion: CARING CHOICES PREGNANCY HELP COMMUNITY INC., STUDY THE OPTIONS PLEASE INC. d/b/a CARE NET PREGNANCY CENTER OF WAYNE COUNTY, PREGNANCY CENTER OF PENN YAN, INC. d/b/a CARE NET PENN YAN, ADIRONDACK PREGNANCY CENTER d/b/a ASCENTCARE, ALTERNATIVE CRISIS PREGNANCY CENTER, INC. d/b/a CARE NET PREGNANCY CENTER OF THE HUDSON VALLEY, 1ST WAY LIFE CENTER INC., NEW HOPE FAMILY SERVICES, INC., THE CARE CENTER d/b/a SOUNDVIEW PREGNANCY SERVICES AND SOUNDVIEW, CARE NET PREGNANCY CENTER OF CENTRAL NEW YORK d/b/a WILLOW NETWORK.

110. The following Plaintiffs in the Pregnancy Help Collective provide APR via licensed medical professionals fully authorized to administer the APR protocol: ADIRONDACK PREGNANCY CENTER d/b/a ASCENTCARE.

111. The following Plaintiffs in the Pregnancy Help Collective do not provide APR but refer for it to licensed medical professionals: CARE NET PREGNANCY CENTER OF CENTRAL NEW YORK d/b/a WILLOW NETWORK, CARING CHOICES PREGNANCY HELP COMMUNITY INC., THE CARE CENTER d/b/a SOUNDVIEW PREGNANCY SERVICES AND SOUNDVIEW, and NEW HOPE FAMILY SERVICES, INC.

112. The following Plaintiffs in the Pregnancy Help Collective neither provide nor refer for APR but publish information about APR and/or the APR Network: THE BRIDGE TO LIFE INC. d/b/a BRIDGE WOMEN'S SUPPORT CENTER, PREGNANCY CENTER OF PENN YAN,

FILED: MONROE COUNTY CLERK 04/30/2024 04:54 PM INDEX NO. E2024007242
NYSCEF DOC. NO. 2                                                RECEIVED NYSCEF: 04/30/2024

Case 1.24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 115 of 304
Case 1.24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 30 of 67

INC. d/b/a CARE NET PENN YAN, ALTERNATIVE CRISIS PREGNANCY CENTER, INC. d/b/a CARE NET PREGNANCY CENTER OF THE HUDSON VALLEY, STUDY THE OPTIONS PLEASE INC. d/b/a CARE NET PREGNANCY CENTER OF WAYNE COUNTY, 1ST WAY LIFE CENTER INC.

113. Each member of the Pregnancy Help Collective is an association of persons who share pro-life views in general, including the view that APR treatments should be considered by any woman who wishes to prevent the death of her unborn child by reversing the effects of mifepristone, who collaborate to enhance their capacity to reach women interested in this option.

114. The Plaintiffs in the Pregnancy Help Collective agree with the assessment of the efficacy of APR and the dangers of chemical abortion as pleaded in ¶¶ 1-27 and 43-58 above.

115. The Plaintiffs in the Pregnancy Help Collective have not published any false or misleading statements or material omissions regarding APR, but rather any statements they have published are entirely consistent with those published by Plaintiffs Heartbeat and CompassCare as set forth in ¶¶ 72-79 and 93-107 above.

116. Despite the lack of any evidence of fraud, misrepresentation, or other law violation by any of the Plaintiffs in the Pregnancy Help Collective, they were all issued one of Defendant James' identically worded, boilerplate NOIs on and after April 24, 2024.

117. All the organizations in the Pregnancy Help Collective are thus facing the imminent threat of irreparable harm from Defendant James' *in terrorem* litigation seeking to punish their protected speech, expressive activity and expressive association, and her destructive intrusion into their private affairs and the intimate medical decisions of expectant mothers with urgent needs in matters of life and death for their unborn children.

## DEFENDANT JAMES' RETALIATORY ANIMUS

118. As Attorney General of the State of New York, Defendant James has brazenly tethered her office to the advancement of her militantly pro-abortion politics and corresponding official harassment of pro-life pregnancy help organizations such as Heartbeat, CompassCare and the Plaintiffs herein described as the Pregnancy Help Collective.

119. In May of 2022, at an abortion-related political rally, James revealed that, after she was elected to the City Council of New York City, she "walked proudly into Planned Parenthood" for an abortion, "and I make no apologies to anyone." *See* "'*No Apologies:' NY AG Letitia James Tells Protesters 'I Chose to Have an Abortion'*", NBC News (May 3, 2022), https://www.nbcnewyork.com/news/local/ny-attorney-general-letitia-james-i-chose-to-have-an-abortion-years-ago/3673421/.

120. In 2022 James announced and stumped for a bill that would provide state funding for abortion providers, at New York taxpayer expense, to "support the recruitment and retention of staff, patient navigators, staff training, the establishment of new or renovation of existing health centers, investments in technology to facilitate care, security enhancement, and other operational needs." N.Y.S. Bill No. 10148-A (May 4, 2022).

121. The bill James introduced also would have provided unlimited state funding at New York taxpayer expense for abortions and abortion-related travel and lodging for out-of-state residents. *See* Erin Durkin et al., *Tish James Pitches Abortion Fund*, Politico (May 10, 2022).

122. James pushed for the creation of the taxpayer-funded abortion fund for out-of-state residents to abet those residents in avoiding the valid and constitutional abortion laws of the states where they reside. *See* Grace Ashford, *New York Lawmakers Push for Abortion Fund to Establish 'Safe Harbor'*, N.Y. Times (May 9, 2022).

29

123.  James has publicly advocated for an amendment to enshrine abortion in the New York Constitution. *See* Deanna Paul, *New York Attorney General Pushes for State Abortion Fund,* Wall St. J. (May 9, 2022).

124.  James has engaged in lawfare against at least eight other states whose voters and elected officials have chosen pro-life policies she dislikes. *See* NY AG James, Twitter.com (May 3, 2022) (bragging about the interference); *id.* (Aug. 16, 2022) (adding eighth state).

125.  James has led an effort by a coalition of state attorneys general to urge the U.S. Supreme Court to reverse a Texas court's ruling restricting use of the abortion drug mifepristone to its originally authorized, on-label use.

126.  James used her government Twitter account to deceive the public and disseminate misinformation about pregnancy help organizations by making the false and/or misleading blanket allegation that they "don't offer health care services." *Id.* (May 3, 2022), https://perma.cc/P6VE-3WQK.

127.  James used her government Twitter account to heavily pressure pharmacy store chains Walgreens and CVS to promote chemical abortion by providing the two drugs involved in chemical abortion to their customers. *Id.* (Mar. 9, 2023).

128.  James pressured Google to alter the Google Map results it displays so that Internet users are directed away from pro-life pregnancy resource centers and toward abortion clinics instead. *Id.* (Aug. 25, 2022).

129. On April 22, James blitzed not only Heartbeat and CompassCare but PRCs throughout New York, including the Plaintiff organizations of the Pregnancy Help Collective, with Notices of Intention to Sue them five business days later under New York Executive Law § 63(12) and New York General Business Law art. 22-A, §§ 349, 350.

130.  James has used her official New York Attorney General Twitter account to post at least 16 times that New Yorkers should adhere to her view of "science" and fight against attempts to undermine it, and to demean politicians and judges she personally believes ignore her notion of "science" when it conflicts with her policy views. NY AG James, https://perma.cc/P6VE-3WQK.

131.  As shown above, there is no evidence to support James' pretextual allegation in her NOIs James that Heartbeat, CompassCare, and the Plaintiff pregnancy help organizations in the Pregnancy Help Collective, have made "repeated and persistent misleading statement and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol."

132.  In furtherance of her pro-abortion political views, James now imminently threatens Heartbeat, Compass Care, and the Plaintiffs in the Pregnancy Help Collective, as well as other similarly situated pro-life organizations with *in terrorem* lawsuits for "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper."

133.  James is motivated by retaliatory animus against the pro-life speech and expressive association of Heartbeat, CompassCare, the Plaintiffs in the Pregnancy Help Collective, and similarly situated pro-life pregnancy help centers. James threatens imminently to impose retaliatory censorship and other restrictions on Plaintiffs' protected speech, expressive conduct, and association.

## DEFENDANT JAMES' VIEWPOINT DISCRIMINATION

134.  James herself has published false and/or misleading information about APR. A reproductive healthcare brochure her office publishes includes a special call-out section just on APR, claiming that APR is "unproven" and that "'abortion pill reversal' has "not been accepted by

31

**685**

any major medical association" or "demonstrated safe or effective through clinical trials." Letitia James, *How New York Protects Your Right to Reproductive Health Care*, https://ag.ny.gov/publications/reproductive-health-care. That brochure also refers to PRCs as "fake" and contends they "inaccurately claim medication abortion can be 'reversed.'"

135. While James threatens all the Plaintiffs herein, and potentially still other pro-life pregnancy help organizations, with *in terrorem* litigation, despite lacking any evidence of fraud, deception, or injury to anyone, James has taken no action regarding the demonstrably false and misleading statements of providers of chemical abortion as described above—a risky procedure that uses two powerful drugs to end a pregnancy in its early stages. *See* Cleveland Clinic, Medical Abortion (2024).

136. For example, for at least the past six years Planned Parenthood of Greater New York (PPNY) has made false and misleading statements about both abortion pill reversal under APR and abortion pill administration under the chemical abortion regimen.

137. As to APR, PPNY falsely claimed on its website that APR has never "been tested for safety, effectiveness, or the likelihood of side effects." Emily, *Ask the Experts: Can the Abortion Pill Be Reversed after You Have Taken It?*, (Sept. 14, 2017), https://perma.cc/6Z2D-5EJD.

138. Much more than just a "repeated and persistent misleading statement" about the "safety and efficacy of the APR protocol," of which Plaintiffs stand accused in the NOIs, PPNY's claim is an objective falsehood that deceives visitors to the Planned Parenthood website.

139. In addition to lying about the pro-life service of APR, PPNY misleads vulnerable women about the serious risks involved in the chemical abortion regimen, consisting of two powerful drugs: first mifepristone, which blocks progesterone, literally starving the unborn child, and then off-label misoprostol which forcibly expels the child from the uterus. For example, PPNY

FILED: MONROE COUNTY CLERK 04/30/2024 04:54 PM
NYSCEF DOC. NO. 2

INDEX NO. E2024007242
RECEIVED NYSCEF: 04/30/2024

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 120 of 304
Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 35 of 67

has for years falsely advised vulnerable women, with no mention of risks, that "Medication abortion - also called the abortion pill - is a *safe and effective* way to end an early pregnancy." *See* "The Abortion Pill", https://www.plannedparenthood.org/planned-parenthood-greater-new-york/campaigns/medication-abortion (emphasis added).

140.   Further misleading women, PPNY, which charges for administration of the second drug in the chemical abortion regimen, misoprostol, states that "the Abortion Pill" merely "causes cramping and bleeding that can last several hours or more. You can be at home, or wherever is comfortable for you. Plan on taking it easy for the day." *See* "How does the abortion pill work?", https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/how-does-the-abortion-pill-work.

141.   Even more egregiously, in answer to the specific question: "What can I expect after I take the abortion pill?", PPNY—again avoiding any mention of potential risks or serious side effects, states on its website that "You may feel tired or crampy for a day or so, and you'll have bleeding and spotting for awhile [sic]. Most people go back to normal activities the day after a medication abortion." See "What can I expect after I take the abortion pill?", https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/what-can-i-expect-after-i-take-the-abortion-pill.

142.   PPNY also fails to disclose that the Federal Drug Administration estimates that more than 4,000 women who completed the two-drug medication regimen have suffered serious adverse medical events, including hemorrhage, septic shock, ruptured ectopic pregnancies, and at least 28 deaths. Susan Jaffe, *Drug Developers Caution Against US Mifepristone Ban*, 401 The Lancet 1325-26 (2023).

NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 04/30/2024

143.  Also not disclosed is the far greater risk of emergency hospitalization due to chemical versus surgical abortion. *See* Maarit Niinimaki, et al., *Immediate Complications after Medical Compared with Surgical Termination of Pregnancy*, 114 Obstet. Gynecol. 795, 795 (2009), (finding that "overall incidence of adverse events was fourfold higher in the medical compared with surgical abortion cohort (20.0% compared with 5.6%, P<.001)").

144.  In contrast, as shown above, APR is entirely safe with no such history of adverse outcomes. Over seven decades, medical professionals have used bioidentical progesterone to support healthy pregnancies and prevent miscarriage when a pregnant woman naturally produces too little of the hormone for a pregnancy to continue. *See* Gian Carlo De Renzo et al., *Progesterone: History, Facts, and Artifacts*, 69 Best Pract. & Res. Clinical Obstetrics & Gynecology 78 (2020).

145.  In 1998, the FDA gave the administration of bioidentical progesterone the agency's formal approval to support healthy pregnancies. *See* "Drug Approval Package," Prometrium (Progesterone) Capsules, Application No. 020843, U.S. Food & Drug Administration (approved Dec. 26, 1998).

146.  The FDA based that approval, in part, on a pharmacology/toxicology review that found that the bioidentical progesterone produced the same pharmacologic responses as naturally occurring progesterone and is thus not at all harmful. *See* FDA, Center for Drug Evaluation and Research, Application No. NDA 2-843, at 4 (Feb. 25, 1998).

147.  Today, bioidentical progesterone treatment is commonly used worldwide to reduce the risk miscarriage. *See* Line Rode et al., *Systematic Review of Progesterone for the Prevention of Preterm Birth in Singleton Pregnancies*, 88 Acta Obstetricia et Gynecologica Scandinavica 1180, 1180-89 (2009).

148.  Bioidentical progesterone treatment also is used to help prevent uninduced abortion that would occur from IVF patients' bodies rejecting embryos trying to implant. *See* Am. Society for Reproductive Medicine, *Fact Sheet: Progesterone Supplementation During IVF* (2016).

149. Multiple peer-reviewed medical studies have found that this same kind of progesterone supplementation treatment discussed above can save about two-thirds of unborn children from death if given within three days of when mifepristone was administered. *See e.g.*, George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues in Law & Medicine 21, 21-31 (Spring 2018).

150.  The APR protocol is a legitimate reproductive health procedure, fully legal in New York, the advocacy and promotion of which are protected by the First Amendment as a matter of public concern in which government has no right to interfere by attempts to impose, through lawfare or otherwise, Defendant James' preferred perspective in favor of abortion-on-demand or her view of what constitutes valid "medical science."

151.  Yet, despite the medical facts showing the serious risks of chemical abortion versus the safety of progesterone therapy to reverse the effects of chemical abortion, including the off-label use of misoprostol, Defendant James has not noticed a proposed lawsuit against Planned Parenthood of Greater New York for "persistent misleading statements and omissions … relating to the safety and efficacy" of pregnancy-destroying chemicals.

152.  Rather, because APR *saves* lives in instead of ending them in the womb, James now targets Plaintiffs and all similarly situated pro-life pregnancy help organizations in New York State with *in terrorem* litigation with no evidence of harm to anyone from the administration of a pregnancy-protecting hormone approved by the FDA for that very purpose.

35

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 38 of 67

153. Defendant James thus reveals her intent imminently to impose viewpoint-discriminatory censorship and other restrictions on Plaintiffs' protected speech and expressive conduct and association.

## FIRST CAUSE OF ACTION

(Violation of Art. 1, § 8 of the Constitution of the State of New York - Freedom of Speech and Expressive Association)

154. The preceding allegations are incorporated here by reference.

155. Art. 1, § 8 of the Constitution of the State of New York provides that "Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

156. James has no evidence that any Plaintiff has made any "misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol" or any evidence that any Plaintiff has made misleading "statements and omissions relating to the safety and efficacy of the APR protocol."

157. James' view of what constitutes a "misleading" statement or omission regarding APR is nothing but her opinion, and James has no competence or authority to dictate what constitutes valid medical opinion and practice regarding APR.

158. James' evident attempt to impose an official narrative against APR flatly contradicts the teaching of the United States Supreme Court in *Nat'l Inst. of Fam. & Life Advocates (NIFLA) v. Becerra,* 585 U.S. 755 (2018), which holds that the state has no competence or authority under the First Amendment to impose on private parties, in the name of "science", the government's side of a First Amendment-protected medical debate on a matter of public importance. James' actions also run afoul of the Second Circuit's teaching in *Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d

36

233, 239 (2d Cir. 2014), which stands for the proposition that government may not force pro-life pregnancy help organizations like the Plaintiffs here to parrot government propaganda favoring abortion (including chemical abortion) and disfavoring APR, nor force them to declare in the manner the government demands that they oppose abortion and will not provide or refer for abortion (including chemical abortion)

159. Defendant James' imminent threat of a baseless and vastly intrusive suit against Plaintiffs for "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper" is intended to harass and intimidate Plaintiffs in retaliation for their protected speech as pro-life pregnancy help organizations, whose viewpoint James unabashedly and publicly detests.

160. This "lawfare" against what James falsely deems "fake clinics" is intended to chill, and does chill, Plaintiffs' speech and expressive conduct as faith-based pro-life organizations devoted to promoting the sanctity of life in the womb, including by preservation through abortion pill reversal for women who exercise their right to change their minds about abortion.

161. James' threatened lawfare involves unconstitutional and overbroad misapplication of business laws to religiously motivated non-profit organizations engaging in protected speech and expressive activity that James disfavors and seeks to suppress.

162. Further, James' threat to intrude into the affairs of Plaintiffs as pro-life organizations, if carried out, will chill and censor Plaintiffs' protected speech regarding alternatives to abortion and will also chill and interfere with Plaintiffs' right of expressive association under the free speech clause of the New York Constitution.

163. In the absence of injunctive relief, Plaintiffs will imminently suffer irreparable harm from James' viewpoint-discriminatory, unwarranted and retaliatory intrusion into their affairs, and

FILED: MONROE COUNTY CLERK 04/30/2024 04:54 PM

NYSCEF DOC. NO. 2

INDEX NO. E2024007242

RECEIVED NYSCEF: 04/30/2024

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 125 of 304

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 40 of 67

her threatened censorship and suppression of their speech and interference with their expressive association, via "injunctive relief, restitution, damages, civil penalties, auditing and compliance review."

164.  In the absence of injunctive relief, Plaintiffs will imminently suffer irreparable harm from James' threatened violation of their right to the freedom of speech and expressive association.

165.  Plaintiffs are thus entitled to a declaratory judgment that James' Notices of Intention to Sue and the threatened litigation are violative of Art. 1. § 8 of the New York Constitution and appropriate temporary, preliminary and final injunctive relief to put a stop to James' unconstitutional lawfare, including by the immediate withdrawal of her unlawful Notices of Intention.

## SECOND CAUSE OF ACTION
(Violation of Art. 1, § 3 of the Constitution of the State of New York - Free Exercise and Enjoyment of Religion)

166.  The preceding allegations are incorporated here by reference.

167.  Art. 1, Sec. 3 of the Constitution of the State of New York provides that "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind."

168.  Defendant James' imminent threat of a baseless and vastly intrusive suit against Plaintiffs for "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper" is intended to harass and intimidate Plaintiffs in order to inhibit their Christian pro-life mission, which is motivated by the sincere religious conviction that all human life is made in the image and likeness of God, including life in the womb, is sacred and must be protected.

169. James' lawfare is intended to chill, and does chill and will chill, Plaintiffs' free exercise of religion as faith-based organizations to which James, unlawfully misapplying business laws to the Plaintiff organizations, is implacably posed in pursuit of a personal political agenda in favor of abortion on demand.

170. James' threat to intrude into the affairs of Plaintiffs as faith-based organizations by "injunctive relief, restitution, damages, civil penalties, auditing and compliance review," if carried out, will chill, suppress and directly interfere with Plaintiffs' free exercise of religion regarding their religious mission of speaking about, providing, or referring for life-giving alternatives to abortion.

171. In the absence of injunctive relief, Plaintiffs will imminently suffer irreparable harm from James' threatened violation of their right to the free exercise of religion.

172. Plaintiffs are thus entitled to a declaratory judgment that James' Notices of Intention to Sue and the threatened litigation are violative of Art. 1. § 3 of the New York Constitution and appropriate temporary, preliminary and final injunctive relief to put a stop to James' unconstitutional lawfare, including by the immediate withdrawal of her unlawful Notices of Intention.

### THIRD CAUSE OF ACTION
(Violation of Art. 1, § 11 of the New York Constitution –
Equal Protection of the Laws)

173. The preceding allegations are incorporated here.

174. Art. 1, § 11 of the New York Constitution provides that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof."

175. As shown by the facts pleaded above, Defendant James has targeted Plaintiffs and other pro-life pregnancy help organizations for harassment, intimidation and intrusion into their

FILED: MONROE COUNTY CLERK 04/30/2024 04:54 PM INDEX NO. E2024007242
NYSCEF DOC. NO. 2                                                    RECEIVED NYSCEF: 04/30/2024

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 127 of 304
Case 1.24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 42 of 67

affairs by lawfare on the sole pretext, supported by no evidence of fraud or harm to anyone, that Plaintiffs have made "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol."

176.     As shown by the allegations above, at the same time James targets Plaintiffs and other pro-life pregnancy help organizations for official harassment based on APR, , James ignores the "repeated and persistent misleading statements and omissions in the advertising" of the chemical abortion regimen by pro-abortion organizations, including Planned Parenthood of Greater New York, which organizations hide the serious risks of chemical abortion, including severe hemorrhage, septic shock, ruptured ectopic pregnancies, and death—none of which have ever are known to have happened, or likely even *could* happen, from APR.

177.     James thus selectively targets pro-life, nonprofit pregnancy help organizations for official harassment and punishment based on non-existent misrepresentations and omissions, while taking no action against clear misrepresentations and omissions by profit-making, pro-abortion businesses, similarly situated in the same field of pregnancy and reproductive health, and with respect to the government's stated interest in protecting consumers from risk of harm, targeting Plaintiffs on the basis of the impermissible considerations, i.e., their religious missions and the exercise of their constitutional rights to freedom of speech, expressive conduct and association, and the free exercise of religion. *See Bower Assocs. v. Town of Pleasant Valley,* 2 N.Y.3d 617 (2004).

178.  In the absence of injunctive relief, Plaintiffs will imminently suffer irreparable harm from James' viewpoint-discriminatory, arbitrary, and selective enforcement and unconstitutional misapplication of the laws.

40

179.  Plaintiffs are thus entitled to a declaratory judgment that James' Notices of Intention to Sue and the threatened litigation are violative of Art. 1, § 11 of the New York Constitution Amendment, and appropriate temporary, preliminary, and final injunctive relief to put a stop to James' unconstitutional lawfare, including by the immediate withdrawal of her unlawful Notices of Intention.

### FOURTH CAUSE OF ACTION
(Violation of Civil Rights Law § 70-b –
Interference with Protected Rights)

180.  The preceding allegations are incorporated here.

181.  NY Civil Rights Law, §70-b prohibits lawsuits by "any person or entity" that interferes with or attempts to interfere with protected rights under the Constitution or laws of the State of New York by means of allegations, "whether civil or criminal, [that] involve accessing, providing, facilitating, or attempting to access, provide… medical, counseling or referral services relating to pregnancy."

182.  Defendant James' baseless, retaliatory and vindictive "Notices of Intention to Sue" imminently threaten a violation of Plaintiffs' protected rights to provide pro-life medical, counseling or referral services relating to pregnancy without official harassment.

183.  Plaintiffs are entitled to a declaratory judgment that James' imminently threatened "lawfare" is violative of their protected rights under § 70-b, as well as an injunction to prevent the threatened litigation, absent which Plaintiffs will suffer irreparable harms from violation of their protected rights.

184.  Should James commence suit despite the filing of this action, Plaintiffs are further entitled to an award of compensatory damages, costs and attorneys' fees, including expert witness fees, as well as triple damages under §70(b)(3)(a) and (b) on the ground that James' the action

41

"was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the exercise of rights…"

### FIFTH CAUSE OF ACTION
(Violation of the First Amendment to the United States Constitution –
Freedom of Speech and Expressive Association)

185.  The preceding allegations are incorporated herein by reference.

186.  For the reasons stated in the previous Causes of Action, Defendant James' imminent and retaliatory threat of a baseless and vastly intrusive suit against Plaintiffs for "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper" will, if carried out, infringe Plaintiffs' right to freedom of speech and expressive association under the First Amendment as applied to the States via the Fourteenth Amendment, and is thus redressable under 42 U.S.C. § 1983.

187.  James' actions, which imminently threaten unconstitutional and overbroad misapplication of business laws, have already chilled, and will chill, Plaintiffs' protected pro-life speech and expressive association and, unless enjoined, will result in censorship of that speech and interference with that expressive association, imminently inflicting irreparable harm absent injunctive relief.

188.  In the absence of injunctive relief, Plaintiffs will imminently suffer irreparable harm from James' retaliatory and viewpoint-discriminatory enforcement of the laws in violation of the First Amendment.

189.  Plaintiffs are thus entitled to a declaratory judgment that James' Notices of Intention to Sue and the threatened litigation are violative of the First Amendment, and appropriate temporary, preliminary and final injunctive relief to put a stop to James' unconstitutional lawfare, including by the immediate withdrawal of her unlawful Notices of Intention.

190. Plaintiffs are further entitled to an award of costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

### SIXTH CAUSE OF ACTION

(Violation of the First Amendment to the United States Constitution –
Free Exercise of Religion)

191. The preceding allegations are incorporated here by reference.

192. For the reasons stated in the previous Causes of Action, Defendant James' imminent and retaliatory threat of a baseless and vastly intrusive suit against Plaintiffs for "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper" will, if carried out, infringe Plaintiffs' right to the free exercise of religion under the First Amendment as applied to the States via the Fourteenth Amendment, and is thus redressable under 42 U.S.C. § 1983.

193. James' threatened intrusion into the affairs of Plaintiffs as faith-based organizations will chill, suppress and directly interfere with Plaintiffs' free exercise of religion regarding their religious mission of speaking about, providing, or referring for life-giving alternatives to abortion, imminently inflicting irreparable harm absent injunctive relief.

194. Plaintiffs are thus entitled to a declaratory judgment that James' Notices of Intention to Sue and the threatened litigation are violative of the Free Exercise Clause of the First Amendment, and appropriate temporary, preliminary and final injunctive relief to put a stop to James' unconstitutional lawfare, including by the immediate withdrawal of her unlawful Notices of Intention.

195. Plaintiffs are further entitled to an award of costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

## SEVENTH CAUSE OF ACTION

(Violation of the Fourteenth Amendment to the United States Constitution –
Equal Protection of the Law)

196.  The preceding allegations are incorporated here by reference.

197.  As shown by the facts pleaded above, Defendant James has targeted Plaintiffs and other pro-life pregnancy help organizations for harassment, intimidation and intrusion into their affairs by lawfare on the sole pretext, supported by no evidence of fraud, misrepresentation, material omission, or harm to anyone, that Plaintiffs, who provide free services, have made "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol."

198.    James targets Plaintiffs and other pro-life pregnancy help organizations for official harassment based on APR, while ignoring "repeated and persistent misleading statements and omissions in the advertising" of the chemical abortion regimen by profit-making pro-abortion businesses, including Planned Parenthood of Greater New York, which organizations hide the serious risks of chemical abortion from *paying* customers.

199.    James thus selectively targets pro-life pregnancy help organizations, similarly situated in the same field of pregnancy and reproductive health, on the basis of the impermissible considerations of Plaintiffs' religious convictions concerning the sanctity of life and the evil of abortion, and the exercise of their constitutional rights to freedom of speech, expressive conduct and association, and the free exercise of religion, conduct that is redressable under 42 U.S.C. § 1983.

200.  In the absence of injunctive relief, Plaintiffs will imminently suffer irreparable harm from James' viewpoint-discriminatory, arbitrary and selective enforcement and misapplication of

44

the law in violation of the Equal Protection Clause of the Fourteenth Amendment.

201. Plaintiffs are thus entitled to a declaratory judgment that James' Notices of Intention to Sue and the threatened litigation are violative of the Equal Protection Clause of the Fourteenth Amendment, and appropriate temporary, preliminary and final injunctive relief to put a stop to James' unconstitutional lawfare, including by the immediate withdrawal of her unlawful Notices of Intention.

202. Plaintiffs are further entitled to an award of costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

## EIGHTH CAUSE OF ACTION

(Declaratory Judgment –
Plaintiffs Have Not Violated New York General Business Law Article 22-A, §§ 349, 350)

203. The preceding allegations are incorporated here by reference.

204. James alleges that Plaintiffs have and continue to violate New York General Business Law Article 22-A, §§ 349, 350.

205. However, Sections 349 and 350 are wholly inapplicable to Plaintiffs' protected speech informing the public about APR.

206. Sections 349 and 350 are also wholly inapplicable to Plaintiffs' protected speech referring pregnant women seeking APR to licensed New York healthcare professionals that provide APR.

207. And Sections 349 and 350 are wholly inapplicable to Plaintiffs' provision of APR, provided by New York-licensed healthcare professionals, as a charitable service freely given without any cost to the pregnant women so helped.

208. Plaintiffs have not advertised or in any way engaged in deceptive acts or practices likely to mislead a reasonable consumer—a pregnant woman at serious risk of miscarriage,

45

**699**

having taken mifepristone (whether voluntarily or by force or trick or coercion) but now seeking to have its life-threatening action reversed—acting reasonably under the circumstances.

209.  Pursuant to New York Civil Practice Law & Rules Section 3001, Plaintiffs are thus entitled to a declaratory judgment that they have not and do not violate New York General Business Law Article 22-A, §§ 349, 350.

**WHEREFORE**, Plaintiffs respectfully request the entry of an Order and Judgment, as applicable, for the following relief:

A.    A preliminary injunction barring Defendant James from initiating the litigation threatened in the Notices of Intention to Sue issued to the Plaintiffs or imposing any penalty or disability on any Plaintiff pursuant to New York Executive Law § 63(12) or New York General Business Law Article 22-A, §§ 349, 350.

B.    Final injunctive relief barring Defendant James from initiating the litigation threatened in the Notices of Intention to Sue issued to the Plaintiffs or imposing any penalty or disability on any Plaintiff pursuant to New York Executive Law § 63(12) or New York General Business Law Article 22-A, §§ 349, 350.

C.    A declaratory judgment that James' Notices of Intention to Sue and the threatened litigation are violative of Art. 1. § 8 of the New York Constitution, Art. 1. § 3 of the New York Constitution, Art. 1, § 11 of the New York Constitution, the First Amendment to the United States Constitution and the Equal Protection Clause of the United States Constitution.

D.    Pursuant to New York Civil Practice Law & Rules Section 3001, a declaratory judgment that Plaintiffs have not violated and do not violate New York General Business Law Article 22-A, §§ 349, 350.

E.   Should James commence suit before any of the aforesaid relief can be granted, and despite the filing of this action, an award of compensatory damages, costs and attorneys' fees, including expert witness fees, as well as triple damages for unlawful interference with protected rights in violation of N.Y. Civ. Rights Law § 70-b on the ground that the action "was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the exercise of rights…"

F.   An award of costs and reasonable attorney fees on the federal claims for injunctive relief pursuant to 42 U.S.C. § 1988.

G.   Such other relief as this Court may deem just and proper.

THOMAS MORE SOCIETY

Anjan Ganguly
GANGULY BROTHERS, PLLC
140 Allens Creek Rd, Ste 220
Rochester, NY 14618
585-232-7747
anjan@gangulylaw.com
*Counsel for Plaintiffs*
*CompassCare & Caring Choices*

Christopher A. Ferrara, Senior Counsel
Dennis Ring, Special Counsel
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
docketing@thomasmoresociety.org
*Counsel for Plaintiffs*

Danielle M. White[†]
General Counsel
Heartbeat International, Inc.
8405 Pulsar Place
Columbus, OH 43240
614-885-7577
*Counsel for Plaintiff Heartbeat*
*International Inc.*

Peter Breen[†]
Joan M. Mannix [†]
Michael G. McHale [†*]
B. Tyler Brooks[†**]
Christopher J.F. Galiardo [†***]
309 W. Washington St., Ste. 1250
Chicago, Illinois 60606
(312) 782-1680
*Counsel for Plaintiffs*

Raymond J. Dague
DAGUE LAW OFFICE
4874 Onondaga Road
Syracuse, New York 13215
Phone: (315) 422-2052

† *pro hac vice forthcoming.*

†* *pro hac vice forthcoming*; admitted in
   Nebraska.

†** *pro hac vice forthcoming*; admitted in North

47

*Counsel for Plaintiffs New Hope
Family Services & AscentCare*

Thomas N.N. Angell, Esq.
ANGELL LAW, PLLC
Bentley Fieldhouse
6030 Route 82, Suite D
Stanfordville, NY  12581
845 705 4219
*Counsel for Plaintiff Care Net
Hudson Valley*

Carolina, South Carolina, Tennessee, and
Michigan.

†*** *pro hac vice forthcoming*; admitted in Texas.

48

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
HEALTH CARE BUREAU

## NOTICE OF PROPOSED LITIGATION PURSUANT TO
## NEW YORK EXECUTIVE LAW § 63(12) AND
## ARTICLE 22-A OF THE NEW YORK GENERAL BUSINESS LAW

April 22, 2024

**BY CERTIFIED MAIL**

Crisis Pregnancy Services, Inc.
d/b/a CompassCare Pregnancy Services
Attn: Medical Director
2024 West Henrietta Road, Suite 6D
Rochester, NY 14623

Crisis Pregnancy Services, Inc.
d/b/a CompassCare Pregnancy Services
Attn: Medical Director
1230 Eggert Road
Buffalo, NY 14226

Crisis Pregnancy Services, Inc.
d/b/a CompassCare Pregnancy Services
Attn: Medical Director
951 Albany Shaker Road
Latham, NY 12110

Crisis Pregnancy Services, Inc.
d/b/a CompassCare Pregnancy Services
Attn: Medical Director
44 Court Street
Brooklyn, NY 11201

**Notice of Intention to Sue**

To Whom It May Concern,

Please be advised that the New York State Office of the Attorney General intends to commence litigation against Crisis Pregnancy Services, Inc. d/b/a CompassCare Pregnancy Services ("CompassCare"), on behalf of the People of the State of New York, pursuant to New York Executive Law § 63(12) and New York General Business Law Article 22-A, §§ 349, 350, in light of CompassCare's repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ("APR") protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol. The Attorney General intends to seek injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper.

Exhibit

**703**

PLEASE TAKE NOTICE THAT, under General Business Law §§ 349(c) and 350-c, you are hereby afforded the opportunity to show, orally or in writing, within five (5) business days of receipt of this notice, why such proceeding should not be commenced.

Sincerely,

/s/   Eve Woodin

Eve Woodin, Assistant Attorney General
Health Care Bureau
Eve.Woodin@ag.ny.gov | (212) 416-6389

Louisa Irving, Assistant Attorney General
Civil Rights Bureau
Louisa.Irving1@ag.ny.gov | (212) 416-8534

State of New York Office of the Attorney General
28 Liberty Street, New York, NY 10005



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
HEALTH CARE BUREAU

## NOTICE OF PROPOSED LITIGATION PURSUANT TO
## NEW YORK EXECUTIVE LAW § 63(12) AND
## ARTICLE 22-A OF THE NEW YORK GENERAL BUSINESS LAW

April 22, 2024

**BY CERTIFIED MAIL**

Heartbeat International, Inc.
Attn: Jor-El Godsey, President
8405 Pulsar Place, Suite 100
Columbus, OH 43240

### Notice of Intention to Sue

To Whom It May Concern,

Please be advised that the New York State Office of the Attorney General intends to commence litigation against Heartbeat International, Inc., on behalf of the People of the State of New York, pursuant to New York Executive Law § 63(12) and New York General Business Law Article 22-A, §§ 349, 350, in light of Heartbeat International, Inc.'s repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ("APR") protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol.  The Attorney General intends to seek injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper.

PLEASE TAKE NOTICE THAT, under General Business Law §§ 349(c) and 350-c, you are hereby afforded the opportunity to show, orally or in writing, within five (5) business days of receipt of this notice, why such proceeding should not be commenced.

Sincerely,

*/s/   Eve Woodin*
Eve Woodin, Assistant Attorney General

Exhibit

**705**

Health Care Bureau
Eve.Woodin@ag.ny.gov | (212) 416-6389

Louisa Irving, Assistant Attorney General
Civil Rights Bureau
Louisa.Irving1@ag.ny.gov | (212) 416-8534

State of New York Office of the Attorney General
28 Liberty Street, New York, NY 10005

2

## VERIFICATION

I, the President of Heartbeat International Inc., affirm this 30th day of April, 2024, under the

penalties of perjury under the laws of New York, which may include a fine or imprisonment, that

the information herein is true and I understand that this document may be filed in an action or

proceeding in a court of law.

Jor-El Godsey

## **VERIFICATION**

I, the Chief Executive Officer of Crisis Pregnancy Services Inc. d/b/a CompassCare, affirm this

30th day of April, 2024, under the penalties of perjury under the laws of New York, which may

include a fine or imprisonment, that the information herein is true and I understand that this

document may be filed in an action or proceeding in a court of law.

Rev. Jim Harden

## VERIFICATION

I, the [TITLE] of Caring Choices Pregnancy Help Community Inc., affirm this 30th day of April, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing paragraphs referencing my pregnancy help organization, Caring Choices Pregnancy Help Community Inc., and referencing the "Pregnancy Help Collective," insofar as they pertain to my pregnancy help organization, are true, and I understand that this document may be filed in an action or proceeding in a court of law.

_Barbara Silva, Executive Director_

[NAME]

## VERIFICATION

I, the [TITLE] of Pregnancy Center of Penn Yan, Inc. d/b/a Care Net Penn Yan, affirm this 30th

day of April, 2024, under the penalties of perjury under the laws of New York, which may

include a fine or imprisonment, that the foregoing paragraphs referencing my pregnancy help

organization, Pregnancy Center of Penn Yan, Inc. d/b/a Care Net Penn Yan, and referencing the

"Pregnancy Help Collective," insofar as they pertain to my pregnancy help organization, are true,

and I understand that this document may be filed in an action or proceeding in a court of law.

Michael S. Arrington - Executive Director
                [NAME]   Pregnancy Center of Penn Yan, Inc
                         Care Net Penn Yan

Case 1:24-cv-00514-JLS   Document 3-4   Filed 05/24/24   Page 144 of 304

## VERIFICATION

I, the Executive Director of Study The Options Please Inc. d/b/a Care Net Pregnancy Center of

Wayne County, affirm this 30th day of April, 2024, under the penalties of perjury under the laws

of New York, which may include a fine or imprisonment, that the foregoing paragraphs

referencing my pregnancy help organization, Study The Options Please Inc. d/b/a Care Net

Pregnancy Center of Wayne County, and referencing the "Pregnancy Help Collective," insofar as

they pertain to my pregnancy help organization, are true, and I understand that this document

may be filed in an action or proceeding in a court of law.


                                        *Melissa Kowaleski*
                                        _____
                                        Melissa Kowaleski

## VERIFICATION

I, the Executive Director of Adirondack Pregnancy Center Inc. d/b/a AscentCare, affirm this 30th

day of April, 2024, under the penalties of perjury under the laws of New York, which may

include a fine or imprisonment, that the foregoing paragraphs referencing my pregnancy help

organization, Adirondack Pregnancy Center Inc. d/b/a AscentCare, and referencing the

"Pregnancy Help Collective," insofar as they pertain to my pregnancy help organization, are true,

and I understand that this document may be filed in an action or proceeding in a court of law.

Jennifer Hunt

Jennifer Hunt

## VERIFICATION

I, Doreen Jansson, the CEO of The Care Center d/b/a Soundview Pregnancy Services and
Soundview, affirm this 30th day of April, 2024, under the penalties of perjury under the laws of
New York, which may include a fine or imprisonment, that the foregoing paragraphs referencing
my pregnancy help organization, The Care Center d/b/a Soundview Pregnancy Services and
Soundview, and referencing the "Pregnancy Help Collective," insofar as they pertain to my
pregnancy help organization, are true, and I understand that this document may be filed in an
action or proceeding in a court of law.

Doreen Jansson, CEO
Soundview Pregnancy Services

## VERIFICATION

I, the Executive Director of New Hope Family Services, Inc., affirm this 30th day of April, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing paragraphs referencing my pregnancy help organization, New Hope Family Services, Inc., and referencing the "Pregnancy Help Collective," insofar as they pertain to my pregnancy help organization, are true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
[NAME]

Case 1:24-cv-00514-JLS Document 3-4 Filed 05/24/24 Page 148 of 304 Page 63 of 67

## VERIFICATION

I, the President and Executive Director of Care Net Pregnancy Center of Central New York d/b/a Willow Network, affirm this 30th day of April, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing paragraphs referencing my pregnancy help organization, Care Net Pregnancy Center of Central New York d/b/a Willow Network, and referencing the "Pregnancy Help Collective," insofar as they peltain to my pregnancy help organization, are true, and I understand that this document may be filed in an action or proceeding in a court of law.

Paul Marshall

**715**

## **VERIFICATION**

I, the Executive Director of Alternative Crisis Pregnancy Center, Inc. d/b/a Care Net Pregnancy

Center of the Hudson Valley, affirm this 30th day of April, 2024, under the penalties of perjury

under the laws of New York, which may include a fine or imprisonment, that the foregoing

paragraphs referencing my pregnancy help organization, Alternative Crisis Pregnancy Center,

Inc. d/b/a Care Net Pregnancy Center of the Hudson Valley, and referencing the "Pregnancy Help

Collective," insofar as they pertain to my pregnancy help organization, are true, and I understand

that this document may be filed in an action or proceeding in a court of law.

_Deborah Townsend_

_____

Deborah Townsend

Verification

I, the Executive Director of 1st Way Life Center Inc. affirm this 30th day of April, 2024 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing paragraphs referencing my pregnancy help organization, 1st Way Life Center Inc. and referencing the "Pregnancy Help Collective", insofar as they pertain to my pregnancy help organization are true, and I understand that this document may be filed in an action or proceeding in a court of law.

## VERIFICATION

I, the Executive Director of The Bridge to Life Inc, d/b/a Bridge Women's Support Center,

affirm this 30th day of April, 2024, under the penalties of perjury under the laws of New York,

which may include a fine or imprisonment, that the foregoing paragraphs referencing my

pregnancy help organization, The Bridge to Life Inc, d/b/a Bridge Women's Support Center, and

referencing the "Pregnancy Help Collective," insofar as they pertain to my pregnancy help

organization, are true, and I understand that this document may be filed in an action or

proceeding in a court of law.

Francesca Yellico

## VERIFICATION

I, the Medical Director for the APR-related activities of Heartbeat International Inc., affirm this

30th day of April, 2024, under the penalties of perjury under the laws of New York, which may

include a fine or imprisonment, that the information contained in paragraphs 4-6, 15-16, 35-58,

70-76, and 96-97 is true, and I understand that this document may be filed in an action or

proceeding in a court of law.




_____

Charles Brent Boles, M.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

NATIONAL INSTITUTE OF FAMILY
AND LIFE ADVOCATES, GIANNA'S
HOUSE, INC., and CHOOSE LIFE OF
JAMESTOWN, INC. d/b/a OPTIONS
CARE CENTER,

                 *Plaintiffs*,

     v.

LETITIA JAMES, in her official
capacity as Attorney General of the
State of New York,

                 *Defendant*.

Case No.: 1:24-cv-00514

## [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Before the Court is the Motion of Plaintiffs National Institute for Family and Life Advocates (NIFLA), Gianna's House, Inc., and Choose Life of Jamestown, Inc. d/b/a Options Care Center for a Preliminary Injunction. The Motion came on regularly for hearing on _____. The Court, having considered the parties' submissions, evidence admitted at the hearing on the Motion, and oral argument by the parties, after due deliberation and sufficient cause appearing, **GRANTS** the Motion and **ORDERS** as follows:

Defendant Letitia James and her agents, officials, servants, employees, and any other persons acting on her behalf are enjoined from enforcing New York General Business Law Article 22-A, §§ 349 and 350 and New York Executive Law § 63(12) against Plaintiffs and their members for speaking about the use of progesterone for abortion pill reversal pending a final judgment in this action.

     **IT IS SO ORDERED.**

Dated: _____

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

NATIONAL INSTITUTE OF FAMILY AND
LIFE ADVOCATES, GIANNA'S HOUSE, INC.,
and CHOOSE LIFE OF JAMESTOWN, INC. d/b/a
OPTIONS CARE CENTER,

                       Plaintiffs,

    vs.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York.

                    Defendant.

Case No. 24-cv-00514-JLS

---

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

LETITIA JAMES
Attorney General of the State of New York
ALYSSA J. PANTZER
DANIEL R. MAGUIRE
Assistant Attorney General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
Tel: (716) 853-8419

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT ........................................................................................................ 6

POINT I  THE COURT SHOULD ABSTAIN ................................................. 6

    A.  Under the *Younger* abstention doctrine, the Court lacks subject matter
jurisdiction over this lawsuit. .......................................................... 6

        1.  The Enforcement Action provides an adequate opportunity for review of
Plaintiffs' constitutional claims. ............................................ 7

        2.  The important State interest of enforcement of New York's Consumer
Protection Statutes is implicated in the Enforcement Action. .............. 10

        3.  Neither the "Bad Faith" nor the "Extraordinary Circumstances"
Exceptions Apply. ............................................................. 10

    B.  Even if abstention is not mandatory, this Court should exercise its discretion to
abstain. ....................................................................................... 11

        1.  The Court should abstain from exercising jurisdiction pursuant to the
*Colorado River* abstention doctrine. .......................................... 12

        2.  The Court should abstain from exercising jurisdiction pursuant to the
*Pullman* abstention doctrine. .................................................. 12

        3.  The Court should decline to exercise jurisdiction pursuant to its broad
discretion under the Declaratory Judgment Act. ............................. 13

POINT II  PLAINTIFFS DO NOT HAVE STANDING BECAUSE THEY HAVE NOT
SUFFERED AN INJURY-IN-FACT. ................................................ 14

    A.  Plaintiffs have not alleged that they have made or would make statements about
APR that would violate the Consumer Protection Statutes. ................... 16

        1.  NIFLA ......................................................................... 16

        2.  Gianna's House ............................................................... 17

        3.  Options Care Center .......................................................... 18

    B.  Plaintiffs do not face a sufficient threat of injury to establish
standing in the context of this pre-enforcement, "as-applied" challenge to
enforcement of the Consumer Protection Statutes. ............................. 19

POINT III  PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW .................... 21

    A.  Plaintiffs' claims are not constitutionally ripe for review. ................... 21

    B.  Plaintiffs' claims are not prudentially ripe for review. ...................... 22

        1.  Fitness for Judicial Review ................................................. 22

        2.  Hardship to Plaintiff of Withholding Judicial Review ..................... 24

POINT IV      PLAINTIFFS HAVE NOT MET THEIR BURDEN FOR A PRELIMINARY INJUNCTION ................................................................................... 24

    A.    Plaintiffs are unlikely to succeed on the merits. ..................................... 25

        1.    Plaintiffs are unlikely to succeed on the merits of their First Amendment content and viewpoint discrimination claims. ........................................ 25

            a.    OAG's enforcement of the Consumer Protection Statutes are not subject to strict scrutiny because the First Amendment does not protect false or misleading commercial speech. .......................................................... 25

            b.    PHOs' false and/or misleading advertisements about APR constitutes commercial speech. ................................ 28

            c.    The OAG's Enforcement Action is not content or viewpoint based. ............................................................. 30

            d.    Rational basis is the applicable level of scrutiny and is satisfied. ...................................................................... 34

        2.    Plaintiffs are unlikely to succeed on the merits of their claim that the Enforcement Action is selective enforcement based on PHO's viewpoint. .................................................................. 35

        3.    Plaintiffs are unlikely to succeed on the merits of their free exercise claim. ...................................................................... 37

    B.    Plaintiffs have not shown irreparable harm. .......................................... 39

    C.    The balance of equities and the public interest weigh in favor of the OAG. ......... 40

CONCLUSION .................................................................................................... 40

## TABLE OF AUTHORITIES

### Cases

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................... 22

*Adam v. Barr*,
    No. 18-CV-2106 (AJN), 2019 WL 1426991 (S.D.N.Y. Mar. 29, 2019) ............... 17

*All-Options, Inc. v. Atty. Gen. of Ind.*,
    546 F. Supp. 3d 754 (D. Ind. 2021) ............................................................. 30

*Am. Med. Ass'n v. Stenehjem*,
    412 F. Supp. 3d 1134 (D.N.D. 2019) ........................................................... 30

*Americans for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) ................................................................... 26, 28

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023) ................................................................... 19

*Ashcroft v. ACLU*,
    535 U.S. 564 (2002) ........................................................................... 32

*Bad Frog Brewery, Inc. v. New York State Liquor Auth.*,
    134 F.3d 87 (2d Cir. 1998) ................................................................... 29

*Bolger v. Youngs Drugs Prod. Corp.*,
    463 U.S. 60 (1983) ................................................................... 26, 28

*Casa Marie Inc. v. Superior Court of Puerto Rico*,
    988 F.2d 252 (1st Cir. 1993) ..................................................................... 9

*Cayuga Nation v. Tanner*,
    824 F.3d 321 (2d Cir. 2016) ................................................................... 19

*Cedar Rapids Cellular Tel., L.P. v. Miller*,
    280 F.3d 874 (8th Cir. 2002) ..................................................................... 9

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980) ................................................................... 25, 28

*Church of American Knights of the Ku Klux Klan v. Kerik*,
    356 F.3d 197 (2d Cir. 2004) ................................................................... 34

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ........................................................................... 37

*City of Austin v. Reagan National Advertising*,
    596 U.S. 61 (2022) ........................................................................... 31

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ........................................................................... 25

*Clementine Company, LLC. v. Adams*,
    74 F.4th 77 (2d Cir. 2023) ................................................................... 31

iii

*Colorado River Water Conservation Dist. v. U.S.*,
424 U.S. 800 (1976) ................................................................................ 11, 12

*CompassCare v. Cuomo*,
465 F. Supp. 3d 122 (N.D.N.Y. 2020) ................................................................ 37

*Conn. v. Duncan*,
612 F.3d 107 (2d Cir. 2010) ........................................................................... 22

*Copeland v. Vance*,
893 F.3d 101 (2d Cir. 2018) ........................................................................... 19

*Crowley v. Courville*,
76 F.3d 47 (2d Cir. 1996) ............................................................................. 35

*Cytyc Corp. v. Neuromedical Sys.*,
12 F. Supp. 2d 296 (S.D.N.Y. 1998) .................................................................. 36

*Diamond "D" Const. Corp. v. McGowan*,
282 F.3d 191 (2d Cir. 2002) .................................................................. 7, 10, 11

*Employment Div. v. Smith*,
494 U.S. 872 (1990) .................................................................................... 37

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .................................................................................... 37

*Goshen v. Mutual Life Ins. Co.*,
98 N.Y.2d 314 (N.Y. 2002) ......................................................................... 10, 27

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,
721 F.3d 264 (4th Cir. 2013) ......................................................................... 29

*Grieve v. Tamerin*,
269 F.3d 149 (2d Cir. 2001) ............................................................................. 7

*Hassan v. United States*,
441 F. App'x 10 (2d Cir. 2011) ....................................................................... 15

*Hedges v. Obama*,
724 F.3d 170 (2d Cir. 2013) ........................................................................... 19

*Hicks v. Miranda*,
422 U.S. 332 (1975) .................................................................................... 8, 9

*Hindu Temple Society of North America v. Supreme Court of State of New York*,
335 F. Supp. 2d 369 (E.D.N.Y. 2004) .................................................................. 7

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ............................................................................. 21

*Joglo Realties, Inc. v. Seggos*,
No. 16-cv-1666, 2016 WL 449140 (E.D.N.Y. Aug. 24, 2016) ........................................ 39

*Karlin v. IVF America*,
93 N.Y.2d 282 (1999) ............................................................................. 34, 37

*Koch v. Acher, Merrall & Condit Co.*,
    967 N.E.2d 675 (N.Y. 2012) ........................................................................ 27

*Lefkowitz v. Colo. State Christian Coll. of Church of the Inner Power, Inc.*,
    346 N.Y.S.2d 482 (Sup. Ct. N.Y. Cnty. 1973) ........................................ 27

*Make the Rd. N.Y. v. Cuccinelli*,
    419 F. Supp. 3d 647 (S.D.N.Y. 2019) ...................................................... 40

*Marathon Outdoor, LLC v. Vesconti*,
    107 F. Supp. 2d 355 (S.D.N.Y. 2000) ...................................................... 35

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*,
    173 F.3d 469 (2d Cir. 1999) ........................................................ 22, 23, 24

*Miller v. McDonald*,
    No. 23-00484, 2024 WL 104077 (W.D.N.Y. Mar. 11, 2024) ................... 38

*Moody v. NetChoice, LLC*,
    144 S.Ct. 2383 (2024) .............................................................................. 26

*Mount v. PulsePoint, Inc.*,
    684 Fed. Appx. 32 (2d Cir. 2017) ............................................................ 27

*N.Y. Times Co. v. Gonzales*,
    459 F.3d 160 (2d Cir. 2006) .................................................................... 14

*Nastri v. Dykes*,
    No. 23-1023, 2024 WL 1338778 (2d Cir. 2024) ..................................... 15

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ................................................................................ 31

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) .......................................................................... 21, 22

*Nat'l Prods. Assn. v. James*,
    No. 23-cv-08912 (JMA)(LGD), 2024 WL 2977683 (E.D.N.Y. June 13, 2024) ..................... 17

*New York v. Arm or Ally, LLC*,
    No. 22-6124, 2024 WL 756474 (S.D.N.Y. 2024) .................................... 27

*November Team, Inc. v. New York Joint Commn. on Public Ethics*,
    233 F. Supp. 3d 366 (S.D.N.Y. 2017) ...................................................... 13

*Nutritional Health Alliance v. Shalala*,
    144 F.3d 220 (2d Cir. 1998) .............................................................. 22, 23

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ................................................................................ 21

*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Servs.*,
    769 F.3d 105 (2d Cir. 2014) .................................................................... 40

*People v. Credit Suisse Sec. (USA) LLC*,
    107 N.E.3d 515 (N.Y. 2018) .................................................................... 27

v

*People v. Gen. Elec. Co.*,
302 A.D.2d 314 (N.Y. App. Div. 2003) ................................................. 27

*Planned Parenthood of Tennessee and N. Mississippi v. Slatery*,
523 F. Supp. 3d 985 (M.D. Tenn. 2021) ............................................... 30

*Quackenbush v. Allstate Insurance Co.*,
517 U.S. 706 (1996) .............................................................................. 11

*R.R. Comm'n of Tex. v. Pullman Co.*,
312 U.S. 496 (1941) .............................................................................. 11

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) .............................................................................. 31

*Roman Cath. Diocese of Albany v. Vullo*,
__ N.E. 3d __, 2024 WL 2278222 (N.Y. May 21, 2024) ..................... 39

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .............................................................................. 32

*Ross v. Bank of Am., NA.*,
524 F.3d 217 (2d Cir. 2008) ................................................................. 21

*See First Resort Inc. v. Herrera*,
860 F.3d 1263 (9th Cir. 2017) ............................................................. 34

*Simmonds v. INS*,
326 F.3d 351 (2d Cir. 2003) ................................................................. 24

*Slatteru v. Hochul*,
61 F.4th 278 (2d Cir. 2023) .................................................................. 38

*Spargo v. New York State Comm'n on Judicial Conduct*,
351 F.3d 65 (2d Cir. 2003) ............................................................. 7, 8, 9

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .............................................................................. 14

*Stivers v. State of Minn.*,
575 F.2d 200 (8th Cir. 1978) ................................................................. 8

*Time Warner Cable v. Bloomberg L.P.*,
118 F.3d 917 (2d Cir. 1997) ................................................................. 39

*U.S. v. Hansen*,
599 U.S. 762 (2023) .............................................................................. 26

*United Fence & Guard Rail Corp. v. Cuomo*,
878 F.2d 588 (2d Cir. 1989) ................................................................. 12

*United States v. Caronia*,
703 F.3d 149 (2d Cir. 2012) ................................................................. 32

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) .............................................................................. 26

*Village of Westfield, N.Y. v. Welch's*,
   170 F.3d 116 (2d Cir. 1999) .................................................................. 11

*Virginia Office for Protection and Advocacy v. Stewart*,
   563 U.S. 247 (2011) ........................................................................... 12

*Vitagliano v. County of Westchester*,
   71 F.4th 130 (2d Cir. 2023) ................................................................ 15

*Vt. All. for Ethical Care, Inc. v. Hoser*,
   274 F. Supp. 3d 227 (D. Vt. 2017) ...................................................... 20

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................... 31

*We The Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) ................. 37

*Williams v. Lambert*,
   46 F.3d 1275 (2d Cir. 1995) ............................................................... 12

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ........................................................................... 13

*Winter v. Natural Res. Defense Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................. 24

*Women's Community Health Center v. Texas Health Facilities Commission*,
   685 F.2d 974 (5th Cir.1982) ................................................................. 8

*Younger v. Harris*,
   401 U.S. 37 (1971) .......................................................................... 6, 7

*Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985) ....................................................................... 26, 34

## **Statutes**

15 U.S.C.A § 45 .................................................................................. 11

28 U.S.C.A § 2201(a) ..................................................................... 12, 13

N.J.S.A. 56:8-4 ................................................................................... 11

N.Y. Exec. Law § 63(12) .............................................................. *passim*

N.Y. Gen. Bus. Law § 349 ............................................................ *passim*

N.Y. Gen. Bus. Law § 350 ............................................................ *passim*

Defendant Letitia James, in her official capacity as New York State Attorney General, submits this memorandum of law in opposition to Plaintiffs' Motion for a Preliminary Injunction.

## PRELIMINARY STATEMENT

This lawsuit is a collateral attack on a pending enforcement action in New York state court brought by the New York State Office of the Attorney General ("OAG") under its authority to enforce state protections against consumer fraud and false advertising. The OAG commenced that action against a group of non-profit business entities in connection with their false and misleading advertising statements about a scientifically untested treatment they call "Abortion Pill Reversal" (or "APR"). In response, Plaintiffs National Institute of Family and Life Advocates ("NIFLA") and two member organizations, Gianna's House and Options Care Center, initiated this litigation, asserting that the OAG's enforcement of the Consumer Protection Statutes (defined below) against the other entities for false and misleading advertising statements violates Plaintiffs' First Amendment rights to free speech and free exercise of religion. NIFLA is a membership organization to which at least some of the defendants in the state-court action belong. In bringing this action, NIFLA is attempting to litigate issues on behalf of the parties to the state-court action. Through this pre-enforcement challenge, Plaintiffs seek a preliminary and permanent injunction preventing the OAG from bringing a similar action against *them* (and NIFLA's members) based on similar statements they have not yet made but allege they might someday make about APR.

Plaintiffs cannot meet the demanding test for obtaining a preliminary injunction. As an initial matter, this Court should abstain from exercising jurisdiction over these claims while the state court action is pending, Plaintiffs have not suffered an injury sufficient to establish standing, and their claims are not constitutionally or prudentially ripe for review. Plaintiffs are also unable to succeed on the merits of their First Amendment speech claims because the Consumer Protection

Statutes are constitutional regulations of commercial speech, and false or misleading advertising—as Plaintiffs seek to engage in with respect to APR—is not protected.

Plaintiffs' Free Exercise claim likewise fails because the Consumer Protection Statutes are neutral laws of general applicability that are rationally related to protecting New Yorkers from fraudulent and deceptive business conduct, and there is no evidence they would be targeted with selective enforcement. Ultimately, while organizations may use lawful means to attempt to persuade pregnant individuals to continue their pregnancies in furtherance of their mission and beliefs, they cannot publicly advertise APR to consumers with unsubstantiated claims about its efficacy and safety. They must be held to the same standards under as anyone else advertising health care services in New York. Given this backdrop, Plaintiffs cannot demonstrate irreparable harm and the balance of equities and the public interest weigh heavily against them.

This case represents an unprecedented attempt to thwart the longstanding authority of the OAG to enforce consumer protection laws. The Court should reject Plaintiffs' attempt to put the OAG's state law claims to the test here in federal court or, at a minimum, abstain while the state action is pending.

## **STATEMENT OF FACTS**

This case is a response to a state court enforcement action focused on the widespread promotion of a scientifically unproven medical intervention known as APR, through which proponents claim to be able to "reverse" a medication abortion. *See* Verified Complaint, ECF. No. 1 ("NIFLA Compl.") ¶¶ 9, 12; *James v. Heartbeat Int'l, Inc.*, No. 451314/2024 (Sup. Ct. N.Y. Cty.), filed May 6, 2024 ("HBI Compl."), ¶ 5; Irving Decl. ¶ 2. The APR protocol involves advising a pregnant person who has taken mifepristone, the first step in the United States Food and Drug Administration ("FDA")-approved regimen for a medication abortion, not to take the second

2

drug in that regimen, misoprostol, thus interrupting that FDA-approved process before it is complete. HBI Compl. ¶ 8. In place of misoprostol, the APR protocol entails administering repeated doses of the hormone progesterone, which is claimed to increase the chances of the pregnancy continuing without harmful effects, and thus to "reverse" the effects of the "abortion pill." *Id.*

In fact, no valid scientific evidence has demonstrated that APR is safe, or even that it is effective in increasing the chances of a pregnancy continuing after a patient takes mifepristone. Schreiber Decl. ¶ 5. To the contrary, progesterone's use in APR has never been approved by the FDA, the only clinical trial that has been conducted to assess APR's safety or efficacy had to be halted due to serious safety concerns, and the practice has been condemned as "unproven" and "unethical" by the American College of Obstetricians and Gynecologists, along with other leading medical associations. *Id.* ¶¶ 37, 42.

Concerned about the advertisement of this risky and unproven treatment to New York consumers, in 2023, the OAG undertook an investigation into public advertising on websites and other social media platforms relating to APR. Irving Decl. ¶¶ 7-8. Through that investigation, the OAG identified numerous false and misleading advertisements regarding APR's safety and efficacy that are not backed by valid scientific evidence. *Id.* The investigation further determined that many of these statements appeared to originate with an entity called Heartbeat International ("HBI"), an international organization that operates a network of self-described "pro-life pregnancy help organizations" ("PHOs"). *Id.*; HBI Compl. ¶ 5. The OAG identified eleven New York organizations that were (a) identified on HBI's website as being part of HBI's worldwide network of PHOs; (b) making claims about APR on their own websites, social media platforms, or other consumer-facing promotional materials that were substantially similar to those found on

abortionpillreversal.com, a central website operated by HBI and (c) participating in HBI's scheme to advertise and promote APR in New York by funneling New York consumers to obtain APR treatment, by linking their websites directly to abortionpillreversal.org, or by directing consumers to call a national hotline number, also operated by HBI. There, callers would be connected with a local medical provider in HBI's "Abortion Pill Rescue Network," who has been trained and vetted by HBI to perform APR. Irving Decl. ¶¶ 8-13.

Following a thorough investigation, the OAG commenced legal action against HBI and those eleven entities (collectively "HBI Defendants") under New York General Business Law ("GBL") Article 22-A, §§ 349 and 350, which broadly prohibit false advertising and fraudulent or misleading business practices, and under §63(12) of the Executive Law, which prohibits repeated fraudulent conduct (collectively "Consumer Protection Statutes").[1] Pursuant to the Consumer Protection Statutes, prior to commencing suit, OAG notified the HBI Defendants of its intent to commence legal action under those provisions. *See* NIFLA Compl. Ex. A, ECF No. 1-3. Before the statutory five-day waiting period had elapsed, the HBI Defendants filed their own affirmative lawsuit in New York Supreme Court, Monroe County, seeking to prevent the OAG from taking further enforcement action. *Heartbeat Int'l, Inc. v. James*, No. E2024007242 (Sup. Ct. Monroe Cty.), filed April 30, 2024. The HBI Defendants' action asserts substantially the same claims as this case. *Id.* ¶¶ 154-209. No such relief having been ordered, OAG subsequently filed suit in New York County. *See People v. Heartbeat Intl, Inc., et al.*, No. 451314/2024 (Sup. Ct. N.Y. Cnty. 2024) (hereinafter the "Enforcement Action").

---

[1] GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[,]" and GBL § 350 prohibits "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service." Executive Law § 63(12) prohibits repeated or persistent fraud "in the carrying on, conducting or transaction of business."

4

In the Enforcement Action, the OAG asserts that the HBI Defendants have engaged in widespread false and/or misleading business and advertising practices targeting New York consumers, by making a series of specific false and misleading advertising statements on their websites and other consumer-oriented marketing materials about the safety and efficacy of APR to induce consumers to undergo APR treatment. *Id.* ¶¶ 259-91. The two actions were subsequently consolidated. *HBI v. James*, No. E2024007242 (Sup. Ct. Monroe Cty.), Order dated May 24, 2024 (together, "HBI Litigation").[2]

Within three weeks of the OAG filing its suit, Plaintiffs filed this federal action asserting that the pending Enforcement Action against the HBI Defendants threatens their work promoting APR and violates their rights under the Free Speech and Free Exercise Clauses of the First Amendment. *See,* NIFLA Compl. Plaintiffs do not allege they are currently making exactly the same statements or engaging in exactly the same conduct as the HBI Defendants, but rather, broadly allege that they "advertise their services and any referral services on their websites and through print handouts and brochures, newspaper or magazine ads, television commercials, social media, and other online ads," that they "have made or would like to make statements about the safety and effectiveness" of APR, and that those statements are truthful and accurate. *Id.* ¶ 37-38. They further allege that the OAG's actions against other entities have chilled their speech causing them to remove discussion of APR from their own websites and, for NIFLA, to advise its members to do the same. *Id.* ¶¶ 41, 165-70. Plaintiffs also concede that some of NIFLA's member organizations received the OAG's Notices of Intention to Sue, *id.* ¶ 170, and presumably therefore, were included as HBI Defendants. Plaintiffs assert that the Enforcement Action against the HBI Defendants—and hypothetical future enforcement against them—is unconstitutional content-

---

[2] The Attorney General appealed the part of that order setting venue for the two cases in Monroe County. HBI Litigation, NYSCEF No. 43 (June 12, 2024).

based and viewpoint discrimination, selective enforcement, and an infringement on the free exercise of their religion, and seek preliminary and permanent injunctive relief and a declaratory judgment.

## ARGUMENT

### POINT I

### THE COURT SHOULD ABSTAIN.

In bringing this lawsuit, Plaintiffs ask this Court to inject itself into a pending Enforcement Action brought by the OAG against the HBI Defendants for their advertisements about APR. In the Enforcement Action, a state court will determine: (1) whether advertising APR on a consumer-facing website and directing consumers to obtain APR services by linking to abortionpillreversal.org or providing a national hotline number constitutes commercial speech; and (2) whether the HBI Defendants' statements, including that "APR can reverse an abortion," "reverse the effects of the abortion pill," or "increase the chances of allowing a pregnancy to continue," are false or misleading. Through this lawsuit, Plaintiffs (who have not had the Consumer Protection Statutes enforced against them) ask this Court to resolve these precise issues. And, through their preliminary injunction motion, they seek to have this Court resolve those issues before the state court can address them. This Court should decline Plaintiffs' request to involve itself in these actively litigated issues currently pending in a state forum.

**A.**   **Under the *Younger* abstention doctrine, the Court lacks subject matter jurisdiction over this lawsuit.**

Under the abstention doctrine derived from *Younger v. Harris*, 401 U.S. 37 (1971), the Court lacks subject matter jurisdiction over Plaintiff's attempt to undermine the Enforcement Action. The *Younger* abstention doctrine is based on "respect for State functions, a recognition of the fact that the entire country is made up of a Union of separate State governments, and a

continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions …" *Younger*, 401 U.S. at 44. "The spirit animating *Younger* is that state courts can be trusted to follow the mandates of the federal constitution." *Hindu Temple Society of North America v. Supreme Court of State of New York*, 335 F. Supp. 2d 369, 374 (E.D.N.Y. 2004); *see also Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65 (2d Cir. 2003) (acknowledging "the dignity of states as co-equal sovereigns in our federal system.") (*citing Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 200 (2d Cir. 2002) [hereinafter "*Diamond*"]).

*Younger* abstention is required when: (1) there is an ongoing state action; (2) an important state interest is implicated in that action; and (3) the state action affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims. *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001). So long as all three elements are met, the only way to avoid application of *Younger* is to establish that the "bad faith" or "extraordinary circumstances" exceptions are met. Here, all three elements are met, and neither exception applies.

### 1. The Enforcement Action provides an adequate opportunity for review of Plaintiffs' constitutional claims.

"Under *Younger*, it is the plaintiff's burden to demonstrate that state remedies are inadequate." *Spargo,* 351 F.3d at 78. Plaintiffs cannot do so here. The Enforcement Action will fully address and resolve the issues presented by Plaintiffs in this litigation. Specifically, whether PHOs' statements about APR's ability to reverse abortions while directing consumers to HBI's network of medical professionals providing APR services violate the Consumer Protection Statutes or are protected First Amendment speech. Because the legal issues presented in the Enforcement Action and this lawsuit are the same, *Younger* abstention applies.

*Younger* abstention applies even though Plaintiffs are not the specific defendants in the Enforcement Action. First, NIFLA concedes that certain of its members—on whose behalf NIFLA purports to assert claims—*are* named as defendants in the Enforcement Action. NIFLA Compl. ¶ 171.

Second, *Younger* abstention applies even as to NIFLA itself and the other Plaintiffs not named as defendants in the Enforcement Action. Where the interests of parties involved in a state proceeding and nonparties to that proceeding are intertwined, "*Younger* cannot be avoided simply by joining the nonparties to the state court proceeding in order to procure injunctive and declaratory relief (in federal court) against that proceeding." *Women's Community Health Center v. Texas Health Facilities Commission*, 685 F.2d 974 (5th Cir.1982); *see also Stivers v. State of Minn.*, 575 F.2d 200, 203 (8th Cir. 1978) (holding that the "district court correctly applied the principles of *Younger* to [federal plaintiffs challenging state law practice regulations], even though they were not named as parties in the state proceedings," because their interests were "closely intertwined" with those of fellow legal association members sued in state court for unauthorized practice of law).

For example, in *Hicks v. Miranda*, 422 U.S. 332 (1975), the state seized allegedly obscene films at a theater and filed criminal charges against two of the theater's employees. The owners of the theater brought a federal action for declaratory and injunctive relief with respect to the state obscenity statute. The Supreme Court held that the district court should have abstained from entertaining the owners' constitutional challenges because the same issues were presented before the state criminal court. *Id.* at 349-50 ("Obviously, [the owners'] interests and those of their employees were intertwined and, ... the federal action sought to interfere with the pending state prosecution.").

Likewise, in *Spargo,* 351 F.3d at 81, the Second Circuit applied *Younger* to bar the claims of federal plaintiffs who were not parties to an ongoing state proceeding. *Spargo* involved disciplinary hearings against a state judge who allegedly violated New York's rules of judicial conduct. *Id.* at 67. The judge, along with two of his political supporters, sought to enjoin the state disciplinary proceeding in federal court, claiming that the State's judicial conduct rules violated their First Amendment rights. *Id.* Although the political supporters were not parties to the ongoing disciplinary proceeding, the Court held that their First Amendment claims were barred by *Younger* because their interests were "inextricably intertwined" with those of the judge facing discipline and because they sought "to directly interfere with the pending disciplinary proceeding." *Id.* at 85; *see also Cedar Rapids Cellular Tel., L.P. v. Miller,* 280 F.3d 874, 881-82 (8th Cir. 2002) (applying *Younger* to claims of federal plaintiffs not party to state proceedings); *Casa Marie Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 268-69 (1st Cir. 1993) (same).

Plaintiffs effectively concede that their interests are inextricably intertwined with the HBI Defendants. Any NIFLA members named as HBI Defendants will of course have full opportunity to vindicate their rights, and as to the other Plaintiffs, the First Amendment arguments presented here will be adjudicated by way of the First Amendment claims brought by the HBI Defendants as well as their pending anti-SLAPP motion to dismiss the Enforcement Action.[3] Not only are the Plaintiffs' interests intertwined with those of the HBI Defendants, but, as in *Hicks*, this action requires the Court to adjudicate the very same issues that are presented in the Enforcement Action before the state court renders a determination. Just like in *Spargo* and *Hicks,* the application of

---

[3] In the Enforcement Action, the HBI Defendants filed a motion to dismiss under New York's anti-SLAPP statute (N.Y. Civil Rights Law § 76-(a)(1)-(2)) arguing that their statements about APR are protected by the First Amendment. *See* Enforcement Action, NYSCEF Dkt. Nos. 39-44.

9

*Younger* abstention cannot be evaded by having Plaintiffs, who are nonparties to the Enforcement Action, bring this suit.

**2.      The important State interest of enforcement of New York's Consumer Protection Statutes is implicated in the Enforcement Action.**

New York State has an important interest in the enforcement of its Consumer Protection Statutes. The Consumer Protection Statutes were "enacted to provide consumers with a means of redress for injuries caused by unlawfully deceptive acts and practices [and] to secure an honest market place where trust, and not deception, prevails." *Goshen v. Mutual Life Ins. Co.*, 98 N.Y.2d 314, 324 (N.Y. 2002) (internal citations and quotations omitted). By filing the Enforcement Action, the OAG seeks to protect New York consumers from false and deceptive advertising regarding APR services. New York's interest in vigorous enforcement of the Consumer Protection Statutes, including in regulating the advertising of scientifically invalid medical services, implicates an important state interest.

**3.      Neither the "Bad Faith" nor the "Extraordinary Circumstances" Exceptions Apply.**

To invoke the "bad faith" exception, Plaintiffs must show that, when the OAG commenced the Enforcement Action, OAG had "no reasonable expectations of obtaining a favorable outcome." *Diamond*, 282 F.3d at 199 (internal quotations and citation omitted). Plaintiffs cannot meet this high burden. As demonstrated by the OAG's substantive opposition to Plaintiffs' motion (which addresses the same issues as the Enforcement Action), the OAG has a reasonable expectation that it will prevail in the Enforcement Action.  Indeed, other courts have already found that APR lacks scientific support and that the advertisements similar to those made by the HBI Defendants are false.  *See* Point IV.A.1.b, *infra*.

10

The "extraordinary circumstances" exception also does not apply. That exception is available only when: (1) there is no "state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation"; and (2) a finding is "made that the litigant will suffer great and immediate harm if the federal court does not intervene." *Diamond*, 282 F.3d at 201 (internal quotation marks and citation omitted). The Supreme Court has recognized two circumstances that meet this high standard: when a statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it," or when a state body is "incompetent by reason of bias to adjudicate the issues pending before it." *Id.*

There is nothing to suggest that the Consumer Protection Statutes alleged to be violated in the Enforcement Action are "flagrantly and patently violative of express constitution prohibitions" or that the state court hearing the Enforcement Action is "incompetent by reason of bias." The First Amendment does not protect false commercial speech. *See* Point IV.A.1.a., *infra*. Moreover, federal and state law and prohibit false advertising, fraud, and deceptive business practices. *See, e.g.*, 15 U.S.C.A § 45; N.J.S.A. 56:8-4. The exceptions to *Younger* do not apply—abstention is therefore mandatory. *Diamond*, 282 F.3d at 201.

**B.    Even if abstention is not mandatory, this Court should exercise its discretion to abstain.**

In addition to mandatory abstention under *Younger*, federal courts decline to exercise jurisdiction, "where denying a federal forum would clearly serve an important countervailing interest…for example where abstention is warranted by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or wise judicial administration.'" *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706, 716-19 (1996). Other "traditional categories of abstention" set forth by the Supreme Court apply to this case: those derived from *Colorado River Water*

11

*Conservation Dist. v. U.S.*, 424 U.S. 800 (1976) and *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). *Village of Westfield, N.Y. v. Welch's*, 170 F.3d 116 (2d Cir. 1999). Even if this Court determines that none of these doctrines apply, it should nonetheless decline to exercise jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

1. **The Court should abstain from exercising jurisdiction pursuant to the *Colorado River* abstention doctrine.**

Under *Colorado River* abstention, "while the [general] rule is that the pendency of an action in the state court is no bar to proceedings concerning the matter in the Federal court having jurisdiction" a court may abstain to conserve federal judicial resources where resolution of the state matter may result in "comprehensive disposition of the litigation." *Colorado River Water Conservation Dist.*, 424 U.S. at 817. This litigation was filed in reaction to the Enforcement Action, which will necessarily address the precise underlying issues Plaintiffs seek to have this Court adjudicate. Such overlapping parallel litigation is a waste of federal judicial resources. Therefore, this Court should exercise its discretion and abstain.

2. **The Court should abstain from exercising jurisdiction pursuant to the *Pullman* abstention doctrine.**

When there is a "state-law issue that may be dispositive federal courts should abstain under *Pullman*." *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 264 (2011) (concurring) (*citing R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S 496,496 (1941). Three conditions must be present to trigger *Pullman* abstention: "First, the state statute must be unclear or the issue of state law uncertain; second, resolution of the federal issue must depend upon the interpretation given to the ambiguous state provision; and third, the state law must be susceptible of an interpretation that would avoid or modify the federal constitutional issue." *Williams v. Lambert*, 46 F.3d 1275, 1281 (2d Cir. 1995) (quoting *United Fence & Guard Rail Corp. v. Cuomo*,

878 F.2d 588, 594 (2d Cir. 1989)).  While the Second Circuit advises "particular caution" when abstaining in a First Amendment case, it is still appropriate to abstain when the *Pullman* factors are satisfied. *See November Team, Inc. v. New York Joint Commn. on Public Ethics*, 233 F. Supp. 3d 366, 372 (S.D.N.Y. 2017).

Whether Plaintiffs' proposed statements are false and whether they are "in the conduct of business" are squarely issues of state law under the Consumer Protection Statutes. If the speech is false and is commercial than the First Amendment is not implicated at all, *see* Point IV.A.1.a., and therefore, whether a federal constitutional question even exists depends upon the interpretation of the state Consumer Protection Statutes.

### 3. The Court should decline to exercise jurisdiction pursuant to its broad discretion under the Declaratory Judgment Act.

Even if the Court were to determine that none of the abstention doctrines apply, it should still exercise its broad discretion under the Declaratory Judgment Act and decline to hear this case. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a)(emphasis added). The permissive language of the Declaratory Judgment Act has consistently been construed to grant district courts broad discretion to refuse to exercise jurisdiction over a declaratory action otherwise properly lodged before them—greater discretion than in the context of the abstention doctrine. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-83, 287 (1995).

The Second Circuit has identified five factors to be considered before a court entertains a declaratory judgment action: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether a judgment would finalize the controversy and offer

relief from uncertainty; (3) whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"; and (5) whether there is a better or more effective remedy. *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006).

These factors weigh against the exercise of jurisdiction. First, the requested judgment would not necessarily "serve a useful purpose in clarifying or settling the legal issues involved" nor "finalize the controversy and offer relief from uncertainty." *Id.* The Enforcement Action was preceded by a lengthy legal and factual investigation into the specific statements by the HBI Defendants. By contrast, Plaintiffs here seeks a declaration regarding vague and unspecified future statements which are devoid of context. In addition, this action is blatant procedural fencing—an attempt to use a federal court to enjoin the OAG's Enforcement Action. Next, the declaratory and injunctive relief sought here would impinge upon the OAG's ability to protect New Yorkers from false and deceptive advertising and thus improperly encroach upon state sovereignty. Finally, there is a more effective remedy here – allowing the Enforcement Action to play out so that state courts can resolve the application of the Consumer Protection Statutes to the statements from which this action arose.

## POINT II

## PLAINTIFFS DO NOT HAVE STANDING BECAUSE THEY HAVE NOT SUFFERED AN INJURY-IN-FACT.[4]

Constitutional standing, which derives from Article III, is designed "to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins,*

---

[4] If this Court concludes that Plaintiffs lack standing, the Court "need not address the factors to be considered in deciding whether to award a preliminary injunction" and should instead deny the motion and dismiss the case for lack of subject matter jurisdiction. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015).

14

578 U.S. 330, 338 (2016). The doctrine imposes three requirements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

The requirement that a plaintiff demonstrate an injury-in-fact "has been repeatedly described as the hard floor of Article III jurisdiction, and requires a litigant to show an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Hassan v. United States*, 441 F. App'x 10, 11 (2d Cir. 2011) (citations and quotations omitted). Here, the OAG has not sued, threatened to sue, or otherwise acted against Plaintiffs for their statements about APR. Plaintiffs, therefore, premise their theory of standing on the chilling effect created by the threat of future civil litigation against them for their potential future statements about APR, stemming from the OAG's enforcement of the Consumer Protection Statutes against the HBI Defendants. The question presented is whether Plaintiffs' unrealized fears of the OAG civilly enforcing the Consumer Protection Statutes against them in the future establishes their standing to bring this lawsuit. They do not.

In pre-enforcement challenges, the plaintiff must show that the "threatened enforcement" of the law against him is "sufficiently imminent." *Nastri v. Dykes*, No. 23-1023, 2024 WL 1338778, at *1 (2d Cir. 2024). This imminence showing requires Plaintiffs to demonstrate that (1) they "inten[d] to engage in a course of conduct" that arguably involves a "constitutional interest;" (2) the intended conduct is "proscribed by the challenged law;" and (3) "there exists a credible threat" that he would be prosecuted for violating that law. *Vitagliano v. County of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023). Plaintiffs cannot satisfy these elements.

**A.    Plaintiffs have not alleged that they have made or would make statements about APR that would violate the Consumer Protection Statutes.**

**1.    NIFLA**

NIFLA alleges that its past statements about APR run afoul of the Consumer Protection Statutes as enforced by the OAG.[5] But NIFLA avoids identifying the statements it allegedly made **and** the context in which it made those statements making it impossible to determine whether the statements violate the Consumer Protection Statutes. *See* NIFLA Compl. ¶¶ 176-179. Without such context, it is impossible to determine whether the statement was made in a commercial context implicating the Consumer Protection Statutes. *See also id.* ¶¶ 181, 182, 185.

In the few specific examples NIFLA does provide, the alleged speech is not consumer oriented. For example, the advice NIFLA gives to its member organizations was, on its face, targeted *at its members*, rather than at consumers.  *See id.* at ¶¶ 177-179. Similarly, while the full context of the testimonial NIFLA points to from an individual woman is not apparent—nor has the post been produced to the Court—it appears to have been made in the context of a weblog offering "tips *for pregnancy centers* regarding the use of progesterone therapy to serve women who want to 'reverse the effects of mifepristone." NIFLA Compl. ¶ 181. Such statements were made in a non-commercial context and, therefore, differ materially from the consumer-facing statements targeted by the OAG in the Enforcement Action. Irving Decl. ¶¶ 16-17.

---

[5] NIFLA also points to statements by its unidentified members (NIFLA Compl. ¶¶ 169-173), but NIFLA cannot rely on such statements to establish standing because organizational plaintiffs "lack standing to assert the rights of its members." *See Connecticut Citizens Defense League Inc. v. Lamont*, 6 F.4th 439, 447 (2021) (noting the Second Circuit's longstanding doctrine that an organization "lack[s] 'standing to assert the rights of its members," and could only bring "suit on its *own* behalf" if it could show that the organization itself suffered an "actual or threatened injury in fact."). Moreover, because Gianna's House and Options Care Center do not have standing to sue in their own right, NIFLA cannot rely on its association with them to establish standing for itself. *See Do No Harm v. Pfizer, Inc.*, 646 F. Supp. 3d 490, 502 (S.D.N.Y. 2022).

16

Ultimately, NIFLA failed to identify any specific statements about APR that would trigger certain or "imminent" enforcement of the Consumer Protection Statutes by the OAG. NIFLA, therefore, cannot rely on a "threat of enforcement" to establish standing in this litigation.[6]

## 2. Gianna's House

Gianna's House alleges that the statement "[i]f you have recently taken the abortion pill and are having regret, it may be possible to undo the effects of abortion drugs. Learn more here" violates the Consumer Protection Statutes. NIFLA Compl. ¶ 208. This statement does not use the "reverse/reversal language" targeted in the Enforcement Action and is therefore not identical to the specific statements that are the subject of that Action.

Gianna's House also alleges that it would like to make future statements about APR but is refraining from doing so because of the Enforcement Action. *Id.* ¶ 215. That Gianna's House might make similar statements in the future is insufficient to establish standing. "To sufficiently allege standing on [a] pre-enforcement claim, [a] [p]laintiff must…allege **both** a concrete intention to violate the law and the credible threat of prosecution if he were to do so." *Adam v. Barr*, No. 18-CV-2106 (AJN), 2019 WL 1426991, at *3 (S.D.N.Y. Mar. 29, 2019) (emphasis added). Gianna's House's conclusory assertion that it would like to make certain statements in an unspecified context at some undefined point in the future is not sufficient to establish either a concrete intention to violate the Consumer Protection Statutes, or a credible threat of prosecution by the OAG. *See Nat'l Prods. Assn. v. James*, No. 23-cv-08912 (JMA)(LGD), 2024 WL 2977683, at *6 (E.D.N.Y. June 13, 2024) (plaintiffs failed to establish a concrete intent to expose themselves to harm when

---

[6] NIFLA also attempts to establish standing based on it expending organizational resources to change its advice because of the threat of litigation from the OAG. NIFLA Compl. ¶ 191. An organization, however, "that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing by expending money to gather information and advocate against the defendants' action." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024).

plaintiffs provided thread-bare affidavits that did not provide specifics as to their "concrete intention to engage in a course of conduct prohibited by the Statute.").

### 3.    Options Care Center

Options Care Center identifies four statements it claims violate the Consumer Protection Statutes as enforced by the OAG. NIFLA Compl. ¶¶ 223, 225, 226, 228-29. The first three statements, *id.* at ¶¶ 223, 225, 226, do not directly link to abortionpillreversal.com or provide the hotline number, and are therefore unlike the commercial advertising campaigns targeted in the Enforcement Action. Irving Decl. ¶¶ 25-31. Moreover, Options Care Center does not allege where its "Abortion Pill FAQ" appeared or to whom its "postcards" were "disseminated," nor are those materials provided, NIFLA Compl. ¶¶ 223–24, making it impossible to determine whether any statements made in these contexts were, in fact, consumer-facing. Irving Decl., ¶¶ 25-31. Options Care Center also fails to allege that the fourth statement, which appeared on "small cards" distributed to the community, violates the Consumer Protection Statutes as enforced by the OAG. While the "small cards"—which, again, have not been provided— allegedly included a QR code to the Abortion Pill Rescue Network website, Options Care Center cleverly avoids identifying the specific language or website address included on the card. NIFLA Compl. ¶¶ 227-28. Options Care Center cannot meet its burden to show that a statement violates the Consumer Protection Statutes as enforced by the OAG without specifying the language of the statement.

Options Care Center also alleges that it has prepared specific statements to post to one of its websites about APR, but that it has not posted the statements for fear of prosecution. *Id.* ¶ 234. But those statements appear to differ from the advertising statements targeted in the Enforcement Action because they were allegedly slated to be posted on a website that appears to be aimed at *donors and volunteers*, friendsofocc.com. Consequently, because the context of the proposed

18

**746**

statements differs materially from that of the statements targeted in the Enforcement Action, Options Care Center cannot show that any such enforcement is likely or imminent.

**B.    Plaintiffs do not face a sufficient threat of injury to establish standing in the context of this pre-enforcement, "as-applied" challenge to enforcement of the Consumer Protection Statutes.**

Even assuming that Plaintiffs' allegations establish that their statements violated the Consumer Protection Statutes (they do not), Plaintiffs still do not face a sufficient threat of injury in the context of a pre-enforcement, as-applied challenged. Although courts generally presume that the government will enforce the challenged law against a violator, that presumption should not apply here. *See Hedges v. Obama*, 724 F.3d 170, 200 (2d Cir. 2013).

First, like the statute at issue in *Hedges*, the Consumer Protection Statutes merely authorize—but do not mandate or direct—the civil prosecution that Plaintiffs' fear. *See* N.Y. Exec. Law § 63(12) (the "Attorney General *may* apply…"); N.Y. Gen. Bus. Law § 349 (OAG "*may* bring an action…"). Because the OAG's enforcement authority under the Consumer Protection Statutes is explicitly permissive, not mandatory, the Court should not presume the Consumer Protection Statutes will be enforced against Plaintiffs.

Second, this lawsuit is unique in the context of standing for preenforcement challenges. Normally, a plaintiff seeking to challenge a statute he believes to be unconstitutional brings a preenforcement facial challenge to a statute (*Hedges*, 724 F.3d at 173) or an as-applied challenge to a statute proscribing very specific conduct (*Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)). *See Copeland v. Vance*, 893 F.3d 101, 112 (2d Cir. 2018) ("Courts consider prospective as-applied vagueness challenges comparatively infrequently."). In a preenforcement facial challenge context, how the government chooses to interpret the statute is of limited relevance since the plaintiffs are arguing the statute is unconstitutional under any interpretation.    The

government's interpretation of a statute is also of limited relevance when the statute clearly prescribes certain conduct because there is not significant ambiguity in how the statute can be interpreted.  In those contexts, it is sensible to presume the government will enforce the statute against violators.

Here, however, Plaintiffs bring their claims principally an as-applied challenge to the Consumer Protection Statutes despite those statutes never being applied to them. In an as-applied challenge, the central issue is whether the application of a statute in a specific circumstance is constitutional. Resolving that issue, however, cannot be done until the statute is applied because courts cannot discern how the government will apply the statute until it does so. *See Vt. All. for Ethical Care, Inc. v. Hoser*, 274 F. Supp. 3d 227, 239 (D. Vt. 2017) ("In the absence of an actual enforcement action, the court is left to speculate about how a member of Plaintiffs' organizations might respond to an inquiry from a terminally ill patient and whether that response might precipitate a disciplinary proceeding.").

As to the Plaintiffs themselves, the same future contingencies facing the court in *Vt. All. for Ethical Care, Inc.* are present here, leaving this Court to speculate as to (1) what statements about APR Plaintiffs want to make and (2) whether the OAG would commence enforcement proceedings in response to those statements.

Lastly, this court should not presume that the OAG will enforce the Consumer Protection Statutes against Plaintiffs for the self-evident reasons that she has not enforced the Consumer Protection Statutes against the Plaintiffs.

Ultimately, there is not a sufficient or imminent threat of the OAG enforcing the Consumer Protection Statutes against Plaintiffs to support Article III standing.

## POINT III

### PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW.

For similar reasons, this case is not yet ripe for judicial review. "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted). There are "two overlapping threshold criteria for the exercise of a federal court's jurisdiction" that fall under the term ripeness: (1) constitutional ripeness; and (2) prudential ripeness. *Simmonds v. Immigration and Naturalization Serv.*, 326 F.3d 351, 356-57 (2d Cir. 2003) (internal citations omitted).

### A.     Plaintiffs' claims are not constitutionally ripe for review.

The constitutional ripeness requirement "overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (quoting *Ross v. Bank of Am., NA.*, 524 F.3d 217, 226 (2d Cir. 2008)). As discussed in detail above, two contingencies must be met before Plaintiffs' injury becomes imminent, as opposed to "conjectural or hypothetical": (1) Plaintiffs must make a statement about APR that violates the Consumer Protection Statutes;[7] and (2) the OAG must exercise its discretion under the Consumer Protection Statutes to bring a civil enforcement action against Plaintiffs for that statement. Because these contingencies remain unfulfilled, Plaintiffs have not met the constitutional requirements of ripeness. *See, e.g.*, *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733-34 (1998) (challenge to agency action unripe where there is no "significant practical

---

[7] As detailed in Point II.C., *supra*, Plaintiffs have not identified any past statements they made about APR that violate the Consumer Protection Statutes as enforced by the OAG.

harm" at the present time because a number of future actions would need to occur to make the harm more "imminent" and "certain").

**B.      Plaintiffs' claims are not prudentially ripe for review.**

To determine whether a challenge to a government action is prudentially ripe for judicial review, courts proceed with a two-step inquiry, "requiring [courts] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

**1.      Fitness for Judicial Review**

Whether an action is "fit" for determination turns on whether "consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce" the law at issue. *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998). "[T]he 'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *Simmonds,* 326 F.3d at 359 (internal quotation marks omitted). If further factual development would facilitate the legal analysis and prevent the possibility of an advisory determination, the court should, at a minimum, decline to exercise jurisdiction as a prudential matter. *Nat'l Hospitality Assoc*, 538 U.S. at 811. These concerns are of heightened importance "when, as in the present case, the potentially unripe question presented for review is a constitutional question. If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality … unless such adjudication is unavoidable." *Conn. v. Duncan*, 612 F.3d 107, 113 n.3 (2d Cir. 2010).

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469 (2d Cir. 1999) is instructive. There, a teacher argued that an employer directive prohibiting him from using references to

22

**750**

religion in the delivery of his instructional program were unconstitutional as applied to (1) his responses to personal questions raised by students off school grounds; and (2) his responses to such questions raised outside of class but on school grounds. *Id.* at 475. The Second Circuit found these questions unripe:

> Since BOCES has not threatened to apply the directive to any of Marchi's off-campus expressive activities, a court entertaining Marchi's challenge would be forced to guess how BOCES might apply the directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical. *Id.* at 478.

Plaintiffs' claims regarding their APR speech are similarly unripe. In their Prayer for Relief, Plaintiffs seek a broad injunction barring the OAG from enforcing the Consumer Protection Statutes "against Plaintiffs and their members for speaking about the use of progesterone for abortion pill reversal." NIFLA Compl. ¶ 66). Given the broad range of statements that Plaintiffs could potentially make about APR in various contexts, it is easy to imagine statements that would clearly run afoul of the Consumer Protection Statutes. "Plaintiffs and their members" would be able such statements if the Court issues the broad injunction sought by Plaintiffs.

Since the OAG has not sued or threatened to sue Plaintiffs under the Consumer Protection Statutes for their APR statements, this Court would be forced to guess at how the OAG might apply the Consumer Protection Statutes to Plaintiffs' future APR statements and to act as a clearinghouse for the various, hypothetical statements that Plaintiffs might like to make about APR in the future. "Such an open-ended and indefinite challenge is not well suited to judicial decision." *Marchi*, 173 F.3d at 478. Rather, any such determinations "would necessarily be facilitated if they were raised in the context of a specific attempt to enforce" the laws at issue. *Nutritional Health Alliance*, 144 F.3d at 225. Ultimately, what will "facilitate the legal analysis" is the state courts determination of these issues in the Enforcement Action, which has yet to occur.

2.     **Hardship to Plaintiff of Withholding Judicial Review**

The second step in the ripeness analysis is "whether and to what extent the parties will

endure hardship if a decision is withheld." *Simmonds v. INS,* 326 F.3d 351, 359 (2d Cir. 2003). In

assessing this possibility of hardship, "we ask whether the challenged action creates a direct and

immediate dilemma for the parties." *Marchi,* 173 F.3d at 478. "The mere possibility of future

injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds,*

326 F.3d at 360. The hardship standard is relaxed somewhat in the First Amendment context "to

avoid the chilling of protected speech," but "some credible fear of enforcement must exist."

*Marchi,* 173 F.3d at 479.

As discussed above, Plaintiffs have not demonstrated a credible fear that the OAG intends

to enforce the Consumer Protection Statutes against them in an unconstitutional manner. First, the

OAG has not filed a civil enforcement action against the Plaintiffs, has not threatened to do so,

and has given no indication that she views Plaintiffs' past statements about APR as violating the

Consumer Protection Statutes. *See* Irving Decl. ¶¶ 14-31. Second, to the extent any Plaintiff has

identified with sufficient specificity the statements it would like to make about APR in the future

and the contexts in which it would make them (which it has not), the Enforcement Action will

resolve whether such statements violate the Consumer Protection Statutes or are protected First

Amendment speech. There is consequently no hardship to Plaintiffs in withholding judicial review.

## POINT IV

### PLAINTIFFS HAVE NOT MET THEIR BURDEN FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter*

*v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). The movant bears the heavy burden

of establishing: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer

irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest. *Id.* at 20. Plaintiffs cannot establish a substantial likelihood of success on the merits.

**A.    Plaintiffs are unlikely to succeed on the merits.**

**1.    Plaintiffs are unlikely to succeed on the merits of their First Amendment content and viewpoint discrimination claims.**

**a.    OAG's enforcement of the Consumer Protection Statutes are not subject to strict scrutiny because the First Amendment does not protect false or misleading commercial speech.**

Even assuming this Court has jurisdiction, Plaintiffs' First Amendment claims fail. False and misleading commercial speech, like the false and misleading advertising practices at issue in the Enforcement Action, is not protected by the First Amendment and therefore must satisfy only rational basis review.

Plaintiffs insist that OAG's enforcement of the Consumer Protection Statutes must meet and fails strict scrutiny. But regulation of false and/or misleading commercial speech is not subject to strict scrutiny, because false and/or misleading commercial speech receives no First Amendment protection. In a First Amendment challenge to government restriction of commercial speech, the court must first determine (1) "whether the expression is protected by the First Amendment," and (2) "whether the asserted governmental interest is substantial." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980). "If both inquiries yield positive answers, [the court] must determine (3) whether the regulation directly advances the governmental interest asserted, and (4) whether it is more extensive than is necessary to serve that interest." *Id*. If the commercial speech is found to be false or misleading, "then it is not protected by the First Amendment at all," and the inquiry ends there. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 433-434 (1993) (citation omitted).

25

Plaintiffs first appear to assert that the Consumer Protection Statutes are facially unconstitutional. However, they do not, and could not, mount a meritorious content-based or viewpoint based *facial* challenge. "Even in the First Amendment context, facial challenges are disfavored[.]" *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2409 (2024). To state a facial challenge, Plaintiffs would have had to allege, and did not, that "a substantial number of the [Consumer Protection Statutes] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021); *U.S. v. Hansen*, 599 U.S. 762, 770 (2023) (likewise asking whether the law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep."); *see also U.S. v. Hansen*, 599 U.S. 762, 770 (2023). It has long been settled that the "[s]tates and the federal government are free to prevent dissemination of commercial speech that is false, deceptive, or misleading . . . or that proposes an illegal transaction[.]" *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 638 (1985); *see also Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976) (First Amendment does not bar a state from "dealing effectively" with "deceptive or misleading commercial speech"); *Bolger v. Youngs Drugs Prod. Corp.*, 463 U.S. 60, 65 (1983) (("In light of the greater potential for deception or confusion in the context of certain advertising messages content-based restrictions on commercial speech may be permissible.") (internal citations omitted)).

Plaintiffs next argue that the Consumer Protection Statutes are required to incorporate "traditional" elements of "knowledge, reliance, loss, or materiality to a victim or consumers" to satisfy constitutional requirements. *See* PI Mem. 12. First, the Enforcement Action *has* alleged the statements were materially misleading. *See* HBI Compl. ¶¶ 109-258. And unlike common-law or criminal fraud, which do include the elements of scienter and reliance, the Consumer Protection

Statutes do not. *See, e.g.*, *People v. Credit Suisse Sec. (USA) LLC*, 107 N.E.3d 515, 524 (N.Y. 2018); *Koch v. Acher, Merrall & Condit Co.*, 967 N.E.2d 675, 675-76 (N.Y. 2012) ("Justifiable reliance by the plaintiff is not an element of the statutory claim." (citations omitted)); *People v. Gen. Elec. Co.*, 302 A.D.2d 314, 315 (N.Y. App. Div. 2003) ("[N]either bad faith nor scienter is required under Executive Law § 63(12)." (citations omitted)). Nor must the OAG demonstrate damages when seeking injunctive relief. *Mount v. PulsePoint, Inc.*, 684 Fed. Appx. 32, 36 (2d Cir. 2017); *Goshen*, 98 N.Y.2d at 324. Plaintiffs' citations to common-law fraud cases arising in these other contexts are therefore inapposite, and they have cited no case holding that such elements are constitutionally required in the context of regulation of commercial speech.[8] And because false commercial speech is not protected by the First Amendment at all, once speech is found to be false and commercial, no further element is mandated by the constitution.

Accordingly, as state and federal courts have recognized, the First Amendment does not insulate fraudulent and misleading commercial speech from the OAG's enforcement of the Consumer Protection Statutes. *See Lefkowitz v. Colo. State Christian Coll. of Church of the Inner Power, Inc.*, 346 N.Y.S.2d 482, 484 (Sup. Ct. N.Y. Cnty. 1973) ("[I]n moving to enjoin, restrain and prohibit the defendants' fraudulent and misleading practices in New York State the Attorney General is not infringing upon the First Amendment guarantee of freedom of religion but, rather acting well within its right to prevent a fraud being committed on the citizens of this State."); *see also New York v. Arm or Ally, LLC*, No. 22-6124, 2024 WL 756474, at *15 (S.D.N.Y. 2024) (appeal pending) (rejecting First Amendment challenge to OAG's enforcement of Consumer Protection Statutes where defendants' commercial speech was "false and misleading"). The

---

[8] To the extent that plaintiffs rely on criminal fraud prohibitions, those are even more inapposite. (*See* PI Mem. 12).

"plainly legitimate" sweep of the Consumer Protection Statutes cannot seriously be questioned. *Americans for Prosperity Found.*, 594 U.S. at 615.

### b.     PHOs' false and/or misleading advertisements about APR constitutes commercial speech.

Plaintiffs assert that any past or proposed statements they make about APR and referrals to APR providers could not constitute commercial speech because they do not charge consumers for their services and receive no renumeration for the referrals to APR providers, and because it is an expression their religious viewpoint. PI Mem. 6-7, 11. Setting aside the unanswered question of exactly what speech is at issue in this case,[9] neither the absence of a direct financial transaction for the services advertised nor the religious viewpoint of the speaker provides a blanket exemption from speech being considered commercial.

"The First Amendment's concern for commercial speech is based on the informational function of advertising." *Central Hudson.*, 447 U.S. at 563 (internal citation omitted). "[W]hether or not the communication is an advertisement, [makes] reference to a specific product, and economic motivations, are all factors to be considered in whether or not speech is commercial or non-commercial." *Bolger*, 463 U.S. at 66. "[T]he potential commercial nature of speech does not hinge solely on whether the [speaker] has an economic motive, as even *Bolger* does not preclude

---

[9] As discussed above, Plaintiffs' own past statements do not implicate the Consumer Protection Statutes and it is not possible to evaluate Plaintiffs' *hypothetical future* statements without knowing the content of those statements or their context. *See infra* POINT II.A. However, it is worth noting that Plaintiffs concede they do generally engage in advertising targeting consumers. NIFLA Compl. ¶ 37 (alleging that NIFLA members "advertise their services and any referral services on their websites and through print handouts and brochures, newspaper or magazine ads, television commercials, social media, and other online ads"). They further concede their hypothetical future advertisements would be about a specific product or service—APR—and that they currently provide referrals to APR providers. NIFLA Compl. ¶¶ 34, 38. Thus, Plaintiffs cannot seriously contend that any hypothetical false or misleading advertisements about APR would satisfy at least two of the *Bolger* factors, notwithstanding their lack of an economic motivation. *See Bolger*, 463 U.S. at 66 (explaining that Court should consider "whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication" in determining whether the speech should be treated as commercial speech.).

classification of speech as commercial in the absence of the speaker's economic motivation." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 285 (4th Cir. 2013) (citing *Bolger*, 463 U.S. at 67 n. 14). Under *Bolger*'s functional analysis, Plaintiffs' lack of direct payment therefore would not, on its own, render any advertising statements non-commercial speech.

Plaintiffs' next attempt to shield their past and their proposed statements about APR and referrals to APR providers from the Consumer Protection Statutes by linking them to the public debate over reproductive healthcare. PI Mem., 11, n. 24. This is equally unavailing because alleging a link to a "current debate" is not enough to remove commercial advertisements from lawful governmental commercial speech regulations. *See Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998). As the Enforcement Action makes clear, Plaintiffs remain free to make "general expressions of opinion about public matters," *see* PI Mem., 11, n. 24, and to make even blatantly false statements about abortion or APR, in the context of public debate. HBI Compl. ¶ 15. But them may not advertise a specific medical service using false statements about safety and efficacy that could impact consumers' health care decisions—and ultimately place their health at risk. *Id.* ¶¶ 120-149; 166-168; 176-179; 188-190; 196-202; 209-213; 218-220; 227-230; 236-239; 243-245; 249-251; 255-258.

Finally, the speech at issue in the Enforcement Action is unprotected because it is false and/or misleading. The safety and efficacy of APR have not been established by any credible scientific evidence. *See* Schreiber Decl. ¶ 101. Several courts have evaluated evidence offered to justify similar claims about APR—evidence virtually identical to what Plaintiffs proffer here—and, crediting Dr. Schreiber's expert opinion, concluded that "the 'abortion reversal' protocol is devoid of scientific support, misleading, and untrue." *Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134,

1149 (D.N.D. 2019) (preliminarily enjoining law that would require physicians to inform patients that it "may be possible to reverse the effects of an abortion-inducing drug," because the state-mandated message is based on an "unproven medical and scientific theory" and "devoid of credible scientific evidence"); *see also, e.g.*, *Planned Parenthood of Tennessee and N. Mississippi v. Slatery*, 523 F. Supp. 3d 985, 989 (M.D. Tenn. 2021) (preliminarily enjoining law requiring physicians to inform patients that "[i]t may be possible to reverse the intended effects of a chemical abortion [*sic*] utilizing mifepristone" based, in part, on finding that "the mandated 'reversal' message is misleading because it suggests progesterone therapy has reached a level of safety and efficacy that is not supported by medical evidence"); *All-Options, Inc. v. Atty. Gen. of Ind.*, 546 F. Supp. 3d 754, 766-68 (D. Ind. 2021) (preliminarily enjoining law that would require physicians to inform patients that "[s]ome evidence suggests that the effects of Mifepristone may be avoided, ceased, or reversed" based on finding that the published studies, biological principles, and clinical experience proffered by the State was insufficient evidence of APR's effectiveness). To the extent Plaintiffs allege that they made or would like to make the same statements, in the same consumer-oriented context as those at issue in the Enforcement Action, those statements would likewise be false and/or misleading commercial speech and beyond the scope of First Amendment protection.

### c.  The OAG's Enforcement Action is not content or viewpoint based.

Plaintiffs argue that the Enforcement Action and/or hypothetical future enforcement of the Consumer Protection Statutes would infringe upon their First Amendment rights, asserting without support that the laws are facially content-based, and that as applied to the statements regarding APR they discriminate as to viewpoint. PI Mem. 8. Neither position finds support in fact or law.

Content-based discrimination occurs when a law facially, *i.e.*, through its text, regulates specific content, or where a facially neutral law is shown to have a discriminatory purpose, *i.e.*,

where the restriction is purely "adopted by the government because of disagreement with the message the speech conveys[.]" *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015) (internal quotations and citations omitted); *see also City of Austin v. Reagan National Advertising*, 596 U.S. 61 (2022).

The "first step in the content-neutrality analysis [is] determining whether the law is content neutral on its face." *Reed*, 576 U.S. at 1165. Even where a law is found to be facially content neutral, the law must then be examined to assess "whether the government has adopted [the] regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see generally Clementine Company, LLC. v. Adams*, 74 F.4th 77, 84-90 (2d. Cir. 2023). "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791 (internal quotation and citation omitted). The Consumer Protection Statutes are facially content-neutral—they apply on their face to false statements, and that prohibition applies regardless of the nature of the subject advertised or the content of the falsehood.

Plaintiffs rely exclusively on cases concerning *facially* content-based laws and regulations, which offer no support for their content-based discrimination argument. For example, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018), which addresses a California law that required crisis pregnancy centers to post government scripted messages concerning abortion and reproductive health. But government-scripted compelled speech is not relevant to the Consumer Protection Statutes, a neutral and generally applicable law that merely prohibits false speech rather than compelling any particular statements, or to their application in the Enforcement Action.

*Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002), involved a First Amendment overbreadth challenge to a federal law targeting and restricting materials the government deemed obscene, namely internet pornography, in the asserted interest of preventing children from accessing harmful material. The *Ashcroft* court found that the governmental interest was compelling but was not narrowly tailored because what was obscene to some may not be obscene to others, thus some of the material received First Amendment protection and the regulation was subject to strict scrutiny. The Court reasoned that the law did not enable others, like consenting adults, to access materials that would not be considered obscene, violating the First Amendment. *Ashcroft* is wholly inapposite because the law at issue was enacted targeting specific content, and some of the regulated content received First Amendment protection. Here, as explained, false and misleading commercial speech receives no First Amendment protection.

Similarly, *United States v. Caronia*, 703 F.3d 149, 152 (2d Cir. 2012), does not advance Plaintiffs' argument, because in *Caronia* the court found that the FDA's prohibition of certain *truthful* and *not misleading* off-label promotions of a drug violated the defendant's First Amendment rights when he was criminally charged and convicted for misbranding a drug. But notably, the *Caronia* court observed that "[o]f course, off-label promotion that is false or misleading is not entitled to First Amendment protection." *Id.* at 165 n.11. Neither *Caronia* nor any other precedent entitles Plaintiffs to engage in false and/or misleading advertising of APR.

Plaintiffs' efforts to demonstrate viewpoint discrimination are equally unavailing. Viewpoint discrimination is "[w]hen the government [is] not targeting subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The test for viewpoint discrimination is "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the [governmental]

restriction." *Id.* The application of the Consumer Protection Statutes in the Enforcement Action rests not on the viewpoints of the Defendants—who, the Complaint makes clear, remain free to oppose and counsel against abortion, HBI Compl. ¶ 15—but on the inaccuracy of their false and/or misleading statements to consumers regarding APR's safety and efficacy.

Plaintiffs cite *Rosenberger*, but that case involved a First Amendment challenge to the denial of generally available university funding to a student group based on the religious subject matter of the student group's publication. The denial was found to be viewpoint discrimination against a religious perspective. Here, the Enforcement Action named certain PHOs not because of their opposition to abortion or the viewpoints expressed in their advertisements, but because they maintained consumer-oriented websites with advertising containing false and/or misleading statements about APR, are part of HBI's network, and channeled consumers to obtain APR services. *See* Irving Decl. ¶ 9. While the Enforcement Action contained allegations regarding PHOs' opposition to abortion, and specifically, to medication abortion as a factor motivating the increasing promotion of APR, that viewpoint was not the basis of any claims asserted, and the Enforcement Action makes clear that PHOs remain free to continue advocating for their viewpoints outside of the context of false and/or misleading consumer advertising. HBI Compl. ¶ 15.

Plaintiffs attack the Attorney General's personal views on abortion, but have not produced a shred of evidence beyond their own conclusory statements demonstrating that the OAG targeted PHOs because of their viewpoints, as opposed to their fraudulent and misleading advertising practices.  Indeed, there are countless PHOs that were *not* named in the Enforcement Action presumably holding similar views opposing abortion, including Gianna's House, Options Care

Center, and the numerous other PHOs listed in HBI's "Worldwide Directory of Pregnancy Help" as having locations in New York. *See* Irving Decl. ¶¶ 8-9.

### d.    Rational basis is the applicable level of scrutiny and is satisfied.

Because OAG's enforcement of the Consumer Protection Statutes "regulates only unprotected commercial speech[,]" it "does not unconstitutionally burden the fundamental right to free speech [and]. . . is subject only to rational basis review." *See First Resort Inc. v. Herrera*, 860 F.3d 1263, 1278 (9th Cir. 2017); *see also Church of American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 208 (2d Cir. 2004) (laws will withstand judicial review if justified by a rational basis where the activity does not invoke First Amendment protection).

The Enforcement Action arises from the State of New York's interest, at the heart of the Consumer Protection Statutes, in protecting New York consumers and the public interest from the harms false and/or misleading business and advertising practices cause. The Supreme Court has long recognized the governmental interest in preventing dissemination of commercial speech that is false, deceptive, or misleading." *Zauderer*, 471 U.S. at 638; *see also Karlin v. IVF America*, 93 N.Y.2d 282, 287 (1999) ("In order to ensure an honest marketplace, the [Consumer Protection Statutes] prohibit[] all deceptive practices, including false advertising, 'in the conduct of any business, trade or commerce or in the furnishing of any service in this state.'" (quoting N.Y. Gen. Bus. Law §§ 349, 350)). Because "consumers of medical services and products might be particularly vulnerable to unscrupulous business practices," and the Consumer Protection Statutes "have long been powerful tools aiding the Attorney General's efforts to combat fraud in the health care and medical services areas," the enforcement of those laws is rationally related to protecting those interests, satisfying rational basis review.  *Karlin*, 93 N.Y.2d at 291.

2. **Plaintiffs are unlikely to succeed on the merits of their claim that the Enforcement Action is selective enforcement based on PHO's viewpoint.**

Plaintiffs' selective enforcement claim similarly fails because they do not offer any evidence demonstrating that the Enforcement Action—much less any hypothetical future enforcement OAG might take against them—was or would be based on an impermissible consideration. To prevail in a selective enforcement claim, a party must demonstrate that, "(1) the person, compared with others similarly situated, was selectively treated; and (2) ... such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Crowley v. Courville*, 76 F.3d 47, 52-53 (2d Cir. 1996). Courts explain that both elements must be met: "in order to succeed on this claim, Plaintiff would have to establish not only disparate treatment, but also an intent by Defendants to inhibit the exercise of Plaintiff's constitutional rights, or an intent to discriminate based on race, religion, malice or bad faith." *Marathon Outdoor, LLC v. Vesconti*, 107 F. Supp. 2d 355, 363 (S.D.N.Y. 2000) (denying a preliminary injunction). Here, Plaintiffs fail to meet either element.

Plaintiffs argue that by applying the Consumer Protection Statutes in the Enforcement Action but not bringing an action against supporters of medication abortion, namely Planned Parenthood, the OAG has engaged in viewpoint based selective enforcement, in violation of PHOs' First Amendment rights. *See* PI Mem. 18. First, as previously discussed, the Enforcement Action is targeted at specific false and/or misleading statements about APR, not the HBI Defendants' religious or pro-life views, and Plaintiffs' conclusory assertions aside, there is no evidence that it is aimed at advancing anti-religious or anti-pro life views. Second, Planned Parenthood's statements about medication abortion are not comparable to the statements at issue in the Enforcement Action, or to the statements Plaintiffs allege they wish to make about APR. PI Mem.

19-20. Unlike APR, medication abortion is an FDA-approved medical treatment that has undergone rigorous clinical testing and demonstrated decades of safe and effective use. *See* Schreiber Decl. ¶¶ 16-23. Making representations "that comport substantively with statements approved as accurate by the FDA cannot supply the basis for" false advertising claims. *Cytyc Corp. v. Neuromedical Sys.*, 12 F. Supp. 2d 296, 301 (S.D.N.Y. 1998). In contrast, APR is an unproven and experimental treatment that has not undergone rigorous clinical testing and has been denounced by major medical associations. *See Id.* ¶ 98. Plaintiffs' comparison between the safety risks of medication abortion and APR is a false equivalence.

Plaintiffs also fail to show that either they or the HBI Defendants are similarly situated to Planned Parenthood, such that the OAG engaged in selective enforcement by bringing an Enforcement Action against the HBI Defendants but not Planned Parenthood. The general characteristics Plaintiffs identify in support of this claim are so broad that they could be used to describe many types of medical and/or service providers—including certain Plaintiffs and other PHOs that hold pro-life views but were not named in the Enforcement Action. Plaintiffs cannot hang their First Amendment claim on so thin a reed.

Finally, the claim of selective enforcement is defeated by the OAG's routine and historic use of the Consumer Protection Statutes to combat deceptive business and advertising practices related to numerous other medical services and products. As the New York Court of Appeals noted in *Karlin v. IVF*:

> "[The Consumer Protection Statutes] have long been powerful tools aiding the Attorney General's efforts to combat fraud in the health care and medical services areas. The Attorney General has relied on these provisions to challenge deceptive and fraudulent practices in contexts as diverse as the marketing of AIDS-related products (*People. v Overs Enters.*, Sup Ct, Westchester County, Colabella, J., index No. 16221/92); baldness treatments (*People v D.J. Carlisi.*, Sup Ct, NY County, Ostrau, J., index No. 41189/89); anti-abortion counseling clinics (*People v Northern Westchester Putnam Assistance to Mother & Unborn Child*, Sup Ct,

Dutchess County, Beisner, J., index No. 92-135); hearing aids (*People v Tolbert*, Sup Ct, Clinton County, Dawson, J., *292 index No. 35678/97); and the therapeutic benefits of adjustable beds and chairs (*People v Craftmatic/Contour Org.*, Sup Ct, NY County, Friedman, J., index No. 41535/91)[.]"

*See Karlin v. IVF America*, 93 N.Y.2d 282, 291-92 (1999). Indeed, in *Karlin*, as here, OAG brought an enforcement action based on unsubstantiated claims about IVF's safety and efficacy.

**3.    Plaintiffs are unlikely to succeed on the merits of their free exercise claim.**

It is well established that the Free Exercise Clause does not excuse compliance with "a valid and neutral law of general applicability." *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990). Plaintiffs' Free Exercise claim fails because any alleged burden on religion is "merely the incidental effect" of enforcing the neutral and generally applicable Consumer Protection Statutes, which prohibit unlawful conduct that "the State is free to regulate." *Id.* at 878-79.

As an initial matter, the text of the Consumer Protection Statutes are (i) facially neutral, because they do not "refer[] to a religious practice without a secular meaning discernable from the language or context," *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); (ii) operationally neutral because they do not "target[] religious conduct for distinctive treatment" *see id.* at 534; and (iii) generally applicable because they do not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 284 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) (*citing Fulton v. City of Philadelphia*, 593 U.S. 522, 533-34 (2021)).

Government action has been found to have a "neutral, secular purpose" where it relies on "the way that the views of the [Defendants] interfered with the rights of New Yorkers" and not on the "religious motivations" of the prohibited conduct. *See CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 154 (N.D.N.Y. 2020) (appeal pending). And the Second Circuit recently determined that even where a government official's statements could be read by some to suggest animosity towards

religion, that alone does not "establish that the purpose of the legislature was to target religion." *Slattery v. Hochul*, 61 F.4th 278, 292-93 (2d Cir. 2023) rejecting reliance on legislator's mention of employers' "personal beliefs" where the "legislation itself was generally directed at discrimination in the workplace and employee privacy"); *see also Miller v. McDonald*, No. 23-00484, 2024 WL 104077, at *9 (W.D.N.Y. Mar. 11, 2024) (holding that allegation that "the State targeted religious adherents" "fail[ed] to establish non-neutrality" where law was "neutral on its face").

Here, the OAG has denounced businesses that make false and deceptive representations about reproductive health services with no mention of any religious motivations. *See* PI Mem. 22-24 (acknowledging that "the Attorney General did not expressly mention the religious beliefs of [Defendant] organizations in her lawsuit" despite awareness that "many are affiliated with religious organizations[.]"). Plaintiffs offer no support for a conclusion that the OAG's objective was anything other than to protect New Yorkers from businesses and advertisements that provide false and/or misleading consumer-oriented information. Further, as discussed *supra*, *see* POINT IV.A.2, the risks posed by Planned Parenthood's activity and the OAG's interest in regulating such conduct are in no way comparable to those at issue in the Enforcement Action. *See* Schreiber Decl. ¶¶ 16-23.

Plaintiffs' "selective enforcement" argument is equally meritless. Plaintiffs fail to identify where the statutes "invite[] the government to consider the particular reasons for a person's conduct"—let alone that the OAG has "refuse[d] to extend that system to cases of 'religious hardship' without compelling reason." *See Fulton,* 593 U.S. at 533-34; *see also Emilee Carpenter LLC v. James*, __ F.4th __ 2024 WL 3381841 at *13 (2d Cir. July 12, 2024) (finding N.Y. public accommodations law lacks individual exemptions). And because there is no discretionary

exemption system under the Consumer Protection Statutes, there is no "risk that administrators will use their discretion to exempt individuals from complying with the law for secular reasons, but not religious reasons." *We the Patriots,* 17 F.4th at 288; *see also Roman Cath. Diocese of Albany v. Vullo*, __ N.E. 3d __, 2024 WL 2278222 (N.Y. May 21, 2024) (statute requiring insurance coverage of medically necessary abortion care with exceptions for defined religious entities did not constitute discretionary system of individualized assessments).

As neutral, generally applicable laws, the Consumer Protection Statutes—and the OAG's enforcement thereof, including through the Enforcement Action—are subject only to rational basis review. *Cent. Rabbinical Cong. v. NYC Dept. of Health and Mental Hygiene,* 763 F.3d 183, 193 (2d Cir. 2014). These easily meet this standard as they are rationally related to protecting New Yorkers from misleading and/or false advertising and fraudulent business conduct.

**B.    Plaintiffs have not shown irreparable harm.**

In the Second Circuit, the "presumption of irreparable harm arising from a constitutional deprivation is not automatic." *Joglo Realties, Inc. v. Seggos*, No. 16-cv-1666, 2016 WL 449140, at \*16 (E.D.N.Y. Aug. 24, 2016). Instead, the Second Circuit has held that it "often will be more appropriate to" consider the nature and extent of the alleged injuries to the plaintiff absent injunctive relief. *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997).

Here, there is no current risk of irreparable harm requiring this Court's intervention given that the OAG has not sued or taken any action against Plaintiffs. Indeed, as explained above, Plaintiffs' own past statements about APR were not sufficiently commercial-oriented to violate the Consumer Protection Statutes. And, as to Plaintiffs' hypothetical future statements, Plaintiffs have not alleged the substance and context of those statements, nor their intent to make them, in

sufficiently concrete terms. To the extent Plaintiffs wish to copy the statements of the HBI Defendants, the legality of those statements will be resolved in the Enforcement Action.

**C.      The balance of equities and the public interest weigh in favor of the OAG.**

Finally, the balance of equities and considerations of the public interest weigh heavily against Plaintiffs. *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Servs.*, 769 F.3d 105, 112 n.4. (2d Cir. 2014). "These factors merge when the Government is the opposing party." *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019).

The OAG has a significant interest in enforcing the Consumer Protection Statutes to protect New York consumers against false and misleading commercial speech. Through this lawsuit, Plaintiffs seek a broad injunction prohibiting the OAG from not only enforcing the Consumer Protection Statutes against them (something that has not yet occurred) for their vague future statements about APR, but also from enforcing the statutes against any NIFLA member for any potential future statements about APR, even if such statements are blatantly false advertising. Placing such restrictive handcuffs on the OAG's ability to protect New York consumers, based only on hypotheticals, is inequitable and does not serve the public interest.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated:   July 29, 2024
Buffalo, New York

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants

BY: *Daniel R. Maguire*
ALYSSA J. PANTZER
DANIEL R. MAGUIRE
Assistant Attorney General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
(716) 853-8400
Alyssa.Pantzer@ag.ny.gov
Daniel.Maguire@ag.ny.gov

41

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

NATIONAL INSTITUTE OF FAMILY AND
LIFE ADVOCATES, GIANNA'S HOUSE, INC.,
and CHOOSE LIFE OF JAMESTOWN, INC. d/b/a
OPTIONS CARE CENTER,

                              Plaintiffs,                          Case No. 24-cv-00514-JLS

     vs.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York.

                              Defendant.

---

## DECLARATION OF ASSISTANT ATTORNEY GENERAL LOUISA IRVING IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LOUISA IRVING, an attorney duly licensed to practice law in the courts of the State of New York, declare the following to be true under penalty of perjury:

1.      I am over 18 years of age and competent to make this declaration. I am an Assistant Attorney General in the New York State Office of the Attorney General ("OAG") and fully familiar with the facts and circumstances set forth below. I submit this declaration in opposition to Plaintiffs' Motion for Preliminary Injunction.

### The Attorney General's Enforcement Action

2.      On May 6, 2024, the OAG filed an enforcement action in New York Supreme Court, New York County, brought under New York Executive Law § 63(12) and General Business Law §§ 349 and 350 (collectively "Consumer Protection Statutes"), challenging false and/or misleading commercial advertising practices promoting so-called "Abortion Pill Reversal" or "APR." *The People of the State of New York v. Heartbeat Int'l, Inc., et al.,* Index No. 451314/2024, NYSCEF Doc. No. 1, filed on May 6, 2024 ("HBI Compl.") (the "Enforcement Action").

3.      The terms "Abortion Pill Reversal" or "APR" are used to describe a scientifically unproven medical intervention that involves administering repeated high doses of progesterone to a pregnant person who has taken mifepristone, the first drug in the two-drug FDA-approved medication abortion regimen, but not misoprostol, the second drug in that regimen, with the intention of increasing the changes that the pregnancy will continue. However, there is no valid scientific evidence demonstrating that APR is effective or safe. Use of APR with patients is experimental and presents serious safety risks. Several leading medical associations have rejected APR as unproven, unethical, and risky. For these reasons, claims about "reversing" an abortion, the abortion pill, or its effects, and claims touting APR as effective and safe, are inaccurate and misleading.

4.      The Enforcement Action was filed against an international organization, Heartbeat International, Inc. ("HBI"), and various not-for-profit organizations incorporated and located in New York ("New York Defendants") that are part of HBI's worldwide network of what it calls "pro-life pregnancy help organizations" ("PHOs") (collectively "HBI Defendants"). In addition to operating its extensive network of PHOs, HBI also owns and operates a website, abortionpillreversal.com/, that advertises APR directly to consumers, as well as an APR Hotline (877-558-0333), that connects those consumers to medical providers who are part of HBI's Abortion Pill Rescue Network ("APRN") and are trained and vetted by HBI to perform APR.

5.      The Enforcement Action was filed after the OAG sent, via certified mail, to each HBI Defendant, a notice of intention "to commence litigation" against them pursuant to the Consumer Protection Statutes, and waited five days from each Defendants' receipt of the notice, as required by statute.

6.      Before the statutory five-day waiting period had elapsed, the HBI Defendants filed their own affirmative lawsuit in New York Supreme Court, Monroe County, seeking to prevent

the OAG from taking further enforcement action. *Heartbeat Int'l, Inc. v. James*, No. E2024007242 (Sup. Ct. Monroe Cty.), filed April 30, 2024. The HBI Defendants' action asserts substantially the same claims as this case.

7. The Enforcement Action followed an investigation, commenced in the fall of 2023, into publicly available advertising statements and promotional materials related to APR. Initially, the investigation centered on HBI because the OAG determined that abortionpillreversal.com/ contained many consumer-oriented statements about APR's safety and efficacy that are false and/or misleading because they are not backed by valid scientific evidence, in violation of the Consumer Protection Statutes.

8. The investigation identified any PHOs located in New York that were engaged in similar false and misleading commercial advertising practices promoting APR to consumers. To identify such PHOs, the OAG conducted broad internet searches and reviewed the public websites and social media pages of organizations listed in HBI's "Worldwide Directory of Pregnancy Help" as having locations in New York.[1] Plaintiffs Gianna's House and Options Care Center are listed in HBI's directory. Plaintiff National Institute for Family and Life Advocates ("NIFLA") is not.

9. The OAG did not name every PHO in New York that might mention APR on any website, social media account, or other publications as a defendant in the Enforcement Action. Rather, through this investigatory process, the OAG identified PHOs for inclusion in the Enforcement Action that met the following criteria: (1) they were listed in HBI's Worldwide Directory of PHOs; (2) their consumer-oriented websites or social media pages—as distinct from websites or other publications targeting donors, volunteers, or supporters—contained statements or omissions about APR's efficacy and/or safety that were comparably false and/or misleading to

---

[1] *Worldwide Directory of Pregnancy Help*, Heartbeat International, heartbeatinternational.org/index.php?option=com_civicrm&task=civicrm/profile&reset=1&force=1&gid=11&state_province-9=1031 (last visited July 29, 2024).

those on abortionpillreversal.com/; and (3) they participated in HBI's scheme to advertise and promote APR in New York by directing consumers to abortionpillreversal.com/ and/or the APR Hotline (877-558-0333) to be connected with local medical providers in the APRN that will deliver APR treatment.

10. The OAG's investigation also identified various other public statements about APR made on the websites and social media platforms of PHOs, including but not limited to those of some of the HBI Defendants, which were not included in the Enforcement Action.

11. For example, many of the same statements about APR that appear on abortionpillreversal.com/ and are at issue in the Enforcement Action also appear on HBI's other websites. These websites include heartbeatinternational.org/our-work/apr, which describes HBI's APR-related work and APR success stories for the purpose of fundraising, and aprnworldwide.com/abortion-pill-reversal, which describes APR for the purpose of recruiting medical providers and PHOs to join the APRN. The OAG did not include the statements made on these other websites, even if identical in substance to the statements made on abortionpillreversal.com/, in the Enforcement Action because they were not made in the context of advertising APR to consumers and directing consumers toward obtaining APR services.

12. The OAG's Enforcement Action similarly did not generally include personal testimonials by individuals who claimed to have successfully continued their pregnancies after taking mifepristone, and who attributed that outcome to having undergone APR.

13. Finally, although some of the PHOs identified through this investigatory process appeared to either provide or facilitate the provision of APR onsite, this fact was not determinative as to whether the OAG named that PHO as defendant, because the Enforcement Action focuses on the misleading *advertising* of health services, not the provision of those services.

***NIFLA***

14. The OAG did not name NIFLA as a defendant in the Enforcement Action based on its public statements about APR. NIFLA does not allege that it has made or would make public advertising statements about APR that are similar or identical to the consumer-oriented advertising statements that are the subject of the Enforcement Action. Specifically, NIFLA is not in the HBI network and its alleged statements about APR were and would be aimed at its member pregnancy centers, not consumers.

15. NIFLA alleges that prior to the OAG's Enforcement Action, it "made various statements about progesterone treatment *to its New York members*," that it alleges are "identical or nearly identical to" statements at issue in the Enforcement Action. Verified Complaint, ECF No. 1 ("NIFLA Compl.") ¶¶ 172–186 (emphasis added). NIFLA provides materials that it alleges it "has provided and would like to continue to provide *to its New York members*." NIFLA Compl. ¶ 179 (emphasis added). These materials include a NIFLA policy on APR and a NIFLA "Clinic Tips" newsletter, both of which inform and encourage *pregnancy centers* to become involved in the provision of APR. NIFLA Compl. Ex. U, ECF No. 2-9.[2]

16. Because the statements NIFLA alleges it has made and would like to make about APR are directed to its New York members rather than in the context of advertising APR to consumers and connecting them to APR services, those statements are not and would not be identical or even similar to the statements and materials at issue in the Enforcement Action.

17. There is therefore no basis to believe, based on the allegations in the Complaint, that NIFLA would be subject to future enforcement action based on those past or proposed statements alone.

***Gianna's House***

18. The OAG did not name Gianna's House as a defendant in the Enforcement Action

---

[2] Exhibit U was mislabeled in the text of the NIFLA Complaint as Exhibit AA.

based on its public statements about APR. Although Gianna's House is a member of the HBI network, Plaintiff Gianna's House does not allege that it has made or would make public advertising statements about abortion "reversal" that are similar or identical to the consumer-oriented advertising statements that are the subject of the Enforcement Action.

19.    Gianna's House alleges that until May 7, 2024 (the day after the Enforcement Action was filed), it made the following statement about APR on its "Abortion Information" webpage: "[i]f you have recently taken the abortion pill and are having regret, it may be possible to undo the effects of abortion drugs. Learn more here," which it further alleges, "also previously included links to the Abortion Pill Rescue Network landing page at abortionpillreversal.com/." NIFLA Compl. ¶¶ 208–209. But, Exhibit V to the Complaint, cited as evidence of this prior statement, does not, in fact, reflect this statement. Instead, it states: "If you have recently taken the abortion pill and changed your mind about completing the abortion, it may be possible to stop the effects of the abortion drug and continue your pregnancy." NIFLA Compl. Ex. V, ECF No. 2-10.

20.    None of the HBI Defendants includes the language contained in either of these statements on their websites. Only HBI is alleged to make claims on its APR Facebook page about how APR can "undo" an abortion, HBI Compl. ¶ 115, but these claims are *in addition to* the numerous other false and/or misleading statements about APR's efficacy and safety that HBI makes on abortionpillreversal.com/, HBI Compl. ¶¶ 109–157. This distinguishes the single prior statement alleged by Gianna's House from those made by HBI.

21.    Gianna's House also alleges that its prior statement is similar to statements made by HBI Defendants Care Net of Wayne County, Caring Choices, and Bridge Women's Support Center. NIFLA Compl. ¶¶ 205–211. However, the statements by Gianna's House and these HBI Defendants are not similar because the HBI Defendants also make claims about the possibility of "reversal" of an abortion which Gianna's House does not make.

     a.    Care Net of Wayne County's website states: "Reversal is possible if action is taken after the first dose." HBI Compl. ¶ 218.

     b.    Caring Choices website asks: "Is reversal possible?" and states in response: "Reversal may be possible if action is taken after the first dose." HBI Compl. ¶ 249.

     c.    Bridge Women's Support Center states: "The abortion process can often be reversed if you have only taken the first dose." HBI Compl. ¶ 256.

22.     Gianna's House further alleges that it published "success stories" in the form of personal testimonials. NIFLA Compl. ¶ 213. The OAG Enforcement Action does not include such personal testimonials. Were Gianna's House to resume making its prior statement about APR or merely sharing anecdotal APR "success stories," without more, those statements would not be identical or even similar to the statements and materials at issue in the Enforcement Action.

23.     Gianna's House generally alleges that it would like to make additional statements about progesterone treatment similar to statements that also appear on abortionpillreversal.com/. NIFLA Compl. ¶ 215. But Gianna's House does not specify the context in which it would like to make these statements—i.e. whether the statements would appear in the context of a consumer-facing website or in a different context entirely. Gianna's House also does not allege that it would include a link to abortionpillreversal.com/ or to the APR Hotline alongside these additional statements. Without that context or additional information, it is not clear whether the proposed statements would be identical or even similar to the statements and materials at issue in the Enforcement Action.

24.     There is therefore no basis to believe, based on the allegations in the Complaint, that Gianna's House would be subject to a future enforcement action based on these past and proposed statements alone.

*Options Care Center*

25.    The OAG did not name Options Care Center as a defendant in the Enforcement Action based on its past public statements about APR. Although Options Care Center is a member of the HBI network, the statements it alleges it made about APR in the past and that it would like to make about APR in the future, either are not supported by evidence they were ever made or are not similar or identical to the consumer-oriented advertising statements that are the subject of the Enforcement Action.

*26.*    Options Care Center alleges that it previously made statements about APR in its "Abortion Pill FAQ" and on postcards, which it alleges are similar to statements identified in the Enforcement Action. NIFLA Compl. ¶¶ 222–225. However, Options Care Center does not provide any evidence that these statements were in fact made, nor does it allege where the "Abortion Pill FAQ" appeared or to whom the postcards were "disseminated." *Id.*

27.    Further, it is not clear whether, in the context of making these alleged statements, Options Care Center directed consumers to abortionpillreversal.com/ or the APR Hotline. The alleged statement from "Abortion Pill FAQ" apparently indicated contact should be made to "the Abortion Pill Reversal Network," but does not appear to include a website address or phone number. NIFLA Compl. ¶ 223. Similarly, the alleged statement from the postcard does not mention abortionpillreversal.com/ or the APR Hotline. NIFLA Compl. ¶ 225.

28.    Options Care Center also alleges that it previously tweeted a link to an article from Pregnancy Help News reporting an APR "success story," along with the statement: "[i]f a woman changes her mind after taking the first abortion drug, she may be able to save her baby through abortion pill reversal." NIFLA Compl. ¶ 226. This statement describes the article that is linked; it is not advertising APR to consumers, and therefore, is not comparable to the statement made by HBI Defendant Soundview Pregnancy Center. *See* NIFLA Compl. ¶ 227. The Soundview

statement cited by Plaintiffs appeared on Soundview's consumer-oriented website, along with other statements claiming that the "abortion process" can be "reversed," and directing consumers to call the APR Hotline to receive APR. HBI Compl. ¶ 185–188; HBI Compl. Ex. I., NYCEF Doc. No. 10. Options Care Center's tweet lacks this context.

29.      Options Care Center further alleges that it made similar statements on "small cards" that included a "QR code to the Abortion Pill Rescue Network website" and were "distributed . . . throughout the community to reach women in need of support and spread awareness about progesterone treatment." NIFLA Compl. ¶¶ 228–229. Options Care Center provides no evidence that these cards existed or were distributed as alleged, and does not specify the website address linked through the QR code or any other language on the card. Even assuming these cards did exist, these allegations do not provide a basis to believe they are similar or identical to the statements advertising APR that are at issue in the Enforcement Action.

30.      Finally, Options Care Center alleges that it has prepared certain statements about APR that it would like to post on its "website communicating to prospective and current supporters, friendsofocc.com." NIFLA Compl. ¶ 234. By Options Care Center's own admission, these are not advertising statements aimed at consumers or directing consumers to abortionpillreversal.com/ or the APR Hotline to obtain APR services. Rather, they are statements aimed at "supporters" of the organization. Indeed, based on a review of the homepage of friendsofocc.com, it appears that this website is aimed at fundraising and recruiting volunteers. As described above in Paragraph 11, statements made in this context are not the subject of the Enforcement Action.

31.      In sum, the various statements alleged by Plaintiffs are not comparable to the statements at issue in the Enforcement Action because they do not include "reverse" or "reversal" claims; they do not appear in the context of consumer-oriented advertising; and/or they are not accompanied by language directing consumers to abortionpillreversal.com/ or the APR Hotline for

APR services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 29, 2024.

Louisa Irving
Assistant Attorney General
Civil Rights Bureau
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005

10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

NATIONAL INSTITUTE OF FAMILY AND
LIFE ADVOCATES, GIANNA'S HOUSE, INC.,
and CHOOSE LIFE OF JAMESTOWN, INC. d/b/a
OPTIONS CARE CENTER,

                            Plaintiffs,

    vs.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York.

                            Defendant.

Case No. 24-cv-00514-JLS

---

## **EXPERT DECLARATION OF COURTNEY A. SCHREIBER, M.D., M.P.H.**

COURTNEY A. SCHREIBER, M.D., M.P.H., declares and states as follows:

1.      I have been retained as an expert by counsel for Defendant in connection with the above-captioned litigation. I am over 18 years of age and competent to make this declaration. I submit this declaration in support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction.

2.      I have knowledge of the matters stated herein, have cited to relevant literature and other sources concerning these matters, and could and would so testify if called as a witness.

3.      In preparing this Declaration, I have reviewed (a) Plaintiffs' Complaint filed in the above-captioned litigation, ECF No. 1 ("NIFLA Compl."), along with Exhibits B–S and other sources cited therein; (b) Plaintiffs' Motion for Preliminary Injunction, ECF No. 3-1; (c) the Declaration of Christina Francis, M.D., ECF No. 3-2, submitted in support of that Motion ("Francis Decl."); and (d) the Attorney General's complaint in *State v. Heartbeat Int'l, Inc. et al*, Index No.

**780**

451314/2024 (Sup. Ct. N.Y. Cty.).

4.     Based on my review of these materials, I understand that Plaintiffs and other opponents of abortion care endorse a treatment they call "Abortion Pill Reversal" or "APR," that involves administering progesterone to a pregnant person who is in the midst of undergoing a medication abortion, with the intention that this will "reverse" the effects of the medication and result in the continuation of the pregnancy. I also understand that some opponents of abortion care, including the defendants named in the Attorney General's complaint, make claims about APR's efficacy and safety on their websites and in other publications.

5.     As I explain below, it is my expert opinion that claims that progesterone can "reverse" an abortion, the abortion pill, or its effects, and claims or statements implying that APR is effective and safe, are false and misleading because they are inaccurate and are not supported by any scientific evidence. Specifically:

a.  The evidence regarding APR is extremely weak because no rigorous experimental studies have fully tested, much less proven, the efficacy or safety of APR;

b.  The theory on which APR is based is unproven and unlikely to be correct because progesterone levels are already very high during pregnancy and mifepristone has immediate, irreversible effects;

c.  Given the weak state of evidence regarding APR, its use at this time is purely experimental and presents a serious risk of harm to patients; and

d.  It is a false equivalence, and highly misleading, to state or suggest that the weak state of the evidence regarding APR is comparable to the decades of rigorous research and science that have verified the efficacy and safety of the FDA-approved medication abortion regimen involving mifepristone and misoprostol.

6.      The fact that I have not addressed a particular statement or assertion by Plaintiffs or Dr. Francis does not mean that I agree with that statement or assertion.

7.      My opinions are based on my expertise in the fields of obstetrics and gynecology; my decades of experience providing a broad range of reproductive and gynecologic health care to patients, including abortions; my expertise as a published clinical researcher in the field of reproduction; my professional responsibilities as a professor and teacher in the field of obstetrics and gynecology; and my familiarity with the body of scientific literature concerning medication abortion, including the few published papers regarding so-called "reversal."

**<u>Professional Background and Qualifications</u>**

8.      I am a medical doctor and am double board-certified in the fields of Obstetrics & Gynecology and Complex Family Planning by the American Board of Obstetrics and Gynecology. I received my board certifications in 2007 and 2022, respectively. I am licensed to practice medicine in the State of Pennsylvania and have been since 2003. I earned my Doctor of Medicine from the New York University School of Medicine in 1999. I earned my Master's Degree in Public Health, with a concentration in epidemiology (the study of the incidence, distribution, and possible control of diseases and other factors relating to health), from the University of Pittsburgh Graduate School of Public Health in 2005.

9.      I am employed as an obstetrician/gynecologist at the University of Pennsylvania Health System ("Penn Medicine") and a Professor in the Department of Obstetrics and Gynecology at the Perelman School of Medicine at the University of Pennsylvania. At Penn Medicine and the Perelman School of Medicine, I am the Chief of the Division of Complex Family Planning, the former Program Director of the Fellowship in Family Planning, and an attending physician at the Hospital of the University of Pennsylvania.

10.     At Penn Medicine, I provide both clinical and lecture-based training to medical students, residents, and fellows in obstetrics/gynecology and family medicine, among other specialties. Among the subjects I teach is the provision of abortion care, advanced family planning, miscarriage management, ectopic pregnancy management, and contraception.

11.     I am an expert in the provision of abortion, having provided this care for over 10,000 patients as an integral component of my practice. I use a variety of abortion techniques, including medication abortion, vacuum aspiration, and dilation and evacuation. I provide a wide spectrum of general gynecological care and have particular expertise in contraceptive management and care for early pregnancy loss. This has been my practice as an attending physician for almost 20 years.

12.     I am a Fellow of the American College of Obstetricians and Gynecologists ("ACOG"). To become an ACOG Fellow, an obstetrician/gynecologist must be board-certified, with an unrestricted license to practice medicine, and have attained high ethical and professional standing. ACOG is the nation's premier professional membership organization for obstetrician/gynecologists.

13.     I have experience and expertise in conducting medical and scientific research in the field of human reproduction, including research on human subjects, and have conducted, as principal investigator, or participated in, as a co-investigator, over 60 such studies. These studies have included research relating to early pregnancy, abortion, pregnancy loss or miscarriage, contraception, and sexually transmitted infections.

14.     I have published over 120 peer-reviewed publications on a range of reproductive health and health care issues. I served on the editorial board of *Contraception*, a leading monthly peer-reviewed medical journal covering reproductive medicine, for 10 years. I serve and have

served as a peer reviewer for several scientific journals, including *Fertility and Sterility,* an international peer-reviewed journal for physicians, scientists and others who treat and investigate problems of infertility and human reproductive disorders; *Pharmacoepidemiology,* an international, peer-reviewed journal on high-quality epidemiological, clinical research across the fields of clinical pharmacology and epidemiology; and the *American Journal of Obstetrics and Gynecology,* which publishes content, including original research, with a particular focus on the diagnosis, treatment, prediction and prevention of obstetrical and gynecological disorders.

15.    A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

**The Science of Medication Abortion**

16.    Medication abortion is a safe and effective option for ending an early pregnancy (defined as 10 weeks or fewer from the first day of a person's last menstrual period ("LMP")), and is approved by the United States Food and Drug Administration ("FDA"). Medication abortion involves taking two medications, mifepristone (also known as RU-486 or by its trade name in the U.S., Mifeprex®) and misoprostol that together cause termination of pregnancy. To date, more than five million women in the United States and millions more worldwide have had a medication abortion.[1]

17.    In 2000, the FDA approved the use of mifepristone (Mifeprex) in medication abortion, through seven weeks LMP, and outlined an evidence-based regimen for its use involving *both* mifepristone and misoprostol.[2] Then, in 2016, the FDA extended its approval for use of this

---

[1] *Mifeprex Effectiveness & Advantages*, Danco Laboratories, www.earlyoptionpill.com/is-mifeprex-right-for-me/effectiveness-advantages/ (last visited July 29, 2024).

[2] MIFEPREX (mifepristone) Approval Letter (Sept. 28, 2000), FDA, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf; MIFEPREX (mifepristone) Approved Labeling Text (Sept. 28, 2000), FDA, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.pdf

regimen in patients with pregnancies through 10 weeks LMP. As set forth in the FDA-approved

2016 label for Mifeprex, the protocol for administration of medication abortion is as follows: on

day one, the patient takes 200 mg of mifepristone orally; twenty-four to forty-eight hours later, the

patient takes 800 mcg of misoprostol buccally (in the cheek pouch).[3] According to this label, of

the 16,794 patients monitored during in-person clinical trials in the United States, 97.4% of the

patients had a complete abortion.[4]

18.    Because taking these two drugs is part of a single regimen, the terms "medication

abortion" or "the abortion pill," are commonly used to refer to the combination of the two drugs.

This is the same combination of medications I use to provide medication abortion in my own

clinical practice and in training medical students and other health care professionals.

19.    When used in a medication abortion, mifepristone works by binding to

progesterone receptors in the uterus and cervix, blocking the activity of progesterone, and resulting

in the pregnancy tissue and uterine lining breaking down and separating from the uterine wall.[5]

Progesterone is a hormone produced by the body that is essential to maintaining the lining of the

uterus for a fertilized egg to implant and grow and is essential for the maintenance of a pregnancy.

Progesterone also helps keep the uterus from contracting. The body dramatically increases

progesterone production during pregnancy, and progesterone levels remain very high for the

---

[3]  MIFEPREX (Mifepristone) Revised Labeling Text (Mar. 2016), FDA, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf    (herein "Mifeprex 2016 Label")

[4] *Id.* at Table 3.

[5] N.N. Sarkar, *Mifepristone: Bioavailability, Pharmacokinetics, and Use-Effectiveness*, 101 Eur. J. of Obstetrics & Gynecology & Reprod. Biology 113, 115–16 (2002); Regine Sitruk- Ware & Irving M. Spitz, *Pharmacological Properties of Mifepristone: Toxicology and Safety in Animal and Human Studies*, 68 Contraception 409, 410 (2003); Beatrice Couzinet et al., *Termination of Early Pregnancy by the Progesterone Antagonist RU486 (Mifepristone)*, 315(25) N. Eng. J. Med. 1565, 1568 (1986).

duration of a pregnancy.

20.    Mifepristone binds to the progesterone receptors both preferentially (meaning the receptors favor mifepristone over progesterone) and more tightly than progesterone.[6] Mifepristone's blocking of progesterone at the receptor level also triggers increased production and release of endogenous prostaglandins (which cause uterine contractions);[7] softens the cervix which can lead to cervical dilation;[8] and increases uterine contractility (capacity of the uterus to contract).[9]

21.    Mifepristone is quickly absorbed, reaching peak concentrations in the bloodstream around one to two hours after it is ingested.[10] Mifepristone is eliminated from the bloodstream slowly for the first 72 hours, then more rapidly thereafter.[11]

22.    Early research showed that mifepristone could not sufficiently and effectively be used alone as an abortion-inducing medication.[12] Subsequent research showed that the *combination* of mifepristone and a prostaglandin, misoprostol, work synergistically to terminate

---

[6] Sitruk-Ware & Spitz, *supra* n.5, at 410; Oskari Heikinheimo et al., *The Pharmacokinetics of Mifepristone in Humans Reveal Insights Into Differential Mechanisms of Antiprogestin Action*, 68 Contraception 421, 425 Table 1 (2003); Christian Fiala & Kristina Gemzell-Danielsson, *Review of Medical Abortion using Mifepristone in Combination with a Prostaglandin Analogue*, 74 Contraception 66, 68 (2006).

[7] Couzinet et al., *supra* n.5, at 1568; Remi Peyron et al., *Early Termination of Pregnancy with Mifepristone (RU 486) and the Orally Active Prostaglandin Misoprostol*, 328 N. Eng. J. Med. 1509, 1509 (1993).

[8] Couzinet et al., *supra* n.5, at 1568; Fiala & Gemzell-Danielsson, *supra* n.6, at 76.

[9] Couzinet et al., *supra* n.5, at 1568; Peyron et al., *supra* n.7, at 1509; Fiala & Gemzell- Danielsson, *supra* n.6, at 68; Sitruk-Ware & Spitz, *supra* n.6, at 411-12.

[10] Heikinheimo et al., *supra* n.6, at 422; Sarkar, *supra* n.5, at 114; Fiala & Gemzell-Danielsson, *supra* n.6, at 68.

[11] Sarkar, *supra* n.5, at 115.

[12] *See, e.g.*, Iain T. Cameron et al., *Therapeutic Abortion in Early Pregnancy with Antiprogestogen RU486 Alone or in Combination with Prostaglandin Analogue (Gemeprost)*, 34(5) Contraception 459, 465–66 (1986).

an early pregnancy with high success because mifepristone primes the uterus for prostaglandins and therefore increases misoprostol's efficacy at inducing uterine contractions to expel the pregnancy.[13] Mifepristone can be thought of as a "premedication" that increases the uterus' and cervix's receptivity to prostaglandins like misoprostol, and increases the likelihood that pregnancy tissue will be expelled from the uterus after misoprostol use. Data from trials looking at the efficacy of the mifepristone-misoprostol combination suggest that the rate of continued pregnancy increases as gestational age increases.[14]

23.    It is difficult to accurately estimate the rate of continuing pregnancy if a patient were to take mifepristone alone. There are several reasons for this: (a) there are very few studies showing the proportion of pregnancies in which mifepristone alone caused complete abortion; (b) almost all of those studies focused on pregnancies earlier than 49 days LMP;[15] (c) nearly all of those studies involved higher doses of mifepristone than are currently FDA-approved and used by most clinicians;[16] (d) more recent studies describe the efficacy of mifepristone only when combined with misoprostol, and most researchers do not study or compute success after mifepristone alone; and (e) large, population-based datasets are not available to analyze, since very few women elect to discontinue the medication abortion regimen after ingesting mifepristone. One systematic review of studies examining the continuing pregnancy rate after mifepristone alone found a wide range of continuing pregnancy rates from 8% up to 46%, depending on the

---

[13] Fiala & Gemzell-Danielsson, *supra* n.6, at 66-67; Couzinet et al., *supra* n.5, at 1568-69.

[14] Beverly Winikoff et al., *Two Distinct Oral Routes of Misoprostol in Mifepristone Medical Abortion: A Randomized Control Trial*, 112(6) Obstetrics & Gynecology 1303, 1305-06 (2008).

[15] *See, e.g.*, Laszlo Kovacs et al., *Termination of Very Early Pregnancy by RU 486—An Antiprogestational Compound*, 29(5) Contraception 399 (1984) (including only women with pregnancies of 42 days LMP or fewer).

[16] *See, e.g.*, Cameron et al., *supra* n.12 (studying total mifepristone dosage of 600 mg, which is three times the current standard dosage).

mifepristone regimen used.[17] Ultimately, we currently do not have adequate data to determine with any precision the rate of continuing pregnancies after mifepristone is taken alone (without misoprostol) at the range of gestations for which medication abortion is currently FDA-approved and used.[18]

**Rigorous Experimental Studies are A Baseline Requirement to Prove the Efficacy and Safety of Medical Treatments in a Clinical Setting**

24.    Scientific research can be designed as observational or experimental.

25.    When it comes to research aimed at testing a proposed treatment's efficacy and safety, experimental studies are used to test a hypothesis. The gold standard experimental study is the randomized controlled trial because this study design ensures that the only variable that is different between the groups being studied is the use of the drug under study. In a well-conducted randomized controlled trial, any difference in outcomes can be attributed to the intervention or drug, because the population and the conditions among the study groups are otherwise similar. Some basic methodologies in experimental studies include using appropriate population selection and size, appropriate control and study groups, randomization, blinding, use of placebo, and other bias controls, as well as careful consideration of appropriate research ethics and ethical board review These principles are necessary to ensure the resulting data, conclusions, and/or treatment recommendations are ethical, improve health care, and do not expose patients to harm.

26.    In randomized controlled trials, for example, participants are randomly and

---

[17] Daniel Grossman et al., *Continuing Pregnancy After Mifepristone and "Reversal" of First-Trimester Medical Abortion: A Systematic Review*, 92(3) Contraception 206 (2015) (herein "Grossman 2015"). A true and correct copy of this systematic review is attached hereto as **Exhibit B**.

[18] Mitchell D. Creinin & Melissa J. Chen, *Mifepristone Antagonization Requires Real Studies to Evaluate Safety and Efficacy*, 100 Contraception 427 (2019). A true and correct copy of this article is attached hereto as **Exhibit C**.

sometimes blindly (meaning neither participants nor researchers know the group assignments for participants) assigned to either (a) an intervention group—which receives the drug or treatment being studied, or (b) a control group—which receives a placebo or another treatment known to be effective, or no treatment at all. The use of a "control group" enables researchers to attribute any difference in outcome to the intervention. Without a control group, it may not be possible to discern if the intervention is the reason for the outcome or if it was due to some other factor. Randomly assigning participants to the intervention or control group avoids other variables affecting the outcome, and blinding is intended to minimize potential biases that could otherwise be introduced. Because of these defining features, randomized controlled trials are a rigorous tool for studying causation, efficacy, and safety.

27.    In addition to incorporating these methodologies, experimental medical research on humans also requires formal approval from an Institutional Review Board ("IRB"), which is a committee that reviews proposed research involving human subjects to ensure such research meets ethical standards. This includes reviewing study design to assess its potential to generate useful knowledge, which is an ethical requirement of subjecting humans to experiments. Federal regulations require that all research on human subjects receive IRB approval, and the federal government requires this step as a research funding prerequisite. Reputable scientific journals will not publish results obtained without IRB approval or exemption.

28.    While experimental studies, such as randomized controlled trials, are considered the gold standard for testing a treatment's efficacy and safety, observational studies, such as case reports and case series are considered a much weaker form of evidence.

29.    A case series, for example, simply describes the characteristics and outcomes for a group of individuals exposed to a particular treatment over a period of time. Without a control

group against which to compare outcomes, causal conclusions cannot be drawn. The absence of any control group or randomization in a case series makes it susceptible to bias and the influence of confounding variables, and thus, a case series allows only for the description of outcomes, but no scientific conclusions. Other limitations of case series generally include relatively small sample size and unrepresentative study populations.

30.     Because of these limitations, a case series may be useful for generating hypotheses related to a new treatment and collecting preliminary data that may inform further experimental studies, but case reports or case series are not considered sufficient evidence to demonstrate the efficacy or safety of a treatment, much less to support use of the treatment in clinical practice.

31.     When a scientific idea is very novel, so novel that introducing the intervention to humans may be dangerous or unethical, animal studies are often performed to assess toxicity and to preliminarily assess mechanistic action at a biological, pre-clinical level. Animals are used when what is being tested needs an initial proof on concept before it would be reasonable to test the intervention in humans. Research performed on animals, such as rats, may also be useful to generate treatment hypotheses and topics for further study in humans, but are insufficient evidence of efficacy and safety upon which to recommend treatment in humans. Any treatment must be rigorously tested in human before it is used clinically, meaning in the general population of humans seeking care.

32.     Many studies on animals have generated promising theories that later turned out to not be successful—or worse, harmful—when studied in humans. For example, preclinical studies in laboratory animals and small, early-stage human clinical trials indicated that progesterone may

be a treatment for traumatic brain injury ("TBI").[19] Early promising results from these studies led researchers to perform a large, randomized, controlled trial to definitively determine the efficacy of this treatment in humans who suffered TBI. However, this randomized controlled trial was suspended early on after interim analyses indicated fewer favorable outcomes in the progesterone group than the placebo group. Researchers concluded that despite previous promising data, including from animal studies, the randomized controlled trial did not show a benefit of using progesterone to treat TBI.

33.      Peer review is another important method to ensure research is rigorous and reliable. Peer reviewers are subject experts who evaluate articles for publication based on an assessment of scientific merit and whether an article's findings advance scientific knowledge and patient care. Publication in a peer-reviewed journal is considered an important measure of quality and validity of the research, and is also how research is disseminated to the clinical community.

**The Evidence Regarding APR is Extremely Weak Because No Rigorous Experimental Studies have Fully Tested—Much Less Proven—its Efficacy or Safety**

34.      As explained below, no rigorous experimental studies have tested, much less proven, the efficacy or safety of APR. The direct evidence cited in support of APR consists primarily of observational studies (case reports and case series) and research on animals, which do not constitute the kind of rigorous scientific research required to definitively demonstrate the efficacy and safety of APR or recommend its use in clinical practice. APR is based on a variety of proposed protocols described in two papers published in 2012 and 2018 by Dr. George Delgado and Dr. Mary Davenport, with colleagues, and were characterized as case reports or case studies,

---

[19] David W. Wright et al., *Very Early Administration of Progesterone for Acute Traumatic Brain Injury*, 371 N. Engl. J. Med. 26 (2014).

i.e. observational studies. Dr. Francis states that the APR protocol she uses with her patients is based on the oral regimen described in the 2018 paper. Francis Decl. ¶ 20.

35.     Neither the 2012 or 2018 papers, or any of the other sources cited by Dr. Francis in her declaration, constitute "[e]mpirical evidence support[ing] that APR is effective in reversing the effects of mifepristone," Francis Decl. ¶ 20. No such evidence exists. As will be explained below, the various sources Dr. Francis cites in support of her opinions are: (a) methodologically and/or ethically flawed to the point of rendering them unreliable; (b) preliminary and lacking sufficient rigor to recommend a change to clinical practice and are in no way "empirical"; and/or (c) on-demonstrative of the efficacy and safety of APR for use in humans because they involve studies using rats or inapposite analogies. The *only* randomized controlled trial aimed at testing APR was halted for safety concerns after three participants experienced severe, brisk hemorrhage, foreclosing any conclusions about APR's efficacy, and raising concerns about the safety of APR.

36.     Many other national and international professional medical associations share this opinion, including ACOG, which, as explained above, is the nation's premier professional membership organization for obstetrician/gynecologists, with over 60,000 members, comprised of practicing physicians, medical students, and other medical professionals across North and South America.[20] Among other things, ACOG produces practice guidelines for health care professionals and programs to improve women's health.[21]

37.     In denouncing APR, ACOG issued a statement explaining that "[c]laims regarding abortion 'reversal' treatment are not based on science and do not meet clinical standards," and that it "ranks its recommendations on the strength of the evidence and does not support prescribing

---

[20] *About,* ACOG, https://www.acog.org/about (last visited July 29, 2024).
[21] *Id.*

progesterone to stop a medication abortion."[22]

38.    ACOG's position on APR is consistent with other major medical associations that have similarly criticized APR as lacking any basis in science. In March 2021, the Society of Obstetricians and Gynecologists of Canada (SOGC), one of Canada's oldest national specialty organizations, with over 4,000 members, that produces Clinical Practice Guidelines for public and medical education,[23] released a statement that it "does not support prescribing progesterone to stop a medical abortion;" that "claims regarding so-called abortion 'reversal' treatments are not based on scientific evidence;" and that the treatments are not only "unproven, they can also result in serious complications for the patient."[24] In July 2022, an interdisciplinary group of leading medical associations in the United Kingdom released a joint statement advising that "[t]here are **no reputable national or international clinical guidelines that recommend the use of progesterone to reverse the effect of mifepristone**, and no evidence that it increases the likelihood of continuing pregnancy."[25] Those associations included The Royal College of Obstetricians and Gynaecologists (RCOG) (which has over 17,500 members worldwide and

---

[22] *Facts Are Important: Medication Abortion "Reversal" Is Not Supported by Science*, ACOG, https://www.acog.org/advocacy/facts-are-important/medication-abortion-reversal-is-not-supported-by-science (last visited July 29, 2024) (herein "ACOG Statement").

[23] *About the SOGC*, The Society of Obstetricians and Gynaecologists of Canada, https://sogc.org/en/en/content/about/about-the-sogc.aspx?hkey=0fe58207-2fef-4845-b345-3ba1a08753e5 (last visited July 29, 2024).

[24] *SOGC Statement on Abortion Medication "Reversal"* (Mar. 19, 2021), SOGC, *available at* https://sogc.org/common/Uploaded%20files/Latest%20News/SOGCStatement_AbortionMedicationReversal.pdf

[25] *Joint statement on 'Abortion reversal': The Royal College of Obstetricians and Gynaecologists (RCOG), The Faculty of Sexual and Reproductive Healthcare (FSRH), the Royal College of Midwives (RCM) and the British Society of Abortion Care Providers (BSACP)* (July 7, 2022), Royal College of Midwives, *available at* https://www.rcog.org.uk/media/nbahkgvo/rcog-fsrh-abortion-reversal-position-statement.pdf (emphasis in original).

publishes national clinical guidelines);[26] The Faculty of Sexual and Reproductive Healthcare (a multidisciplinary professional organization that sets clinical guidance and provides training);[27] the Royal College of Midwives (RCM) (the only professional organization for midwives in the UK, which promotes professional standards);[28] and the British Society of Abortion Care Providers (BSACP) (a multi-professional organization that promotes best practices, education, training, and research in abortion care).[29]

39.     Major, membership-based, professional medical organizations, like ACOG, SOGC, RCOG, RCM, and BSACP, produce and maintain best evidence-based clinical practices that are relied on by healthcare providers worldwide. These organizations do not denounce APR because they are "promoting a pro-abortion agenda," as Dr. Francis claims, Francis Decl. ¶ 45, but because there is no reliable medical or scientific evidence to support it.

**The 2012 Paper Does Not Prove the Efficacy or Safety of APR**

40.     The 2012 paper by Drs. Delgado and Davenport, published in the *Annals of Pharmacotherapy,* describes seven "case reports" of patients who took mifepristone and were then administered progesterone, using various routes of administration (oral, vaginal, and intramuscular). Of these patients, four carried pregnancies to term, two experienced an abortion,

---

[26] *About Us*, Royal College of Obstetricians & Gynaecologists, https://www.rcog.org.uk/about-us/what-we-do/ (last visited July 29, 2024).

[27] *About Us*, The Faculty of Sexual & Reproductive Healthcare, https://www.fsrh.org/Public/Public/About-Us-.aspx?hkey=8258d162-1fa2-4b7e-a109-54ed179afd65 (last visited July 29, 2024).

[28] *Who We Are*, Royal College of Midwives, https://www.rcm.org.uk/about-us/who-we-are/ (last visited July 29, 2024).

[29] *About Us*, British Society of Abortion Care Providers, https://bsacp.org.uk/about-bsacp/ (last visited July 29, 2024).

and the seventh patient's outcome was unreported to due to loss of contact.[30] At the end of the paper, Drs. Delgado and Davenport recommend a protocol of intramuscular injections of 200mg doses of progesterone, administered regularly throughout the first trimester of pregnancy.

41.    Drs. Delgado and Davenport disclose that they based their APR protocol on another clinical protocol using progesterone that was proposed in the separate context of miscarriage prevention, known as "the protocol of Hilgers."[31] This other protocol does not appear to have been endorsed by any major medical organization or derived from any peer-reviewed studies, so itself is likely experimental.

42.    Although progesterone has been proved effective and safe for use in certain other clinical contexts, its use in the context of miscarriage prevention has been significantly called into question by a large, randomized, double-blind, placebo-controlled trial published in 2019 in the peer-reviewed *New England Journal of Medicine*, recognized as the world's leading medical journal, demonstrating that progesterone does <u>not</u> prevent miscarriage among women who experience bleeding in early pregnancy.[32] And in April 2023, the FDA withdrew its prior approval of an injectable form of progesterone after finding that the drug was <u>not</u> effective in reducing the risk of preterm birth, and determining that the known risks associated with this drug were therefore not justified.[33] These developments together call into question the use of supplemental

---

[30] George Delgado & Mary L. Davenport, *Progesterone Use to Reverse the Effects of Mifepristone*, 46 The Annals of Pharmacotherapy e36 (2012) (herein "Delgado & Davenport 2012") (NIFLA Compl. Ex. Q, ECF No. 2-5).

[31] *Id.*

[32] Arri Coomarasamy et al., *A Randomized Trial of Progesterone in Women with Bleeding in Early Pregnancy,* 380 N. Eng. J. Med. 1815 (2019) (NIFLA Compl. Ex. K, ECF No. 1-13).

[33]    *Makena (hydroxyprogesterone caproate injection) Information*, FDA, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/makena-hydroxyprogesterone-caproate-injection-information#FDA-press-release (last visited July 29, 2024) (herein "Makena Withdrawal").

progesterone in increasing the likelihood that a pregnant person will carry a pregnancy to term—a foundational assumption on which APR is based.

43.    Beyond the dubious theoretical rationale for use of progesterone to "reverse" the effects of mifepristone, there are serious flaws with the 2012 paper itself that make its findings, and any inferences based on them, wholly unreliable. The number of patients reported is so small that no responsible researcher or physician would generalize from the outcomes reported. There is a scarcity of relevant facts reported for each woman, such as gestational age of pregnancy or, for the patient lost to follow-up, the outcome of their pregnancy. The four patients who had a continued pregnancy took mifepristone later in the gestational age (between seven and ten or eleven weeks),[34] when clinical evidence has shown mifepristone to be less effective. It appears that all of the patients discussed as "successes" had confirmed embryonic or fetal cardiac activity *before* beginning progesterone treatment,[35] which indicates that these pregnancies were continuing after mifepristone, even without progesterone use. The paper describes a variety of drug regimens provided to the patients, including different routes of progesterone administration (oral, vaginal, and intramuscular), intervals between doses, and durations of doses, which diminishes any ability to draw conclusions about any specific regimen. No conclusions can be drawn from this paper.

44.    Because of these flaws and limitations in the 2012 paper, it is impossible to draw any conclusion about whether progesterone had an effect on the continuation of the patients' pregnancies described in these case reports. I am not alone in this view. As ACOG explained, the 2012 paper "is not scientific evidence that progesterone resulted in the continuation of [the four

---

[34] Delgado & Davenport 2012, *supra* n.30.

[35] The authors report that, in one case (of a patient who went on to miscarry), there was no documentation of cardiac activity before treatment, but do not explain why treatment was provided.

patients'] pregnancies."[36] Furthermore, a systematic review of the research on mifepristone "reversal," published by Grossman et al. in 2015, which considered the 2012 paper, found that evidence was insufficient to determine whether treatment with progesterone after mifepristone results in a higher proportion of continuing pregnancies compared to expectant management—which means closely watching a patient's condition, but not providing any medical intervention unless needed due to some change in symptoms.[37]

45.    Drs. Delgado and Davenport's inclusion of clinical recommendations at the conclusion of the 2012 paper is therefore highly unusual and scientifically unjustified because, as explained above, case reports or case series, including this one, are not considered sufficient evidence to verify the efficacy or safety of a particular treatment. Furthermore, no specific protocol was used much less tested in this paper, but instead, a variety of modes of delivery of progesterone were used. Larger data sets with more rigorous study methodologies, such as randomized controlled trials, are generally required to recommend a clinical practice.

**The 2018 Paper Does Not Prove the Efficacy or Safety of APR**

46.    The 2018 paper by Drs. Delgado, Davenport, and colleagues, and cited by Dr. Francis as "the largest direct study of APR to date," Francis Decl. ¶ 20, is just as unreliable.[38] According to Dr. Delgado et al., the data analyzed in this paper was derived from 547 women who, after taking mifepristone, called an informational hotline, were connected with a provider in their geographic area and underwent APR treatment.[39] The paper was published in *Issues in Law and*

---

[36] ACOG Statement, *supra* n.22.

[37] Grossman 2015, *supra* n.17, at 206.

[38] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone,* 33 Issues in Law & Medicine 21 (2018) (herein Delgado et al. 2018) (NIFLA Compl. Ex. P, ECF No. 2-4).

[39] *Id.* at 24–25.

*Medicine,* a journal that, according to its website, provides "technical and informational assistance to attorneys, health care professionals, educators and administrators on legal, medical, and ethical issues arising from health care decisions."[40] It is not known for publication of peer-reviewed scientific research used by clinicians or for clinically relevant or actionable data. Prior to reading this paper, I had never heard of this journal.

47.     When the 2018 paper was first published its "methods" were described as a "an observational case series with data analysis that received an institutional review board waiver," citing the IRB at the University of San Diego.[41] Following its publication, however, media reports indicated that the University of San Diego's IRB requested that the paper be withdrawn "because the wording regarding [Institutional Review Board] approval in the paper was ambiguous, leading many readers to incorrectly conclude that the University of San Diego's IRB had reviewed and approved the entire study" (alteration in original), when it had in fact only approved a *retrospective* analysis of pre-existing, de-identified patient data.[42] When the paper was republished, the authors altered the description of their "methods," now calling it a "retrospective analysis of clinical data," but did not change their results or discussion.[43] It is unheard-of to withdraw a paper, rewrite its methods section to describe an entirely different study design, and republish the remainder of the

---

[40] *About,* Issues in Law & Medicine, https://issuesinlawandmedicine.com/about/ (last visited July 29, 2024).

[41] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone,* 33 Issues in Law & Medicine 1, 6, n.33 (2018). A true and correct copy of this paper is attached hereto as **Exhibit D**.

[42] *See Study Claiming "Abortion Reversal" Is Safe and Effective Temporarily Withdrawn for Ethical Issues,* Retraction Watch (July 17, 2018), https://retractionwatch.com/2018/07/17/study-claiming-abortion-reversal-is-safe-and-effective-temporarily-withdrawn-for-ethical-issues/ (last visited July 29, 2024).

[43] *Compare* Delgado et al. 2018, *supra* n.38, at 21, 24, *with* George Delgado et al., *supra* n.41 (describing methods as "an observational case series with data analysis that received an institutional review board waiver").

paper unchanged.

48.     Dr. Francis states that the 2018 paper "found an overall fetal survival rate following APR of 48%, with rates rising to 64% and 68% respectively for intramuscular and oral administration of progesterone." Francis Decl. ¶ 20. As with the 2012 paper, any interpretation of results in the 2018 paper is limited by the variety of progesterone delivery systems (including high dose oral progesterone, intramuscular injections ranging from 1 to 11 or more injections, and vaginal suppositories), that were administered by 325 different medical professionals.[44] As Dr. Francis concedes, Francis Decl. ¶ 20, Dr. Delgado in fact found that *only 48%* of patients who underwent APR remained pregnant at twenty weeks, and the 64% and 68% numbers refer to subsets of patients who received either varying numbers of injections of progesterone intramuscularly or high-dose oral progesterone (only 31 patients). Thus, statements unqualifiedly touting a "64–68%" success rate for APR, without acknowledging the 48% "overall" rate reported or specifying the subsets of patients referenced are deeply misleading.

49.     Moreover, these purported success rates are misleading and unreliable because the 2018 paper reports that "[t]he gestational age at the time of ingestion [of mifepristone] was directly related to reversal success,"[45] yet provides *no information* about gestational age across the different groups based on progesterone delivery system and dosage.[46] The exclusion of this information is significant because, as Dr. Francis agrees, mifepristone (without misoprostol) is less effective at ending pregnancies in later stages of gestation, Francis Decl. ¶ 22. As a result, it is impossible to determine, for example, if patients at later gestational ages were in the oral administration group,

---

[44] Delgado et al. 2018, *supra* n.38, at 24, 27 ("Table 1: Reversals Compared to Reported Control of 25% Survival if No Treatment Undertaken").

[45] *Id.* at 26.

[46] Compare *id.* at 27 ("Table 1: Reversals Compared to Reported Control of 25% Survival if No Treatment Undertaken"), with *id* at 28 ("Table 2: Gestational Age Compared to Reversal Rate").

and thus whether gestational age alone could explain the 68% rate of continuing pregnancy.

50.      Like the 2012 paper, the 2018 paper almost certainly *overestimates* the pregnancy continuation rate among patients who received progesterone because those reported on were administered progesterone only *after* an ultrasound confirmed ongoing fetal cardiac activity after taking mifepristone (except in an unknown number of instances in which such ultrasound confirmation was not readily available).[47] The fact that the data consisted primarily of patients whose pregnancies had already withstood the effects of mifepristone means that the authors were reporting on pregnancies that had already demonstrated a predisposition towards continuation. The paper does not adequately account for the significance of fact that the outcome, a viable fetus, was present before the exposure to the progesterone.[48] It is not possible to attribute the viable fetus to the progesterone if the fetus was already viable before the progesterone.

51.      Even if the 2018 paper was not mired in these flaws, any reported impact of progesterone on pregnancy continuation is not sufficiently significant to draw any conclusions from the paper. The limitations of the 2018 paper were addressed in an article published in the *New England Journal of Medicine*, which compared the data from the 2018 paper to the only study of the rate of continuing pregnancy after the relevant dose of mifepristone (200 mg), and found that the confidence intervals around the point estimates overlap for women who do and do not use progesterone supplementation after using mifepristone.[49] In other words, there is no evidence at all that progesterone administration after mifepristone use is effective at reversing, avoiding, or ceasing mifepristone's effects. At best, the results would be useful as preliminary data to

---

[47] *Id.* at 29.

[48] *Id.*

[49] Daniel Grossman & Kari White, *Abortion "Reversal"—Legislating without Evidence*, 379(16) N. Eng. J. Med. 1491, 1492–93 (2018). A true and correct copy of this article is attached hereto as **Exhibit E**.

potentially justify further study, for example in a randomized controlled trial testing the hypothesis of APR, but not to recommend a clinical practice.

52.     That neither the 2012 or 2018 papers, are randomized controlled trial limits any conclusions that can be drawn from them about APR's efficacy or safety. Dr. Francis tries to minimize this weakness in the papers with the misleading and distracting claim that "none of the trials relied on in the approval of mifepristone were [randomized controlled trials]." Francis Decl. ¶ 41. The need for a control group to test the efficacy of the mifepristone-misoprostol regimen in terminating pregnancy is different than the need for a control group to test the efficacy of progesterone under the APR protocol in supporting the continuation of pregnancy. This is because, in the context of mifepristone's approval, the baseline expected rate of spontaneous abortion (miscarriage) was well known to be 15-20%, thereby allowing for comparison against the rate of induced abortion under the mifepristone-misoprostol regimen. Whereas, as explained above, the baseline continuation rate of pregnancy after mifepristone alone is not conclusively known, so it is not possible to make a comparison to the rate of continued pregnancies under APR treatment.

53.     Dr. Francis exposes her lack of knowledge regarding the FDA drug approval process, during which the FDA generally works with the sponsor of an application to design studies of sufficient rigor to support, or decline, clinical approval. The FDA advises the sponsor on the study design necessary to demonstrate safety and efficacy for the proposed use in support of registration. According to the FDA-approved label for mifepristone, safety and efficacy data are based on "22 worldwide clinical studies (including 7 U.S. studies)."[50] Moreover, there have been at least 80 randomized controlled trials testing different outcomes with the mifepristone-

---

[50] Mifeprex 2016 Label, *supra* n.3.

misoprostol regimen.[51] The same cannot be said of APR.

54.      In the absence of a proper, concurrent control group, Dr. Francis tries to bolster the

2018 paper by pointing to its use of what she calls a "historical control group." Francis Decl. ¶ 23.

In general, a historical control group is a group of patients who were previously studied and are

used as a control for the group of patients receiving the treatment that is later being studied. If a

historical control group is used, it is important that details about that group be well documented

and understood so that researchers can ensure that whether participants received the treatment

being tested is the *only variance* between the historical control group and the treatment group.

55.      However, the 2018 paper did not follow this standard approach. Instead, the paper

simply "selected a 25% embryo or fetus survival rate, if mifepristone alone is administered, as a

control[.]"[52] This "control" was selected from another study that found a "fetal survival rate," or

continuing pregnancy rate after mifepristone use, "of 10–23%." Francis Decl. ¶ 22. This other

study,[53] a purported "systematic review" of the literature on mifepristone "reversal" published in

2017, was also authored by Drs. Delgado and Davenport and published in *Issues in Law &

Medicine*, for the apparent purpose of identifying a baseline rate of continuing pregnancy after

mifepristone to use as a comparison for APR treatment in the 2018 paper.

56.      Drs. Delgado and Davenport's systematic review falls victim to well-known errors

in poorly conducted systematic literature reviews and meta-analyses, including selective reporting,

which occurs when the reporting of a subset of outcomes and analyses in the systematic review is

---

[51] Jing Zhang et al., Medical Methods for First Trimester Abortion (Review), 1(5) Cochrane Database Syst. Rev. (2022), available at https://www.cochranelibrary.com/cdsr/doi/10.1002/14651858.CD002855.pub5/epdf/full.

[52] Delgado et al. 2018, *supra* n.38, at 24.

[53] *See* Mary L. Davenport et al., *Embryo Survival After Mifepristone: A Systematic Review of the Literature*, 32(1) Issues in Law & Medicine 3 (2017) (NIFLA Compl. Ex. M, ECF Doc. 2-1).

based only on the results of the studies without accounting for differences in the methods or populations included.[54] The statistical analysis is flawed because the 25% number used as a "control" in the 2018 paper likely *underestimates* the true rate of continuing pregnancy in the population after mifepristone, with the effect that the authors *overestimate* the effectiveness of APR.[55] Ultimately, the 2018 paper's use of a 25% fetal survival rate "control" is arbitrary because, as explained above, estimates of the rate of continuing pregnancy after mifepristone alone are inconclusive and imprecise. Furthermore, this is not actually the proper use of an historical control group, since no details about the individuals in this "control" group are provided. The 25% number is simply an estimate, and one of many possible estimates that could have been used. This is precisely why rigorous experimental studies with proper concurrent control groups are needed to test the effect of progesterone in the context of APR.

57.     Dr. Francis suggests that it "may not be practical or ethical" to conduct a randomized controlled trial of APR. Francis Decl. ¶¶ 23, 39–40. She is wrong. Even the 2012 and 2018 papers appear to acknowledge that the proposal for APR requires such rigorous study to determine safety and efficacy before APR could be recommended as a treatment. The 2012 paper concluded that "if further [clinical] trials confirm the success without complications of this or similar protocols, it should become the standard of care" and that currently physicians "may not want" to provide this treatment and only some physicians may be "comfortable" doing so. [56] The

---

[54] *See* Matthew J. Page et al., *Bias Due to Selective Inclusion and Reporting of Outcomes and Analyses in Systematic Reviews of Randomised Trials of Healthcare Interventions*, 1(10) Cochrane Database Syst. Rev. (2014).

[55] To be appropriately conservative in preparation for the planned 2018 paper, the authors instead should have focused on the upper-bound 95% confidence interval around each study's point estimate of the rate of continuing pregnancy. *See* T.V. Sakpal, *Sample Size Estimation in Clinical Trial*, 1(2) Perspectives in Clinical Research 67 (2010).

[56] Delgado & Davenport 2012, *supra* n.30.

2018 paper similarly acknowledged that only "randomized controlled trials" can "confirm which mode of delivery, dose and duration of progesterone therapy is most efficacious and carries the least burden for the patient."[57]

### The Sole Randomized Controlled Trial Aimed at Testing APR Was Halted for Safety Concerns

58.    The *only* rigorous scientific study aimed at testing APR was halted for safety concerns after three participants experienced severe, brisk hemorrhage, foreclosing any conclusions about APR's efficacy, and raising concerns about the safety of APR.[58]

59.    In 2020, researchers at the University of California, Davis Medical Center, led by Dr. Mitchell Creinin, conducted a randomized, double-blind, placebo-controlled trial to evaluate continuing pregnancy rates, safety, and side effects of high-dose oral progesterone in patients who used mifepristone alone without misoprostol. The researchers did not enroll patients seeking to continue their pregnancies (as Dr. Francis misleadingly suggests would be required, Francis Decl. ¶ 39), but rather, enrolled participants who were pregnant, wanted abortions, were eligible for medication abortion, and were willing to delay their abortion by approximately two weeks. Critically, unlike the 2012 and 2018 papers, the Creinin et al. study had IRB approval and was published in a high-impact, peer-reviewed medical journal, *Obstetrics & Gynecology*.

60.    Ultimately, the researchers halted the study after enrolling only twelve participants, due to serious safety concerns after three of the twelve participants had severe, brisk hemorrhaging and had to be taken by ambulance to an emergency room, leading the researchers to conclude that "[p]atients in early pregnancy who use only mifepristone may be at high risk of significant

---

[57] Delgado et al. 2018, *supra* n.38, at 29.

[58] Mitchell D. Creinin et al., *Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial,* 135(1) Obstetrics & Gynecology 158 (2020). A true and correct copy of this paper is attached hereto as **Exhibit F**.

hemorrhage."[59]

61.     Dr. Francis misrepresents the Creinin et al. study by claiming that it "actually supports the effectiveness of APR." Francis Decl. ¶ 44. This is wrong. The researchers concluded that because the trial stopped at only twelve participants, rather than the forty they planned, the sample size was too small to evaluate any "difference in continuing pregnancy rates between progesterone and placebo treatment after mifepristone ingestion."[60]

62.     Dr. Francis also minimizes the serious safety risks the study revealed. Dr. Francis claims that because two of the three participants who experienced hemorrhaging were from the placebo group, the hemorrhaging "almost certainly originated from the administration of mifepristone" and not "the administration of progesterone following mifepristone without misoprostol." Francis Decl. ¶ 43. However, the fact that all three participants who experienced hemorrhage took mifepristone and *did not take misoprostol*, suggests that the hemorrhaging resulted from using mifepristone alone and not in combination with misoprostol, which is the regimen approved by FDA. Indeed, the researchers concluded that "[p]atients in early pregnancy who use *only* mifepristone may be at high risk of significant hemorrhage."[61] The researchers did not make findings or draw conclusions about any impact the progesterone treatment may have had on the one participant in that group who experienced hemorrhage, nor is there any basis to draw conclusions. Dr. Francis's suggestion that taking progesterone somehow lessens the potentially high risk of hemorrhage from taking mifepristone alone has no scientific support.

63.     The serious safety concerns raised by the Creinin et al. study about not completing the two-drug medication abortion regimen, are referenced in a practice bulletin issued by ACOG

---

[59] *Id.* at 158, 160–62.

[60] *Id.* at 158, 162.

[61] *Id.* at 158 (emphasis added).

and the Society of Family Planning ("SFP"), cautioning that the "limited available evidence suggests that use of mifepristone alone without subsequent administration of misoprostol may be associated with an increased risk of hemorrhage."[62] Yet this is exactly what APR calls for.

64.     It is incorrect for Dr. Francis to suggest that there is no practical or ethical way to conduct the kind of rigorous studies needed to test the "reversal" hypothesis. The Creinin et al. study shows that such studies can be performed. Moreover, the Creinin et al. study confirms the importance of studying APR in a properly monitored setting in which the researchers can halt the study, as Creinin et al. did, if safety concerns arise. Until such studies, optimally randomized controlled trials, are conducted, it would be inappropriate to draw any conclusions about the safety of APR or its effect on pregnancy continuation.

***Other Papers Cited by Dr. Francis Do Not Prove the Efficacy or Safety of APR***

65.     The additional sources cited by Dr. Francis do not alter my opinion, because, as explained below, these sources are either flawed, inapposite, or misconstrued, and therefore are not reliable scientific evidence of APR's efficacy or safety.

66.     To start, Dr. Francis misrepresents the Das and Catt paper[63] by misleadingly claiming that it "showed that the effect of mifepristone was reversed with the addition of exogenous progesterone." Francis Decl. ¶ 20. This paper, published as a "Preliminary Communication," describes scientists trying to understand the pharmacological mechanism of mifepristone by examining cultured placental cells in the laboratory and reporting on early

---

[62] American College of Obstetricians & Gynecologists and Society of Family Planning, *Practice Bulletin No. 225: Medication Abortion up to 70 Days of Gestation*, Oct. 2020, *available at* https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2020/10/medication-abortion-up-to-70-days-of-gestation (hereinafter "ACOG/SFP Guidelines").

[63] Chandra Das & Kevin J. Catt, *Antifertility Actions of the Progesterone Antagonist RU 486 Include Direct Inhibition of Placental Hormonal Secretion,* The Lancet 599 (Sept. 12, 1987).

assessments of their findings.[64] Such early assessments are not used to inform clinical practice or treatment protocols.

67.    Dr. Francis then cites a "randomized controlled trial" testing a progesterone injectable contraceptive administered "at the time of a mifepristone induced abortion," as showing the "probable causal relationship of progesterone on pregnancy continuation after mifepristone ingestion." Francis Decl. ¶ 21. This research is inapplicable to the use of progesterone under the APR protocol for several reasons: the study was investigating the *termination* and prevention of pregnancy, not its continuation; the contraceptive was administered either after the abortion was complete or *concurrently* with mifepristone, not up to 72 hours after mifepristone ingestion; the "progesterone injectable contraceptive" is not the same molecule recommended under the APR protocol; the study focused on the timing of the contraceptive use, rather than the fact of its use; and the results were not significant enough for the researchers to recommend against concurrent use of this contraceptive with mifepristone.[65] Per the study authors, the data are consistent with only a "very small (0.4%)" increased risk of ongoing pregnancy.[66] Thus, this study does not support a "probable causal relationship" between progesterone and pregnancy continuation, Francis Decl. ¶ 21, and certainly does not support the use of exogenous progesterone as clinically effective to "reverse" the effects of mifepristone. Finally, another study by the same authors tested the effects of a different progestin (synthetic or pharmacologic progesterone) contraceptive on

---

[64] *Id.* at 599–600.

[65] Elizabeth G. Raymond et al., *Effects of Depot Medroxyprogesterone Acetate Injection Timing on Medical Abortion Efficacy and Repeat Pregnancy*, 128(4) Obstetrics & Gynecology 739 (2016).

[66] *Id.* at 744–45.

medication abortion outcomes and did not show a difference in continuing pregnancy rates.[67]

68.    Dr. Francis later cites a 2023 paper published by Turner et al. as "showing that progesterone can counteract the effects of mifepristone." Francis Decl. ¶ 24. But that study concluded that "[o]ngoing pregnancy viability rate *did not reach statistical significance* for determining treatment success;" that "*clinical recommendations cannot be made* from the data presented," and that "*[l]arger clinical trials are required* to determine the clinical effectiveness of progesterone-after-mifepristone[.]"[68] Moreover, any application of its findings are seriously limited by the fact that it involved only six patients and the authors relied heavily on self-reporting by patients without any confirmation that either mifepristone or progesterone were in fact ingested.[69] At best, the results of a trial this small may be used to generate hypotheses for future larger clinical trials (as the authors acknowledge are needed).

69.    Dr. Francis also points to studies performed on rats to support the claim that mifepristone is a reversible inhibitor of progesterone, claiming that "mice and rats have been used for decades in biomedical research due to their anatomical, physiological, and genetic similarity to humans." Francis Decl. ¶ 28. This statement is completely misleading and flies in the face of the bedrock scientific principle that a study on rats (or animals generally) is not sufficient to support a change in practice on humans. The example of studies of progesterone's use to treat TBI, described above, illustrates that findings in animals may not translate to findings in humans. In fact, progesterone receptors vary widely between species in their affinities for different

---

[67] Elizabeth G. Raymond et al., *Effect of Immediate Compared with Delayed Insertion of Etonogestrel Implants on Medication Abortion Efficacy and Repeat Pregnancy*, 127(2) Obstetrics & Gynecology 306, 311 (2016).

[68] Joseph V. Turner et al., *Progesterone After Mifepristone: A Pilot Prospective Single Arm Clinical Trial for Women who have Changed Their Mind After Commencing Medical Abortion*, 50 J Obstet Gynaecol Res. 182, 187–88 (2023) (emphasis added).

[69] *Id.* at 188.

molecules,[70] making it even less appropriate to draw conclusions about the efficacy or safety of a treatment for humans from a study of rats.

70.     The first rat study Dr. Francis relies on does not even show that mifepristone's effects can be reversed in rats.[71] The researchers injected one group of rats with mifepristone alone, a second group with mifepristone and progesterone, and a third group with ethanol (as a control).[72] The rats that were administered both mifepristone and progesterone appear to have received both substances *simultaneously.*[73] The study therefore does not tell us anything about the rate of continued pregnancy in rats injected with progesterone *after* mifepristone has already taken effect (as is the sequence under the APR protocol). Furthermore, the experiment was not designed to, nor did it, assess live-birth outcomes, as Dr. Francis claims. Francis Decl. ¶ 26. The rats were *decapitated* and underwent hysterectomy-procedures that are incompatible with fetal life.[74] Dr. Francis's description of the test animals "delivering live offspring," Francis Decl. ¶ 26, is impossible.

71.     The second rat study on which Dr. Francis relies fares no better.[75] To begin with, the authors of this study are a Senior Research Assistant and a Professor with a Ph.D. in Neuroscience in the Department of *Psychology* at Franciscan University of Steubenville. The

---

[70] Etienne-Emile Baulieu, RU 486: *An Antiprogestin Steroid with Contragestive Activity in Women*, in THE ANTIPROGESTIN STEROID RU 486 AND HUMAN FERTILITY CONTROL 1, 5–6 (Etienne-Emile Baulieu and Sheldon J. Segal eds., 1985).

[71] Shingo Yamabe et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy,* 65 Nihon Naibunpi Gakkai Zasshi 497 (1989) (NIFLA Compl. Ex. O, ECF No. 2-3).

[72] *Id.* at 497–99.

[73] *Id.*

[74] *Id.* at Figure 1 (rats were "decapitated" at 24, 48, 72, 96 hours after injection).

[75] Christina Camilleri & Stephen Sammut, *Progesterone-Mediated Reversal of Mifepristone-Induced Pregnancy Termination in a Rat Model: An Exploratory Investigation*, 13-10942 Scientific Reports 1 (2023) (NIFLA Compl. Ex. R, ECF No. 2-6).

authors' apparent backgrounds in psychology raise serious questions about their qualifications to conduct research that has no apparent nexus with their field of expertise. Dr. Francis states that the research "specifically looked at survival of the [rat] fetus to term" and that the results showed that "13 of 16 (81%) of the fetuses in the progesterone group survived." Francis Decl. ¶ 27. But remarkably, the study only reported results on ultrasound measurements of fetal heart rates for the "reversal group" that took both mifepristone and progesterone, and the "normal pregnancy" group that took neither mifepristone or progesterone, but *not* for the group that took only mifepristone but not progesterone.[76] Thus, the authors omit the outcome that is needed to compare the effect of progesterone as administered under APR to expectant management. Because the presence of "fetal heart rate" was used to confirm fetal survival in this study, and is the best direct marker of fetal viability, the omission of this key datapoint makes the survival rate cited by Dr. Francis utterly unreliable.

72.     Dr. Francis also makes passing reference to a "recent systematic review of studies on reversal of medication abortion by progesterone," that she misleadingly claims highlights safety concerns of not taking progesterone after mifepristone, in the absence of misoprostol. Francis Decl. ¶ 47. In fact, this systematic review, only confirms, once again, the lack of any credible scientific evidence supporting the use of APR. The review aimed to "determine whether there is new sufficient evidence to recommend treatment with progesterone for pregnant individuals who took mifepristone and no longer wish to complete the medication abortion process," and identified only four relevant studies: the 2012 and 2018 papers described above; another case series of only three

---

[76] *Id.* at 3, 6.

patients; and Creinin et al.'s randomized controlled trial.[77] The authors identified the Creinin et al. study as the only one "rigorously designed," but noted that it "did not reach its intended sample size due to safety concerns," and criticized the other three case series as having "serious ethical and methodological concerns."[78] Based on their analysis, the authors "found that ongoing pregnancy rates are not significantly different for individuals treated with progesterone compared with those managed expectantly" and that "individuals who do not receive misoprostol after mifepristone may be at increased risk of bleeding."[79]

73.     Dr. Francis's claim that this study supports the idea that there are safety concerns when progesterone is not taken after mifepristone in the absence of misoprostol is flatly wrong. The authors pointed to the Creinin et al. study's conclusion that "both expectant management *and treatment with progesterone* may be associated with higher risk of bleeding than continuing with the abortion with misoprostol, where complications requiring emergency department visits are rare."[80] Ultimately, the authors concluded until "high-quality evidence" of APR's efficacy is available, clinicians "should be cautious about providing high-dose progesterone off-label given the lack of evidence of benefit and the potential safety concerns."[81]

74.     Additionally, Plaintiffs refer to a 2023 review[82] by DeBeasi that they claim demonstrates that use of progesterone for APR is safe. Mem. of Law in Supp. of Prelim. Inj., ECF

---

[77] Bianca M. Stifani & Antonella F. Lavelanet, *Reversal of Medication Abortion with Progesterone: A Systematic Review*, 50 BMJ Sexual Reproductive Health 43, 44–46 (2024). A true and correct copy of this paper is attached hereto as **Exhibit G**.

[78] *Id.* at 49.

[79] *Id.*

[80] *Id.* at 50.

[81] *Id.*

[82] Paul L. C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion: A Scoping Review*, 90(4) The Linacre Quarterly 395 (2023) (NIFLA Compl. Ex. S, ECF Doc. 2-7).

No. 3-1, at 5. The author appears to have a Master's Degree in Bioethics and other degrees in engineering,[83] which raises serious questions about his qualification to draw conclusions about the safety and efficacy of APR as a medical treatment. The review was published in *The Linacre Quarterly*. As with *Issues in Law and Medicine,* which published the 2018 paper, *The Linacre Quarterly* is not a journal utilized by clinicians or scientists for clinically relevant or actionable data. The conclusions drawn in this paper are not supported by the data, and the author himself states that "[t]here is insufficient evidence to establish the continuing pregnancy rate after mifepristone alone for gestational age ≥50 days,"[84] which, as explained above, underscores again that the effect of progesterone after mifepristone use cannot be reliably computed without use of a proper control group.

75.     In addition to citing these various sources as support for APR's use, Dr. Francis also references "sound clinical experience" and her history of "providing APR through the Abortion Pill Rescue Network since 2015." Francis Decl. ¶¶ 7–10, 48. However, anecdotal experience is not a substitute for credible scientific evidence substantiating efficacy and safety. Neither the "Pro-life pregnancy centers" that claim to have "witnessed numerous successful incidents" of APR, NIFLA Compl. ¶ 141, nor Dr. Francis know whether any of the patients they are referring to would have continued their pregnancies anyway *without* APR.

76.     For all these reasons, statements regarding APR's effectiveness are inaccurate and misleading because no credible scientific evidence has established any causal relationship between APR and pregnancy continuation after mifepristone, or even an increased chance of pregnancy continuation with APR.

---

[83] *Id.* at 407.
[84] *Id.* at 399.

77.     Additionally, claims implying APR's effectiveness more than 72 hours after mifepristone is taken are misleading. Dr. Francis opines that such statements are not misleading because "[i]t is possible that the embryo or fetus could still be living and in that case it would not be too late." Francis Decl. ¶ 6. However, none of the studies Dr. Francis cites even purport to evaluate APR's efficacy when progesterone is initiated *more than* 72 hours after mifepristone has been taken, and moreover, for the reasons explained above, do not otherwise prove the efficacy and safety of APR.

## The Theory of APR is Unproven and Unlikely to Be Correct

78.     In the absence of any scientific evidence directly supporting the efficacy of APR, Dr. Francis opines that the *theory* of APR simply makes sense because it is "based on the scientific principle of reversible competitive inhibition." Francis Decl. ¶ 16. Even if that were true (as I explain below, it is not), APR would still be just a theory—and theories must be tested before they are put into clinical practice.

79.     The theory of APR—that exogenous progesterone can outcompete mifepristone at the progesterone receptor site—is not supported by any credible evidence and is unlikely to be correct. As explained above, progesterone levels are already very high in pregnancy. There is no reason to believe that adding more (exogenous) progesterone to the already biologically high levels in pregnancy would have any effect. Mifepristone already outcompetes these very high levels of progesterone and binds *more tightly* to the progesterone receptors than progesterone—a fact that Dr. Francis does not dispute. Francis Decl. ¶ 30. Because of mifepristone's higher affinity for progesterone receptors there is no reason to think that adding exogenous progesterone would "displace" mifepristone or cause it to no longer bind to the receptors.

80.     In addition, when mifepristone binds to the progesterone receptors it induces

34

**813**

molecular changes in the receptor that make the receptor a better fit for the mifepristone than progesterone. It also triggers a downstream effect of responses at the intra-cellular level, including the release of enzymes and constricting of blood vessels, that start to separate the pregnancy from the uterus and initiate the abortion process. In virtually all cases, this cascade of responses begins *before* the addition of exogenous progesterone under the APR protocol, which I understand is typically initiated within a 72-hour window after mifepristone is taken. Thus, the theory of APR is highly unlikely because when mifepristone binds to progesterone receptors it has immediate, irreversible downstream intra-cellular and physiologic effects.

81.   The analogies Dr. Francis uses to illustrate the theory of APR are irrelevant and ultimately meaningless. For example, Dr. Francis points to methotrexate and folate as illustrating the theory of "reversible competitive inhibition" that "undergirds the rationale behind APR." Francis Decl. ¶¶ 16–17. Dr. Francis also cites examples of mifepristone's interactions with glucocorticoid receptor (a different hormone receptor than at issue in APR), the use of oxygen to treat carbon monoxide poisoning, and the use of Narcan to counteract the effects of an opioid overdose. Francis Decl. ¶¶ 29–30. Whatever may be happening in these examples, they involve entirely different molecules than those involved in APR, with distinct and independent biological interactions, and are therefore irrelevant to understanding or proving any effect exogenous progesterone may have on mifepristone.

82.   Even if exogenous progesterone had been shown to outcompete mifepristone and bind to the receptors (it has not), this would not be "reversing" an abortion, mifepristone, or its effects. As a general matter, an "abortion" cannot be "reversed." More technically, the downstream effects at the intra-cellular level that are triggered when mifepristone binds to the receptor cannot be "reversed." If progesterone were to have any effect, it would be to *overcome* the downstream

physiological effects of mifepristone to allow a pregnancy to continue to grow (which is entirely theoretical and unproven). Therefore, the use of the terms "reverse" or "reversal" in the context of APR is a complete misnomer, and misleading and confusing to patients.

83.     In fact, in my own practice I have treated patients who have come to me completely confused after seeing abortion reversal advertised and asked if an abortion can be reversed. When I explain that there is no scientific evidence to support APR, patients remain confused and ask why information about APR is being advertised. Based on these patient interactions, I am concerned that false claims that an abortion or the abortion pill could be reversed might distort patients' decision-making and create a risk that patients would begin the abortion process before they are fully prepared to do so. It is critical that the decision to proceed with an abortion is fully contemplated *before* the abortion is begun. Not after.

## Given the Weak State of Evidence Regarding APR, its Use at This Time is Purely Experimental and Presents a Serious Risk of Harm to Patients

84.     Contrary to Plaintiffs' assertions and Dr. Francis's testimony, claims that APR is safe are inaccurate and not supported by any scientific evidence. On the contrary, given the weak state of evidence regarding APR, its use at this time is purely experimental and presents a serious risk of harm to patients.

85.     Dr. Francis's assertion that "APR is safe for pregnant women and fetuses," Francis Decl. at 13, lacks any specific support in science and is dangerously misleading. Aside from the 2018 paper by Drs. Delgado and Davenport et al., none of the other sources cited by Dr. Francis even purport to study the safety risks of APR, that is, of discontinuing the mifepristone-misoprostol combined regimen in favor of repeated high doses of progesterone after mifepristone.

86.     The Bernard et al. study and the rat and mice experiments referenced in the package insert for mifepristone that Dr. Francis cites for the claim that "birth defects in children exposed

to mifepristone in the first trimester" are the same as in the general population is misleading. Francis Decl. ¶ 33. The Bernard study considered the teratogenic effects (meaning harming of the embryonic/fetal development or causing malformations) of mifepristone in the absence of misoprostol but in contexts *other than APR*, i.e., not together with high-dose exogenous progesterone, and thus has no application to understanding the risks associated with the use of progesterone on human fetuses in this situation.[85] Moreover, the FDA specifically qualifies its animal data as reflecting only observations "in rats or mice" and does not purport to draw any conclusions about this data's application to humans[86]

87. Similarly, the FDA review, American Society for Reproductive Medicine bulletin ("ASRM"), and National Institute of Health and Care Excellence ("NICE") guidelines cited by Dr. Francis, Francis Decl. ¶¶ 35–37, considered the risks associated with progesterone in contexts *other than APR*, i.e., not when taken after mifepristone and in the absence of misoprostol. As Dr. Francis concedes, the other contexts referenced in these sources include use of progesterone during IVF cycles and for pregnant women experiencing bleeding in early pregnancy who have had at least one previous miscarriage—there is no mention of APR.

88. Although progesterone is considered a low-risk medication, it does carry risks. As noted above, in April 2023, the FDA withdrew its approval of an injectable form of progesterone after determining that its known risks were not justified given that effectiveness has not been demonstrated.[87] In addition, Progesterone has been associated with maternal complications such

---

[85] N. Bernard et al., *Continuation of Pregnancy After First-Trimester Exposure to Mifepristone: An Observational Prospective Study*, 120 BJOG 568 (2013).

[86] Mifeprex 2016 Label, *supra* n.3, at 9.

[87] Makena Withdrawal, *supra* n.33.

as depression, cholestatic jaundice, and hypertension.[88] And while some data support the general safety of progesterone in pregnancy, there are also some studies that have raised concerns about a possible association with second-trimester miscarriage and stillbirth in pregnancies exposed to certain exogenous progesterone preparations.[89] Investigators also have reported associations with hypospadias, a defect in the male infant's genitalia, occurring in the male infants born to women who used progestins during pregnancy.[90] While none of these data are conclusive, they are enough to raise concern in the absence of proven benefit.

89.     It is inaccurate for Dr. Francis to suggest that progesterone's use and studies of its use in certain populations or for certain indications, such as to support IVF pregnancies and in woman who have a history of pregnancy loss, Francis Decl. ¶¶ 34–37, substantiate progesterone's use in the context of APR. The safety of administering high-dose progesterone has not been adequately studied for *this particular indication* or for use by *this particular population,* i.e., pregnant people who have already taken mifepristone and will not take misoprostol.

90.     It is also deeply misleading for Dr. Francis to claim that this experimental use of progesterone is somehow justified as an "off-label" use. Francis Decl. ¶ 38. Once the FDA approves a drug, a healthcare provider may prescribe that drug for an *evidence-based* unapproved or "off-label" use when that provider judges that it is medically appropriate to do so for a specific patient given their knowledge of that patient's condition and medical history, among other

---

[88] Naama Farago et al., *Vaginal Progesterone Increases the Risk of Intrahepatic Cholestasis of Pregnancy. A Case-Control Study*, American Journal of Obstetrics & Gynecology S701 – 02 (Jan. 2020); Mario Barbagallo et al., *Vascular Effects of Progesterone: Role of Cellular Calcium Regulation*, 37(1) Hypertension (Jan. 2001).

[89] Paul J. Meis et al., *Prevention of Recurrent Preterm Delivery by 17 Alpha-Hydroxyprogesterone Caproate*, 348 N. Eng. J. Med. 2379, 2382 (2003).

[90] Suzan L. Carmichael et al., *Maternal Progestin Intake and Risk of Hypospadias*, 159(10) Archives of Pediatric & Adolescent Med. 957 (2005).

considerations. However, proponents of APR promote progesterone's off-label use to the public as a treatment of general applicability to "reverse" the abortion pill. Off-label use is only ethical when there is a preponderance of valid scientific evidence to support its safety and effectiveness. As I have described in detail above, this is not the case with the use of progesterone under the APR protocol.

91.    Dr. Francis's reference to the off-label use of misoprostol for induction of labor, Francis Decl. ¶ 38, only underscores the inappropriateness of progesterone's off-label use in APR. The ACOG guidelines cited by Dr. Francis explain that "[t]here is extensive clinical experience with [misoprostol] and a large body of published reports supporting its safety and efficacy when used appropriately," and that the FDA, in fact, "approved a new label on the use of misoprostol during pregnancy for cervical ripening and for the induction of labor."[91] The same cannot be said for the off-label use of progesterone in APR.

92.    Ultimately, the combined effect of mifepristone and progesterone, in the absence of misoprostol, has not been adequately studied. As the Creinin et al. study showed, this regimen presents serious risks to the pregnant person. And while mifepristone is not established to be teratogenic, neither mifepristone nor high doses of progesterone has been conclusively shown to be safe for fetal development. It is entirely possible this combined regimen could cause harm to the fetus, including birth defects, and almost impossible that it would be acceptable per current federal standards, outlined in the federal regulation regarding research involving pregnant women or fetuses,[92] to test this hypothesis without intensive safety monitoring board oversight.

93.    For all of these reasons, cherry-picked statements about the safety of mifepristone

---

[91] ACOG Practice Bulletin No. 107: Induction of Labor, 114 Obstetrics & Gynecology 386, 387 (2009).
[92] 45 C.F.R. § 46.204.

and progesterone in contexts other than APR are misleading when presented as evidence of their safe use together and in the absence of misoprostol, per the APR protocol. There is simply no evidence proving that APR is safe for a pregnant person or for fetal development.

**It is a False Equivalence to Compare Medication Abortion and APR**

94.     Dr. Francis's opinions about the risks of medication abortion, Francis Decl. ¶¶ 11–15, are belied by the significant weight of evidence compiled over the last several decades concluding that medication abortion is an effective and safe way to end an early pregnancy. Dr. Francis's implication that this robust body of evidence is in any way comparable to the weak evidence regarding the efficacy and safety of APR is completely unsupportable. In short, this is a false equivalence.

95.     The studies Dr. Francis relies on are of limited relevance and, in fact, contradict the points Dr. Francis relies on them for. The Dzuba et al. paper that Dr. Francis cites to discuss rates of incomplete abortion, Francis Decl. ¶¶ 13–14, concluded the medication abortion regimen is "largely efficacious through 77 days."[93] The Mentula et al. paper Dr. Francis cites to discuss increased risk of complications of medication abortion later in pregnancy, Francis Decl. ¶ 14, looked at medication abortions in the second trimester (13–21 weeks of gestation),[94] which are *not* the FDA-approved regimen, and concluded that increased adverse events were mostly "minor;" that "the risks of surgical evacuation or infection did not increase;" and that this data "encourage further development and use" of medication abortion in the second trimester.[95] The Niinimaki et

---

[93] Ilana G. Dzuba et al., *A Non-Inferiority Study of Outpatient Mifepristone-Misoprostol Medical Abortion at 64-70 Days and 71-77 Days of Gestation*, 101(5) Contraception 302, 305 (2020).

[94] Maarit J. Mentula et al., *Immediate Adverse Events After Second Trimester Medical Termination of Pregnancy: Results of a Nationwide Registry Study*, 26(4) Human Reproduction 927, 927–28 (2011).

[95] *Id.* at 932.

al. paper that Dr. Francis cites to discuss complication rates, Francis Decl. ¶ 14, analyzed hospital data for 42,619 women and concluded that "termination of pregnancy by means of either medical or surgical methods is associated with low level of serious complications."[96] Thus, these studies contribute to the extensive body of literature demonstrating the efficacy and safety of medication abortion.

96.     Importantly too, Dr. Francis misleadingly equates unsuccessful medication abortions with "complications." *See* Francis Decl. ¶¶ 13–14. That an intervention may be needed to complete a medication abortion does not indicate that there are unjustified risks associated with medication abortion. Rather, this is a normal possible outcome about which all patients are counseled.

97.     Dr. Francis attempts to bolster her incorrect claim that medication abortion is unsafe by drawing meaningless comparisons to dosages of Tylenol. Francis Decl. ¶ 15. But the fact remains that, at the dosages approved by the FDA, the two-drug medication abortion regimen is both extremely effective and extremely safe. Studies have shown that major complications—e.g., heavy bleeding or serious infection—occur in approximately 0.3% of medication abortion patients.[97] Moreover, as emphasized by the FDA in the 2016 label, the dosages recommended under the approved medication abortion regimen have been demonstrated by clinical trials to be safe and extremely effective through seventy days or ten weeks LMP.[98]

---

[96] Maarit Niinimäki et al, *Immediate Complications After Medical Compared With Surgical Termination of Pregnancy*, 114(4) Obstetrics & Gynecology 795, 803 (2009).

[97] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125(1) Obstetrics & Gynecology 175 (2015); Daniel Grossman & Kate Grindlay, *Safety of Medical Abortion Provided Through Telemedicine Compared With In Person*, 130(4) Obstetrics & Gynecology 778 (2017).

[98] Mifeprex 2016 Label, *supra* n.3, at 12–13 (detailing studies regarding the safe and effective use of Mifeprex through seventy days LMP); ACOG/SFP Guidelines, *supra* n.62, at 4.

98.     Dr. Francis distorts the boxed warning that appears in the FDA-approved label for Mifeprex. Francis Decl. ¶ 15. The boxed warning states: "Serious and sometimes fatal infections and bleeding ***occur very rarely*** following ***spontaneous***, surgical, and medical abortions, including following MIFEPREX use."[99] (emphasis added). The emphasized language (ignored by Dr. Francis) makes clear that these serious, sometimes fatal complications are exceedingly rare and can occur in the setting of any pregnancy outcome, including "spontaneous" abortions, i.e., miscarriage. The boxed warning does not communicate that medication abortion is unsafe, rather it highlights *for medical providers* the unusual presentation of symptoms associated with certain very rare complications to help ensure timely diagnosis and treatment.

99.     Dr. Francis misleadingly cites "the FDA's own data" as showing that "approximately 1 in 25 women who take mifepristone" will seek "care for complications in the emergency department." Francis Decl. ¶ 15. In fact, the FDA data actually shows somewhere between 2.9% and 4.6% out of 1,043 women visited the ER.[100] What really matters, though, is that the FDA found that "[s]erious adverse reactions were reported in <0.5% of women."[101] Moreover, a February 2024 study that looked at the effectiveness and safety of telehealth medication abortion in the United States found that overall, among 6,034 abortions, 99.8% were not followed by a serious adverse event, and only 1.3% of abortions were followed by a known emergency department visit.[102] This recent data on ER visits is much lower than the "1 in 25" cited by Dr. Francis, and confirms, once again, that medication abortion is safe.

---

[99] Mifeprex 2016 Label, *supra* n.3, at 1.

[100] Dr. Francis does not identify the data she relies on, but it appears to be the FDA's summary of clinical trials included in its 2016 label. Mifeprex 2016 Label, *supra* n.3, at Table 2.

[101] Mifeprex 2016 Label, *supra* n.3, at 7.

[102] Ushma D. Upadhyay et al., *Effectiveness and Safety of Telehealth Medication Abortion in the USA*, 30 Nature Medicine, 1191 (2024), *available at* https://www.nature.com/articles/s41591-024-02834-w.

100.    In fact, studies frequently cited as evidence that mifepristone is not safe were recently retracted.[103] The publisher of these studies issued a statement explaining that the retraction decision was due to "undeclared conflicts of interest," including affiliations with advocacy organizations like American Association of Pro-Life Obstetricians and Gynecologists (of which Dr. Francis is the CEO, Francis Decl. ¶ 2) that explicitly support restrictions on access to mifepristone, and "after expert reviewers found that the studies demonstrate a lack of scientific rigor that invalidates or renders unreliable the authors' conclusions."[104]

101.    In sum, decades of research and decades of FDA-approved use have demonstrated that medication abortion is effective and safe, while APR remains an experimental hypothesis that has not been adequately tested or proven to be either effective or safe for use in patients. Until such studies are conducted on APR, the use of progesterone to support pregnancy continuation after mifepristone remains risky and purely experimental. Statements claiming or suggesting that APR is safe and effective are unsupported by scientific evidence and therefore false and misleading.

---

[103] Selena Simmons-Duffin, *Research at the Heart of a Federal Case Against the Abortion Pill has Been Retracted*, NPR, Feb. 9, 2024, https://www.npr.org/sections/health-shots/2024/02/09/1230175305/abortion-pill-mifepristone-retraction-supreme-court.

[104] *A Note From Sage on Retractions in Health Services Research and Managerial Epidemiology*, Sage Perspectives, https://perspectivesblog.sagepub.com/blog/note-from-sage-on-retractions-in-health-services-research-and-managerial-epidemiology (last visited July 29, 2024).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 29, 2024.

Courtney A. Schreiber, M.D., M.P.H.

44

**823**

# EXHIBIT A

UNIVERSITY OF PENNSYLVANIA - PERELMAN SCHOOL OF MEDICINE
Curriculum Vitae

**Courtney Anne Schreiber, MD, MPH**

| | |
|---|---|
| **Work address:** | 3737 Market Street, 12th floor, Philadelphia, PA 19104 United States |
| **Email:** | cschreiber@pennmedicine.upenn.edu; http://schreibe@upenn.edu |
| **Websites:** | https://www.med.upenn.edu/apps/faculty/index.php/g275/p4014; |
| | https://ldi.upenn.edu/fellows/fellows-directory/courtney-schreiber-md-mph/; |
| | https://peace.med.upenn.edu/ |

| | |
|---|---|
| **Citizenship status:** | U.S. Citizen |

## PERSONAL STATEMENT

I am the Emily and Stuart Mudd Professor of Human Behavior & Reproduction and Chief of the Division of Complex Family Planning in the Department of Obstetrics and Gynecology, Perelman School of Medicine, University of Pennsylvania, and founding director of PEACE, the Pregnancy Early Access Center (PEACE) at Penn Medicine. I serve as Executive Director of FOCUS on Health and Leadership for Women at the Perelman School of Medicine, and Co-lead of Penn Promotes Research on Sex and Gender in Health at the University level. I am a physician-scientist, innovator, and leader in women's health. I apply my expertise institutionally, locally, nationally, and globally to improve health outcomes for females and women at clinical, public health and policy levels. I consistently apply a diversity, equity and inclusion lens and actively promote justice.   Both through direct mentorship and programmatic sponsorship, I support the careers of clinicians and scientists spanning from predoctoral to postdoctoral phases.

## EDUCATION

| | | |
|---|---|---|
| 1993 | BA | Columbia College, Columbia University, New York, NY (Religion) |
| 1995 | | University of Pennsylvania, Philadelphia, PA |
| | | (Postbaccalaurate Premedical Program) |
| 1999 | MD | New York University School of Medicine, New York, NY |
| 2005 | MPH | University of Pittsburgh, Graduate School of Public Health, Pittsburgh, PA |
| | | Epidemiology Track (Public Health) |

## POSTGRADUATE TRAINING AND FELLOWSHIP APPOINTMENT

| | |
|---|---|
| 1999 – 2003 | Resident, Obstetrics and Gynecology, Hospital of the University of Pennsylvania, Philadelphia, PA |
| 2003 – 2005 | Fellow, Contraceptive Research and Family Planning, University of Pittsburgh, Dept of Obstetrics, Gynecology and Reproductive Sciences, Pittsburgh, PA |

## OTHER TRAINING/PROFESSIONAL DEVELOPMENT

| | |
|---|---|
| 2004 | Physicians for Reproductive Health Leadership & Policy Fellowship |
| 2013 | Leading Success Certificate Program, Office of Organization Effectiveness, Perelman School of Medicine |
| 2021 | Leonard Davis Institute of Health Economics Amplify Policy and Media Engagement Training Program |
| 2023 | Dr. Edward S. Cooper Leadership Development Certificate Program, The Wharton School, University of Pennsylvania |

## FACULTY APPOINTMENTS

| | |
|---|---|
| 2005 – 2006 | Instructor, Department of Obstetrics and Gynecology at the Hospital of the University of Pennsylvania, University of Pennsylvania School of Medicine |
| | Assistant Professor of Obstetrics and Gynecology at the Hospital of the University of |
| 2006 – 2014 | Pennsylvania, University of Pennsylvania School of Medicine |

Courtney Anne Schreiber, MD, MPH                Page 2                Last updated 13 Nov 2023

| | |
|---|---|
| 2014 – 2020 | Associate Professor of Obstetrics and Gynecology at the Hospital of the University of Pennsylvania, University of Pennsylvania School of Medicine |
| 2018 – present | Senior Fellow, Leonard Davis Institute of Health Economics |
| 2018 – 2021 | Research Director, Building Interdisciplinary Research Careers in Women's Health K-12 Program, Perelman School of Medicine, University of Pennsylvania |
| 2018 – present | Co-Director, Penn Promotes Research on Sex and Gender in Health |
| 2020 – present | Stuart and Emily B.H. Mudd Endowed Professorship in Human Behavior and Reproduction, University of Pennsylvania School of Medicine |
| 2021 – present | Executive Director, FOCUS on Health and Leadership for Women, Perelman School of Medicine |

## HOSPITAL AND/OR ADMINISTRATIVE APPOINTMENTS

| | |
|---|---|
| 2005 – present | Attending in Obstetrics and Gynecology, Hospital of the University of Pennsylvania, Department of Obstetrics and Gynecology, Philadelphia, PA |
| 2008 – 2017 | Founder and Director, Penn Family Planning and Pregnancy Loss Center |
| 2009 – present | Program Director, Fellowship in Complex Family Planning, University of Pennsylvania Health System |
| 2017 – present | Founder and Director, PEACE, The Pregnancy Early Access Center |
| 2017 – present | Division Chief, Family Planning, Department of Obstetrics and Gynecology, Penn Medicine |
| 2022 – present | Lead, Post-Roe Working Group, Penn Medicine |

## OTHER APPOINTMENTS/SERVICE

| | |
|---|---|
| 2021 – present | Leonard Davis Institute, University of Pennsylvania Gender Equity Special Interest Group (Founder) |
| 2022 | Chair, Maternal-Fetal Medicine Division Chief Search Committee, Penn Medicine |
| 2023 – present | Lead, Elevating Women's Health, OBGYN Strategic Plan, Penn Medicine |
| 2023 – present | Co-Lead, Women's Tower Work Group, Hospital of the University of Pennsylvania |
| 2023 – present | Member, Search Committee Vice Dean/Vice President of Inclusion, Diversity and Equity, Penn Medicine/PSOM |

## SPECIALTY CERTIFICATION

| | |
|---|---|
| 2007 | Obstetrics and Gynecology, American Board of Obstetrics and Gynecology |
| 2022 | Complex Family Planning, American Board of Obstetrics and Gynecology |

## LICENSURE

| | |
|---|---|
| 2003 – present | Pennsylvania Medical Licensure |

## AWARDS, HONORS AND MEMBERSHIP IN HONORARY SOCIETIES

| | |
|---|---|
| 1996 | Reproductive Health Fellowship, Medical Students for Choice, San Francisco, CA |
| 1998 | National Abortion Federation Early Achievement Award |
| 1999 | James E Constantine Award in Obstetrics and Gynecology, NYU School of Medicine |
| 1999 | Dr. Martin Gold Visionary Provider Award, Diana Foundation, New York, NY |
| 2001 | Resident Teaching Award, Hospital of the University of Pennsylvania |
| 2004 | Wyeth New Leader's Award Fellowship, Association of Reproductive Health Professionals |
| 2005 | Philip F. Williams Prize Award, American College of Ob/Gyn |
| 2005 | Wyeth New Leader's Award Fellowship, Association of Reproductive Health Professionals |
| 2005 | Donald F. Richardson Memorial Prize Paper Award Nominee, American College of Obstetricians and Gynecologists |
| 2010 | Women's Way Unsung Heroine Award: Turning Talk into Action |
| 2011 | Emily B. Hartshorne Mudd Award for Contributions to the Field of Family Health |

Courtney Anne Schreiber, MD, MPH          Page 3          Last updated 13 Nov 2023

| | |
|---|---|
| 2011 | The Penn Medicine "Penn Pearls" Award for Excellence in Teaching |
| 2015 | Penn Center for Innovation Accelerator Award Phase I |
| 2016 | Penn Center for Innovation Accelerator Award Phase II |
| 2019 | Clinical Research Forum Top 10 Clinical Research Achievement Award |
| 2020 | Women's Medical Fund Abortion Hero Award (Awarded to PEACE) For Compassion, Dedication, and Resiliency |
| 2022 | Penn Medicine Difference Maker |
| 2022 | Penn Medicine Award for Excellent Service and Seamless Patient Care (Awarded to PEACE) |
| 2023 | Alpha Omega Alpha Honor Medical Society |

**MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES AND OTHER PROFESSIONAL ACTIVITIES**

NATIONAL

| | |
|---|---|
| 1995 – 1999 | Medical Students for Choice (Board of Directors) |
| 1997 – 2002 | American Medical Women's Association |
| 1997 – present | Physicians for Reproductive Choice and Health (Board of Directors 1997 – 1999) |
| 1999 – present | American College of Obstetricians and Gynecologists |
| | Junior Fellow (1999 – 2008) |
| | Fellow (2002 – present) |
| | Physician Member, Committee on Health Care for Underserved Women (2012 – 2013) |
| 2001 – 2006 | American Society for Reproductive Medicine |
| 2003 – 2018 | Association of Reproductive Health Professionals |
| 2003 – present | National Abortion Federation |
| 2004 – 2012 | American Public Health Association |
| 2005 – present | Society of Family Planning (Complex Family Planning Fellowship Executive Committee Chair, 2017-2019) |
| 2008 – present | Peer Health Exchange (Curriculum Advisory Board) |
| 2012 – present | Center for Disease Control Teen Pregnancy Prevention Project, Family Planning Council of Pennsylvania (Consultant) |
| 2014 | NIH (Study Section Reviewer: Female Contraceptive Development Program (U01) |
| 2015 – present | Expert Witness, Center for Reproductive Rights |
| 2015 – present | Expert Witness, Planned Parenthood Federation of America |
| 2017 – present | Expert Witness, American Civil Liberties Union |
| 2019 – present | American Board of Obstetrics and Gynecology |
| | Complex Family Planning Committee Chair (2019) |
| | Complex Family Planning Division Chair (2020 – present) |
| | Member at Large, Board of Directors Credentials Committee (2020 – present) |
| | Audit Committee (2020 – present) |
| | Certifying Examination Development Committee (2021 – present) |
| 2019 – present | The Accreditation Council for Graduate Medical Education, Complex Family Planning Task Force |
| 2021 – present | American Association of Academic Medical Centers (AAMC) |
| | Group on Women in Medicine Steering Committee elected (2022 – present) |
| 2021 – present | American Gynecological and Obstetrical Society (AGOS) (Steering Committee, Women First Research Coalition [WFRC] 2021 – present) |
| 2023 – present | Alpha Omega Alpha National Honor Medical Society |

LOCAL

| | |
|---|---|
| 2008 – 2016 | Family Planning Council (Board Member of the Medical Committee) |
| 2008 – 2016 | Women's Medical Fund Medical Advisory Committee |
| 2010 – 2016 | American Civil Liberties Union of Pennsylvania, Clara Bell Duvall Reproductive Freedom Project (Advisory Council Member) |
| 2011 – 2017 | Women's Way (Board Member. Vice Chair of the Board 2014-2016) |

Courtney Anne Schreiber, MD, MPH                  Page 4                    Last updated 13 Nov 2023

**EDITORIAL POSITIONS**

| | |
|---|---|
| 2005 – present | Reviewer, Contraception |
| 2007 – present | Reviewer, American Journal Obstetrics and Gynecology |
| 2008 – 2010 | Reviewer, Pharmacoepidemiology |
| 2011 – 2018 | Associate Editor, Contraception |
| 2017 – present | UpToDate Section Editor, Contraception, |
| 2018 – present | UpToDate Section Editor, Ectopic Pregnancy |
| 2018 – present | UpToDate Section Editor, Pregnancy Loss |
| 2018 – present | Deputy Editor, Contraception |

**ACADEMIC AND INSTITUTIONAL COMMITTEES**

| | |
|---|---|
| 2002 – 2003 | House Officer Committee, Hospital of the University of Pennsylvania |
| 2005 – 2010 | Resident Curriculum Development Committee |
| 2009 – 2019 | Operating Room Committee |
| 2010 – 2012 | Grant Reviewer Penn CFAR Pilot Grants Program |
| 2011 – 2014 | Chair, Management of Early Pregnancy Failure Working Group |
| 2012 – 2018 | Center for AIDS Research Committee on Women and HIV |
| 2013 – 2018 | Core Member, Women's Health Scholar Certificate |
| 2014 – 2015 | Member, Department of Obstetrics and Gynecology Executive Committee |
| 2014 – present | Medical School Admissions Interview Committee, Perelman School of Medicine of the University of Pennsylvania. |
| 2018 – 2019 | Member, Review Committee for the Department of Biostatistics, Epidemiology, and Informatics |
| 2018 – 2020 | Department of Obstetrics and Gynecology Executive Committee |
| 2022 | Chair, Maternal-Fetal Medicine Division Chief Search Committee, PennMedicine |
| 2022 – present | Member, Search Committee for Penn Medicine/Perelman School of Medicine Vice Dean and Vice President for Inclusion, Diversity, and Equity |
| 2022 – present | Physician Leader, Elevating Women's Health, OBGYN Strategic Plan |
| 2022 – present | OBGYN Department Committee on Appointments and Promotions |
| 2023 | Presenter, Penn Medicine ACT/IDE Summit |

**MAJOR ACADEMIC TEACHING RESPONSIBILITIES AND MENTORSHIP**

| | |
|---|---|
| 2002 – 2003 | Organizer, Ob/Gyn resident journal club, Hospital of the University of Pennsylvania |
| 2002 – present | Lecturer, Ob/Gyn resident didactics and journal club |
| 2005 – 2015 | Lecture on Family Planning, Core Clinical Clerkship in Ob/Gyn (OG200), (8x/yr) |
| 2005 – 2016 | Faculty preceptor, Core Clinical Clerkship in Ob/Gyn (OG200), (1-2x/yr) |
| 2006 – 2017 | Lecturer "Contraception," Reproduction module (1 lecture/yr) |
| 2006 – 2016 | "Bridging the Gaps" Academic Mentor for 1 student each summer |
| 2006 – 2017 | Director, Family Planning Rotation for Ob/Gyn residents |
| 2006 – 2017 | Course Director, Family Planning and Abortion Care Elective (OG300), medical students |
| 2006 – 2017 | Small group discussion leader on abortion and contraception, Reproduction Module II (2 sessions/yr), medical students |
| 2006 – present | Attending Physician, Family Planning, supervise and teach medical students, residents, and fellows |
| 2006 – 2016 | Attending physician, Resident Gynecology service (4 weeks/yr) |
| 2006 – present | Research mentor for resident research projects |
| 2006 – 2017 | Lecture "Abortion," Reproduction Module II (1 lecture/yr), medical students |
| 2006 – 2007 | Mentor, Sabrina Sukhan, MD, Resident in Obstetrics and Gynecology "Is exposure to prenatal care associated with improved pregnancy outcomes and post-partum contraception continuation in a teenage population?" |

Courtney Anne Schreiber, MD, MPH                    Page 5                    Last updated 13 Nov 2023

| | |
|---|---|
| 2006 | Hospital of The University of Pennsylvania Department of Obstetrics and Gynecology Grand Rounds, "The Characterization and Treatment of Early Pregnancy Failure" |
| 2007 | Division of Cardiology, University of Pennsylvania Medical Center, "Contraception in Women with Congenital Heart Disease" |
| 2008 – 2010 | Mentor, Monika Goyal, MD, Pediatric Emergency Fellow "Prevalence of Trichomonas vaginitis in a symptomatic adolescent ED population" |
| 2010 – 2012 | Fellowship Mentor, Sara Pentlicky, MD |
| 2010 – 2013 | Mentor, Holly Langmuir, MD, Resident in Obstetrics and Gynecology "Immediate postpartum IUD placement: a decision analysis" |
| 2010 – 2013 | Mentor, Peter Vasquez, MD, Resident in Obstetrics and Gynecology "Factors that decrease morbidity among women undergoing second trimester uterine evacuation at an urban academic medical center" |
| 2010 – 2013 | Mentor, Ericka Gibson, MD, Resident in Obstetrics and Gynecology "Risk Factors for pregnancy during contraceptive clinical trials" |
| 2010 – 2012 | Mentor, Sara Pentlicky, MD, Fellow in Family Planning "Weight Loss in the postpartum: impact of different contraceptive methods" |
| 2010 – 2013 | Mentor, Corina Tennant, MD, Resident in Obstetrics and Gynecology "Uptake, acceptability, and continuation of the Implanon contraceptive implant immediately postpartum in an urban medical center" |
| 2011 – 2013 | Mentor, Lily Pemberton, MD, Resident in Obstetrics and Gynecology "Establishment of an academic family planning outpatient facility increases uptake of LARC among inner-city women" |
| 2011 – 2017 | Public Health Perspectives in Family Planning Instructor and course co-director (offered through the MPH program) |
| 2011 – 2012 | Doris Duke Clinical Research Fellowship Mentor (Mentee - Kelly Quinley - Awarded Society of Academic Emergency Medicine Medical Student Excellence Award) |
| 2011 – 2013 | Fellowship Mentor, Stephanie Sober, MD |
| 2011 | Mentor, Valerie Colleselli, medical student, University of Innsbruck, Austria "Medical management of early pregnancy failure (EPF): a retrospective analysis of a combined protocol of mifepristone and misoprostol used in clinical practice" |
| 2012 – 2014 | Fellowship Mentor, Susan Wilson, MD |
| 2012 – 2015 | Mentor, Andrea Roe, MD, Resident in Obstetrics and Gynecology "Cystic Fibrosis and Fertility" |
| 2012 – 2015 | Mentor, Joni Price, MD, Resident in Obstetrics and Gynecology "Risk of unplanned pregnancy by cycle day among contracepting women" |
| 2012 – 2016 | Clinician Trainings for the Family Planning Council's CDC Teen Pregnancy Prevention Project |
| 2014 – 2015 | Mentor, Pooja Mehta, MD, ACOG Industry-Funded Research Fellowship in Contraceptive Access within Low-Resource Populations |
| 2014 – 2016 | Mentor, Elizabeth Gurney, MD, Fellow in Family Planning "Six-month Retention Rates of Copper IUDs Placed Immediately Post-placentally" |
| 2014 – 2016 | Mentor, Alyssa Colwill, MD, Resident in Obstetrics and Gynecology "Immediate Post-placental IUD Expulsion - a Retrospective Cohort Study" |
| 2015 | "Prevention and Management of Early Pregnancy Complications, " Department of Obstetrics and Gynecology, Pennsylvania Hospital, Philadelphia PA |
| 2015 – 2017 | Mentor, Elizabeth Greenstein, MD, Resident in Obstetrics and Gynecology "Doctor-Patient Communication at the Time of Miscarriage Management" |
| 2015 – 2018 | Mentor, Maryl Sackheim, MD, Resident in Obstetrics and Gynecology "Rapid Repeat Pregnancy at Penn Medicine: Prevalence and Risk Factors" |
| 2015 – 2017 | Mentor, Alhambra Frarey, MD, Fellow in Family Planning "Referral and Delay in Abortion Care: a Cross-sectional Study" |
| 2015 | "Contraception for women with rheumatologic disease," Division of Rheumatology of Penn Medicine, Philadelphia PA |
| 2016 – 2018 | Mentor, Sarah Horvath, MD, Fellow in Family Planning "Quantifying Feto-Maternal Hemorrhage in the First Trimester of Pregnancy" *Winner, Society of Family Planning Young Investigator Award, 2018 |

Courtney Anne Schreiber, MD, MPH                    Page 6                    Last updated 13 Nov 2023

| | |
|---|---|
| 2016 | "History of Contraception in the US," Master of Public Health Program, University of Pennsylvania, Philadelphia PA |
| 2016 | "Academic Medicine as an Instrument of Change," Master of Science of Health Policy, University of Pennsylvania, Philadelphia PA |
| 2017 | "The role of public health practice and research in reproductive health" Master of Public Health Program, University of Pennsylvania Perelman School of Medicine, Philadelphia, PA |
| 2017 – 2019 | Mentor, Divyah Nagendra, MD, Fellow in Family Planning "Pain Control for Uterine Evacuation: a Non-Inferiority Trial" |
| 2017 | "Academic Medicine as an Instrument of Change," University of Pennsylvania MSHP Program |
| 2017 – 2020 | Mentor, Dr. Sarita Sonalkar, Perelman School of Medicine NIH/NICHD K12--HD-001265 WRHR Scholar, "Feasibility and acceptability of the mobile PPFP Compendium among obstetrical providers, and to pilot-test the effectiveness of a provider-based postpartum family planning intervention that incorporates both use of the WHO PPFP Compendium mobile application and LARC method availability, using a hybrid implementation-effectiveness design" |
| 2018 | Pediatric Grand Rounds: Children's Hospital of Philadelphia "Progress and Opportunities in Adolescent Reproductive Health" |
| 2018 – 2020 | Mentor, Jade Shorter, MD, Fellow in Family Planning "Disparities in Reproductive Health: The Patient Experience with Miscarriage Management" |
| 2018 – present | Mentor, Dr. Andrea Roe, "Maximizing reproductive health outcomes for patients with cystic fibrosis and sickle cell anemia" |
| 2019 – 2021 | Mentor, Anne Flynn, MD, "Early Pregnancy Loss Patient Decision Aid" |
| 2020 – 2022 | Mentor, Sarah Gutman, MD, Fellow in Complex Family Planning "Centering Contraceptive Counseling" |
| 2021 – 2023 | Mentor, Emma Gilmore MD, "Rh-Immunoglobulin administration for patients with first trimester bleeding: estimating the cost to the healthcare system" |
| 2021 – present | Mentor, Dr. Jamie Krashin University of New Mexico K-L2, "Implementation of evidence-based pregnancy loss care practices in rural settings" |
| 2021 – present | Mentor, Dr. Alice Abernathy (NCSP 2021-2023, WRHR, 2023-present) |
| 2022 – present | Mentor, Dr. Sarah Horvath, Penn State University Clinical and Translational Science Institute's Early-Stage Investigator Training Program (KL2), "Reducing barriers to patient-centered delivery of contraceptive care" |
| 2023 – present | Mentor, Dr. Melissa Montoya, Fellow in Complex Family Planning "Letrozole pre-treatment for medical management of early pregnancy loss" |

**LECTURES BY INVITATION (LAST 5 YEARS)**

| | |
|---|---|
| Jan 2018 | "Patient-Centered Early Pregnancy Loss Care," UC San Diego Obstetrics and Gynecology Grand Rounds, San Diego, CA |
| Apr 2018 | "Hormonal Contraception and the Risk of Mood Symptoms," North American Society for Psychosocial Obstetrics and Gynecology, Philadelphia, PA |
| Oct 2018 | "Advances in the Care of Patients with Early Pregnancy Loss," Magee-Women's Hospital Alumni Day, Pittsburgh, PA |
| Nov 2018 | "Healthy Child-Spacing, Healthy Families: Best Practices in Postpartum Contraception," Plenary session, Chilean Society of Obstetrics and Gynecology (SOCHOG) and the Chilean Section of ACOG, Santiago, Chile |
| Nov 2018 | "Miscarriage Management: Updates and Innovations," Plenary session, Chilean Society of Obstetrics and Gynecology (SOCHOG) and the Chilean Section of ACOG, Santiago, Chile |
| Nov 2018 | "Advances is Early Pregnancy Loss Care" Einstein Healthcare Network, Obstetrics and Gynecology Departmental Grand Rounds |
| Jan 2019 | "Advances in the Care of Patients with Early Pregnancy Loss," Obstetrics and Gynecology Grand Rounds, MedStar Washington Hospital Center and MedStar Georgetown University Hospital, Washington, DC |

Courtney Anne Schreiber, MD, MPH                    Page 7                    Last updated 13 Nov 2023

| | |
|---|---|
| Mar 2019 | "Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss," Ob/Gyn Grand rounds, Beth Israel Deaconess Medical Center, Boston, MA |
| Mar 2019 | "The Medical Management of Early Pregnancy Loss," Translational Science 2019 Conference, Washington, DC |
| Jul 2019 | "Abortion in the United States," Department of Obstetrics and Gynecology University of Helsinki, Helsinki, Finland |
| Jul 2019 | "Biomarkers of Human Reproduction," Department of Obstetrics and Gynecology, Karolinska Institute, Stockholm, Sweden |
| Jan 2020 | "Advances in the Care of Patients with Early Pregnancy Loss," Columbia University Medical Center Obstetrics and Gynecology Grand Rounds, New York, NY |
| May 2020 | "Academic Medicine as an Instrument of Social Change," Invited Professorship University of Pennsylvania Obstetrics and Gynecology Resident Research Day |
| Oct 2020 | "The Integration of Early Pregnancy Care into Family Planning Services," Closing Plenary, Society of Family Planning Annual Scientific Meeting |
| Feb 2021 | "The Long and Winding Road," Family Planning Symposium Visiting Professor, University of Utah |
| Feb 2021 | "High-value Early Pregnancy Care," Family Planning Symposium Visiting Professor, University of Utah |
| Apr 2021 | "Advancing the care of early pregnancy loss patients," Highland OBGYN City Grand Rounds. Rochester, NY (virtual) |
| Oct 2021 | "The Other Fifty Percent," New York Obstetrical Society, The Yale Club, New York, NY |
| Apr 2022 | "Innovations and Opportunities for Sex and Gender Equity in Academic Medicine," Association of Senior & Emeritus Faculty-PSOM President's Distinguished Speaker |
| May 2022 | "Innovations and Opportunities for Sex and Gender Equity in Academic Medicine," Joanne Decker Memorial Lectureship, Children's Hospital of Philadelphia |
| May 2023 | "Science=Hope: Mifepristone Past Present, and Future," Hammond Lecture, Annual Charles B. Hammond Research Day, Department of Obstetrics and Gynecology, Duke University Medical Center |
| Jul 2023 | "Medical Crossfire: Where We Are 1 Year After Dobbs vs Jackson," 4th Annual International Congress on the Future of Women's Health (virtual) |
| Jul 2023 | "National Academies Webinar on the Impact of the Dobbs Decision on Cancer Care," National Academies of Sciences, Engineering, and Medicine, Washington, DC |
| Oct 2023 | "American Board of Obstetrics and Gynecology Complex Family Planning Updates," Society of Family Planning, Seattle, WA |
| Dec 2023 | "Academic Medicine as an Instrument of Change," Allen Barnes Lecture, Department of Obstetrics and Gynecology, The Ohio State University, Columbus, Ohio. |
| Apr 2024 | "Post-abortion Contraception," Karolinska Institute, Stockholm, Sweden. |

## ORGANIZING ROLES IN SCIENTIFIC MEETINGS

| | |
|---|---|
| Apr 2010 | Chair, National Abortion Federation 2010 Postgraduate course: "Team Work and Patient Safety," Philadelphia, PA |
| 2011 | Co-Chair HIV and Women subgroup of the Penn Center For Aids Research Philadelphia, PA |
| Apr 2013 | Facilitator: Controversies in Family Planning. Fellowship in Family Planning Annual Meeting Chicago, IL |
| May 2013 | Co-Chair, Penn CFAR Women and HIV Symposium: "Biobehavioral approaches to HIV prevention and management in adolescent women," Perelman School of Medicine, Philadelphia, PA |
| May 2013 | Facilitator, "Controversies in Family Planning," Fellowship in Family Planning Annual Meeting, Denver, CO |
| May 2014 | Facilitator, "Controversies in Family Planning," Fellowship in Family Planning Annual Meeting New Orleans, LA |
| Apr 2015 | Moderator, second year family planning fellows' research presentations on contraception San Francisco, CA |

**831**

Courtney Anne Schreiber, MD, MPH                  Page 8                  Last updated 13 Nov 2023

| | |
|---|---|
| Apr 2017 | Organizer and Panel Moderator, "Moving Forward: Protecting and Promoting Reproductive Health," University of Pennsylvania, Philadelphia, PA |
| May 2019 | Chairperson, Directors' Meeting, Fellowship in Family Planning, Boston, MA |
| Sep 2022 | Co-Chair, AGOS Plenary Session "Tired and Inspired: Notes for Leaders on a Post-Roe abortion Landscape," Chicago, IL |
| Nov 2023 | Moderator, "Advocacy & Activism in a Post-Roe v. Wade World: Tools for Action and Access to Reproductive Health," AAMC Annual Learn Serve Lead Meeting, Seattle, WA |
| 2023 | Chairperson and moderator, AAMC Group on Women in Medicine and Science Webinar Series, "Reproductive Health in a Post-Dobbs World Matters to All of Us," (5 webinars over 6 months) |

## GRANTS

CURRENT

1. Contraceptive Development Program NICHD Contraceptive Clinical Trials Network - Female Sites (Task Order 1) $66,000.00 75N94020F00001 NIH/NICHD 08/01/2020 – 07/31/2027 (Role: PI)

2. Achieving Maternal Equity and Transforming Health through Implementation Science and Training (AMETHIST@Penn; Lane-Fall, Hamm MPIs) $2,749,745 NIH-NICHD-1U24HD113146-01 08/15/2023-07/31/2030 (Role: co-I)

3. Giving Circle Grant $50,000.00 Cosmopolitan Club of Philadelphia 05/01/2022 – 05/01/2024 (Role: PI)

PENDING OR PENDING REVIEW

1. Spillover Effects of Abortion Provider Closures on Medicaid-funded Preventive Services (The CAPture Study) $491,078.00 1R01HD114608-01 NIH/NICHD 04/01/2024 – 03/31/2029 (Role: PI)

PAST (MOST RECENT FIRST)

1. Population Health Research Support: Start Trial (Barnhart) $110,888.00 NIH-NICHD-DIPHR-2018-12 09/28/2018 – 09/27/2023 (Role: coI)
2. The RhIMAB Study: A Prospective Trial to Evaluate the Value of Rh Immune Globulin in Medication Abortion Service Provision $378,199.00 SFPRF12-MA11 Society of Family Planning 10/01/2018 – 04/30/2023 (Role: PI)
3. Clinical Care Innovation - Integration of early pregnancy care into family planning service delivery $166,666.00 Independence Blue Cross 01/01/2022 – 12/31/2022 (Role: PI)
4. Fellowship in Family Planning $45,000.00 923.12 Anonymous Foundation 07/01/2021 – 06/30/2022 (Role: PI)
5. Facilitated group contraceptive counseling for patients presenting to abortion care $14,913.00 SFPRF21-14 Society of Family Planning 01/01/2021 – 06/30/2022 (Role: PI)
6. A multi-center, single-blind, randomized clinical trial to compare two copper IUDs: Mona Lisa NT Cu380 Mini and ParaGard $238,292.00 OPP1200867 Gates Foundation/FHI360 11/01/2015 – 06/30/2022 (Role: PI)
7. Contraceptive Clinical Trials Network-Female Sites (CCTN013C) $48,064.00 HHSN275201300020I NIH/NICHD 01/01/2018 – 12/31/2021 (Role: PI)
8. A Phase 3, Randomized, Multi-Center, Open-Label Study of a Levonorgestrel-Releasing Intrauterine System (20 mcg/day) and Mirena for Long-Term, Reversible Contraception up to Five Years $55,886.00 M360-L102 Medicines360 05/12/2010 – 12/31/2021 (Role: PI)
9. Multi-center, open-label, uncontrolled study to assess contraceptive efficacy and safety of Mirena during extended use beyond 5 years in women 18 to 35 years of age including a subgroup evaluation of treatment effect on heavy menstrual bleeding $26,616.00 BAY 86-5028/18649 Bayer Healthcare Pharmaceuticals Inc. 02/28/2017 – 10/31/2021 (Role: PI)
10. Fellowship in Family Planning $385,000.00 923.11 Anonymous Foundation 07/01/2020 – 06/30/2021 (Role: PI)
11. Evaluation of the Effectiveness, Safety and Tolerability of LevoCept (Levonorgestrel-Releasing Intrauterine System) for Long-Acting Reversible Contraception $75,750.00 CMDOC-0022 CONTRAMED INC. 01/18/2017 – 01/17/2021(Role: PI)

Courtney Anne Schreiber, MD, MPH                Page 9                Last updated 13 Nov 2023

12. Building Interdisciplinary Research Careers In Women's Health, BIRCWH K-12 (Oquendo) $24,743.00 5 K12 HD085848-05 NIH/NICHD 09/01/2018 – 08/30/2020 (Role: Research Director)

13. Fellowship in Family Planning $389,000.00 FPF 923.10 Anonymous Foundation 07/01/2019 – 06/30/2020 (Role: PI)

14. Disparities in Reproductive Health: The Patient Experience with Miscarriage Management $15,000.00 SFPRF19-02 Society of Family Planning 01/01/2019 – 06/30/2020 (Role: PI)

15. Mid-Career Mentoring Grant $66,667.00 Society of Family Planning 07/01/2017 – 06/30/2020 (Role: PI)

16. A Feasibility, Open-Label, Postcoital, Safety, Release, Fit, and Acceptability Study of Ovaprene $118,391.00 DR-OVP-001 Dare Bioscience Inc 06/13/2018 – 06/12/2020 (Role: PI)

17. Comparative Effectiveness of Pregnancy Failure Management Regimens, Pre-Fai-R $335,751.00 R01-HD-071920-05 (N.C.E.) NIH/NICHD (R01) 08/06/2013 – 04/30/2020 (Role: PI)

18. Family Planning Service Delivery Integration for HIV Positive and At-Risk Women in Botswana: A Hybrid Type 2 Clinical Intervention and Implementation Strategy $40,000.00 P30-AI-45008-21 NIH/NIAID & Penn Center for AIDS Research (CFAR) Pilot 09/01/2016 – 12/31/2019 (Role: Pilot Study PI)

19. Contraceptive Clinical Trials Network-Task Order 3 (CCTN) $159,050.00 HHSN275201300020I NIH/NICHD 09/19/2014 – 09/18/2019 (Role: Co-I)

20. Fellowship in Family Planning $389,000.00 FPF.09 Anonymous Foundation 07/01/2018 – 06/30/2019 (Role: PI)

21. A Pilot Randomized Non-inferiority Trial of Ibuprofen versus Oxycodone for Overnight Pain Control During Second-Trimester Abortion Care $96,827.00 SFPRF18-19 Society of Family Planning 05/01/2018 – 06/30/2019 (Role: PI)

22. Veracept - Evaluation of the Effectiveness, Feasibility, Safety and Tolerability of the ContraMed Intrauterine Copper Contraceptive for Long Acting Reversible Contraception $89,000.00 CMDOC-0008 CONTRAMED INC. 07/14/2015 – 06/30/2019 (Role: PI)

23. Fellowship in Family Planning $380,694.00 FPF.08 Buffett Susan Thompson Foundation 07/01/2017 – 06/30/2018 (Role: PI)

24. Flow Cytometry Quantification of Feto-Maternal Hemorrhage Following Uterine Aspiration in the First Trimester $100,000.00 SFPRF17-6 Society of Family Planning 02/01/2017 – 06/03/2018 (Role: PI)

25. Pregnancy Early Assessment CEnter (PEACE) $107,700.00 University of Pennsylvania/Penn Center for Health Care Innovation 04/01/2016 – 12/31/2017 (Role: PI)

26. Fellowship in Family Planning $356,970.00 923.07 Anonymous Foundation 07/01/2016 – 06/30/2017 (Role: PI)

27. Referral and delay in abortion care: A cross-sectional study $94,921.00 SFPRF16-16 Society of Family Planning 02/01/2016 – 06/30/2017 (Role: PI)

28. Expulsion of Immediate Postplacental Copper Intrauterine Devices at Six Months: A Prospective Cohort Study $100,000.00 SFPRF15-15 Society of Family Planning 04/01/2015 – 02/28/2017 (Role: PI)

29. Family Planning Service Delivery Integration for HIV Positive and At-Risk Women in Botswana: A Hybrid Type 2 Clinical Intervention and Implementation Strategy $40,000.00 University of Pennsylvania Center for AIDS Research 07/01/2015 – 06/30/2016 (Role: PI)

30. Fellowship in Family Planning $340,044.00 923.06 Anonymous Foundation 07/01/2015 – 06/30/2016 (Role: PI)

31. Pilot Study - Fertility After Contraceptive Termination (FACT Pilot) $12,500.00 Washington University in Saint Louis/Bayer 03/15/2013 – 06/30/2016 (Role: Subcontract PI)

32. Contraception in Women with Cystic Fibrosis: Satisfaction and Effects on Disease $35,000.00 SFPRF14-13 Society of Family Planning 04/01/2014 – 06/30/2015 (Role: PI)

33. Core Function Activities Task Order #1 $88,683.00 HHSN275201300020I NIH/NICHD (CCTN) 06/26/2013 – 06/25/2015 (Role: Co-I; PI: Barnhart)

34. SFPRF14-3 - The Impact of Doulas in the Surgical Management of Early Pregnancy Failure and Abortion care $29,761.00 Society of Family Planning 03/01/2014 – 12/31/2014 (Role: PI)

35. A Phase 1, Multi-Center Study to Assess the Performance of a LNG20 Intrauterine System Inserter $94,000.00 L104 Medicines360 12/01/2013 – 12/31/2014 (Role: PI)

36. Impact Of Peer Counseling On Long Acting Reversible Contraception Uptake Among Adolescents And Duration Of Contraceptive Use  $69,931.00 Society of Family Planning 01/01/2013 – 07/31/2014 (Role: PI)

**833**

Courtney Anne Schreiber, MD, MPH          Page 10          Last updated 13 Nov 2023

37. Fellowship in Family Planning $366,800.00 923.04 Anonymous Foundation 07/01/2013 – 06/30/2014 (Role: PI)

38. Evaluation of a Brief Standardized Postpartum Counseling Intervention's Effect on Repeat Pregnancy Rates and Contraceptive Choice/Use/Continuation/Satisfaction in Adolescents $49,144.00 Society of Family Planning 02/01/2012 – 03/30/2014 (Role: PI)

39. Task 6 - Clinical Evaluation of Nestoronel Estradiol-Releasing Vaginal Ring for Female Contraception $705,379.00 HHSN275201100041U NIH/NICHD contract 03/31/2011 – 01/30/2014 (Role: Co-I; PI: Barnhart)

40. Pharmacokinetic And Pharmacodynamic Study Of Tenofovir 1% Gel Using The Bat 24 Regimen Versus Daily And Pericoital Dosing $127,508.00 PPA-11-115 CONRAD/Eastern Virginia Medical School 06/15/2011 – 12/31/2013 (Role: PI)

41. A Multicenter, Open-Label, Randomized Study of the Contraceptive Efficacy and Safety of Amphora Gel Compared to Conceptrol Vaginal Gel $56,891.00 AMP001 EvoFem Inc. 05/23/2011 – 08/31/2013 (Role: Co-I; PI: Barnhart)

42. Task 8 - Core Function Activities $114,253.00 HHSN275201100068U NIH/NICHD contract 03/31/2011 – 07/30/2013 (Role: Co-I; PI: Barnhart)

43. Study Of Uptake, Continuation And Removal Of Intra-Uterine Contraception $8,182.00 7272sc University Of California - San Francisco 08/01/2012 – 06/30/2013 (Role: PI)

44. Fellowship in Family Planning $366,800.00 923.03 Anonymous Foundation 07/01/2012 – 06/30/2013 (Role: PI)

45. Teva CT - Women In Steady Exercise Research (WISER) Sister Substudy - Contraceptive use in Women at Increased Risk for Breast Cancer $10,000.00 Teva Women's Health Research 08/01/2009 – 05/31/2013 (Role: PI)

46. A Phase 1, Multi-Center Study to Assess the Safety and Performance of a Novel LNG20 Intrauterine System Inserter $38,170.00 M360-L103 Medicines360 11/01/2011 – 12/31/2012 (Role: PI)

47. Contraceptive Efficacy Evaluation Of The Path Female Condom HHSN275200900083U NIH 09/30/2009 – 12/31/2012 (Role: Co-I)

48. Task 7 - Clinical Evaluation of Levonorgestrel Butaoate for Female Contraception $64,704.00 HHSN275201100071U NIH/NICHD contract 03/31/2011 – 08/31/2012 (Role: Co-I; PI: Barnhart)

49. Task 5 - Contraceptive Efficacy and Safety of Two Progestin Patches $183,073.00 HSN275201000022U NIH/NICHD contract 01/11/2010 – 07/31/2012 (Role: Co-I; PI: Barnhart)

50. Fellowship in Family Planning $323,520.00 923.02 Anonymous Foundation 07/01/2011 – 06/30/2012 (Role: PI)

51. The Impact of Contraception on Post Partum Weight Loss: A Prospective Study $46,548.00 3643 Anonymous Foundation 07/01/2011 – 06/30/2012 (Role: PI)

52. Kenneth J. Ryan Residency Training Program In Abortion and Family Planning $499,996.00 296.03 Anonymous Foundation 01/01/2008 – 10/31/2011 (Role: PI)

53. A Plan B 1.5 Emergency Contraception Actual Use Study $20,476.00 Dr-Lev-302 Duramed Research 04/27/2009 – 07/31/2011 (Role: PI)

54. Penn Family Planning And Pregnancy Loss Center Database Proposal $15,000.00 SFP3-18 Society of Family Planning 10/01/2009 – 03/31/2011 (Role: PI)

55. Contraceptive Clinical Trials Network (Female Contraceptive Trials Topic Area): Task Order 2- Female Contraceptive Clinical Trial: A Randomized Controlled Study of the Efficacy, Safety and Acceptability of C31G NIH 04/01/2004 – 03/31/2011 (Role: Co-I)

56. GYNUITY - Uptake And Acceptability Of Home Use Of Mifepristone $34,808.00 Gynuity Health Projects 12/01/2009 – 11/30/2010 (Role: PI)

57. Contraceptive Clinical Trials Network (Female Contraceptive Trials Topic Area) Task Order 3: A Multi-Center, Open-Label Trial on the Efficacy, Cycle Control, and Safety of a Contraceptive Vaginal Ring Delivering a Daily Dose Nestoron and Ethinyl Estradiol $170,518.00 RFTOP#:003 NIH/NICHD 08/13/2006 – 01/30/2010 (Role: Co-I)

58. Contraceptive Effectiveness Diaphragm and Safety Study of the SILCS with Nonoxynol-9: The Pivotal Study $243,820.00 CSA-06-430 Eastern Virginia Medical School (CONRAD) 07/01/2006 – 12/31/2009 (Role: Co-I)

59. University Of Pennsylvania Center For Aids Research $1,822,128.00 5-P30-AI-045008-10 NIH 07/01/2004 – 09/24/2009 (Role: Co-PI)

**834**

60. A Pilot Study To Evaluate Precision And Accuracy Of Smart Applicator For Microbicide Clinical Trials IPM 022 International Partnership For Microbicides 08/01/2008 – 07/31/2009 (Role: PI)
61. U01-AI-069534 - Clinical Trials Unit: Microbicide Trials Network IH/NIAID 02/01/2007 – 06/30/2009 (Role: Co-I)
62. Career Development In Women's Health Research $462,965.00 5-K12-HD-043459-05 NIH 09/26/2002 – 07/31/2008 (Role: Co-PI)
63. How to avoid pregnancies in HIV prevention trials: A case control study and point-of-care questionnaire $40,000.00 Penn Center for AIDS Research (CFAR) 07/01/2007 – 06/30/2008 (Role: PI)
64. A Pilot Randomized Controlled Trial of Advanced Supply of Levonorgestrel Emergency Contraception vs. Routine Postpartum Contraceptive Care in the Teenage Population University Research Foundation 07/01/2006 – 01/31/2008 (Role: PI)
65. Building Interdisciplinary Research Careers in Women's Health (BIRCWH) 5K12HD043459-05 NIH NICHD 09/26/2002 – 12/31/2007 (Role: BIRCWH Scholar)
66. A Study of Mucosal and Inflammatory Effects of Vaginal Gels on Reproductive Tract Magee Women's Health Corp. VIA NIH 06/29/2006 – 05/31/2007 (Role: Co-I)
67. Mifepristone and Misoprostol for the Treatment of Early Pregnancy Failure: a Pilot Clinical Trial Anonymous 09/01/2004 – 10/30/2005 (Role: PI)
68. A multicenter, randomized, double masked, comparator study of the safety and contraceptive efficacy of C31G vaginal gel compared to 15% Conceptrol® vaginal gel N01-HD-4-3372 NICHD 07/01/2004 – 10/30/2005 (Role: Study Site Co-I)
69. An Evaluation of NuvaRing® for the Treatment of Abnormal Patterns Bleeding in the Perimenopause Organon 07/01/2004 – 06/30/2005 (Role: Co-I)
70. A Multicenter, Randomized Comparison of Mifepristone and Misoprostol Simultaneously Versus 24 Hours Apart for Abortion Through 63 Days Gestation Anonymous 01/01/2004 – 06/30/2005 (Role: PI)
71. A Survey of Contraception Knowledge and Attitudes among Graduating Residents in Pittsburgh Anonymous 01/01/2004 – 06/30/2005 (Role: PI)
72. An Evaluation of the Return to Ovulation After Treatment with Mifepristone and Misoprostol For Undesired Pregnancy Anonymous 01/01/2004 – 06/30/2005 (Role: PI)
73. A Randomized Controlled Study of the Efficacy, Safety and Acceptability of Buffer Gel HD-1-3319 NICHD-N01-HD 07/01/2003 – 06/30/2005 (Role: Study Site Co-I)
74. Same Day Initiation of the Combined Hormonal Transdermal Delivery System Traditional Initiation Method Anonymous 06/01/2003 – 12/01/2004 (Role: Co-I)
75. Phase I Post Coital Testing and Safety Study of the SILCS Diaphragm, Prototype VI $120,000.00 A02-081 CONRAD 09/01/2003 – 08/31/2004 (Role: Study Site Co-I)
76. Randomized Clinical Trial on Management of Early Pregnancy Failure N01-HD-1-3322 NICHD 07/01/2003 – 07/01/2004 (Role: Study Site Co-I)
77. An Open Label Study of the Contraceptive Efficacy and Safety of Triphasic Norethindrone Acetate 1 mg/Ethinyl Estradiol 0.005, 0.030, and 0.035 mg Oral Tablets Administered for 24 Days of a 28 Day Cycle Galen 02/01/2004 – 06/30/2004 (Role: Study Site Co-I)
78. Mifepristone and Misoprostol Administered at the Same Time for Medical Abortion Up to 49 Days' Gestation Anonymous 06/01/2003 – 06/01/2004 (Role: Co-I)
79. Mifepristone and Misoprostol Administered at the Same Time for Medical Abortion from 50-63 Days' Gestation Anonymous 06/01/2003 – 05/30/2004 (Role: PI)
80. Phase III Multicenter Open Label Study to Evaluate the Safety and Efficacy of Levonorgestrel 90 micrograms and Ethinyl Estradiol 20 micrograms in a Continuous Daily Regimen for Oral Contraception Wyeth Pharmamaceuticals 09/01/2003 – 05/30/2004 (Role: Study Site Co-I)
81. Safety Analysis of the Diaphragm in Combination with Vaginal Microbicide Gels CDC 06/01/2003 – 05/30/2004 (Role: Study Site Co-I)

Courtney Anne Schreiber, MD, MPH                 Page 12                 Last updated 13 Nov 2023

## BIBLIOGRAPHY

RESEARCH PUBLICATIONS, PEER REVIEWED

1.  **Schreiber CA**, Wan L, Sun Y, Krey L, Lee-Huang S: The antiviral agents MAP30 and GAP31 are not toxic to human spermatozoa and may be useful in preventing the sexual transmission of HIV-I. Fertil Steril 72:686-690, 1999.

2.  Murthy AS, Creinin MD, Harwood B, **Schreiber C**: A pilot study of mifepristone and misoprostol administered at the same time for abortion up to 49 days gestation. Contraception 71(5):333-6, May 2005.

3.  **Schreiber CA**, Creinin MD, Harwood B, Murthy AS: A pilot study of mifepristone and misoprostol administered at the same time for abortion in women with gestation from 50 to 63 days. Contraception 71(6):447-50, Jun 2005.

4.  Murthy AS, Creinin MD, Harwood BJ, **Schreiber CA**: Same day initiation of the transdermal hormonal delivery system (contraceptive patch) versus traditional initiation methods. Contraception 72(5):333-36, Nov 2005.

5.  **Schreiber CA**, Creinin MD: Mifepristone in abortion care. Semin Reprod Med 23(1):82-91, 2005.

6.  **Schreiber CA**, Creinin MD: The health benefits of hormonal contraception. The Female Patient (Suppl):19-24, 2005.

7.  **Schreiber CA**, Meyn, L, Creinin MD, Barnhart KT, Hillier SL: The effects of long-term use of nonoxynol-9 on vaginal flora. Obstet Gynecol 107(1):136-43, Jan 2006.

8.  **Schreiber CA**, Harwood BJ, Switzer GE, Creinin MD, Reeves MF, Ness RB: Training and attitudes about contraceptive management across primary care specialties: a survey of graduating residents. Contraception 73(6):618-22, Jun 2006.

9.  **Schreiber CA**, Creinin MD, Reeves MF, Harwood BJ: Mifepristone and misoprostol for the treatment of early pregnancy failure: a pilot clinical trial. Contraception 74(6):458-62, Dec 2006.

10. **Schreiber CA**, Creinin MD: The health benefits of hormonal contraception. The Female Patient (RA suppl):10-12, 2006.

11. Creinin MD, **Schreiber CA**, Bednarek P, Lintu H, Wagner MS, Meyn LA: Medical abortion at the same time (MAST) study trial group. Mifepristone and misoprostol administered simultaneously versus 24 hours apart for abortion: a randomized controlled trial. Obstet Gynecol 109(4):885-894, Apr 2007.

12. Creinin MD, **Schreiber CA**, Bednarek P, Lintu H, Wagner MS, Meyn LA; Medical Abortion at the Same Time (MAST) Study Trial Group: Mifepristone and misoprostol administered simultaneously versus 24 hours apart for abortion: a randomized controlled trial. Obstet Gynecol 109(4):885-94, Apr 2007.

13. **Schreiber CA**, Sammel M, Hillier SL, Barnhart KT: A little bit pregnant: modeling how the accurate detection of pregnancy can improve HIV prevention trials. Am J Epidemiol 169: 515-21, Feb 2009.

14. Barnhart KT, **Schreiber CA**: Return to fertility following discontinuation of oral contraceptives. Fertil Steril 91(3):659-63, 2009.

15. **Schreiber CA**, Barnhart KT: Contraceptive Concerns: Return to Fertility. The Female Patient 34(12), 2009.

16. **Schreiber CA**, Ratcliffe SJ, Barnhart KT: A randomized controlled trial of the effect of advanced supply of emergency contraception in postpartum teens: a feasibility study. Contraception 81(5):435-40, May 2010.

17. Gibson E, **Schreiber CA**: When uterine leiomyomas complicate uterine evacuation. Contraception 82(6):486-8, Dec 2010.

18. Vasquez P, **Schreiber CA**: Controversies in Family Planning: The missing IUD. Contraception 82(2):126-8, 2010.

19. **Schreiber CA**, Whittington S, Cen L, Maslankowski L: Good intentions: risk factors for unintended pregnancies in the US cohort of a microbicide trial. Contraception 83(1):74-81, Jan 2011.

20. Quinn SM, **Schreiber CA**: IUD use in HIV-positive women. Contraception 83(2):99-101, Feb 2011.

21. **Schreiber CA**, Sober S, Ratcliffe S, Creinin MD: Ovulation resumption after medical abortion with mifepristone and misoprostol. Contraception 84(3):230-3, Sep 2011.

22. Su IH, **Schreiber CA**, Fay C, Parry S, Elovitz MA, Zhang J, Shaunik A, Barnhart K: Mucosal integrity and inflammatory markers in the female lower genital tract as potential screening tools for vaginal microbicides. Contraception 84(5):525-32, Nov 2011.

23. Perron-Burdick M, **Schreiber CA**, Gupta P: Ophthalmic migraines and combined hormonal contraceptives. Contraception 84(5):442-4, 2011.

24. Sober SP, **Schreiber CA**: Controversies in family planning: are all oral contraceptive formulations created equal? Contraception 83(5):394-6, 2011.

Courtney Anne Schreiber, MD, MPH                Page 13                Last updated 13 Nov 2023

25. Lathrop E, **Schreiber CA**: Controversies in family planning: management of second-trimester pregnancy terminations complicated by placenta accreta. <u>Contraception</u> 85(1):5-8, 2012.

26. Pentlicky S, Harken T, **Schreiber CA**: Controversies in family planning: first trimester uterine evacuation for the anticoagulated patient. <u>Contraception</u> 85(5):434-36, 2012.

27. Kinariwala M, Quinley K, Datner E, **Schreiber CA**: Manual vacuum aspiration in the emergency department for management of early pregnancy failure. <u>Am J Emerg Med</u> 31(1):244-7, Jan 2013.

28. Pentlicky S, Rosen M, Coffey P, Kilbourne-Brook M, Shaunik A, **Schreiber CA**, Barnhart K: An exploratory, randomized, crossover MRI study of microbicide delivery with the SILCS diaphragm compared to a vaginal applicator. <u>Contraception</u> 87(2):187-92, Feb 2013.

29. Chen SP, Massaro-Giordano G, Pistilli M, **Schreiber CA**, Bunya V: Tear osmolarity and dry eye symptoms in women using oral contraception and contact lenses. <u>Cornea</u> 32(4):423-8, Apr 2013.

30. Swica Y, Chong E, Middleton T, Prine L, Gold M, **Schreiber CA**, Winikoff B: Acceptability of home use of mifepristone for medical abortion. <u>Contraception</u> 88(1):122-7, Jul 2013.

31. Wilson S, Tan G, Baylson M, **Schreiber CA**: Controversies in family planning: how to manage a fractured IUD. <u>Contraception</u> 88(5):599-603, Nov 2013.

32. Owen C, Sober S, **Schreiber CA**: Controversies in family planning: desired pregnancy, IUD in situ and no strings visible. <u>Contraception</u> 88(3):330-3, 2013.

33. Patel PR, **Schreiber CA**: Controversies in family planning: contraceptive counseling in the solid organ transplant recipient. <u>Contraception</u> 138-142, 2013.

34. Quinley K, Ratcliffe S, **Schreiber CA**: Psychological coping in the immediate post-abortion period. <u>J Women's Health</u> 23(1):44-50, Jan 2014.

35. Colleselli V, **Schreiber CA**, D'Costa E, Mangesius S, Ludwig W, Seeber BE: Medical management of early pregnancy failure (EPF): a retrospective analysis of a combined protocol of mifepristone and misoprostol used in clinical practice. <u>Arch Gynecol Obstet</u> 289(6): 1341-45, Jun 2014.

36. Foster DG, Grossman D. Turok DK, Peipert JF, Prine L, **Schreiber CA**, Jackson A, Barar R, Schwarz EB: Interest in and experience with IUD self-removal. <u>Contraception</u> 90(1): 54-59, Jul 2014.

37. Wilson S, Tennant C, Sammel MD, **Schreiber CA**: Immediate postpartum etonogestrel implant: a contraception option with long-term continuation. <u>Contraception</u> 90(3): 259-64, Sep 2014.

38. Sober S, **Schreiber CA**: Postpartum contraception. <u>Clin Obstet Gynecol</u> 57(4): 763-76, Dec 2014.

39. **Schreiber CA**, Ratcliffe SJ, Quinley KE, Miller C, Sammel MD: Serum biomarkers to predict successful misoprostol management of early pregnancy failure. <u>Reprod Biol</u> 15(2):79-85, Jun 2015.

40. **Schreiber CA**, Traxler S: State of family planning. <u>Clin Obstet Gynecol</u> 58(2): 392-408, Jun 2015

41. **Schreiber CA**, Traxler S: State of family planning. <u>Clin Obstet Gynecol</u> 58(2):392-408, Jun 2015.

42. Eisenberg DL, **Schreiber CA**, Turok DK, Teal SB, Westhoff CL, Creinin MD: Three-year efficacy and safety of a new 52-mg levonorgestrel-releasing intrauterine system. <u>Contraception</u> 92(1): 10-16, Jul 2015.

43. Quinley KE, Falck A, Kallan MJ, Datner EM, Carr BG, **Schreiber CA**: Validation of ICD-9 Codes for Stable Miscarriage in the Emergency Department. <u>West J Emerg Med</u> 16(4):551-6, Jul 2015.

44. Dzuba IG, Grossman D, **Schreiber CA**: Off-label indications for mifepristone in gynecology and obstetrics. <u>Contraception</u> 92(3):203-5, Sep 2015.

45. Roe A, Traxler SA, **Schreiber CA**: Contraception in Women with Cystic Fibrosis: A Systematic Review of the Literature. <u>Contraception</u> 93(1): 3-10, Jan 2016.

46. **Schreiber CA**, Ratcliffe SJ, Sammel MD, Whittaker PG: A self-assessment efficacy tool for spermicide contraceptive users. <u>Am J Obstet Gynecol</u> 214(2): 264.e1-7, Feb 2016.

47. Wilson SF, Degaiffier N, Ratcliffe SJ, **Schreiber CA**: Peer counselling for the promotion of long-acting, reversible contraception among teens: a randomised, controlled trial. <u>Eur J Contracept Reprod Health Care</u> 21(5): 380-7, Oct 2016.

48. Roe AH, Traxler SA, Hadjiliadis D, Sammel MD, **Schreiber CA**: Contraceptive choices and preferences in a cohort of women with cystic fibrosis. <u>Respir Med</u> 121: 1-3, Dec 2016.

49. **Schreiber CA**, Chavez V, Whittaker PG, Ratcliffe SJ, Easley E, Barg FK: Treatment Decisions at the Time of Miscarriage Diagnosis. <u>Obstet Gynecol</u> 128(6): 1347-1356, Dec 2016.

50. Wilson SF, Gurney EP, Sammel MD, **Schreiber CA**: Doulas for surgical management of miscarriage and abortion: a randomized controlled trial. <u>Am J Obstet Gynecol</u> 216(1):44.e1-44.e6, Jan 2017.

Courtney Anne Schreiber, MD, MPH          Page 14          Last updated 13 Nov 2023

51.  Frisse AC, Marrazzo JM, Tutlam NT, **Schreiber CA**, Teal SB, Turok DK, Peipert JF: Validity of Self-Reported History of Chlamydia trachomatis Infection. <u>Am J Obstet Gynecol</u> 216(4): e1-393, Apr 2017.

52.  Sober S, Shea J, Shaber A, Whittaker P, **Schreiber C**: Postpartum Adolescents' Contraceptive Counselling Preferences. <u>Eur J Contracept Reprod Health Care</u> 22(2): 83-87, Apr 2017.

53.  Horvath S, **Schreiber CA**: Unintended Pregnancy, Induced Abortion, and Mental Health. <u>Curr Psychiatry Rep</u> 19(11): 77, Sep 2017.

54.  Akers AY, Steinway C, Sonalkar S, Perriera LK, **Schreiber C**, Harding J, Garcia-Espana JF: Reducing Pain During Intrauterine Device Insertion: A Randomized Controlled Trial in Adolescents and Young Women. <u>Obstet Gynecol</u> 130(4): 795-802, Oct 2017.

55.  Sonalkar S, Gurney EP, McAllister A, **Schreiber CA**: A randomized pilot evaluation of individual-level abortion stigma resulting from Pennsylvania mandated abortion counseling. <u>Contraception</u> 96(4): 227-232, Oct 2017.

56.  Colwill AC, **Schreiber CA**, Sammel MD, Sonalkar S: Six-week retention after postplacental copper intrauterine device placement. <u>Contraception</u> 97(3): 215-218, Mar 2018.

57.  **Schreiber CA**, Teal SB, Blumenthal PD, Keder LM, Olariu AI, Creinin MD: Bleeding patterns for the Liletta levonorgestrel 52 mg intrauterine system. <u>Eur J Contracept Reprod Health Care</u> 23(2): 116-120, Apr 2018.

58.  Akers AY, Harding J, Perriera LK, **Schreiber CA**, Garcia-Espana JF, Sonalkar S: Satisfaction with the Intrauterine Device Insertion Procedure Among Adolescent and Young Adult Women. <u>Obstet Gynecol</u> 131(6): 1130-1136, Jun 2018.

59.  **Schreiber CA**, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT: Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss. <u>N Engl J Med</u> 378: 2161-2170, Jun 2018.

60.  Gurney EP, Sonalkar S, McAllister A, Sammel MD, **Schreiber CA**: Six-month expulsion of postplacental copper intrauterine devices placed after vaginal delivery. <u>Am J Obstet Gynecol</u> 219(2): 183.e1-183.e9, Aug 2018.

61.  Whittaker PG, **Schreiber CA**, Sammel MD: Gestational hormone trajectories and early pregnancy failure: a reassessment. <u>Reprod Biol Endocrinol</u> 16(1): 95, Oct 2018.

62.  Sonalkar S, Hunter T, Gurney EP, McAllister A, **Schreiber CA**: A Decision Analysis Model of 1-Year Effectiveness of Intended Postplacental Compared with Intended Delayed Postpartum Intrauterine Device Insertion. <u>Obstet Gynecol</u> 132(5):1211-122: 1211-1221, Nov 2018.

63.  Clement EG, Horvath S, McAllister A, Koelper NC, Sammel MD, **Schreiber CA**: The Language of First-Trimester Nonviable Pregnancy: Patient-Reported Preferences and Clarity. <u>Obstet Gynecol</u> 133(1):149-154: 149-154, Jan 2019.

64.  Frarey A, Gurney EP, Sober S, Whittaker PG, **Schreiber CA**: Postpartum contraceptive counseling for first-time adolescent mothers: a randomized controlled trial. <u>Arch Gynecol Obstet</u> 299(2):361-369: 361-369, Feb 2019.

65.  Frarey A, **Schreiber C**, McAllister A, Shaber A, Sonalkar S, Sammel MD, Long JA: Pathways to Abortion at a Tertiary Care Hospital: Examining Obesity and Delays. <u>Perspect Sex Reprod Health</u> 51(1):35-41, Mar 2019.

66.  Sackeim MG, Gurney EP, Koelper N, Sammel MD, **Schreiber CA**: Effect of contraceptive choice on rapid repeat pregnancy. <u>Contraception</u> 99(3):184-186: 184-186, Mar 2019.

67.  Shorter JM, Atrio JM, **Schreiber CA**: Management of early pregnancy loss, with a focus on patient-centered care. <u>Seminars in Perinatology</u> Page: 84-94, Mar 2019.

68.  Chen BA, Blithe DL, Muraguri GR, Lance AA, Carr BR, Jensen JT, Kimble TD, Murthy AS, **Schreiber CA**, Thomas MA, Walsh TL, Westhoff C, Burke AE: Acceptability of the Woman's Condom in a phase III multicenter open-label study. <u>Contraception</u> 99(6): 357-362, Jun 2019.

69.  O'Flynn O'Brien KL, Akers AY, Perriera LK, **Schreiber CA**, Garcia-Espana JF, Sonalkar S: Intrauterine Device Insertion Procedure Duration in Adolescent and Young Adult Women. <u>J Pediatr Adolesc Gynecol</u> 32(3):312-315, Jun 2019.

70.  Deshpande NA, Labora A, Sammel MD, **Schreiber CA**, Sonalkar S: Relationship between body mass index and operative time in women receiving immediate postpartum tubal ligation. <u>Contraception</u> 100(2): 106-110, Aug 2019.

71.  Traxler SA, Chavez V, Hadjiliadis D, Shea JA, Mollen C, **Schreiber CA**: Fertility considerations and attitudes about family planning among women with cystic fibrosis. <u>Contraception</u> 100(3):228-233, Sep 2019.

72.  Miller CA, Roe AH, McAllister A, Meisel ZF, Koelper N, **Schreiber CA**: Patient Experiences with Miscarriage Management in the Emergency and Ambulatory Settings. <u>Obstet Gynecol</u> 134(6):1285-1292, Dec 2019.

Courtney Anne Schreiber, MD, MPH                Page 15                Last updated 13 Nov 2023

73. Albright BB, Shorter JM, Mastroyannis SA, Ko EM, **Schreiber CA**, Sonalkar S: Gestational Trophoblastic Neoplasia After Human Chorionic Gonadotropin Normalization Following Molar Pregnancy: A Systematic Review and Meta-analysis. <u>Obstet Gynecol</u> 135(1): 12-23, Jan 2020.

74. Anand P, McAllister A, Hunter T, **Schreiber C**, Koelper N, Sonalkar S: A Simulated Patient Study to Assess Referrals to Abortion Care by Student Health Centers in Pennsylvania. <u>Contraception</u> 102(1): 23-29, Feb 2020.

75. Hunter TA, Sonalkar S, **Schreiber CA**, Perriera LK, Sammel MD, Akers AY: Anticipated Pain During Intrauterine Device Insertion. <u>J Pediatr Adolesc Gyneco</u> 33(1): 840-847, Feb 2020.

76. Nagendra D, Koelper, N, Loza-Avalos SE, Sonalkar S, Chen M, Atrio J, **Schreiber CA**\*, Harvie HS\* (\*co-senior authors): Cost-effectiveness of Mifepristone Pretreatment for the Medical Management of Nonviable Early Pregnancy. Secondary Analysis of a Randomized Clinical Trial. <u>JAMA Network Open</u> 3(3):e20159, Mar 2020.

77. Chen BA, Eisenberg DL, **Schreiber CA**, Turok DK, Olariu AI, Creinin MD: Bleeding changes after levonorgestrel 52mg intrauterine system insertion for contraception in women with self-reported heavy menstrual bleeding. <u>Am J Obstet Gynecol</u> 222(4S):S888.e1-S888.e6, Apr 2020.

78. Turok DK, Nelson AL, Dart C, **Schreiber CA**, Peters K, Schreifels MJ, Katz B: Efficacy, Safety, and Tolerability of a New Low-Dose Copper and Nitinol Intrauterine Device: Phase 2 Data to 36 Months. <u>Obstet Gynecol</u> 135(4):840-847, Apr 2020.

79. Roe AH, McAllister A, Sammel MD, **Schreiber CA**: Pregnancy intentions and contraceptive uptake after miscarriage. <u>Contraception</u> 101(6): 427-431, Jun 2020.

80. Anand P, McAllister A, Hunter T, **Schreiber CA**, Koelper N, Sonalkar S: A simulated patient study to assess referrals to abortion care by student health centers in Pennsylvania. <u>Contraception</u> 102(1):23-29, Jul 2020.

81. Horvath S, Tsao P, Huang ZY, Zhao L, Du Y, Sammel MD, Luning Prak ET, **Schreiber CA**: The concentration of fetal red blood cells in first-trimester pregnant women undergoing uterine aspiration is below the calculated threshold for Rh sensitization. <u>Contraception</u> 102(1):1-6, Jul 2020.

82. Gurney EP, McAllister A, Lang B, **Schreiber CA**, Sonalkar S: Ultrasound assessment of postplacental copper intrauterine device position 6 months after placement during cesarean delivery. <u>Contraception: X</u> 2: 100040, Oct 2020.

83. Sonalkar S, Koelper N, Creinin MD, Atrio JM, Sammel MD, McAllister A, **Schreiber CA**: Management of early pregnancy loss with mifepristone and misoprostol: clinical predictors of treatment success from a randomized trial. <u>Am J Obstet Gynecol</u> 223: 551, Oct 2020.

84. Flynn AN, **Schreiber CA**, Roe A, Shorter JM, Frarey A, Barnhart K, Sonalkar S: Prioritizing Desiredness in Pregnancy of Unknown Location: An Algorithm for Patient-Centered Care. <u>Obstet Gynecol</u> 136: 1001-1005, Nov 2020.

85. Nagendra D, Sonalkar S, Schurr D, McAllister A, Roe AH, Shorter JM, Sammel MD, **Schreiber CA**: Opioid prescription for pain after osmotic dilator placement in abortion care: A randomized controlled trial. <u>Contraception</u> 103(1): 13-18, Jan 2021.

86. Shorter JM, Koelper N, Sonalkar S, Oquendo MA, Sammel MD, **Schreiber CA**: Racial Disparities in Mental Health Outcomes Among Women With Early Pregnancy Loss. <u>Obstet Gynecol</u> 137: 156-163: 156-163, Jan 2021.

87. Hawkins L, Gertz AM, Badubi O, Sickboy O, Mussa A, Maotwe T, Whittaker PG, **Schreiber CA**, Ramagola-Masire D, Morroni C: Integration of family planning services into health care for HIV-positive women in Botswana. <u>Int J Gynaecol Obstet</u> 152: 208-214, Feb 2021.

88. Flynn AN, Roe AH, Koelper N, McAllister A, Sammel MD, **Schreiber CA**: Timing and efficacy of mifepristone pretreatment for medical management of early pregnancy loss. <u>Contraception</u> 103(6):404-407, Jun 2021.

89. Sonalkar S, Maya E, Adanu R, Samba A, Mumuni K, McAllister A, Fishman J, Schurr D, **Schreiber CA**, Kolev S, Doe R, Gaffield ME: Pilot monitoring and evaluation of the WHO Postpartum Family Planning Compendium mobile application: an in-depth, qualitative study. <u>Int J Gynaecol Obstet</u> 153(3):508-513, Jun 2021.

90. Flynn AN, Shorter JM, Roe AH, Sonalkar S, **Schreiber CA**: The burden of the Risk Evaluation and Mitigation Strategy (REMS) on providers and patients experiencing early pregnancy loss: a commentary. <u>Contraception</u> 104(1):29-3, Jul 2021.

91. Peipert JF, Zhao Q, **Schreiber CA**, Teal S, Turok DK, Natavio M, Cordon S, Daggy J: Intrauterine device use, sexually transmitted infections, and fertility: a prospective cohort study. <u>Am J Obstet Gynecol</u> 225(2):157.e1-157.e9, Aug 2021.

92. Shorter JM, Pymar H, Prager S, McAllister A, **Schreiber CA**: Early pregnancy care in North America: a proposal for high-value care that can level health disparities. <u>Contraception</u> 104(2):128-131, Aug 2021.

Courtney Anne Schreiber, MD, MPH                    Page 16                    Last updated 13 Nov 2023

93.   Burlando AM, Flynn AN, Gutman S, McAllister A, Roe AH, **Schreiber CA**, Sonalkar S: The Role of Subcutaneous Depot Medroxyprogesterone Acetate in Equitable Contraceptive Care: A Lesson From the Coronavirus Disease 2019 (COVID-19) Pandemic. Obstet Gynecol 138: 574-577, Oct 2021.

94.   Roe AH, McAllister A, Flynn AN, Martin B, Jiang E, Koelper N, **Schreiber CA**: The effect of mifepristone pretreatment on bleeding and pain during medical management of early pregnancy loss. Contraception 104(4):432-436, Oct 2021.

95.   Roe AH, Lang B, McAllister A, Gaitors MC, Smith-Whitley K, **Schreiber CA**, Sayani F: Contraceptive use and preferences among females with sickle cell disease. Contraception 105:42-45, Jan 2022.

96.   Sonalkar S, Short WR, McAllister A, Kete C, Ingeno L, Fishman J, Koenig HC, **Schreiber CA**, Teitelman AM: Incorporating HIV Pre-Exposure Prophylaxis Care for Patients Seeking Induced Abortion and Pregnancy Loss Management. Womens Health Issues Page: epub ahead of print, Jan 2022.

97.   Beer LA, Senapati S, Sammel MD, Barnhart KT, **Schreiber CA**, Speicher DW: Proteome-defined changes in cellular pathways for decidua and trophoblast tissues associated with location and viability of early-stage pregnancy. Reprod Biol Endocrinol 20: 36-40, Feb 2022.

98.   McAllister A, Lang B, Flynn A, Meisel ZF, Abernathy A, Sammel MD, **Schreiber CA**: Pregnant and bleeding: A model to assess factors associated with the need for emergency care in early pregnancy. Am J Emerg Med 53: 94-98, Mar 2022.

99.   McAllister A, Lang B, Flynn A, Meisel ZF, Abernathy A, Sammel MD, **Schreiber CA**: Pregnant and bleeding: A model to assess factors associated with the need for emergency care in early pregnancy. Am J Emerg Med 53: 94-98, Mar 2022.

100.  Burger T, Li J, Zhao Q, **Schreiber CA**, Teal S, Turok DK, Natavio M, Peipert JF: Association of Obesity With Longer Time to Pregnancy. Obstet Gynecol 139: 554-560, Apr 2022.

101.  Creinin MD, **Schreiber CA**, Turok DK, Cwiak C, Chen BA, Olariu AI: Levonorgestrel 52 mg intrauterine system efficacy and safety through 8 years of use. Am J Obstet Gynecol Page: epub ahead of print, May 2022.

102.  Flynn AN, Hoffman E, Murphy C, Jen A, **Schreiber CA**, Roe AH: Fetomaternal hemorrhage assessment in Rh-negative patients undergoing dilation and evacuation between 20 and 24 weeks' gestational age: A retrospective cohort study. Contraception. 110: 27-29, Jun 2022.

103.  Nagendra D, Gutman SM, Koelper NC, Loza-Avalos SE, Sonalkar S, **Schreiber CA**, Harvie HS: Medical management of early pregnancy loss is cost-effective compared with office uterine aspiration. Am J Obstet Gynecol Jun 2022.

104.  Roe AH, Abernathy A, Flynn AN, McAllister A, Koelper NC, Sammel MD, **Schreiber CA**, Sonalkar S: Utility and Limitations of Human Chorionic Gonadotropin Levels for Remote Follow-up After Medical Management of Early Pregnancy Loss. Obstet Gynecol 139: 1149-1151, Jun 2022.

105.  Hubacher D, **Schreiber CA**, Turok DK, Jensen JT, Creinin MD, Nanda K, White KO, Dayananda I, Teal SB, Chen PL, Chen BA, Goldberg AB, Kerns JL, Dart C, Nelson AL, Thomas MA, Archer DF, Brown JE, Castaño PM, Burke AE, Kaneshiro B, Blithe DL: Continuation rates of two different-sized copper intrauterine devices among nulliparous women: Interim 12-month results of a single-blind, randomised, multicentre trial. EClinicalMedicine 51: 101554, Jul 2022.

106.  Sonalkar S, McAllister A, Kete C, Fishman J, Frarey A, Short WR, **Schreiber CA**, Teitelman A: Implementation of an HIV Pre-exposure Prophylaxis Strategy Into Abortion and Early Pregnancy Loss Care. J Acquir Immune Defic Syndr 90: S129-S133, Jul 2022.

107.  Sonalkar S, Short WR, McAllister A, Kete C, Ingeno L, Fishman J, Koenig HC, **Schreiber CA**, Teitelman AM: Incorporating HIV Pre-Exposure Prophylaxis Care for Patients Seeking Induced Abortion and Pregnancy Loss Management. Womens Health Issues. 32(4): 388-394, Jul-Aug 2022.

108.  Roe AH, McAllister A, Kete C, Pishko A, Whitworth H, **Schreiber CA**, Sayani FA: Sex as an Independent Risk Factor for Venous Thromboembolism in Sickle Cell Disease: A Cross-Sectional Study. J Womens Health (Larchmt). 31(10): 1467-1471, Oct 2022.

109.  Flynn AN, Hoffman E, Murphy C, Jen A, **Schreiber CA**, Roe AH: Fetomaternal hemorrhage assessment in Rh-negative patients undergoing dilation and evacuation between 20 and 24 weeks' gestational age: A retrospective cohort study. Contraception 110: 27029, 2022.

110.  Gilmore E, Sonalkar S, **Schreiber CA**: Use of Rh Immune Globulin in First-Trimester Abortion and Miscarriage. Obstet Gynecol 141: 219-222, Jan 2023.

111. Roe AH, Koelper N, McAllister A, Barnhart KT, **Schreiber CA**, Hadjiliadis D: Cervical mucus quality in females with and without cystic fibrosis. J Cyst Fibros Mar 2023.

112. Abernathy A, **Schreiber CA**, Srinivas SK: State restrictions on abortion are associated with fewer abortions in patients with high risk cardiovascular conditions. Contraception May 2023.

113. Lee IT, Senapati S, **Schreiber C**, Koelper N, Takacs P, Barnhart K: Application of a Multiplex Platform to Identify Novel Biomarkers for Pregnancy Location and Viability. Res Sq May 2023.

114. Flynn AN, McAllister A, Kete C, Koelper NC, Gallop RJ, **Schreiber CA**, Schapira MM, Sonalkar S: Evaluation of a decision aid for early pregnancy loss: A pilot randomized controlled trial. Contraception Jun 2023.

115. Gutman S, Connor H, Mumford SL, Gilmore E, Roe AH, **Schreiber CA**: Feasibility and acceptability of virtual group contraceptive counseling prior to abortion care. Contraception Jul 2023.

116. Horvath S, Huang ZY, Koelper NC, Martinez C, Tsao PY, Zhao L, Goldberg AB, Hannum C, Putt ME, Luning Prak ET, **Schreiber CA**: Induced Abortion and the Risk of Rh Sensitization. JAMA 330: 1167-1174, Sep 2023.

117. Gilmore E, Sonalkar S, **Schreiber CA**.: Use of Rh Immune Globulin in First-Trimester Abortion and Miscarriage. Obstet Gynecol 141: 219-222, Jan 2023.

118. Horvath S, **Schreiber CA**, Luning Prak ET.: Rh Sensitization and Induced Abortion-Reply. JAMA 331: 445-446, Feb 2024.

119. Chesnokova AE, Nagendra D, Dixit E, McAllister A, Schachter A, **Schreiber CA,** Roe AH, Sonalkar S: Trust in provider and stigma during second-trimester abortion. Sex Reprod Healthc 39:100932, Mar 2024.

120. Krashin JW, Black P, Brannen E, Gard CC, Lin Y, Greenwood-Ericksen M, Trujillo VY, Burkhardt G, **Schreiber CA**.: Geographic Access to Early Pregnancy Loss Management. Obstet Gynecol 143: 435-439, Mar 2024.

121. Mauck C, Thurman A, Jensen JT, **Schreiber CA**, Baker J, Hou MY, Chavoustie S, Dart C, Wu H, Ravel J, Gajer P, Herold BC, Jacot T, Zack N, Hatheway J, Friend D: Safety testing of Ovaprene: An investigational nonhormonal monthly vaginal contraceptive. Contraception 27:110440, Mar 2024.

122. Edelman A, Jensen JT, Brown J, Thomas M, Archer DF, **Schreiber CA**, Teal S, Westhoff C, Dart C, Blithe DL: Emergency contraception for individuals weighing 80kg or greater: a randomized trial of 30 mg ulipristal acetate and 1.5 mg or 3.0 mg levonorgestrel. Contraception 23:110474, Apr 2024.

123. Gilmore EV, Russell LB, Harvie HS, **Schreiber CA**: Estimating the cost of Rh testing and prophylaxis in early pregnancy: A time-driven activity-based costing study. Contraception 20:110468, Apr 2024.

124. Jensen JT, Edelman A, Westhoff CL, **Schreiber CA**, Archer DF, Teal S, Thomas M, Brown J, Blithe DL: Use of serum evaluation of contraceptive and ovarian hormones to assess reduced risk of pregnancy among women presenting for emergency contraception in a multicenter clinical trial. Contraception 24:110475, Apr 2024.

125. Mauck C, Thurman A, Jensen JT, **Schreiber CA**, Baker J, Hou MY, Chavoustie S, Dart C, Wu H, Zack N, Hatheway J, Friend D: Successful postcoital testing of Ovaprene: An investigational non-hormonal monthly vaginal contraceptive. Contraception 132:110373, Apr 2024.

126. Brown JE, Creinin MD, Wu H, Hubacher D, **Schreiber CA,** Kaneshiro B, Nanda K, Blithe DL: Menstrual cup use and intrauterine device expulsion in a copper intrauterine device randomized trial. Contraception 134:110415, Jun 2024.


EDITORIALS, REVIEWS, CHAPTERS, INCLUDING PARTICIPATION IN COMMITTEE REPORTS (PRINT OR OTHER MEDIA)

1. **Schreiber CA**, Creinin MD: The health benefits of hormonal contraception. The Female Patient 10-12, Jan, 2006 (RA Suppl).

2. **Schreiber CA**, Creinin MD: The health benefits of hormonal contraception. The Female Patient 19-24, Apr, 2005 (Suppl).

3. **Schreiber CA**, Rhoa MF, Holland L: Vaginal Discharge. Clinical Handbook of Pediatrics, 3rd Edition. Schwartz MW (eds.). Lippincott Williams and Wilkins, Baltimore, MD. Page: 747-753, 2003.

4. **Schreiber CA**, Rhoa MF, Holland L: Pelvic Pain. Clinical Handbook of Pediatrics, 3rd Edition. Schwartz MW (eds.). Lippincott Williams and Wilkins, Baltimore, MD, Page: 569-576, 2003.

5. **Schreiber CA**, Rhoa MF, Holland L: Vaginal Bleeding. Clinical Handbook of Pediatrics, 3rd Edition. Schwartz MW (eds.). Lippincott Williams and Wilkins, Baltimore, MD. Page: 739-746, 2003.

6. **Schreiber CA**: The Female Reproductive System. Concepts in Medical Physiology. Seifter J, Sloane D, Ratner A (eds.). Lippincott Williams & Wilkins, Philadelphia, PA, Page: 573-604, October 2005.

7. Barnhart K, **Schreiber CA**, Shaunik A: Contraception. www.endotext.org 2006.

Case: 24-2481  12/24/2024  DktEntry: 27.1  Page 275 of 304
Case 1:24-cv-00514-JLS  Document 20-3  Filed 07/29/24  Page 19 of 20

Courtney Anne Schreiber, MD, MPH                    Page 18                    Last updated 13 Nov 2023

8. **Schreiber CA**, Barnhart KT: Contraception. Yen & Jaffe's Reproductive Endocrinology. Drs. Strauss and Barbieri (eds.). 6th edition: 873, 2009.

9. **Schreiber CA**: Introduction to Controversies in Family Planning. Contraception 82:25, August 2010.

10. Tennant C, **Schreiber CA**: Time to trim the loose ends of the tailstring debate. Contraception 84(1): 108; author reply 108-9, Jul 2011.

11. **Schreiber CA**, Ratcliffe S, Barnhart KT: Finding the right face for advanced supply of emergency contraception. Contraception 2011.

12. **Schreiber CA**, Barnhart KT: Contraception. Yen & Jaffe's Reproductive Endocrinology 7/e. Strauss/Barbieri (eds.). Chpt 36, October 2013.

13. Pentlicky S, **Schreiber CA**: Vaginal Bleeding. Schwartz's Clinical Handbook of Pediatrics 5th edition. Zorc JJ, Alpern ER, Brown L, Clark BJ, Marino BS, Mollen CM, Eds (eds.). Lippincott Williams and Wilkins, Page: 833-840, 2013.

14. Pentlicky S, **Schreiber CA**: Pelvic Pain. Schwartz's Clinical Handbook of Pediatrics 5th edition. Zorc JJ, Alpern ER, Brown L, Clark BJ, Marino BS, Mollen CM, Eds (eds.). Lippincott Williams and Wilkins, Page: 624-632, 2013.

15. Pentlicky S, **Schreiber CA**: Vaginal Discharge. Schwartz's Clinical Handbook of Pediatrics 5th edition. Zorc JJ, Alpern ER, Brown L, Clark BJ, Marino BS, Mollen CM, Eds. (eds.). Lippincott Williams and Wilkins, Page: 841-848, 2013.

16. Warden M, **Schreiber CA**, Steinauer J: Diagnostic criteria for nonviable pregnancy. N Engl J Med 370: 86, Jan 2014.

17. Sonalkar S, **Schreiber CA**, Barnhart KT: Contraception. http://www.ncbi.nlm.nih.gov/books/NBK279148/ De Groot LJ, Beck-Peccoz P, Chrousos G, Dungan K, Grossman A, Hershman JM, Koch C, McLachlan R, New M, Rebar R, Singer F, Vinik A, Weickert MO (eds.). MDTEXT.com South Dartmouth, MA, Nov 2014.

18. Sober S, **Schreiber CA**: Pregnancy Counseling Options. Contraception for Adolescent and Young Adult Women. Whittaker A, Gilliam M (eds.). Springer Science+Business Media, NY, Chpt 14, 2014.

19. **Schreiber CA**, Barnhart KT: Contraception. Yen and Jaffe's Reproductive Endocrinology. Strauss II JF, Barbieri RL (eds.). Elsevier, 2018.

20. Sonalkar SS, **Schreiber CA**: It is cost effective to improve the standard of care for women experiencing miscarriage. Lancet Glob Health 7(9): e1164-e1165, Sep 2019.

21. Albright BB, Shorter JM, Mastroyannis SA, Ko EM, **Schreiber CA**, Sonalkar S: In Reply. Obstet Gynecol 135: 1226-1227, May 2020.

22. **Schreiber CA**, Madden T: Complex family Planning: A newly accredited, landmark fellowship. Contraception 103: 1-2, Jan 2021.

23. **Schreiber CA**, Khabele D, Gehrig PA: The Dobbs v Jackson Women's Health Organization Supreme Court Decision-Concerns, Challenges, and Consequences for Health Care. JAMA Surg 158(3): 229-230, Mar 2023.

24. Meisel ZF, **Schreiber CA**: Variations in Care for Early Pregnancy Loss Across Clinical Settings. JAMA Netw Open 6: e232645, Mar 2023.

## ALTERNATIVE MEDIA

1. Janet Weiner, PhD, MPH, **Courtney A. Schreiber**, MD, MPH: FDA RESTRICTIONS ON MIFEPRISTONE: TIME FOR A CHANGE? Recent studies confirm clinical and cost effectiveness for medical management of early miscarriage. Leonard Davis Institute Issue Brief 24(1), Sep 2020. Notes: https://ldi.upenn.edu/sites/default/files/pdf/LDI%20Issue%20Brief%202020%20Sept.%20Vol.%2024%20No.%201_3.pdf

2. https://ldi.upenn.edu/fellows/fellows-directory/courtney-schreiber-md-mph/

3. https://pennlisteninglab.com/stories/feeling-like-a-queen

4. https://ldi.upenn.edu/our-work/research-updates/a-common-antibody-treatment-may-be-unnecessary-after-first-trimester-abortion/

5. https://peace.med.upenn.edu/

## PATENTS

1. Courtney Schreiber: Medical Management of Nonviable Pregnancy. USA Patent Number 62/777,369, 2018.

Courtney Anne Schreiber, MD, MPH                Page 19                Last updated 13 Nov 2023

2.    Perelman School of Medicine: License: L2462-Athenium Pharmaceuticals, LLC. USA Patent Number 18-8692, 2022.

**843**

# EXHIBIT B




Contraception

Contraception 92 (2015) 206–211

Review article

# Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review☆

Daniel Grossman[a,b,*], Kari White[c], Lisa Harris[d,e], Matthew Reeves[f,g], Paul D. Blumenthal[h], Beverly Winikoff[i], David A. Grimes[j]

[a]Ibis Reproductive Health, Oakland, CA 94612, USA
[b]Bixby Center for Global Reproductive Health, Department of Obstetrics, Gynecology and Reproductive Sciences, University of California, San Francisco, San Francisco, CA 94143, USA
[c]Department of Health Care Organization and Policy, School of Public Health, University of Alabama at Birmingham, Birmingham, AL 35233, USA
[d]Department of Obstetrics and Gynecology, University of Michigan, Ann Arbor, MI 48109, USA
[e]Department of Women's Studies, Program in Sexual Rights and Reproductive Justice, University of Michigan, Ann Arbor, MI 48109, USA
[f]National Abortion Federation, Washington, DC 20036, USA
[g]Johns Hopkins Bloomberg School of Public Health, Baltimore, MD 21205, USA
[h]Department of Obstetrics and Gynecology, Stanford University, Stanford, CA 94305, USA
[i]Gynuity Health Projects, New York, NY 10010, USA
[j]Department of Obstetrics and Gynecology, University of North Carolina School of Medicine, Chapel Hill, NC 27516, USA

Received 4 May 2015; revised 27 May 2015; accepted 2 June 2015

## Abstract

**Objective:** We conducted a systematic review of the literature on the effectiveness of medical abortion "reversal" treatment. Since the usual care for women seeking to continue pregnancies after ingesting mifepristone is expectant management with fetal surveillance, we also performed a systematic review of continuing pregnancy after mifepristone alone.
**Study design:** We searched PubMed, CINAHL (*Cumulative Index to Nursing and Allied Health Literature*), Scopus and the Cochrane Library for articles published through March 2015 reporting the proportion of pregnancies continuing after treatment with either mifepristone alone or after an additional treatment following mifepristone aimed at reversing its effect.
**Results:** From 1115 articles retrieved, 1 study met inclusion criteria for abortion reversal, and 13 studies met criteria for continuing pregnancy after mifepristone alone. The one report of abortion reversal was a case series of 7 patients receiving varying doses of progesterone in oil intramuscularly or micronized progesterone orally or vaginally; 1 patient was lost to follow-up. The study was of poor quality and lacked clear information on patient selection. Four of six women continued the pregnancy to term [67%, 95% confidence interval (CI) 30–90%]. Assuming the lost patient aborted resulted in a continuing pregnancy proportion of 57% (95% CI 25–84%). The proportion of pregnancies continuing 1–2 weeks after mifepristone alone varied from 8% (95% CI 3–22%) to 46% (95% CI 37–56%). Continuing pregnancy was more common with lower mifepristone doses and advanced gestational age.
**Conclusions:** In the rare case that a woman changes her mind after starting medical abortion, evidence is insufficient to determine whether treatment with progesterone after mifepristone results in a higher proportion of continuing pregnancies compared to expectant management.
**Implications:** Legislation requiring physicians to inform patients about abortion reversal transforms an unproven therapy into law and represents legislative interference in the patient–physician relationship.
© 2015 Elsevier Inc. All rights reserved.

*Keywords:* Medical abortion; Mifepristone; Reversal; Progesterone; Continuing pregnancy

☆ Conflicts of interest: none.
 * Corresponding author. Ibis Reproductive Health, 1330 Broadway, Ste 1100, Oakland, CA 94612, USA. Tel.: +1-510-986-8941; fax: +1-510-986-8960.
 *E-mail address:* DGrossman@ibisreproductivehealth.org (D. Grossman).

http://dx.doi.org/10.1016/j.contraception.2015.06.001
0010-7824/© 2015 Elsevier Inc. All rights reserved.

## 1. Introduction

First-trimester medical abortion involves the use of mifepristone followed by misoprostol, generally up to a gestational age of 63 days from last menstrual period [1,2]. Many women prefer medical abortion to surgical abortion

D. Grossman et al. / Contraception 92 (2015) 206–211

207

because they perceive it as less invasive and more private [3]. The proportion of all nonhospital abortions in the United States that were early medical abortions increased from 17% in 2008 to 23% in 2011 [4].

In early 2015, legislatures in Arizona and Arkansas passed laws requiring physicians providing abortion to inform women that if they choose to have a medical abortion and then decide not to complete the abortion, the effect of mifepristone may be reversed with specific treatment [5]. Treatment to reverse the effects of mifepristone is not considered an established practice by the American College of Obstetricians and Gynecologists (ACOG) [6] and was not described in a recent practice bulletin on first-trimester medical abortion issued by ACOG and the Society of Family Planning (SFP) [1].

The purpose of this study was to perform a systematic review of the literature on reversal of medical abortion that documented the proportion of pregnancies continuing after treatment. Since the usual care for women seeking to continue pregnancies after ingesting mifepristone is expectant management with fetal surveillance, we also performed a systematic review of continuing pregnancy after treatment with mifepristone alone.

## 2. Materials and methods

### 2.1. Systematic review of medical abortion reversal

In this review, we searched for reports of pharmacological methods (e.g., intramuscular injection of progesterone) to reverse the effects of mifepristone prior to administration of misoprostol (or any other prostaglandin) for first-trimester medical abortion. We anticipated few, if any, randomized controlled trials and therefore broadened our search to include cohort studies and case studies or case series; we excluded review articles, editorials and commentaries. The primary outcome was the proportion of women who carried their pregnancies to term after receiving treatment to reverse the effect of mifepristone.

We searched for studies published through March 31, 2015, using databases for PubMed, the CINAHL (*Cumulative Index to Nursing and Allied Health Literature*), Scopus and the Cochrane Library. We combined the following search terms as Medical Subject Headings (MeSH) and text words: induced abortion, steroidal abortifacient agents; mifepristone; Mifeprex; Mifegyne; RU-486; reverse; antidote; progesterone; progestin; first-trimester pregnancy (see Box).

After initial title and abstract screening, two reviewers (DG and KW) independently evaluated full-text articles to determine whether they met the inclusion criteria. For relevant studies, we recorded the number of women enrolled in the study (or included in the case series) and the number of continuing pregnancies. We then calculated the percentage of continuing pregnancies and 95% Wilson Score confidence intervals (CIs) for women receiving reversal therapy.

Box
List of PubMed search terms used in a systematic review of studies on the efficacy of medical abortion reversal

| Search | |
|---|---|
| (1) | "Abortifacient Agents, Steroidal"[mesh] or "Mifepristone" [mesh] or mifepristone or mifegyne or mifeprex or "r 38486" or r38486 or r-38486 or "ru 38486" or "ru 486" or ru486 or ru-486 or ru38486 or "zk 98296" or zk98296 or zk-98296 |
| (2) | "Abortion, Induced"[mesh] or abort* or terminat* |
| (3) | ("Pregnancy"[mesh] or pregnan* and ("first trimester") or (week*)) or "Pregnancy Trimester, First"[mesh] or "early pregnancy" |
| (4) | revers* or antidote or "Progesterone"[mesh] or progesterone or "progestins"[mesh] or progestin* #1 AND #2 AND #3 AND #4 AND (("0001/01/01"[PDAT]: "2015/03/31"[PDAT]) AND "humans"[MeSH Terms]) |

### 2.2. Systematic review of continuing pregnancies following the use of mifepristone alone for first-trimester medical abortion

We reviewed cohort studies and randomized controlled trials that used mifepristone alone during the first trimester of pregnancy to induce abortion, which we identified through a search of the same four databases and using the same search strategy, excluding the reversal terms. We also searched the reference lists of relevant publications for additional studies. We excluded studies that only reported medical abortion failure after mifepristone alone and did not specify the number of continuing pregnancies. We calculated the proportion of pregnancies continuing at the time of the follow-up visit after treatment with mifepristone alone and 95% Wilson Score CIs. Because the mifepristone regimens were not uniform, metaanalysis could not be performed.

## 3. Results

### 3.1. Systematic review of medical abortion reversal

Of the 319 unduplicated titles identified in our search, one article met our inclusion criteria (Fig. 1). This article was a case series by Delgado and Davenport [7] of seven women who received progesterone treatment after taking mifepristone for medical abortion at 7–11 weeks gestation. The mifepristone dosage was not noted. One patient was lost to follow-up. Of the six patients with follow-up data, four continued the pregnancy and delivered at term with no apparent congenital malformations; two patients aborted the pregnancy within 3 days of taking mifepristone. The progesterone regimen varied from progesterone in oil 200 mg intramuscularly daily to twice per week, sometimes followed by oral micronized progesterone, to micronized

208                                    *D. Grossman et al. / Contraception 92 (2015) 206–211*



Fig. 1. Summary of study selection process for medical abortion reversal.

progesterone administered vaginally. Therapy was continued for up to 5 months. The publication provides limited details, but it appears that, in at least five cases, a living embryo was documented prior to initiating progesterone treatment. The authors did not report how many women presented seeking medical abortion reversal after taking mifepristone and were found to have already aborted and therefore excluded from treatment. The dates during which cases were collected are not specified, and it is unclear if all women treated were included in the case series. Based on the four continuing pregnancies and excluding the patient lost to follow-up, the proportion of pregnancies continuing after this therapy was 67% (95% CI 30–90%). If we assume that the patient lost to follow-up had an abortion, the continuing pregnancy proportion was 57% (95% CI 25–84%).

### 3.2. Systematic review of continuing pregnancies following the use of mifepristone alone for first-trimester medical abortion

Our search retrieved 1115 unduplicated articles, and 13 studies in 11 publications met our inclusion criteria (one publication was an English-language article that included two relevant studies performed in China, and one publication provided complete information on two relevant mifepristone dosages) (Fig. 2) [8–18]. Women were generally assessed 1–2 weeks after mifepristone and those with a continuing pregnancy at that time underwent surgical abortion. Table 1 shows for each study the mifepristone regimen used, the gestational age limit, when the follow-up visit occurred, the proportion of pregnancies that had a complete abortion after

mifepristone alone and the proportion of pregnancies that were continuing at the follow-up visit. The continuing pregnancy proportions ranged from 8% to 46% with the different regimens.

### 4. Discussion

We found only one small case series that evaluated a treatment aimed at reversing the effects of mifepristone. The proportion of pregnancies that continued after this treatment was 57–67%, but the 95% CI of this estimate was wide, ranging from 25% to 90% [7]. The study was of poor quality with few details.

Due to the limited information in the article [7], one cannot directly compare the results of this single small series to the continuing pregnancy rate after mifepristone alone, which was as high as 46% in one of the clinical trials [15]. In the report by Delgado and Davenport [7], women presented 7–48 h after mifepristone ingestion, and, except for two cases, the patient had a live embryo at the time of treatment. In order to calculate the proportion of women with a continuing pregnancy seeking this treatment, which would be comparable to the proportion of continuing pregnancies after mifepristone alone, one must know how many women requested treatment and were found to already have an embryonic demise or incomplete abortion. It is reasonable to suppose that women who have an ongoing pregnancy 1–2 days after mifepristone are more likely to have pregnancies that continue to term with no further treatment. It is also possible that some of the continuing pregnancies noted 1–2

D. Grossman et al. / Contraception 92 (2015) 206–211          209



Fig. 2. Summary of study selection process for continuing pregnancy following administration of mifepristone alone for medical abortion.

weeks after treatment in the studies of mifepristone alone may have aborted if the period of follow-up were longer.

Although the dose of mifepristone was not noted in the report by Delgado and Davenport [7], women likely received 200 mg, which is the dosage recommended by ACOG and SFP and most often used by providers in the US [1,19]. Most of the studies of mifepristone alone used a higher dose, and the one study that compared 600 mg to 200 mg found a higher proportion of continuing pregnancies with 200 mg

[18]. In addition, none of the studies of mifepristone alone included women pregnant beyond 56 days, while the report by Delgado and Davenport [7] included women up to 11 weeks gestation. In the first trimester, the risk of continuing pregnancy after medical abortion increases as gestational age advances [15,20].

Progesterone is used for other indications during pregnancy. Injections of 17a-hydroxyprogesterone caproate or administration of vaginal progesterone suppositories or

Table 1
Studies reporting the proportion of women with continuing pregnancies following administration of mifepristone alone for medical abortion

| Study | Mifepristone oral dose | N | Gestational age limit | Follow-up visit (number of days after mifepristone) | Complete abortion | Continuing pregnancy at follow-up visit (%, 95% CI) |
|---|---|---|---|---|---|---|
| Birgerson 1988 [9] | 10, 25 or 50 mg twice daily for 7 days | 153 | 49 days | 8–10 days | 67% | 27% (20–34%) |
| Cameron 1986 [8] | 150 mg daily for 4 days | 20 | 56 days | 14 days | 60% | 25% (11–47%) |
| Carol 1989 [17] | 600 mg (single dose) | 50 | 39 days | NS | 80% | 12% (6–24%) |
| Grimes 1988 [10] | 600 mg (single dose) | 50 | 49 days | 14 days | 88% | 10% (4–21%) |
| Kovacs 1984 [11] | 25–100 mg twice daily for 4 days | 36[a] | 42 days | 14 days | 61% | 8% (3–22%) |
| Maria 1988a [16] | 600 mg (single dose) | 149[a] | 42 days | 7 days | 88% | 9% (6–15%) |
| Maria 1988b [18] | 600 mg (single dose) | 174 | 49 days | 7 days | 84% | 11% (8–17%) |
| Maria 1988b [18] | 200 mg (single dose) | 30 | 49 days | 7 days | 63% | 23% (12–41%) |
| Somell 1990 [12] | 600 mg (single dose) | 70 | 42 days | 7 days | 80% | 17% (10–28%) |
| Swahn 1989 [13] | 25 mg twice daily for 4 days | 14 | 49 days | 14 days | 57% | 36% (16–61%) |
| Ylikorkala 1989 [14] | 600 mg (single dose) | 47[b] | 43 days | 14 days | 70% | 11% (5–23%) |
| Zheng 1989 [15] | 600 mg (single dose) | 204 | 42 days | 7 days | 65% | 31% (25–38%) |
| Zheng 1989 [15] | 600 mg (single dose) | 95 | 49 days | 7 days | 53% | 46% (37–56%) |

NS, not specified.
[a] One additional participant was later found to have an ectopic and is excluded from the total here.
[b] Three additional participants had a missed abortion at time of treatment and are excluded from the total here.

*D. Grossman et al. / Contraception 92 (2015) 206–211*

gel may be used for prevention of preterm birth among women at high risk of early delivery, generally weekly from 16 weeks to 36 weeks gestation [21]. Progesterone supplementation is also used with assisted reproductive technologies that involve treatment with a gonadotropin-releasing hormone (GnRH) analog, agonist or antagonist, which may interrupt the normal functioning of the corpus luteum [22]. Progesterone in oil injections or vaginal suppositories or gel may be used for this purpose, but treatment is generally stopped after 9–12 weeks gestation, by which time the trophoblast is the primary source of progesterone. Progesterone is not associated with an increased risk of congenital anomalies, including genital abnormalities. Adverse events associated with progesterone injections include injection site swelling or irritation [23], as well as the potential of allergies to the yam, soy or peanut used in manufacturing or compounding the medication [21].

However, the evidence supporting the use of progesterone early in pregnancy after GnRH treatment or to prevent preterm birth is not directly applicable to the situation after mifepristone treatment. Mifepristone blocks the progesterone receptor with a higher affinity than progesterone itself [24]. Women treated with mifepristone for abortion have normal pregnancies with high progesterone levels, and it is not clear that adding more progesterone would counteract the effect of the receptor blockade. A recent randomized controlled trial found that insertion of an etonogestrel contraceptive implant, a very potent progestin, immediately after ingestion of mifepristone did not reduce the effectiveness of the medical abortion regimen compared to delayed insertion after abortion completion [25], confirming the findings of a previous pilot study [26]. In addition, the duration of treatment that women received in the report by Delgado and Davenport [7] was more consistent with preterm labor prevention (albeit with an unproven regimen). It also far exceeded the expected duration of action of mifepristone since the drug is undetectable in humans 10 days after ingestion of a 200-mg dose [27].

The evidence to date does not suggest an elevated risk of congenital malformations after mifepristone administration alone. A recent prospective study from France reported on 46 pregnancies exposed to mifepristone only [28]. Two major malformations occurred among 38 continuing pregnancies (5.3%), which, based on these small numbers, does not appear to be significantly elevated above the expected proportion of about 3%. While more prospective data are needed, information about the low risk of congenital malformations after mifepristone exposure should be given to women who decide to continue a pregnancy after taking the drug.

The clinical use and new state laws concerning abortion "reversal" raise serious ethical concerns. The limited data on mifepristone reversal grew out of the anecdotal experiences of physicians who performed experimental treatment on pregnant women, without usual research safeguards. Delgado and Davenport [7] do not report that their study

had an ethics board or institutional review board (IRB) approval. Case reports involving retrospective analysis of three or fewer cases do not generally require IRB oversight, although institutions or journals may require IRB review to determine that the report is exempt. While Delgado and Davenport [7] published their findings as a "case report," their study is clearly "research" as defined in federal policy. Federal regulations define research as "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge [29]." The report clearly extends into the realm of research, whether measured by its prospective nature, the number of patients on which it reports, its attempt to assess a specific new treatment regimen or the suggestion that the data produced be used to guide treatment of other women. In recognition of the report's limitations, Delgado and Davenport [7] themselves called for further clinical trials before routine use of their protocol. The new laws in Arizona and Arkansas have now bypassed the research process, in effect making all women who undergo this treatment subjects in an uncontrolled, unmonitored experiment.

Providing evidence-based care is part of how physicians meet their beneficence-based obligations to patients, and therefore, it is a *moral* as well as a clinical mandate to base care on accepted scientific fact. The new laws compel physicians to say things that may contradict their clinical knowledge and judgment. Some physicians will not be able to do so in good conscience; they may feel that suggesting unproven treatment or suggesting that a woman can begin an abortion with uncertainty about her decision contradicts their duty to do no harm.

Women rarely change their minds after beginning a medical abortion. According to reports that physicians are required to submit to the drug's manufacturer, between 2000 and 2012, less than 0.004% of women taking mifepristone in the US later chose to continue the pregnancy (personal communication, Danco Laboratories). In such a case, a woman should be counseled that there is a reasonable chance (10–45%) that the pregnancy will continue. We found no credible evidence that using medication after ingestion of mifepristone is better than expectant management in assuring a continuing pregnancy; suggesting otherwise is scientifically untenable. Legislative interference in the patient–physician relationship is unwarranted and dangerous [30]. In the case of recent Arizona and Arkansas laws, this interference transforms an unproven therapy into law, bases law on methodologically flawed research and in effect turns unethical experimentation on pregnant women into legislative mandate. These features of mifepristone reversal represent an affront to responsible research conduct and to the ethical practice of medicine.

### Acknowledgments

This work was supported by grants from the William and Flora Hewlett Foundation and an anonymous foundation.

*D. Grossman et al. / Contraception 92 (2015) 206–211*                                                      211

# References

[1] American College of Obstetricians and Gynecologists. Practice Bulletin No 143: Medical management of first-trimester abortion. Obstet Gynecol 2014;123:676–92.

[2] World Health Organization. Safe abortion: technical and policy guidance for health systems. 2nd ed. Geneva: WHO; 2012.

[3] Ho PC. Women's perceptions on medical abortion. Contraception 2006;74:11–5.

[4] Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2011. Perspect Sex Reprod Health 2014;46:3–4.

[5] Arizona Senate Bill 1318. Available at, https://legiscan.com/AZ/text/SB1318/2015 [Accessed 25 April 2015].

[6] American Congress of Obstetricians and Gynecologists. Medication Abortion Reversal. Available at, http://www.acog.org/-/media/Departments/State-Legislative-Activities/2015AZFactSheetMedicationAbortionReversalfinal.pdf?dmc=1&ts=20150425T1907218559 [Accessed 25 April 2015].

[7] Delgado G, Davenport ML. Progesterone use to reverse the effects of mifepristone. Ann Pharmacother 2012;46:e36.

[8] Cameron IT, Michie AF, Baird DT. Therapeutic abortion in early pregnancy with antiprogestogen RU486 alone or in combination with prostaglandin analogue (gemeprost). Contraception 1986;34:459–68.

[9] Birgerson L, Odlind V. The antiprogestational agent RU 486 as an abortifacient in early human pregnancy: a comparison of three dose regimens. Contraception 1988;38:391–400.

[10] Grimes DA, Mishell DR, Shoupe D, Lacarra M. Early abortion with a single dose of the antiprogestin RU-486. Am J Obstet Gynecol 1988;158:1307–12.

[11] Kovacs L, Sas M, Resch BA, Ugocsai G, Swahn ML, Bygdeman M, et al. Termination of very early pregnancy by RU 486 — an antiprogestational compound. Contraception 1984;29:399–410.

[12] Somell C, Olund A. Induction of abortion in early pregnancy with mifepristone. Gynecol Obstet Invest 1990;29:13–5.

[13] Swahn ML, Ugocsai G, Bygdeman M, Kovacs L, Belsey EM, Van Look PF. Effect of oral prostaglandin E2 on uterine contractility and outcome of treatment in women receiving RU 486 (mifepristone) for termination of early pregnancy. Hum Reprod 1989;4:21–8.

[14] Ylikorkala O, Alfthan H, Kääriäinen M, Rapeli T, Lähteenmäki P. Outpatient therapeutic abortion with mifepristone. Obstet Gynecol 1989;74:653–7.

[15] Zheng SR. RU 486 (mifepristone): clinical trials in China. Acta Obstet Gynecol Scand Suppl 1989;149:19–23.

[16] Maria B, Stampf F, Goepp A, Ulmann A. Termination of early pregnancy by a single dose of mifepristone (RU 486), a progesterone antagonist. Eur J Obstet Gynecol Reprod Biol 1988;28:249–55.

[17] Carol W, Klinger G. Experiences with the antigestagen mifepristone (RU 486) in the interruption of early pregnancy. Zentralbl Gynakol 1989;111:1325–8.

[18] Maria B, Chaneac M, Stampf F, Ulmann A. Early pregnancy interruption using an antiprogesterone steroid: mifepristone (RU 486). J Gynecol Obstet Biol Reprod (Paris) 1988;17:1089–94.

[19] Wiegerinck MM, Jones HE, O'Connell K, Lichtenberg ES, Paul M, Westhoff CL. Medical abortion practices: a survey of National Abortion Federation members in the United States. Contraception 2008;78:486–91.

[20] Spitz IM, Bardin CW, Benton L, Robbins A. Early pregnancy termination with mifepristone and misoprostol in the United States. N Engl J Med 1998;338:1241–7.

[21] Iams JD. Identification of candidates for progesterone: why, who, how, and when? Obstet Gynecol 2014;123:1317–26.

[22] Practice Committee of the American Society for Reproductive Medicine. Progesterone supplementation during the luteal phase and in early pregnancy in the treatment of infertility: an educational bulletin. Fertil Steril 2008;89:789–92.

[23] Meis PJ, Klebanoff M, Thom E, Dombrowski MP, Sibai B, Moawad AH, et al. Prevention of recurrent preterm delivery by 17 alpha-hydroxyprogesterone caproate. N Engl J Med 2003;348:2379–85.

[24] Heikinheimo O, Kontula K, Croxatto H, Spitz I, Luukkainen T, Lähteenmäki P. Plasma concentrations and receptor binding of RU 486 and its metabolites in humans. J Steroid Biochem 1987;26:279–84.

[25] Raymond EG, Weaver MA, Tan YL, Louie KS, Bousiéguez M, Sanhueza P, et al. Medical abortion outcomes following quickstart of contraceptive implants. Contraception 2015;91:429.

[26] Sonalkar S, Hou MY, Borgatta L. Administration of the etonogestrel contraceptive implant on the day of mifepristone for medical abortion: a pilot study. Contraception 2013;88:671–3.

[27] Sitruk-Ware R, Spitz IM. Pharmacological properties of mifepristone: toxicology and safety in animal and human studies. Contraception 2003;68:409–20.

[28] Bernard N, Elefant E, Carlier P, Tebacher M, Barjhoux CE, Bos-Thompson MA, et al. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG 2013;120:568–74.

[29] Department of Health and Human Services. Code of Federal Regulations, 45 CFR 46.102 (d); 2009.

[30] Weinberger SE, Lawrence HC, Henley DE, Alden ER, Hoyt DB. Legislative interference with the patient–physician relationship. N Engl J Med 2012;367:1557–9.

# EXHIBIT C

Contraception 100 (2019) 427–429



Contents lists available at ScienceDirect

# Contraception

journal homepage: www.elsevier.com/locate/con



Commentary

# Mifepristone antagonization requires real studies to evaluate safety and efficacy



Mitchell D. Creinin *, Melissa J. Chen

*Department of Obstetrics and Gynecology, University of California, Davis, Sacramento, CA, USA*

The modern era of medical abortion treatment evolved with the development of mifepristone, a progesterone-receptor antagonist with an affinity for the receptor greater than progesterone itself [1]. Early studies of modern medical abortion regimens evaluated mifepristone alone, primarily at very early gestations. Continued research demonstrated that adding a prostaglandin analogue within a few days after mifepristone significantly improved the efficacy of the treatment [2]. The current FDA-approved regimen of mifepristone 200 mg with misoprostol treatment 24–48 h later is effective through 70 days gestation [3]. Ongoing pregnancy as a reason for treatment failure increases 10-fold from 0.3% at less than 49 days gestation to approximately 3% at 64–70 days' gestation [3–5]. While most women with an ongoing pregnancy opt for further treatment, such as surgical aspiration, some decide to continue the pregnancy. Recent UK data show that among 2673 women having a medical abortion from 9 to 10 weeks' gestation, 90 women had ongoing pregnancies after treatment of whom 9 (10%) opted to continue the pregnancy [6]. Thus, even following treatment, some women do change their mind.

The non-medical terms "abortion reversal," "medical abortion reversal" and "abortion pill reversal" have been used to describe a purported treatment first published as a case series in the Annals of Pharmacotherapy in December 2012 [7]. However, medical abortion cannot be "reversed," which would imply putting a pregnancy back in the uterus. Conceptually, the goal of progesterone proponents is mifepristone antagonization with high doses of progesterone; two small case reports and one large case series have been published about such treatment [7–9]. Commentaries in the American Journal of Obstetrics and Gynecology and New England Journal of Medicine have outlined the numerous scientific and ethical problems with these reports, including lack of control groups, no confirmation of mifepristone ingestion, failure to establish viability prior to progesterone treatment, and providing experimental treatment without patient consent or institutional review board oversight [10,11]. Within the reproductive rights community, some may even argue that mifepristone antagonization is conceptually impossible and potentially harmful to women.

We see a parallel issue in second trimester surgical abortion, with women requesting osmotic dilator removal in less than 1%

of procedures [12]. Even when providers have reviewed all pregnancy options prior to dilator placement, counsel patients that dilator placement is the start of the procedure, and confirm with patients that they are absolutely clear in their decision before proceeding, a small minority of women do change their mind. The best information we have about dilator removal is a small case series of 12 women, which demonstrated pregnancy loss in 50% and complications in 66% of women [12]. Still, when requested, patient autonomy requires dilator removal.

What should we do for the small fraction of women who change their mind after taking mifepristone? Is recommending expectant management or progesterone treatment the better choice? To answer this question, we need to understand what happens when mifepristone is taken without misoprostol, if mifepristone antagonization with progesterone works (including the appropriate progesterone route, dose and duration) for all or just for specific gestational age ranges, and what safety concerns are present in both scenarios.

## 1. Trying to understand efficacy of mifepristone-only treatment

Two competing systematic reviews, both of which have inherent problems, attempted to establish the continuing pregnancy rate after mifepristone-only treatment to provide a base rate for comparison with attempted mifepristone antagonization [13,14].

First, Grossman et al [13] found 11 publications with 17 treatment groups meeting criteria to be included in the review. Continuing pregnancy rates ranged from 0 to 36% when patients were assessed generally 1–2 weeks after mifepristone ingestion. Overall, the review included 1092 women with an intrauterine pregnancy; continuing pregnancies occurred in 193 (18%) after mifepristone alone. Of note, all but one of the studies included women at 49 days gestation or less. Only six of the included studies clearly defined the outcome of continuing pregnancy as a viable pregnancy [15–20]. The other five studies appeared to consider retained nonviable gestations in the outcome of continuing pregnancies [21–25].

In 2017, Davenport, Delgado and colleagues [14] published a second review as a rebuttal to the review from Grossman et al. This review included 12 publications with 16 treatment groups; seven publications [15–20,25] had been considered acceptable for inclusion in the analysis by Grossman et al. These authors report a

 * Corresponding author: 4860 Y Street, Suite 2500, Sacramento, CA 95817, USA.
 *E-mail address:* mdcreinin@ucdavis.edu (M.D. Creinin).

https://doi.org/10.1016/j.contraception.2019.10.016
0010-7824/© 2019 Elsevier Inc. All rights reserved.

M.D. Creinin, M.J. Chen/Contraception 100 (2019) 427–429

slightly lower combined continuing pregnancy rate of 13%. While this review excluded four studies that did not clearly define a continuing pregnancy as a viable pregnancy [18–21], it did include three reports of published meeting proceedings that were not peer-reviewed. Only one published study (by Vervest and Haspels [26]) in the Davenport et al review was not included in the Grossman et al review.

In our own re-evaluation of the peer-reviewed studies included in both reviews, only seven studies clearly define continuing viable pregnancy rates after mifepristone alone (Table 1). We excluded non-peer-reviewed meeting proceedings, three studies that considered an increasing hCG as evidence of continuing pregnancy as this could represent viable or non-viable gestations [21,24,25], and two studies without any definition of continuing pregnancies in the text [22,23]. The studies in Table 1 include 550 women who received a wide range of mifepristone dosing, the majority (n = 468, 88%) of whom were enrolled in studies with an upper gestational age limit of 49 days or less. Among the four studies using a single mifepristone dose, only one had a study arm with 200 mg, the dose used in contemporary clinical practice. The continuing pregnancy rate was higher with 200 mg (7/30 [23%, 95% confidence interval 8–38%]) than 600 mg (29/420 [7%, 95% confidence interval 4–9%]), p = .006 (Fisher exact test) [17–20]. However, the number of women (n = 30) is too little for this statistical comparison to be considered precise [17].

## 2. Trying to understand harm

Because we have inadequate data to determine the continuing pregnancy rate after mifepristone alone, we cannot be certain if mifepristone antagonization is effective. Some argue that since progesterone might be effective, is there any harm in offering such treatment to the rare patient who does change her mind? We do not know that answer either. Whereas the first two published case series included only eight women at 10 weeks or less gestation [7,8], a single large series analyzed 547 women treated in various ways by 325 different providers with "high-dose" progesterone, including progesterone in oil intramuscularly, micronized progesterone orally, micronized progesterone capsules administered vaginally, compounded micronized progesterone vaginal suppositories, progesterone vaginal gel, and progesterone vaginal suppositories [9]. The authors reported continuing pregnancy in 261 (48%) but did not report any adverse events, side effects, or details of what happened to the approximately 50% of women for whom the treatment did not "work."

In contrast, mifepristone-only studies for abortion did report complications, including hemorrhage and transfusion [15,16,26].

Among eight studies that used a single dose of mifepristone 200 mg or 600 mg, no cases of hemorrhage or transfusion occurred, though these studies were limited to women 49 days gestation or less [17–20,22–25]. Since medical abortion is available through 70 days [3], what are the risks when mifepristone is used without misoprostol beyond 49 days? These unanswered questions underscore that the published case series of progesterone use for mifepristone antagonization are reports and not clinical trials.

## 3. Laws based on no science

Unfortunately, in the absence of rigorous evaluations, some lawmakers are using case reports as medical gospel and passing laws stipulating mifepristone antagonization as fact. These laws mandate that women who receive mifepristone be informed that it may be possible to reverse the effects of mifepristone if they change their minds. In 2015, Arkansas implemented the first mandatory abortion reversal counseling. Other states that soon followed included Arizona (later repealed in 2016), South Dakota, Utah, and Idaho. In 2019, Arkansas updated its law to clarify the information provided to patients, and four states (Oklahoma, Kentucky, Nebraska, and North Dakota) enacted new laws. Kansas also passed such a law that the governor vetoed. A federal judge recently blocked the North Dakota law following a lawsuit from plaintiffs that included the American Medical Association. The judge's decision acknowledged that compelling counseling based on the State's viewpoint without credible scientific evidence that the treatment was effective interfered with health care providers' first-amendment rights. Similarly, when Louisiana was considering such a law in 2017, a Louisiana Department of Health report in April 2017 found "neither sufficient evidence nor a scientific basis to conclude that the effects of an abortion induced with drugs or chemicals can be reversed" [27]. Still, states continue to introduce bills to create similar laws. These laws interfere with our duty to counsel women about both efficacy and safety, and put providers in the position of counseling about uproven assurances without any mention of potential harms. In 2015 and reiterated in August 2017, the American Congress of Obstetricians and Gynecologists publicly opposed laws mandating reversal information as lacking scientific standing [28].

## 4. So, what do we do now?

Abortion providers can either continue to dismiss the concept of mifepristone antagonization or can work to help patients find answers. Choosing the latter option is a proactive stance towards

**Table 1**
Studies reporting the proportion of continuing viable pregnancies after mifepristone alone for medical abortion[*]

| First author | Year published | Mifepristone dose | Duration of treatment | Number | Gestational age limit (days) | Follow-up (days after mifepristone) | Complete abortion | Continuing viable pregnancy rate |
|---|---|---|---|---|---|---|---|---|
| Kovacs [15] | 1984 | 25 mg twice daily | 4 days | 18 | 42 | 14 | 12 (67%) | 2 (11% [0–26%]) |
| | | 50 mg twice daily | 4 days | 10 | 42 | 14 | 5 (50%) | 1 (10% [0–29%]) |
| | | 100 mg twice daily | 4 days | 8 | 42 | 14 | 5 (63%) | 0 |
| Cameron [16][†] | 1986 | 150 mg daily | 4 days | 20 | 56 | 14 | 12 (60%) | 5 (25% [11–47%]) |
| Vervest [26] | 1985 | 100–200 mg daily | 4 days | 35 | 55 | 14 | 25 (71%) | 0 |
| | | 200 mg daily | 4 days | 9 | 56–70 | 14 | 3 (33%) | 0 |
| Maria [17][†] | 1988 | 200 mg | Single dose | 30 | 49 | 7 | 19 (63%) | 7 (23% [12–41%]) |
| | | 600 mg | Single dose | 174 | 49 | 7 | 147 (84%) | 4 (2% [0.1–5%]) |
| Maria [18][†] | 1988 | 600 mg | Single dose | 149 | 42 | 7 | 131 (88%) | 14 (9% [5–14%]) |
| Carol [19] | 1989 | 600 mg | Single dose | 50 | 39 | NR | 40 (80%) | 6 (12% [6–24%]) |
| Ylikorkala [20][†] | 1989 | 600 mg | Single dose | 47 | 43 | 14 | 33 (70%) | 5 (11% [5–23%]) |

NR: not reported.
Data presented as n (%) or n (% [95% confidence interval]).
[*] All studies except Vervest et al [26] included in systematic review by Grossman et al [13]; all studies included in Davenport et al [14].
[†] Gestational age determination included ultrasound examination.

*M.D. Creinin, M.J. Chen / Contraception 100 (2019) 427–429*                                                                 429

providing evidence-based care to patients seeking medical abortion, especially to the very few who may change their mind.

If a woman uses mifepristone and then returns to the same provider's office 24 hours later stating she has changed her mind, what should that provider tell her? Is progesterone itself harmful – likely not based on widespread use within obstetrics. Does progesterone actually work for mifepristone antagonization – we don't know and can only tell our patient that the existing reports in the literature are inadequate to answer that question. Is NOT using misoprostol harmful, especially if the patient is beyond 49 days gestation – we also do not know that answer. If one believes that progesterone treatment cannot antagonize mifepristone, then the safety of not using misoprostol after starting a mifepristone-misoprostol regimen is the real question. Using progesterone for mifepristone antagonization means not using misoprostol as prescribed. Currently, the rare patient who changes her mind is potentially going to a website to get an experimental treatment rather than returning to the clinician providing her abortion services. The answers can only be found in properly conducted clinical trials that can inform evidence-based decision making and not in poorly conceived laws based on no science. For FDA approval, new treatments go through safety testing before efficacy testing. It is incumbent upon the medical community to conduct proper research on mifepristone antagonization that evaluates the efficacy and safety of providing progesterone and not using misoprostol.

## Funding

This work did not receive any specific grant from funding agencies in the public, commercial, or not-for-profit sectors.

## Conflicts of interest

Dr. Creinin is a consultant for Danco Laboratories to provide medical advice to clinicians who contact the company with questions related to mifepristone use.

## References

[1] Heikinheimo O, Kontula K, Croxatto H, Spitz I, Luukkainen T, Lähteenmäki P. Plasma concentrations and receptor binding of RU 486 and its metabolites in humans. J Steroid Biochem 1987;26:279–84.

[2] Bygdeman M, Swahn ML. Progesterone receptor blockage. Effect on uterine contractility and early pregnancy. Contraception 1985;32:45–51.

[3] Mifeprex® label. Danco Laboratories, LLC. March, 2016. Available at <https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf>. Accessed 02.08.19.

[4] Spitz IM, Bardin CW, Benton L, Robbins A. Early pregnancy termination with mifepristone and misoprostol in the United States. N Engl J Med 1998;338:1241–7.

[5] Chen MJ, Creinin MD. Mifepristone with buccal misoprostol for medical abortion: a systematic review. Obstet Gynecol 2015;126:12–21.

[6] Hsia JK, Lohr PA, Taylor J, Creinin MD. Medical abortion with mifepristone and vaginal misoprostol between 64 and 70 days' gestation. Contraception 2019;100:178–81.

[7] Delgado G, Davenport ML. Progesterone use to reverse the effects of mifepristone. Ann Pharmacother 2012;46. e36.

[8] Garratt D, Turner JV. Progesterone for preventing pregnancy termination after initiation of medical abortion with mifepristone. Eur J Contracept Reprod Health Care 2017;22:472–5.

[9] Delgado G, Condly SJ, Davenport M, Tinnakornsrisuphap T, Mack J, Khauv V, et al. A case series detailing the successful reversal of the effects of mifepristone using progesterone. Issues Law Med 2018;33:3–13.

[10] Bhatti KZ, Nguyen AT, Stuart GS. Medical abortion reversal: science and politics meet. Am J Obstet Gynecol 2018;218:315.e1–6.

[11] Grossman D, White K. Abortion, "reversal" – legislating without Evidence. N Engl J Med 2018;379:1491–3.

[12] Mark K, Merchant RM, Hu K. Pregnancy outcomes after removal of osmotic dilators in patients who presented for second-trimester abortion. Contraception 2019;99:285–7.

[13] Grossman D, White K, Harris L, Reeves M, Blumenthal PD, Winikoff B, et al. Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review. Contraception 2015;92:206–11.

[14] Davenport ML, Delgado G, Harrison MP, Khauv V. Embryo survival after mifepristone: a systematic review of the literature. Issues Law Med 2017;32:3–18.

[15] Kovacs L, Sas M, Resch BA, Ugocsai G, Swahn ML, Bygdeman M, et al. Termination of very early pregnancy by RU 486 — an antiprogestational compound. Contraception 1984;29:399–410.

[16] Cameron IT, Michie AF, Baird DT. Therapeutic abortion in early pregnancy with antiprogestogen RU486 alone or in combination with prostaglandin analogue (gemeprost). Contraception 1986;34:459–68.

[17] Maria B, Chaneac M, Stampf F, Ulmann A. Early pregnancy interruption using an antiprogesterone steroid: mifepristone (RU 486). J Gynecol Obstet Biol Reprod (Paris) 1988;17:1089–94.

[18] Maria B, Stampf F, Goepp A, Ulmann A. Termination of early pregnancy by a single dose of mifepristone (RU 486), a progesterone antagonist. Eur J Obstet Gynecol Reprod Biol 1988;28:249–55.

[19] Carol W, Klinger G. Experiences with the antigestagen mifepristone (RU 486) in the interruption of early pregnancy. Zentralbl Gynakol 1989;111:1325–8.

[20] Ylikorkala O, Alfthan H, Kääriäinen M, Rapeli T, Lähteenmäki P. Outpatient therapeutic abortion with mifepristone. Obstet Gynecol 1989;74:653–7.

[21] Birgerson L, Odlind V. The antiprogestational agent RU 486 as an abortifacient in early human pregnancy: a comparison of three dose regimens. Contraception 1988;38:391–400.

[22] Grimes DA, Mishell DR, Shoupe D, Lacarra M. Early abortion with a single dose of the antiprogestin RU-486. Am J Obstet Gynecol 1988;158:1307–12.

[23] Swahn ML, Ugocsai G, Bygdeman M, Kovacs L, Belsey EM, Van Look PF. Effect of oral prostaglandin E2 on uterine contractility and outcome of treatment in women receiving RU 486 (mifepristone) for termination of early pregnancy. Hum Reprod 1989;4:21–8.

[24] Zheng SR. RU 486 (mifepristone): clinical trials in China. Acta Obstet Gynecol Scand Suppl 1989;149:19–23.

[25] Somell C, Olund A. Induction of abortion in early pregnancy with mifepristone. Gynecol Obstet Invest 1990;29:13–5.

[26] Vervest HA, Haspels AA. Preliminary results with antiprogesterone RU-486 (mifepristone) for interruption of early pregnancy. Fertil Steril 1985;44:627–32.

[27] Robinson D, Zapata A. Legislative Report on 2016 House Concurrent Resolution 87: Study Related to Whether the Effects of an Abortion Induced with Drugs or Chemicals Can Be Reversed. Louisiana Department of Public Health, April 12, 2017. Available at <http://ldh.la.gov/assets/docs/LegisReports/HCR87RS20161.pdf>. Accessed 02.08.19.

[28] American Congress of Obstetricians and Gynecologists. Facts Are Important: Medication Abortion "Reversal" Is Not Supported by Science, August 2017. Available at <https://www.acog.org/-/media/Departments/Government-Relations-and-Outreach/FactsAreImportantMedicationAbortionReversal.pdf?dmc=1&ts=20180206T1955451745>. Accessed 02.08.19.

# EXHIBIT D

# A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone

George Delgado, M.D.,* Steven J. Condly, Ph.D.,** Mary Davenport, M.D., M.S.,*** Thidarat Tinnakornsrisuphap Ph.D.,**** Jonathan Mack, Ph.D., NP, RN***** Veronica Khauv, B.S., and Paul S. Zhou

**ABSTRACT:**

*Background*: Some women who take mifepristone, a progesterone receptor antagonist, in order to terminate their pregnancies, change their minds and desire to stop the medical abortion process. There are only two articles in the medical literature documenting the reversal of the effects of mifepristone. *Objective*: We present and analyze a series of women who attempted to reverse the effects of mifepristone by taking supplemental progesterone to determine if the reversal of the effects mifepristone with progesterone is possible and safe. Additionally, we compare different progesterone regimens to determine relative efficacies. *Methods*: This is an observational case series of 754 patients who decided to attempt to reverse the medical abortion process after taking mifepristone but before taking the second drug in the protocol, misoprostol. We followed the patients, who were given progesterone in an effort to reverse the effects of

---

*Voluntary Associate Clinical Professor, Department of Family and Preventive Medicine, School of Medicine, University of California, San Diego; gdelgadomd@yahoo.com.

**Department of Behavioral Sciences and Leadership, United States Military Academy, West Point, NY.

***Magnificat Maternal Health Program, Nigeria.

****Adjunct Clinical Associate Professor, Hahn School of Nursing and Health Science, University of San Diego.

*****Associate Clinical Professor, Hahn School of Nursing and Health Science, University of San Diego.

**mifepristone, and conducted statistical analyses to determine the efficacies of different protocols compared to a control mifepristone embryo survival rate, derived from the literature.**

**Results: Intramuscular progesterone and high dose oral progesterone were the most effective with reversal rates of 64% (P < 0.001) and 68% (P < 0.001), respectively. There was no apparent increased risk of birth defects.**

**Conclusions: The reversal of the effects of mifepristone using progesterone is safe and effective.**

---

## Introduction

Medical induced abortion utilizing mifepristone has been available in the United States since 2000. In 2014, 31% of non-hospital induced abortions were medical induced abortions.[1] Some women decide to attempt to reverse the medical abortion process after taking mifepristone but before taking misoprostol, and inquire about the possibility of reversing the effects of mifepristone.[2]

The new FDA protocol, approved for medical abortion in 2016, involves the administration of mifepristone 200 mg orally as a single dose, which leads to embryonic or fetal demise, followed 24-48 hours later by misoprostol 800 mcg buccally as a single dose, which stimulates myometrial contractions. The protocol is approved up to 70 days after the first day of the last menstrual period.[3] Misoprostol is part of the protocol because mifepristone alone has an incomplete abortion rate of 20-40%, as determined by the end point of complete expulsion.[4]

### Pharmacology

Mifepristone is a competitive antagonist of progesterone at the progesterone receptor (PR). It binds to the PR twice as avidly as progesterone.[5] Mifepristone is an orally active compound with a nearly 70% absorption rate, but its bioavailability is reduced to approximately 40% because of the first-pass effect.[6]

Demethylation and hydroxylation are catalyzed by CYP3A4; three metabolites retain biologic activity. The half-life of mifepristone is approximately 18-25 hours. Mifepristone and its metabolites can be measured up to 72 hours after an ingested dose.[5] The half-life of progesterone is longer, approximately 25-55 hours.[6,7]

### Effects of Mifepristone

By blocking progesterone receptors, mifepristone leads to the separation of the decidua basalis from the trophoblast. This separation diminishes the oxygen and nutrients that can be delivered to the embryo or fetus by the maternal circulation and is the primary embryocidal and feticidal effect of mifepristone.[4,8,9]

In addition to this primary effect, mifepristone causes softening and dilatation of the cervix.[4] It also leads to myometrial contractions, increased myometrial sensitivity to prostaglandins[4,10] and the disinhibition of prostaglandin synthesis by the myometrium.[11]

Progesterone has been shown to have an autoregulatory effect on progesterone synthesis by the corpus luteum. Blocking progesterone receptors with mifepristone decreases progesterone secretion by the corpus luteum.[12]

### Logic of Using Progesterone to Reverse Mifepristone Effects

Mifepristone is a competitive inhibitor of the progesterone receptor. It is well known that receptor agonism and antagonism are parts of a dynamic process that can be influenced by changing concentrations of the agonist or antagonist. Therefore, it makes biologic sense that increasing the progesterone levels in a pregnant woman by giving supplemental progesterone would favor the agonist progesterone effects and blunt the abortifacient effects of mifepristone.

### An Animal Model

A Japanese rat study provides basic-science evidence of the ability of progesterone to negate the effects of mifepristone. In this experiment, one group of pregnant rats was given mifepristone while a second was given mifepristone and progesterone. In the group that only received mifepristone, only 33% of the pups survived. In the group that received mifepristone and progesterone, 100% of the pups survived. Furthermore, the first group had characteristic changes in the myometrium and ovaries; the group that received the combination had no such changes.[13]

### Early Mifepristone Studies Reporting Continuing Pregnancy

When mifepristone was first studied as an abortifacient, misoprostol was not part of the protocol. During the 1980's, researchers determined that even though mifepristone was effective as an abortifacient, they believed it was necessary to add a prostaglandin analog to achieve a satisfactory complete uterine evacuation rate.[4] We must emphasize that the definition of incomplete abortion is incomplete emptying of the uterus.[14] Embryo or fetus survival is not implied.

The earliest studies also revealed that some embryos survived mifepristone. Baulieu, the principal developer of the drug, stated that at 4-7 weeks the percentages of efficacy of the regimen were approximately 70% for complete abortions, 20% for incomplete abortions and 10% for ongoing pregnancies (i.e., presumed embryo survival). For gestations 8-10 weeks, the comparable rates were 50% for complete abortions, 35% for incomplete abortions and 15% for embryo survival.[15]

In 2015, Grossman et al. published a review of the first case series of progesterone reversal of mifepristone, as well as 13 studies from the 1980's, addressing continuing pregnancies after mifepristone. The authors concluded that there was insufficient evidence to show that progesterone therapy improved survival over expectant management, based on the reported high ongoing pregnancy rates in some of these older studies.[16] However, closer scrutiny of the studies cited for high ongoing pregnancy rates reveals inadequate criteria for the diagnosis of continuing pregnancies. Many early researchers focused on an efficacy end point of complete uterine evacuation, and did not distinguish missed or incomplete abortions from continuing pregnancies (embryo or fetus

survival).[17] Only eight studies cited by Grossman had criteria sufficient to determine embryo survival and showed continuing pregnancy rates of 8-25%.[17]

A recent review found that 18 of the 30 articles investigating mifepristone monotherapy had adequate criteria to determine embryo survival.[17] After eliminating duplicate publications, 12 studies were identified which utilized follow-up ultrasound to distinguish between incomplete or missed abortion and embryo survival at the end of the study period. The mean percentage of embryos surviving mifepristone among all studies was 12.6%.[17] A single dose of 600 mg in five studies of early gestations 42-49 days in 493 subjects showed survivals of 9.4-17.1%.[17,18,19,20,21] Three studies of 58 women with gestations <49 days, using the current predominant 200-300 mg doses, noted embryo survival rates of 10-23.3%.[19,22,23,24] Four studies of 83 women included gestations up to 70 days, daily doses of 100-200 mg, and total doses 400-800 mg.; in three of these four studies, embryo survival was <25%.[25,26,27,28,29,30,31,32]

## Methods

This is an observational case series with data analysis that received an institutional review board waiver.[33] Subjects were pregnant women from across the United States and from several other countries who had taken mifepristone, but had not yet taken misoprostol, and were interested in reversing its effects.  Subjects called an informational hotline linked to an informational website and  staffed by nurses and a physician assistant. After receiving information about the reversal process, those who decided to proceed with reversal were referred to physicians and mid-level practitioners in their respective geographic areas for treatment. The women gave written informed consent for treatment to their respective treating medical professionals that included permission to track their data. Data were collected from the women themselves and from their treating healthcare professionals.

Data were collected for different variables including gestational age at the time of mifepristone ingestion, mode of delivery of progesterone given, amounts of progesterone received, birth defects and  preterm delivery. Progesterone was given in a variety of  regimens by the 325 different medical professionals who treated these women. The modes of delivery of progesterone were intramuscular injection of progesterone in oil, oral administration of micronized progesterone, vaginal use of oral micronized progesterone capsules, compounded micronized progesterone vaginal suppositories, progesterone vaginal gel and progesterone vaginal suppositories.

We selected a 25% embryo or fetus survival rate, if mifepristone alone is administered, as a control  because it is at the upper range of mifepristone survival rates and close to the 23% survival rate of the one early study that used a single 200 mg dose, the dose currently favored for medical abortions.[17]  This study is designed to ascertain which progesterone treatments clinicians have offered to women seeking mifepristone reversal that demonstrate efficacy beyond the 25% embryo survival rate, and compares the relative efficacies of different treatment protocols to the historic control.

Case 1:24-cv-00514-JLS   Document 20-6   Filed 07/29/24   Page 6 of 13

## Results

From June 24, 2012 to June 21, 2016, 1,668 calls were received by the hotline from women who had taken mifepristone and were interested in reversal. Seven hundred fifty-four (45%) actually initiated progesterone therapy.

Subjects were included in the study if they were 72 hours or less post-mifepristone and had not taken misoprostol; 38 (5%) did not meet these criteria. Of the women who started progesterone therapy and met inclusion criteria, 116 (15.4%) were lost to follow-up at some point.  Of those,112 (14.9%) were lost to follow-up prior to 20 weeks gestation and were excluded from the analysis. Four (0.5%) women remained pregnant with viable fetuses but were lost to follow-up after twenty weeks gestation and were included in the analysis as reversals.

Fifty-seven (7.6%) of the women, after starting progesterone therapy, changed their minds again and either took misoprostol to complete the medical abortion or procured surgical induced abortion. Of those 57, 39 (5.2%) chose to complete abortion medically with misoprostol, seven (0.9%) procured surgical abortions and 11 (1.5%) completed abortion by unspecified means. These were not included in the analysis as they chose to no longer attempt reversal. See Figure 1.

### Figure 1



Women who delivered babies after progesterone therapy or who were lost to follow-up after 20-weeks gestation were considered to have reversed their medical abortions, since any pregnancy loss after 20 weeks would be unlikely to be attributable to the early mifepristone exposure.  The data analysis was accomplished using the Statistical Hypothesis Test on a population proportion.

*Issues in Law & Medicine, Volume 33, Number 1, 2018*

After exclusions, there were 547 patients with analyzable outcomes who underwent progesterone therapy. There were 257 births (47%). Another four were pregnant with viable fetuses but were lost to follow-up after 20 weeks gestation (0.7%). The overall rate of reversal of mifepristone was 48%.

Two subgroups had the highest reversal rates. Those who received progesterone intramuscularly (IM) initially or exclusively had a 64% reversal rate. One subject in this group had an undocumented number of injections. The high-dose oral subgroup received oral progesterone, 400 mg twice a day for three days, followed by 400 mg once a day until the end of the first trimester and had a reversal rate of 68%, similar to the IM group. These survival rates compare favorably with published embryo and fetal survival rate of 25%, if no treatment is attempted,[17] the rate used as a control. See Table 1.

The gestational age at the time of ingestion was directly related to reversal success. See Table 2. This is not surprising since mifepristone embryocidal and feticidal rates fall with advancing gestational age.[34]

There was no correlation between maternal age and rate of reversal. In the subset of records noting time intervals, the time between mifepristone ingestion and the first progesterone dose was not statistically significant in relation to the success rate for reversals attempted within 72 hours of mifepristone injection.

### Birth Defects

There were seven reported birth defects in the women who had reversals and follow-up after their deliveries for a rate of 7/257 (2.7%). See Table 3. This is equal to the birth defect rate in the general population of approximately 3%[35] and suggests that there is no increased risk of birth defects in babies born after mifepristone reversal.

### Preterm Delivery

There were seven deliveries at <37weeks for a preterm delivery rate of 2.7%. The United States average is 10%.[36]

### Multiple Gestations

There were nine sets of twins (4.3% of the pregnancies). There were no higher order multiples.

## Discussion

### Progesterone Safety

Progesterone is a naturally occurring hormone produced by the corpus luteum and by the placenta, and is essential for maintenance of the maternal fetal interface of pregnancy. It has been used safely in pregnancy for over 50 years.[37] The American Society of Reproductive Medicine states that no long-term risks have been identified when progesterone is used in pregnancy.[38] The FDA has given progesterone a category B rating in pregnancy, in contrast to synthetic progestins.[39]

**861**

*The Successful Reversal of the Effects of Mifepristone Using Progesterone*          9

### Table 1: Reversals Compared to Reported Control of 25% Survival if No Treatment Undertaken

| Progesterone Group | Number | Reversals | Reversal Failures | Percent Reversals | P Value | 95% Confidence Intervals |
|---|---|---|---|---|---|---|
| All Groups | 547 | 261 | 286 | 48% | <0.001 | 0.44-0.52 |
| High Dose Oral | 31 | 21 | 10 | 68% | <0.001 | 0.51-0.84 |
| Intramuscular, All groups | 125 | 80 | 45 | 64% | <0.001 | 0.56-0.72 |
| IM, 1 Injection | 50 | 24 | 26 | 48% | <0.001 | 0.34-0.62 |
| IM, 2-5 Injec. | 36 | 21 | 15 | 58% | <0.001 | 0.42-0.74 |
| IM, 6-8 Injec. | 9 | 9 | 0 | 100% | <0.001 | 0.67-1 |
| IM, 9-10 Injec. | 10 | 9 | 1 | 90% | <0.001 | 0.77-1.0 |
| IM, 11 or More Injec. | 19 | 17 | 2 | 89% | <0.001 | 0.76-1.0 |
| Oral, All Groups | 119 | 64 | 55 | 54% | <0.001 | 0.45-0.63 |
| Oral Caps Vaginally, All Doses | 156 | 61 | 95 | 39% | <0.001 | 0.31-0.47 |
| Vaginal Suppository | 34 | 11 | 23 | 32% | 0.161 | 0.17-0.48 |

A recent retrospective study of a Danish infertility cohort suggested a possible increased risk of acute lymphocytic leukemia and sympathetic neural tumors in children born to mothers who had taken progesterone during pregnancy and before pregnancy. The increased risk was greatest in women who had taken progesterone for three or more cycles.[40] However, the infertility population examined in the Danish study, exposed to

Table 2: Gestational Age Compared to Reversal Rate

| Gesta-tional Age | Total | Reversal | Reversal Failure | Reversal % | *P* value | 95% Confidence Intervals |
|---|---|---|---|---|---|---|
| 5 weeks | 76 | 19 | 57 | 25% | 0.5 | 0.15-0.35 |
| 6 weeks | 113 | 52 | 61 | 46% | <0.001 | 0.37-0.55 |
| 7 weeks | 102 | 50 | 52 | 49% | <0.001 | 0.39-0.59 |
| 8 weeks | 88 | 54 | 34 | 61% | <0.001 | 0.51-0.72 |
| 9 weeks | 30 | 23 | 7 | 77% | <0.001 | 0.62-0.92 |

Table 3: Birth Defects

| Birth Defect | Instances |
|---|---|
| Port Wine Stain | 1 |
| Bilateral Absent Toe | 1 |
| Unilateral Two Absent Fingers | 1 |
| Choroid Plexus Cyst | 1 |
| Cystic Kidney | 1 |
| Unilateral Failed Hearing Test | 1 |
| Heart Murmur | 1 |

many cycles of progesterone and other medications, differs significantly from our population of fertile women who had a single exposure to progesterone.

### Mifepristone Teratogenicity

While previous human studies are not large in number, the available evidence suggests that mifepristone is not teratogenic.[4,41,42] The American College of Obstetricians and Gynecologists (ACOG) Practice Bulletin March 2014 states that there is no evidence that mifepristone is associated with teratogenicity.[43] Our data set, the largest of babies exposed to mifepristone in utero, also indicates that the birth defect risk in women who have reversed mifepristone abortions is no higher than the risk in the general population.

### Study Limitations

This study is limited in that it is not a randomized placebo-controlled trial. However, a placebo-controlled trial in the population of women who regret their abortion and

**863**

want to save the pregnancy would be unethical. Furthermore, although the number of women lost to follow-up was small, it could have affected the results. In addition, some data collection was incomplete.

One potential confounding variable is the use of ultrasound to select for living embryos prior to the first progesterone dose. It is possible that those embryos who were alive at the time of sonogram may have survived without progesterone therapy. However, our study also included some women who started progesterone therapy prior to sonographic documentation that the embryo was alive. Undoubtably, this group included women who already had an embryonic demise prior to initiation of progesterone therapy. Inclusion of these women would falsely lower the success rate of progesterone therapy. The numbers of women who received or did not receive ultrasound exams prior to initiating therapy were not available to our researchers. If ultrasound is readily available, sound practice would dictate that embryonic or fetal viability should be confirmed, or at least suggested, before treatment is started in order to avoid giving women progesterone unnecessarily and to exclude ectopic pregnancy before starting progesterone therapy.

## Conclusions

The use of progesterone to reverse the effects of the competitive progesterone receptor blocker, mifepristone, appears to be both safe and effective. Progesterone therapy makes biologic sense, has been previously published as effective in an animal model and is supported by this case series which demonstrates a statistically significant difference in survival between treatment groups and the historic control. Mifepristone is embryocidal and feticidal but not teratogenic; progesterone is not associated with birth defects.

Based on these new data, two reasonable protocols can be suggested for women who seek to reverse the effects of mifepristone:

1. Progesterone micronized 200 mg capsule two by mouth as soon as possible and continued at a dose of 200 mg capsule two by mouth twice a day for three days, followed by 200 mg capsule two by mouth at bedtime until the end of the first trimester; and

2. Progesterone 200 mg intramuscular as soon as possible and continued at a dose of 200 mg intramuscular once a day on days two and three, then every other day for a total of seven injections. Some clinicians may choose to continue intramuscular treatment longer since this recommendation is based on relatively small numbers.

## Recommendations for Future Research

We propose that further research employing randomized controlled trials comparing progesterone doses and routes of administration are needed to confirm which mode of delivery, dose and duration of progesterone therapy is most efficacious and carries the least burden for the patient.

# References

[1] Jones RK and Jerman J. Abortion incidence and service availability in the United States, 2014. *Perspectives on Sexual and Reproductive Health*, 2017, 49(1), DOI: 10.1363/psrh.12015.

[2] Delgado G, Davenport M. Progesterone Use to Reverse the Effects of Mifepristone. *Ann Pharmacother* 2012;46. Published Online, 27 Nov 2012, *theannals.com*, DOI: 10.1345/aph.1R252.

[3] Medication Guide, Mifeprix. www.fda.gov/downloads/drugs/drugsafety/ucm088643.pdf (accessed November 19, 2016).

[4] Creinin, M, Gemzell Danielsson, K. Chapter 9, Medical abortion in early pregnancy, *in Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care.* Published Online: 22 May 2009 DOI: 10.1002/9781444313031.ch9.

[5] Heikinheimo O, Kekkonen R, Lahteenmaki P. The pharmacokinetics of mifepristone in humans reveal insights into differential mechanisms of antiprogestins action. *Contraception* 2003;68:421-6.

[6] Sarkar NN. Mifepristone: bioavailability, pharmacokinetics and use-effectiveness. *Eur J Obstet Gynaecol Reprod Bio*; 2002;101:113-20.

[7] Drug Bank Progesterone. http://www.drugbank.ca/drugs/DB00396 (accessed 2011 Oct 8).

[8] Johannisson E, Oberholzer M, Swahn ML, Bygdeman M. Vascular changes in the human endometrium following the administration of the progesterone antagonist RU 486. *Contraception* 1989; 39: 103–107.

[9] Schindler AM, Zanon P, Obradovic D, Wyss R, Graff P, Hermann WL. Early ultrastructural changes in RU-486-exposed decidua. *Gynecol Obstet Invest* 1985; 20: 62–67.

[10] Swahn ML, Bygdeman M. The effect of the antiprogestin RU 486 on uterine contractility and sensitivity to prostaglandin and oxytocin. *Br J Obstet Gynaecol* 1988; 95: 126–134.

[11] Herrmann WL, Schindler AM, Wyss R, Bishof P. Effects of the antiprogesterone RU 486 in early pregnancy and during the menstrual cycle. In: Beaulieu EE, Siegel S, eds. *The Antiprogestin Steroid RU 486 and Human Fertility Control*. Plenum, New York, 1985: 259–262.

[12] Ottander U, et al. A Putative Stimulatory Role of Progesterone Acting via Progesterone Receptors in the Steroidogenic Cells of the Human Corpus Luteum. *Biology of Reproduction* March 1, 2000 vol. 62 no. 3 655-663.

[13] Yamabe, S; Katayana, K; Mochuzuki, M *Folio endocrine*. 65, 497-511, 1989. The Effects of RU486 and Progesterone on Luteal Function During Pregnancy.

[14] http://medical-dictionary.thefreedictionary.com/incomplete+abortion (accessed November 20, 2016).

[15] Beaulieu EE. RU-486: An antiprogestin steroid with contragestive effect in women. In Baulieu EE, Siegel S (eds): *The Antiprogestin Steroid RU 486 and Human Fertility Control*. New York, Plenum, 1985. pp. 2-6.

[16] Grossman D et al. Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: A systematic review, *Contraception* (2015) September 2015 Volume 92, Issue 3, pp. 206–211, DOI: 10.1016/j.contraception.2015.06.001).

[17] Davenport M, Delgado G, Khauv V. Embryo survival after mifepristone: review of the literature. *Issues in Law and Medicine* 2017, 32 (1): 3-18.

[18] Ylikorkala O, Alfthan H, Kääriäinen M, Rapeli T, Lähteenmäki P. Outpatient therapeutic abortion with mifepristone. *Obstet Gynecol* 1989;74:653-7.

[19] Maria B, Chaneac M, Stampf F, Ulmann A. [Early pregnancy interruption using anantiprogesterone steroid: Mifepristone (RU 486)]. *J Gynecol Obstet Biol Reprod* (Paris) 1988;17:1089-94.

[20] Carol W, Klinger G. [Experiences with the antigestagen mifepristone (RU 486) in the interruption of early pregnancy]. *Zentralbl Gynakol* 1989;111:1325-8.

[21] Somell C, Olund A. Induction of abortion in early pregnancy with mifepristone. *Gynecol Obstet Invest* 1990;29:13-5.

[22] Kovacs L, Sas M, Resch BA, Ugocsai G, Swahn ML, Bygdeman M, Rowe PJ. Termination of very early pregnancy by RU 486–an antiprogestational compound. *Contraception* 1984;29:399-410.

**865**

*The Successful Reversal of the Effects of Mifepristone Using Progesterone*          *13*

[23] Kovacs L, Termination of Very Early Pregnancy with Different Doses of RU-486: A Phase I Controlled Clinical Trial. *In* Beaulieu EE, Siegel S (eds): *The Antiprogestin Steroid RU 486 and Human Fertility Control*. pp. 179-198. New York, Plenum, 1985.

[24] Swahn ML. S. Cekan, G. Wang, V. Lundstom, and M. Bygdeman. *In* Beaulieu EE, Siegel S (eds): *The Antiprogestin Steroid RU 486 and Human Fertility Control*. pp. 249-258. New York, Plenum, 1985.

[25] Herrmann WL, Schindler AM, Wyss R, et al: Effects of the antiprogesterone RU 486 in early pregnancy and during the menstrual cycle. *In* Beaulieu EE, Siegel S (eds): *The Antiprogestin Steroid RU 486 and Human Fertility Control*. pp. 179-198. New York, Plenum, 1985.

[26] Herrmann W, Wyss R, Riondel A, Philibert D, Teutsch G, Sakiz E, Baulieu EE. [The effects of an antiprogesterone steroid in women: interruption of the menstrual cycle and of early pregnancy]. *Comptes Rendus Seances Acad Sci III*. 1982 May 17;294(18):933-8. French.

[27] Vervest HAM, Haspels AA, Preliminary results with antiprogesterone RU-486. (mifepristone) for interruption of early pregnancy. *FertilSteril*. 1985;44: 627-32.

[28] Haspels AA Interruption of early pregnancy by the antiprogestational compound RU 486 In Beaulieu EE, Siegel S (eds): *The Antiprogestin Steroid RU 486 and Human Fertility Control*. pp. 199-210, New York, Plenum, 1985.

[29] Haspels AA. Interruption of early pregnancy by an anti-progestational compound, RU 486. *Eur J Obstet Gynecol Reprod Biol*. 1985 Sep;20(3):169.

[30] Cameron IT, Michie AF, Baird DT. Therapeutic abortion in early pregnancy with antiprogestogen RU486 alone or in combination with prostaglandin analogue (gemeprost). *Contraception* 1986;34:459-68.

[31] Cameron IT, Baird DT. Early pregnancy termination: a comparison between vacuum aspiration and medical abortion using prostaglandin (16,16 dimethyl-trans-delta 2-PGE1 methyl ester) or the antiprogestogen RU 486. *Br J Obstet Gynaecol*. 1988 Mar; 95(3):271-6.

[32] Elia D. Clinical study of RU 486 in early pregnancy *In* Beaulieu EE, Siegel S (eds): *The Antiprogestin Steroid RU 486 and Human Fertility Control*. pp. 211-220. New York, Plenum, 1985.

[33] Institutional review board University of San Diego, San Diego, CA.

[34] Spitz IM, Bardin W, Benton L, Robbins A, et al. Early pregnancy termination with mifepristone and misoprostol. *N Engl J Med* 1998;338:1241-7. DOI: 0.1056/NEJM199804303381801.

[35] CDC MMWR January 11, 2008 / 57(01);1-5.

[36] Preterm Birth. http://www.cdc.gov/reproductivehealth/maternalinfanthealth/pretermbirth.htm (accessed December 7, 2016).

[37] Dante G, Vaccaro V, Facchinetti. Use of progestogens in early pregnancy. Facts, Views and Vision. *ObGyn*. 2013 5(1): 66-71.

[38] Progesterone. https://www.asrm.org/detail.aspx?id=1881(accessed December 3, 2016).

[39] Progesterone package insert. https://www.drugs.com/pro/progesterone-capsule.html. (accessed December, 3, 2016).

[40] Hargreave M, et al. Maternal use of fertility drugs and risk of cancer in children–a nationwide population-based cohort study in Denmark. *Int. J. Cancer*: 136, 1931–1939 (2015).

[41] Bernard N, Elefant E, Carlier P, Tebacher M, Barjhoux CE, Bos-Thompson MA, Amar E, Descotes J, Vial T. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. *BJOG*. 2013 Apr;120(5):568-74. DOI: 10.1111/1471-0528.12147. Epub 2013 Jan.

[42] Regine Sitruk-Ware a, Angela Davey , Edouard Sakiz. Fetal malformation and failed medical termination of pregnancy. *The Lancet*, Volume 352, Issue 9124, Page 323, 25 July 1998.

[43] Medical Management of First Trimester Abortion. *ACOG Practice Bulletin* 143 March 2014, reaffirmed 2016.

# EXHIBIT E

THE SUPREME COURT'S CRISIS PREGNANCY CENTER CASE

for all disclosures closer to strict scrutiny.

The Court's approach in *NIFLA*, as the dissent noted, "could radically change prior law, perhaps placing much securities law or consumer protection law at constitutional risk." Many health laws could be similarly threatened. Already a lower court has preliminarily enjoined Food and Drug Administration warning labels for cigars on the basis

*An audio interview with Prof. Parmet is available at NEJM.org*

of *NIFLA*.[5] Whether that injunction holds, and whether other health laws will be struck down on First Amendment grounds, remains to be seen. What is clear is that the Court has created new uncertainty, and invited new litigation, regarding numerous health laws that were once assumed to be constitutional.

Disclosure forms provided by the authors are available at NEJM.org.

From Northeastern University School of Law, Boston (W.E.P.); the College of Public

Health and the Moritz College of Law, Ohio State University, Columbus (M.L.B.); and California State University, East Bay, Hayward (J.A.S.).

This article was published on August 29, 2018, at NEJM.org.

1. 138 S. Ct. 2361 (2018).
2. Haupt CE. Professional speech. Yale Law J 2016;125:1238-303.
3. Corbin CM. Abortion distortions. Wash & Lee L Rev 2014;71:1175-210.
4. Central Hudson Gas & Electric Corp. v. Public Service Comm., 447 U.S. 557 (1980).
5. Cigar Ass'n v. US FDA, 2018 WL 3304627 (D.D.C. July 5, 2018).

DOI: 10.1056/NEJMp1809488
*Copyright © 2018 Massachusetts Medical Society.*

# Abortion "Reversal" — Legislating without Evidence

Daniel Grossman, M.D., and Kari White, Ph.D., M.P.H.

Women up to 10 weeks pregnant who are having a medication abortion generally take one dose of mifepristone, which blocks the progesterone receptor, followed within 48 hours by a dose of misoprostol, a prostaglandin that causes cervical dilation and uterine contractions, leading to expulsion of the pregnancy tissue. Four states (Arkansas, Idaho, South Dakota, and Utah) require abortion providers to tell their patients about treatment that may reverse the effect of mifepristone if they change their mind after starting a medication abortion. So-called abortion reversal involves administering repeated doses of progesterone. Since 2017, other states have proposed similar bills and the California Board of Registered Nursing approved a course on medication-abortion reversal for continuing-education credit. This trend is troubling because of the lack of medical evidence demonstrating the safety and efficacy of the treatment; laws promoting it essentially encourage women to participate in an unmonitored research experiment.

When states began passing

laws on abortion reversal, the only published report on this treatment was a case series involving seven patients. A systematic review we coauthored in 2015 found no evidence that pregnancy continuation was more likely after treatment with progesterone as compared with expectant management among women who had taken mifepristone.[1] Our review found that the proportion of continuing pregnancies after mifepristone alone varied from 8% to 46% in published studies.

Recently, Delgado et al. published a case series involving 754 patients who underwent reversal treatment in the United States and several unnamed countries.[2] After excluding 27% of patients for various reasons, they report that 47% had a live birth. The authors conclude that reversal treatment is effective, citing the higher proportion of continuing pregnancies in their study as compared with a historical control rate of 25% of women who had continuing pregnancies after taking mifepristone alone. This estimate comes from Maria et al., the only published report that examined

rates of pregnancy continuation after a single 200-mg dose of mifepristone,[3] which is the dose most commonly used in current medication-abortion regimens. This study, which included 30 women who were up to 7 weeks pregnant, 25 of whom were no more than 6 weeks pregnant, found that 23% had continuing pregnancies 7 days later.

It is difficult to compare the results from Delgado et al. with data on mifepristone alone for several reasons. In the Delgado study, some providers performed ultrasonography in patients presenting for reversal and excluded those found to have embryonic death. These patients were removed from the denominator of the proportion of women with continuing pregnancies, which could have contributed to the higher success rate for reversal treatment — especially at gestational ages of more than 6 weeks, when cardiac activity is more apparent. In addition, the authors excluded patients who were lost to follow-up before 20 weeks, which probably exaggerated the treatment's reported success.

Downloaded from nejm.org at NEW YORK STATE LIB ACQUISITIONS on November 13, 2023. For personal use only. No other uses without permission.
Copyright © 2018 Massachusetts Medical Society. All rights reserved.

ABORTION "REVERSAL"

| Percentage of Women with Continuing Pregnancies after Taking 200 mg Mifepristone with or without Progesterone.* | | | | |
|---|---|---|---|---|
| Treatment | Total No. of Pregnancies | Continuing Pregnancies | Percentage of Continuing Pregnancies (95% CI) | P Value |
| **Gestational age ≤6 wk** | | | | |
| Mifepristone followed by progesterone | 189 | 71 | 38 (31–45) | 0.119 |
| Mifepristone alone | 25 | 5 | 20 (9–39) | |
| **Gestational age ≤7 wk** | | | | |
| Mifepristone followed by progesterone | 291 | 121 | 42 (36–47) | 0.076 |
| Mifepristone alone | 30 | 7 | 23 (21–41) | |

* Data are from Delgado et al.[2] and Maria et al.[3] Maria et al. report a total of seven continuing pregnancies in the sample of 30 women who were 7 weeks pregnant or less. There were two abortion failures among the five women who were between 6 and 7 weeks pregnant, but whether these were continuing pregnancies is unclear. We therefore made the conservative assumption that five of the seven continuing pregnancies occurred among the 25 women who received mifepristone at 6 weeks' gestation or less and that the two failures that occurred among those who were between 6 and 7 weeks pregnant were both continuing pregnancies.

Gestational ages in Delgado et al. (up to 9 weeks) also differed from those in Maria et al. As Delgado et al. note, pregnancy continuation is more common with advanced gestation; therefore, it is important to compare groups of similar gestational age. We analyzed the effectiveness of reversal treatment by comparing rates of continuing pregnancy among women who were up to 6 or 7 weeks pregnant in the two studies.

Among women who were up to 6 weeks pregnant, 38% (95% confidence interval [CI], 31 to 45) of those who received reversal therapy had a continuing pregnancy.[2] This proportion was not significantly different from the 20% (95% CI, 9 to 39) of women who had a continuing pregnancy after taking mifepristone alone (P=0.119) (see table).[3] The rates of pregnancy continuation were also not significantly different when we included women who were up to 7 weeks pregnant, despite the fact that the reported success rate for reversal therapy was most likely an overestimate at 7 weeks because some patients were excluded from treatment after ultrasound screening for embryonic viability. Because there are

no published data on rates of pregnancy continuation after a 200-mg dose of mifepristone alone at more than 7 weeks' gestation, we cannot evaluate the effectiveness of reversal treatment beyond this gestational age.

The safety data presented by Delgado et al. are minimal. No adverse events were reported among pregnant women, but it is unclear whether such data were routinely collected. The reported data on birth defects and preterm birth are generally reassuring; given the range of progesterone regimens used and the lack of reporting by regimen, however, it is difficult to draw conclusions about the treatment's safety. Data from a registry in France suggest that exposure to mifepristone alone does not increase the risk of birth defects.[4]

Equally unclear is the demand for reversal treatment. Since participants in the study by Delgado et al. were recruited from several unnamed countries over a period of 4 years, it is impossible to estimate what proportion of patients undergoing medication abortion is represented by this sample. According to data obtained from Danco Laboratories, the U.S. manufacturer of mifepristone, less than 0.004% of patients who took mife-

pristone between 2000 and 2012 ended up deciding to continue their pregnancies.[1] Other research indicates that decisional certainty among women having an abortion is high — and higher than it is among patients making other decisions about medical treatment.[5]

Still, efforts should be made at the time of preabortion counseling to identify women who may be conflicted and to provide additional support to help them make an informed decision. Allowing patients to take mifepristone at home, which has been permitted since the drug's label was updated in 2016, may reduce the already small number of women who change their mind by giving patients more control over where and when they take the medication. But for patients who do change their mind after taking mifepristone, what is the best course of action? If a woman changes her mind within an hour after taking the drug, vomiting should be induced. Beyond that time frame, we believe the pregnancy should be carefully followed.

One could argue that the demand for abortion reversal treatment is so low that additional research is not justified. But if

The New England Journal of Medicine
Downloaded from nejm.org at NEW YORK STATE LIB ACQUISITIONS on November 13, 2023. For personal use only. No other uses without permission.
Copyright © 2018 Massachusetts Medical Society. All rights reserved.

PERSPECTIVE

ABORTION "REVERSAL"

researchers do perform additional studies, it is critical that such studies be rigorously designed and conducted in an ethical manner. Clinical equipoise exists for this question, since there is no evidence that treatment is superior to doing nothing. In such cases, a randomized, placebo-controlled trial is the most appropriate study design. For now, any use of reversal treatment should be considered experimental and offered only in the context of clinical research supervised by an institutional review board (IRB). Delgado et al. obtained IRB approval for their retrospective data analysis, but it is not clear that approval was obtained in advance for their experimental treatment protocol. In fact, the study was retracted temporarily because of

concerns raised about what the authors initially described as an IRB "waiver."

We believe that states' mandating that health care providers give patients information about an unproven and experimental therapy is a disturbing intrusion into the relationship between physicians and their patients. Additional states will undoubtedly consider such legislation, despite the lack of evidence for abortion reversal treatment. We should all be concerned when politicians recommend treatment options over the advice of medical professionals.

Disclosure forms provided by the authors are available at NEJM.org.

From Advancing New Standards in Reproductive Health, Bixby Center for Global Reproductive Health, and the Department of Obstetrics, Gynecology and Reproductive Sciences, University of California, San Francisco (D.G.); and the Department of Health Care Organization and Policy, School of Public Health, University of Alabama at Birmingham (K.W.).

1. Grossman D, White K, Harris L, et al. Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review. Contraception 2015;92:206-11.
2. Delgado G, Condly SJ, Davenport M, et al. A case series detailing the successful reversal of the effects of mifepristone using progesterone. Issues Law Med 2018;33:3-14.
3. Maria B, Chaneac M, Stampf F, Ulmann A. Early pregnancy interruption using an anti-progesterone steroid: Mifepristone (RU 486). J Gynecol Obstet Biol Reprod (Paris) 1988;17:1089-94. (In French.)
4. Bernard N, Elefant E, Carlier P, et al. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG 2013;120:568-74.
5. Ralph LJ, Foster DG, Kimport K, Turok D, Roberts SCM. Measuring decisional certainty among women seeking abortion. Contraception 2017;95:269-78.

DOI: 10.1056/NEJMp1805927
Copyright © 2018 Massachusetts Medical Society.

# Extensively Drug-Resistant Typhoid — Are Conjugate Vaccines Arriving Just in Time?

Jason R. Andrews, M.D., Farah N. Qamar, F.C.P.S., Richelle C. Charles, M.D., and Edward T. Ryan, M.D.

In Hyderabad, Pakistan, an outbreak of extensively drug-resistant (XDR) *Salmonella enterica ssp. enterica* serovar Typhi, resistant to chloramphenicol, ampicillin, trimethoprim–sulfamethoxazole, fluoroquinolones, and third-generation cephalosporins, was recognized in November 2016 and has now spread to Karachi, home to more than 14 million people. More than 1000 cases have been confirmed by blood culture; since most typhoid cases are treated empirically, however, the true number of cases is probably many times greater. The outbreak is being caused by the H58 clade, a multidrug-resistant haplotype of S. Typhi that is common in Asia and areas of Africa. The H58 S. Typhi involved in the outbreak contains a chromosomally integrated antimicrobial-resistance cassette imparting resistance to chloramphenicol, ampicillin, and trimethoprim–sulfamethoxazole, and the XDR variant also contains an IncY plasmid that carries not only the fluoroquinolone-resistance gene *qnrS* but also the CTX-M-15 gene *bla* that mediates resistance to ceftriaxone.[1] S. Typhi already causes invasive disease in 12 million to 22 million people each year, many of whom live in South and Southeast Asia, and the emergence of an XDR variant in this densely populated area is extremely worrisome.[2]

Prior to the advent of antimicrobial therapy, case fatality rates for typhoid fever exceeded 20% in many areas, since untreated disease led to complications such as intestinal perforation. In 1948, the first effective antimicrobial therapy for typhoidal salmonella, chloramphenicol, ushered in a new era in the management of enteric fever (see timeline). Within 2 years, however, the first clinical isolate resistant to chloramphenicol was reported. But resistance was relatively uncommon, and chloramphenicol remained the mainstay of therapy for the next two decades. In the early 1970s, outbreaks of chloramphenicol-resistant typhoid with evidence of horizontal transfer of resistance genes were reported around the world. Ampicillin and trimethoprim–sulfamethoxazole emerged as alternative, albeit possibly inferior, therapies for chloramphenicol-resistant enteric fever. By the late 1980s, resistance to all three antibiotics (multidrug-resistant typhoid) was increasingly

The New England Journal of Medicine
Downloaded from nejm.org at NEW YORK STATE LIB ACQUISITIONS on November 13, 2023. For personal use only. No other uses without permission.
Copyright © 2018 Massachusetts Medical Society. All rights reserved.