# 24-2481(L)

### 24-2630(CON)

## 𝕌𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

LETITIA JAMES,

*Defendant–Appellant-Cross-Appellee,*

and

EMC FRONTLINE PREGNANCY CENTERS,

*Plaintiff–Appellee,*

v.

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, GIANNA'S HOUSE, INC., CHOOSE LIFE OF JAMESTOWN, INC., doing business as OPTIONS CARE CENTER,

*Plaintiff–Appellees-Cross-Appellants.*

On Appeal from the United States District Court for the Western District of New York

### REPLY BRIEF FOR APPELLANT

BARBARA D. UNDERWOOD
 *Solicitor General*
ANDREA OSER
 *Deputy Solicitor General*
JONATHAN D. HITSOUS
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
The Capitol
Albany, New York 12224
(518) 776-2044

Dated: April 7, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 1

ARGUMENT .................................................................................................. 3

POINT I

THE NIFLA PLAINTIFFS' COMPLAINT WAS SUBJECT TO DISMISSAL
UNDER THE *YOUNGER* ABSTENTION DOCTRINE ...................................... 3

POINT II

THE NIFLA PLAINTIFFS FAILED TO DEMONSTRATE THEIR
ENTITLEMENT TO A PRELIMINARY INJUNCTION ...................................... 11

    A.   The NIFLA Plaintiffs Are Unlikely to Succeed on Their
First Amendment Claim. ......................................................... 11

        1.   The NIFLA plaintiffs' intended advertising of APR
is commercial speech. ...................................................... 11

        2.   The NIFLA plaintiffs failed to demonstrate that
their intended advertising was neither false nor
misleading. ........................................................................ 20

        3.   The injunction may not be affirmed on the
additional alternative ground that the Attorney
General selectively enforces New York law based on
their viewpoint. ............................................................... 25

    B.   The District Court Failed to Weigh Properly the
Remaining Preliminary-Injunction Factors. .......................... 27

CONCLUSION ......................................................................... 29

CERTIFICATE OF COMPLIANCE

ADDENDUM

   *NIFLA v. Bonta,*
     C.D. Cal. No. 24-cv-08468, ECF No. 50 (Mar. 6, 2025) ...........ADD1

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*All-Options, Inc. v. Att'y Gen. of Ind.*,
    546 F. Supp. 3d 754 (S.D. Ind. 2021)................................................22

*Am. Academy of Pain Mgmt. v. Joseph*,
    353 F.3d 1099 (9th Cir. 2004)............................................................13

*Am. Med. Ass'n v. Stenehjem*,
    412 F. Supp. 3d 1134 (D.N.D. 2019)................................................23

*Anderson v. City of Bessemer City*,
    470 U.S. 564 (1985)............................................................................21

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983)...........................................................12-13, 16

*Citizens for a Better Environment v. Nassau Cnty.*,
    488 F.2d 1353 (2d Cir. 1973) .........................................................5-7

*Doninger v. Niehoff*,
    642 F.3d 334 (2d Cir. 2011) ............................................................26

*Doran v. Salem Inn*,
    422 U.S. 922 (1975)......................................................................4-5, 9

*Fargo Women's Health Org., Inc. v. Larson*,
    381 N.W.2d 176 (1986) ...............................................................16-17

*First Resort, Inc. v. Herrera*,
    860 F.3d 1263 (9th Cir. 2017) ..........................................................15

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
    721 F.3d 264 (4th Cir. 2013)........................................................15-16

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
    879 F.3d 101 (4th Cir. 2018)............................................................15

**Cases**                                                    **Page(s)**

*Herrera v. City of Palmdale,*
   918 F.3d 1037 (9th Cir. 2019)............................................................9

*Jordan v. Jewel Food Stores, Inc.,*
   743 F.3d 509 (7th Cir. 2014)............................................................16

*Karlin v. IVF Am.,*
   93 N.Y.2d 282 (1999) ......................................................................10

*Mass. Delivery Ass'n v. Coakley,*
   671 F.3d 33 (1st Cir. 2012) ................................................................9

*N.Y. State Republican Comm. v. Secs. & Exchange Comm'n,*
   799 F.3d 1126 (D.C. Cir. 2015) .........................................................6

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
   585 U.S. 755 (2018)..........................................................................19

*NIFLA v. Bonta,*
   C.D. Cal. No. 24-cv-08468, ECF No. 50 (Mar. 6, 2025).....14-15, 22, 24

*Online Merchants Guild v. Cameron,*
   995 F.3d 540 (6th Cir. 2021).............................................................25

*Planned Parenthood of Tenn. & N. Miss. v. Slatery,*
   523 F. Supp. 3d 985 (M.D. Tenn., 2021).......................................22-23

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.,*
   487 U.S. 781 (1988)..........................................................................18

*Spargo v. N.Y. State Comm'n on Jud. Conduct,*
   351 F.3d 65 (2d Cir. 2003) .......................................................4, 8, 10

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med.*
*Practice, P.C.,*
   120 F.4th 59 (2d Cir. 2024)...............................................................13

*State of N.Y. by Abrams v. Gen. Motors Corp.,*
   547 F. Supp. 703 (S.D.N.Y. 1982).....................................................10

**Cases** **Page(s)**

*Steffel v. Thompson,*
    415 U.S. 452 (1974)...............................................................4-5

*Thompson v. W. States Med. Ctr.,*
    535 U.S. 357 (2002)..............................................................12

*Village of Schaumburg v. Citizens for a Better Environment,*
    444 U.S. 620 (1980)..............................................................18

*Virginia State Bd. of Pharm. v. Va. Citizens Consumer Council,*
    425 U.S. 748 (1976)...........................................................17-18

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021)...............................................11

*Younger v. Harris,*
    401 U.S. 37 (1971)............................................................1, 3

## PRELIMINARY STATEMENT

The National Institute for Family and Life Advocates, Gianna's House, and Options Care Center (the "NIFLA Plaintiffs") sued appellant, New York's Attorney General, to enjoin possible enforcement action against them. They alleged that they wished to advertise abortion pill reversal (APR), an experimental medical treatment, using the same statements as those made by pregnancy centers that are currently defendants in a state-court action brought by the Attorney General to enjoin false and misleading advertising of APR in violation of New York's consumer-protection laws. The NIFLA plaintiffs alleged further that the risk of facing a similar state-court action against them was chilling their First Amendment free-speech rights, even though the Attorney General had threatened no such action based on their statements at that time. The district court (Sinatra, J.) declined to abstain from hearing the case under *Younger v. Harris,* 401 U.S. 37 (1971), and preliminarily enjoined the Attorney General from commencing any such state-court action against the NIFLA plaintiffs.

The NIFLA Plaintiffs contend that abstention is not required because they are asserting free-speech rights independent of those at

issue in the pending state-court action. The threat they perceive to those alleged rights, however, is wholly derived from that state-court action. And while they argue that their federal lawsuit would not interfere with the ongoing state-court action, they are mistaken. Indeed, they appear to misunderstand the nature and purpose of that action.

On the merits, the NIFLA Plaintiffs contend that their proposed advertising should not be treated as commercial speech because their status as a nonprofit entity establishes that they have no pecuniary interests in that advertising. Accepting that contention would create a system in which the same speech would be protected for some speakers, but not others—a framework the Supreme Court has eschewed. And even though the district court did not reach the issue, the NIFLA Plaintiffs urge the Court to affirm on the alternative ground that their proposed advertising of APR would be true and accurate, an argument that improperly calls upon the Court, for the first time on appeal, to engage in factfinding on the basis of conflicting expert opinions.

This Court should vacate the preliminary injunction and remand with instructions to dismiss the complaint or for further proceedings consistent with its decision.

# ARGUMENT

## POINT I

### THE NIFLA PLAINTIFFS' COMPLAINT WAS SUBJECT TO DISMISSAL UNDER THE *YOUNGER* ABSTENTION DOCTRINE

The parties agree that the Attorney General commenced and is currently maintaining a civil enforcement action in state court that involves precisely the same subject matter and legal issues as this action. Indeed, that state-court action was the very impetus for this action, which seeks to prevent the Attorney General from bringing the same enforcement action against the plaintiffs here. The only difference in between the two actions is that the defendants in the state court action, identified here as the "HBI Defendants," do not include the NIFLA Plaintiffs.[1] The parties also agree that, even when federal plaintiffs are not named as parties in a state-court action, abstention under *Younger v. Harris,* 401 U.S. 37 (1971), may nonetheless be appropriate if the federal plaintiffs: (1) pursue claims that are derivative of a state-court parties'

---

[1] Initially, NIFLA sued on behalf of its entire membership, some of whom were also HBI defendants (JA938, 941-942), but the district court found that they lacked standing to do so (SPA9 n.7). The NIFLA Plaintiffs have withdrawn their cross-appeal contesting that ruling.

rights, and (2) seek to directly interfere with the state-court action. *Spargo v. N.Y. State Comm'n on Jud. Conduct*, 351 F.3d 65, 83-85 (2d Cir. 2003). The parties disagree only over whether the NIFLA Plaintiffs' lawsuit satisfies these requirements.

Relying on *Doran v. Salem Inn*, 422 U.S. 922 (1975) and *Steffel v. Thompson*, 415 U.S. 452 (1974), the NIFLA Plaintiffs argue that they are not asserting derivative claims, but rather their independent First Amendment free-speech rights. (NIFLA Br. at 15-19.) Neither case controls here.

In both cases, the federal plaintiffs were engaging in conduct that indisputably had become or was already prohibited, and they faced an imminent threat of enforcement if they continued that conduct. *Doran,* for example, involved a newly enacted local ordinance that prohibited topless dancing. Three bar owners discontinued offering topless dancing, while suing in federal court to enjoin the ordinance's enforcement against them, but one then promptly resumed the prohibited conduct and was served with a criminal summons. 422 U.S. at 924-25. The Court held that *Younger* did not bar the federal action brought by the two bar owners who were not parties to any state-court action, but barred only the federal

action brought by the third. *Id.* at 929-31. And in *Steffel,* the plaintiff was engaged in handbilling activities that he ceased only after police threatened to charge him with trespass. 415 U.S. at 455-56. The Supreme Court held that the fact that his companion did not cease handbilling— resulting in his prosecution for trespass—did not bar a federal court from entertaining the plaintiff's claim that the police were threatening his protected rights. *Id.* at 461-63. In both cases, then, the federal plaintiffs had independent claims, regardless of whether other regulated parties continued or resumed the prohibited conduct and faced enforcement.

In sharp contrast, the NIFLA Plaintiffs would have no claim but for the Attorney General's state-court action. They have not been engaging in the advertising that is at issue in the state-court action, and they have never been threatened with such an action by the Attorney General. To the contrary, they claim that the state-court action against the HBI Defendants itself chills their speech. Absent that state-court action, then, they would have nothing to independently challenge.

The NIFLA Plaintiffs also cite, as a purportedly "identical case" (NIFLA Br. at 17), *Citizens for a Better Environment v. Nassau Cnty.*, 488 F.2d 1353 (2d Cir. 1973), a case this Court decided in the infancy of the

*Younger* doctrine and that this Court did not mention in *Spargo* or any case thereafter. *Citizens for a Better Environment* is also distinguishable, however. The plaintiff in the case was an environmental advocacy organization that, like the plaintiffs in *Doran* and *Steffel*, was already engaged in the allegedly prohibited conduct at issue—there, door-to-door solicitation without a license and during restricted hours in reliance on an exemption that arguably did not apply. *See* 488 F.2d at 1357-58 & n.5. The plaintiff thus faced imminent prosecution, a risk of which it became aware when appearance tickets were issued to some of its employees. *See id.* at 1357-58. The resulting state-court action, however, did not give rise to the plaintiff's claim, a challenge to the meaning of the statutory exemption at issue. Rather, it supported the plaintiff's allegation that it faced imminent enforcement action, as required to establish standing. In fact, even without the local enforcement action, the plaintiff likely still would have been able to establish standing, given its claim that the ordinances were unconstitutionally vague. *Id.* at 1357 n.1. Courts have long regarded such claims as permissible in the pre-enforcement context as a means to avoid the chilling effects that accompany expansive proscriptions on speech. *See N.Y. State Republican Comm. v. Secs. &*

*Exchange Comm'n*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015) (collecting cases). Moreover, in *Citizens for a Better Environment* this Court observed that the organization's very existence was threatened by the manner in which the county was applying the ordinances, giving it an independent interest in the statutory question that might have been frustrated if it had to await the outcome of the state-court cases. 488 F.2d at 1361.

The NIFLA Plaintiffs do not face a choice, as did the federal plaintiffs in *Doran, Steffel*, and *Citizens for a Better Environment*, between altering their conduct or subjecting themselves to an enforcement action in state court. Indeed, the Attorney General has already determined that the NIFLA Plaintiffs' current speech does not violate New York law. Rather, the NIFLA Plaintiffs allege that they now wish to engage in the speech that is at issue in the state-court action. Even if that allegation were sufficient to confer standing, the NIFLA Plaintiffs should not be able to assert an independent claim for *Younger* purposes when, in substance, what they seek is to have the district court essentially take over the state-court action and decide the rights of the HBI Defendants.

In response, the NIFLA Plaintiffs assert that the merits of the state-court action are immaterial. (NIFLA Br. at 19.) Their own briefing belies that assertion. They devote most of their brief to the merits of that action with arguments that APR is in fact a safe, effective, and accepted medical treatment, and thus that the advertising of the *HBI Defendants*—the advertising in which the NIFLA Plaintiffs claim they intend to engage in their derivative action—is not misleading, but accurate. (*See* NIFLA Br. at 36-55). Indeed, amici go so far as to ask this Court to rule affirmatively that the Attorney General's state-court action cannot proceed under New York's consumer-protection statutes. (*See* Br. of Summit Life Ctr. et al. as Amicus Curiae (ECF No. 50) (hereinafter "Summit Br.") at 12-16, 18-20; Br. of Free Speech Coal. et al. as Amicus Curiae (ECF No. 66) (hereinafter "FSC Br.") at 5-15.) Consequently, the legal analysis of the HBI defendant's claims and the NIFLA plaintiffs were "unavoidably intertwined and inseparable." *Spargo*, 351 F.3d at 84.

The NIFLA Plaintiffs nonetheless argue (NIFLA Br. at 17-18) that, because they do not seek to enjoin the state-court action, a ruling in their favor here would not interfere with that action. To be sure, interference "usually" takes the form of an injunction against the pending state-court

action. *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 47 (1st Cir. 2012). But a request for injunctive relief is not a prerequisite to abstention under *Younger*. To the contrary, courts have abstained under *Younger* in cases involving claims for damages and declaratory relief—including claims brought by third parties—where such relief would interfere with the pending state-court action as a practical matter. In *Doran* itself, the Supreme Court held that *Younger* barred the state-court defendant from obtaining declaratory relief, just as it barred an injunction against the state-court prosecution. 422 U.S. at 929; *see also Herrera v. City of Palmdale*, 918 F.3d 1037, 1047-48 (9th Cir. 2019) (same, as to derivative claims brought by nonparties to a state-court civil enforcement action). Courts evaluating interference under *Younger* thus have appropriate leeway to consider the realities of the relationship between the state-court action and the federal lawsuit.

That consideration weighs decisively in favor of abstention here. The NIFLA Plaintiffs' requested relief—an order barring the Attorney General from initiating a civil enforcement action against them—would as a practical matter significantly interfere with the state-court action. The Attorney General commences such civil enforcement actions to

vindicate her quasi-sovereign interest in "securing an honest market-place in which to transact business." *State of N.Y. by Abrams v. Gen. Motors Corp.*, 547 F. Supp. 703, 705 (S.D.N.Y. 1982); *see also Karlin v. IVF Am.*, 93 N.Y.2d 282, 291 (1999) (observing that New York's consumer-protection laws have long been used to combat the deceptive marketing of healthcare services). The relief the NIFLA Plaintiffs request would undermine that interest by allowing the content of the HBI Defendants' false and misleading advertising to continue unabated, as long as it is published by anyone else. Indeed, the NIFLA Plaintiffs' request for a preliminary injunction has already inspired copycat federal lawsuits by other plaintiffs that are similarly preemptive. (*See* JA1030-1031.) By seeking to protect the public from the proliferation of the HBI Defendants' false and misleading advertising by other speakers, the NIFLA Plaintiffs' federal lawsuit does not merely create a risk of "inconsistent judgments." (NIFLA Br. at 20.) It undermines the state-court action's very purpose. As in *Spargo*, then, interference with the state-court action would be "inevitable." 351 F.3d at 82.

# POINT II

## THE NIFLA PLAINTIFFS FAILED TO DEMONSTRATE THEIR ENTITLEMENT TO A PRELIMINARY INJUNCTION

Even if the district court properly declined to abstain here, it nonetheless abused its discretion in granting a preliminary injunction.

## A. The NIFLA Plaintiffs Are Unlikely to Succeed on Their First Amendment Claim.

The NIFLA Plaintiffs attempt to place the burden of proof on the Attorney General (NIFLA Br. at 40, 45, 54), and thereby ignore that, on their motion for a preliminary injunction, they, as the movants, bore the burden to establish a likelihood of success. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021). They failed to carry that burden.

### 1. The NIFLA plaintiffs' intended advertising of APR is commercial speech.

The NIFLA Plaintiffs attempt to defend the district court's determination by arguing that their proposed speech is not commercial in nature and is thus entitled to full First Amendment protection. (NIFLA Br. at 28-36.) In differentiating commercial speech from noncommercial speech, courts consider whether: (1) the speech is about a specific product, (2) the speech is an advertisement, and (3) the speaker has an economic motive.

11

*See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983). The NIFLA Plaintiffs concede that the second factor is satisfied here—*i.e.,* that their proposed speech about APR is advertising (NIFLA Br. at 32)—but they deny that the remaining factors are satisfied.

More particularly, the NIFLA Plaintiffs argue that their proposed advertising would not refer to a specific product, apparently because it would promote APR, regardless of who administers it. (*See* NIFLA Br. at 30-32.) That argument ignores the added undisputed fact that the proposed advertising at issue would direct consumers to an identified network of medical providers who have already been vetted, specially trained, and stand ready to administer APR. (JA771.) Thus, a reasonable consumer would not understand the NIFLA Plaintiffs to be advertising APR generally, but rather APR that *the NIFLA Plaintiffs* facilitate. One of the amici speculates, on this theory, that the Attorney General could next seek to regulate advertisements of religious services. (Br. of Liberty Counsel as Amicus Curiae (ECF No. 51 and hereinafter "LC Br.") at 9.) But unlike religious services, medical services such as pharmaceutical treatments have long been held to constitute products, the regulation of which is subject to review as commercial speech. *See, e.g., Thompson v.*

*W. States Med. Ctr.*, 535 U.S. 357, 366 (2002) (advertisement of compounded drugs); *Bolger*, 463 U.S. at 68-69 (advertisement of contraceptives); *Am. Academy of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (physician advertising).

The NIFLA Plaintiffs argue that they lack an economic motive for their proposed advertising by representing that they would not charge a fee for the APR they would promote, and that their advertising would further their religious mission. (*See* NIFLA Br. at 28-29, 30-31.) This argument fails for three independent reasons.

First, the NIFLA Plaintiffs fail to support their representations with adequate evidence. In quibbling over whether to prevail they need to show a likelihood, rather than strong likelihood, of success on the merits (*see* NIFLA Br. at 22), they overlook that whatever the standard, they needed to satisfy it with a "clear showing." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Practice, P.C.*, 120 F.4th 59, 79 (2d Cir. 2024). They failed to do so. They affirmatively declare that they do not directly offer on-site APR services (JA15, 17-18), but then fail to provide any evidence that the physicians who would administer APR would do so at no cost to the consumer. Indeed, the record suggests

otherwise. The very website to which they would refer consumers—AbortionPillReversal.com—directs consumers to explore insurance options and pledges only to "reduce" the cost to consumers, not to eliminate it. (JA521.) At this preliminary injunction stage, the NIFLA Plaintiffs' conclusory statement that the APR they intend to promote would be provided at no cost to consumers thus falls far short of the "clear showing" needed to support a likelihood of success on the merits.

Second, the possibility that some consumers may get APR at no cost does not establish that the NIFLA Plaintiffs lack any economic motive for their speech. The very recent decision in *NIFLA v. Bonta*, C.D. Cal. No. 24-cv-08468, ECF No. 50 (Mar. 6, 2025),[2] is instructive. In denying NIFLA a preliminary injunction in the virtually identical lawsuit it brought against the California Attorney General, the court highlighted the fact that NIFLA derived a significant portion of its revenue from fees paid by its member pregnancy centers, in exchange for which NIFLA provided benefits that included support with promoting APR. This gave NIFLA a "powerful economic motivation" to engage in such advertising.

---

[2] Because as of the date of this filing the district court's order is not available on Westlaw, a copy of that order is attached to this brief.

*Id.* at 8. Yet the NIFLA Plaintiffs did not even acknowledge this ruling, much less distinguish it, anywhere in their 59-page brief.

Third, where speech proposes a commercial transaction, as it does here, that speech can be regulated, even if pecuniary gain is not the speaker's primary motive. The NIFLA Plaintiffs respond that *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264 (4th Cir. 2013) (en banc), one of the cases on which the Attorney General relied for this principle, resulted in a decision on remand holding that the plaintiffs did not engage in commercial speech, in part because there was no evidence of economic motivation. (NIFLA Br. at 35; *see also* LC Br. at 17-18.) What really drove the decision following remand, however, was the fact that the challenged ordinance was not limited to advertising, but rather applied to all speech made by pregnancy centers that shared certain characteristics. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 108-09 (4th Cir. 2018). In any event, even after the en banc decision in *Greater Baltimore,* courts have correctly adhered to the view that the economic-motivation factor alone is not dispositive. *See, e.g., First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017). The

NIFLA Plaintiffs' contrary claim notwithstanding (NIFLA Br. at 28, 34-36), this is an accurate statement of the law. In setting out the three factors, the Supreme Court made clear that all three need not be present for speech to qualify as commercial. *Bolger*, 463 U.S. at 67 n.14; *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014). Simply put, "context matters." *Greater Balt. Ctr.*, 721 F.3d at 286.

*Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176, *cert. denied*, 476 U.S. 1108 (1986), on which both *Greater Baltimore* and *First Resort* relied, provides useful guidance when applying the commercial-speech analysis to advertisements of goods or services that are free of charge to consumers. *Fargo Women's Health* involved a pregnancy center that had been enjoined from advertising its services in a way that misleadingly suggested it offered abortion services, only to then inundate consumers with "anti-abortion propaganda." *Id.* at 177. On appeal from that injunction, the pregnancy center argued that the First Amendment fully protected its advertising because it did not charge for its services and its advertising furthered its "pro-life" position. *Id.* at 180-81. The North Dakota Supreme Court rejected that argument, explaining that the fact that the center did not charge for its services did not alone

establish that its advertising was noncommercial speech. *Id.* at 180-81. What mattered was that the speech was "directed at the providing of services rather than toward an exchange of ideas." *Id.* at 181. The speech was thus properly characterized as commercial speech. *Id.*

The NIFLA Plaintiffs nonetheless argue (NIFLA Br. at 29-30) that deeming their advertising to be commercial speech would enable the government to regulate any speech that happens to refer to a product or service somewhere in the stream of commerce. (*See also* LC Br. at 3, 8-9, 12, 17 (amplifying the point)). The Attorney General's argument does not sweep so broadly. The speech at issue—the NIFLA Plaintiffs' proposed advertising—does not merely happen to refer to APR in the context of speech addressing the organization's mission or even its views on abortion. That advertising would not mention the NIFLA Plaintiffs' mission or views at all. It would address only the availability of APR, falsely and misleadingly advising consumers that APR is safe and effective, and directing consumers to a network of medical providers from whom they can receive APR. As in *Virginia State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748 (1976), then, the only "idea" that the

NIFLA Plaintiffs propose to communicate is their ability to arrange for consumers to receive a medical treatment. *Id.* at 761.

Contrary to the NIFLA Plaintiffs' claim (NIFLA Br. at 29-30), neither *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988), nor *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), alters the analysis. Those cases stand for the proposition that charitable fundraising receives full First Amendment protection because solicitation of support, financial or otherwise, for the charity is synonymous with advocacy for the charity's mission. *See Riley*, 487 U.S. at 796; *Vill. of Schaumberg*, 444 U.S. at 632.

But solicitation of financial support for a charity is entirely different from solicitation of customers for a service. The NIFLA Plaintiffs argue that a nonprofit organization's speech is necessarily intertwined with the advocacy of its mission, regardless of the content of the speech. (*See* NIFLA Br. at 24, 26, 28-33, 36.) This proposition would improperly upend decades of First Amendment jurisprudence by replacing the context-driven commercial-speech analysis with a categorical rule. It also would shift the focus of the analysis from the speech itself to the speaker. Indeed, the NIFLA Plaintiffs and their amici argue—without support—

that the speaker's identity is central to the commercial-speech analysis. (NIFLA Br. at 34; LC Br. at 14.) Even if the speaker's identity were relevant to that analysis, however, the Supreme Court has rejected the view that the First Amendment "allow[s] speech by some but not others." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 777-78 (2018). The identity of the speaker thus cannot be the sole determinative factor in the commercial-speech analysis.

The NIFLA Plaintiffs may well harbor deep religious or moral convictions about the use of alternatives to abortion. It bears repeating, however, that the speech at issue in this case is the speech in which the HBI Defendants have already engaged, and that the NIFLA allege they would engage but for threat of enforcement against them.[3] Because that speech on its face proposes a transaction and would be commercial speech

_____

[3] Although one of the amici maintains that the Attorney General arbitrarily selected the HBI Defendants for enforcement (FSC Br. at 19-20), it can do no more than speculate that substantively different statements about APR were likely to become the target of a future enforcement action. The Attorney General reserves the right to move to dismiss any or all of the NIFLA Plaintiffs for lack of standing at such time as they represent that the content of their proposed advertising would differ from that of the HBI Defendants.

if published by anyone else, the district court should have held that the proposed advertising was commercial speech here.

**2. The NIFLA plaintiffs failed to demonstrate that their intended advertising was neither false nor misleading.**

The NIFLA Plaintiffs devote much of their brief to arguing that the Court should affirm on the alternative ground that, even if their proposed advertising of APR were commercial speech, that speech was neither false nor misleading, and thus it warrants a level of constitutional protection that the Attorney General cannot overcome. (*See* NIFLA Br. at 40, 42-43, 51, 53.) In making this argument, the NIFLA Plaintiffs purport to defend a "finding" made by the district court in a footnote in which the court remarked that the Attorney General's attempt to regulate the APR advertising at issue would fail under intermediate scrutiny. (SPA31 n.15.) The district court did not elaborate on that brief remark, however, making it difficult to discern whether the court in fact made a finding that the speech at issue was not false or misleading, but rather true and accurate. The NIFLA Plaintiffs' protracted argument here thus asks the Court to go beyond merely reviewing factual findings rendered to making

factual findings in the first instance. That is not a proper role for this Court. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

In any case, the record does not support a finding that the speech at issue is true and accurate. First, it is doubtful that the district court could have credited the opinion of the NIFLA Plaintiffs' expert over that of the Attorney General's expert without holding a hearing. Second, for this Court to adopt any such determination here would amount to clear error.

According to the NIFLA Plaintiffs, any claim that its proposed advertising violated New York's consumer protection laws would improperly require a court to choose a side in an ongoing scientific debate over the safety and efficacy of APR. (NIFLA Br. at 40-43, 45, 51, 54; *see also* Summit Br. at 16-9, 31-32.) But the Attorney General did not claim that the advertising (as published by the HBI Defendants) was false and misleading because it has been rejected by the scientific community. Instead, the Attorney General argued that the advertising is misleading because, on the whole, it suggests that the debate has been settled in favor of APR's legitimacy. For example, on multiple occasions, the NIFLA Plaintiffs highlight a study that concluded that APR "appears to be" safe

and effective (NIFLA Br. at 7, 41, 44, 46)—a conclusion that suggests a need for further research, which the authors in fact recommended (JA463). The district court's order, on the other hand, empowers the NIFLA Plaintiffs to represent that APR *is* safe and effective—a statement that suggests those assertions have been scientifically proven. While the NIFLA Plaintiffs respond that their proposed advertising does not use the phrase "generally accepted" (NIFLA Br. at 51-52), acceptance is the natural inference drawn from the use of unequivocal language. And such language cannot accurately describe a treatment the medical community regards as "experimental" (JA781, 792-794).

Contrary to the NIFLA Plaintiffs' related protest that courts are ill-equipped to "referee such controversies" (NIFLA Br. at 41), courts around the country have grappled with the same question and resoundingly concluded, on records more thorough than the preliminary-injunction record here, that APR cannot accurately be represented as accepted as a safe and effective treatment to reverse the effects of mifepristone. *See, e.g.*, *NIFLA*, No. 24-cv-08468, ECF No. 50 at 13-19; *Planned Parenthood of Tenn. & N. Miss. v. Slatery*, 523 F. Supp. 3d 985, 1003-04 (M.D. Tenn., 2021); *All-Options, Inc. v. Att'y Gen. of Ind.*, 546 F. Supp. 3d 754, 767-69

(S.D. Ind. 2021); *Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134, 1150-51 (D.N.D. 2019).

The NIFLA Plaintiffs ignore these cases and instead rely on evidence that these courts have soundly rejected as insufficient to establish the truth and accuracy of the speech at issue. For instance, the NIFLA Plaintiffs rely on a 2018 study to support their claim that APR has been proven to be 64 to 68% effective in reversing the effects of mifepristone. (*See* NIFLA Br. at 6-7, 46-49.) But that study's own author acknowledged numerous shortcomings in the study, including the exclusion of from the group that initiated progesterone therapy women whose pregnancies terminated after mifepristone alone, as well as the failure to account for the impact of varying gestational age. *Slatery*, 523 F. Supp. 3d at 993-94. (JA799-800, 802-803 [opinion of the Attorney General's expert on the 2018 study].) The NIFLA Plaintiffs similarly rely on a halted 2020 study as evidence of APR's efficacy (*see* NIFLA Br. at 50-51), even though the study's own author concluded that the results were inconclusive as to progesterone's efficacy in counteracting the effects of mifepristone—and ultimately raised safety concerns about interrupting the two-drug medication abortion regimen—which is precisely what APR calls for. *See*

*NIFLA*, No. 23-cv-08468, ECF No. 50 at 18-19. (JA804-806 [opinion of Attorney General's expert on the 2020 study].) Indeed, every purported scientific premise on which the NIFLA Plaintiffs rely to establish the truth and accuracy of the speech at issue has been refuted by others as facially insufficient to support the proposition that APR is accepted as a safe and effective method to reverse a medication abortion.

Finally, it is immaterial that the Attorney General is not attempting to prevent physicians from administering APR treatments. (*See* NIFLA Br. at 37; *see also* Summit Br. at 3-4, 6-7, 13, 24.) The Attorney General has not disputed here that physicians, relying on their medical judgment, may advise patients about the risks and benefits of an experimental treatment or even recommend that treatment. That fact, however, is insufficient to establish that the NIFLA Plaintiffs' proposed advertising of APR is true and accurate.

In sum, this Court need not decide whether the studies on which the NIFPLA Plaintiffs and their amici rely are "clearly erroneous." (NIFLA Br. at 45, 47-48.) The preliminary-injunction record here is simply insufficient to establish that the NIFLA Plaintiffs' proposed advertising would be true and accurate. Accordingly, if this Court

concludes, as it should, that the NIFLA Plaintiffs' proposed advertising is commercial speech, it should vacate the district court's order granting a preliminary injunction.

### 3. The injunction may not be affirmed on the additional alternative ground that the Attorney General selectively enforces New York law based on their viewpoint.

Although the district court did not address the NIFLA Plaintiffs' claim that the Attorney General is selectively enforcing New York consumer-protection laws based on viewpoint, the NIFLA Plaintiffs nonetheless suggest (NIFLA Br. at 25-26), and their amici affirmatively assert (Summit Br. at 5-6; LLD Br. at 18-20; LC Br. at 21, 31-33; FSC Br. at 16-17, 25-26), that the Attorney General is indeed hostile to their viewpoint. That selective-enforcement enforcement claim provides no basis to affirm the preliminary injunction, for any of three reasons.

First, and consistent with the Sixth Circuit's holding in *Online Merchants Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021), the Court should decline to consider in the first instance whether the NIFLA Plaintiffs are likely to succeed on a claim that the district court intentionally refrained from considering. *Id.* at 560.

Second, the NIFLA Plaintiffs are unlikely to succeed on a selective-enforcement claim, because they lack standing to bring such a claim. Because the Attorney General has taken no enforcement action against them, under New York's consumer-protection statutes or otherwise, they cannot claim to be the victims of any selective enforcement. On the contrary, the Attorney General specifically reviewed the then-existing speech of the NIFLA Plaintiffs and determined that it did *not* violate New York law so as to warrant their inclusion as defendants in the civil enforcement action currently pending in state court. (JA774-778.)

Third, the NIFLA Plaintiffs are unlikely to succeed on their selective-enforcement claim, because neither they nor their amici can identify any person or entity that the Attorney General declined to sue, despite knowing that any such person or entity engaged in advertising that was similarly false or misleading. As this Court has explained, such evidence is required to establish a selective-enforcement claim. *See Doninger v. Niehoff*, 642 F.3d 334, 357 (2d Cir. 2011) (no evidence that anyone who engaged in conduct similar to the plaintiff who went unpunished). Amici's reliance on the Attorney General's press releases and other extra-record materials (Summit Br. at 5; LC Br. at 31) does not

alter the fact she has declined to act against other pregnancy centers that likewise support APR, but had not engaged in false or misleading advertising.

## B.    The District Court Failed to Weigh Properly the Remaining Preliminary-Injunction Factors.

In response to the Attorney General's argument that the remaining preliminary-injunction factors, irreparable harm and the public interest, weigh in her favor, the NIFLA Plaintiffs rest solely on their argument that they are likely to succeed on their First Amendment claim. As demonstrated above, however, they have failed to establish that they are likely to succeed, and the district court erred in finding otherwise.

To the extent that amici here raise an independent argument that, regardless of the likelihood of success, the public interest favors an injunction to prevent similarly situated pregnancy centers from going out of business (FSC Br. at 23-24), that argument both exaggerates the potential harm to other pregnancy centers and ignores the significant interest in protecting the public from false and misleading advertising. The Attorney General conducted a broad investigation of pregnancy centers across the state, and ultimately determined to bring enforcement

action against only approximately a dozen of them. (JA772-778.) The pregnancy centers that were not named as defendants can continue their support of APR as-is without credible fear of defending against a civil enforcement action. By enjoining the Attorney General from taking action against the NIFLA Plaintiffs, and thereby enabling the NIFLA Plaintiffs to advertise APR in the same false and misleading manner as the HBI Defendants, the district court has increased the risk of injury to the public.

## CONCLUSION

This Court should vacate the district court's order granting a preliminary injunction to the NIFLA Plaintiffs and remand with instructions to either dismiss the action or for further proceedings consistent with the Court's decision.

Dated:  April 7, 2025
Albany, New York

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant

By:  */s/ Jonathan D. Hitsous*
JONATHAN D. HITSOUS
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
JONATHAN D. HITSOUS
  *Assistant Solicitor General*
    *of Counsel*

The Capitol
Albany, New York 12224
(518) 776-2044

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Jonathan D. Hitsous, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,586 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Jonathan D. Hitsous*

# ADDENDUM

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10   NATIONAL INSTITUTE OF              Case No. 2:24-CV-08468-HDV-(MARx)

11   FAMILY AND LIFE ADVOCATES,

12   et al.,                           **ORDER DENYING PLAINTIFFS'
                                        MOTION FOR PRELIMINARY
13                                      INJUNCTION [DKT. NO. 19]**

14              Plaintiffs,

15

16         v.

17

18   ROB BONTA,

19

20              Defendant.

21

22

23

24

25

26

27

28

1

**ADD1**

1

2    **I.    INTRODUCTION**

3          Plaintiffs National Institute of Family and Life Advocates ("NIFLA") and SCV Pregnancy

4    Resource Center ("SCV") (collectively, "Plaintiffs") bring this pre-enforcement challenge seeking

5    injunctive relief against Defendant Rob Bonta as Attorney General of California (the "Attorney

6    General").  Specifically, Plaintiffs contend that the Attorney General's public statements and

7    pending consumer protection lawsuit against third parties involving abortion pill reversal

8    ("APR")—a controversial and unproven practice that attempts to "reverse" a chemical abortion

9    through the administration of high doses of progesterone—chill Plaintiffs' First Amendment right to

10   advertise the practice using language that the Attorney General considers false and misleading.  To

11   that end, Plaintiffs ask this Court to enjoin the California Attorney General from any action that

12   seeks to prohibit their use of various terms and phrases touting APR as safe and effective.

13         For the reasons discussed below, Plaintiffs' motion for a preliminary injunction is denied.  As

14   an initial matter, the Court finds that Plaintiffs' conduct constitutes commercial speech because, at

15   its core, it involves advertisements for medical services for which Plaintiffs maintain an economic

16   incentive despite their nonprofit status.  *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th

17   Cir. 2017).  Intermediate scrutiny is therefore the appropriate standard.  *Id.*

18         Applying that benchmark here, the Court concludes that Plaintiffs fail to establish a

19   likelihood of success on the merits to justify the extraordinary relief requested.  The principal reason

20   is that the First Amendment does not protect commercial speech that is inherently misleading.  *See*

21   *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980).  What

22   Plaintiffs' motion elides is that APR has been tested in the crucible of litigation by three separate

23   federal courts, and in all three cases the safety and efficacy of APR has been found wanting.  *See*

24   Section IV. A., *infra*.  Indeed, Judge William L. Campbell, Jr. of the Middle District of Tennessee,

25   after an extensive five-day evidentiary hearing involving six medical experts, found that similar

26   statements about APR were "untruthful and/or misleading," *Planned Parenthood of Tennessee and*

27   *North Mississippi, et al. v. Slatery, et al.*, 523 F. Supp. 3d 985, 1003–1004 (M.D. Tenn. 2021).

28

1    Simply put, this Court cannot conclude on this preliminary record that Plaintiffs are likely to prevail

2    once these scientific issues are fully tested here.

3         The Court's conclusion is not grounded solely in a retrospective probe of prior litigation.

4    The Court has independently considered the voluminous expert submissions by the parties and

5    concluded that (at least on this record) there is a dearth of credible scientific evidence supporting the

6    APR-related statements upon which Plaintiffs seek injunctive pre-clearance.  To be clear, the Court

7    appreciates that Plaintiffs have strongly held religious beliefs underpinning their efforts to advocate

8    for APR.  But Plaintiffs are not entitled to their own facts.  Here, Plaintiffs' proposed speech runs

9    headlong into scientific consensus.  The Court cannot ignore the science, and on that basis declines

10   to enjoin California's highest law enforcement officer from enforcing a consumer protection statute

11   designed to prohibit false advertising.

12   **II.    BACKGROUND**

13        NIFLA is a Christian non-profit headquartered in Virginia with a membership that includes

14   pro-life pregnancy centers throughout the nation, including 136 such centers in California.

15   Complaint ¶¶ 25–29 [Dkt. No. 1].   NIFLA provides its members with legal resources and counsel,

16   as well as informational materials, education, and training on various pro-life topics including APR.

17   *Id*. ¶¶ 30–31, 209–213.  NIFLA does not on its own provide any direct APR services to the public.

18   NIFLA members do not offer abortions or counseling that presents abortion as an option.  *Id.* ¶ 33.

19        SCV is a pregnancy resource center based in Santa Clarita, California, and a member of

20   NIFLA.  *Id*. ¶¶ 52–53.  SCV provides free family planning services, on-site medical services, and

21   medical treatment with prescriptions.  *Id.* ¶¶ 35–37.  Although some pregnancy centers and members

22   of NIFLA offer APR, SCV does not.  *Id.* ¶¶ 38, 192, 197.

23        Plaintiffs filed the instant action on October 2, 2024.  Plaintiffs seek an injunction barring the

24   Attorney General of California from taking enforcement action against NIFLA members for a series

25   of statements about APR.  Plaintiffs contend that, as a result of the Attorney General's prior

26   statements and enforcement actions, "California NIFLA members have canceled or postponed plans

27   to advertise about APR options, or to offer APR[.]"  Complaint ¶ 42.

28        The primary concern cited by Plaintiffs' Complaint relates to a consumer protection lawsuit

3

filed by the Attorney General on September 21, 2023, against Heartbeat International, a non-profit

network of pregnancy resource centers that operates the Abortion Pill Rescue Network,[1] and Real

Options, a non-profit that operates five pregnancy resource centers ("State Defendants").

Complaint, Ex. C, *People v. Heartbeat Int'l*, No. 23-CV-044940 (Cal. Super. Ct., Alameda C'nty,

Sept. 21, 2023) (the "State Case") [Dkt. No. 1-3]; *see also* Complaint ¶¶ 168–170.  In the State Case,

the Attorney General asserts claims under Cal. Bus. & Prof. Code Sections 17200 and 17500

("Sections 17200/17500") for alleged false and misleading statements made by these State

Defendants involving the safety, efficacy, and impact of APR.  *See* the State Case ¶¶ 96–101.  The

State Case remains pending.

On October 10, 2024, Plaintiffs filed the instant Motion for Preliminary Injunction

("Motion") [Dkt. No. 19].  Specifically, Plaintiffs seek an injunction barring the Attorney General

from using his regulatory powers to challenge Plaintiffs' use of

- statements using the terms "abortion pill reversal," "APR," or "reverse" related to the use
  of supplemental progesterone to counteract the effects of mifepristone in a chemical
  abortion;

- statements referring to the APR hotline or AbortionPillReversal.com;

- statements indicating that supplemental progesterone for abortion pill reversal is safe; and

- statements indicating that supplemental progesterone for abortion pill reversal is
  effective.

Motion at 2.  On December 17, 2024, the Court held a hearing on the Motion and took the matter

under submission [Dkt. No. 44].

## III.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may be awarded only if the

plaintiff clearly shows entitlement to such relief."  *Am. Bev. Ass'n v. City and County of San*

---

[1] The Abortion Pill Rescue Network in turn operates the website AbortionPillReversal.com as well
as an APR hotline that provides information on and referrals to providers of APR.  Complaint
¶¶ 169, 236. NIFLA advises its members to utilize the website and the hotline.  *Id.* ¶¶ 212, 223.

1    *Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*,

2    555 U.S. 7, 22 (2008)).  To prevail on a motion for a preliminary injunction, the movant must

3    establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent

4    the preliminary injunction, (3) the balance of equities tips in its favor, and (4) a preliminary

5    injunction is in the public interest.  *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).  If

6    the party opposing injunctive relief is a government entity, the third and fourth factors merge.

7    *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th

8    Cir. 2023) (en banc) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

9         Preliminary injunctions are denied unless the movant can make a "clear showing of

10   evidence" that supports each of the preliminary injunction factors.  *J.L. Boyd v. Luna,*

11   No. 2:24-cv-05716-SPG-AJR, 2024 WL 4799125, at *2 (C.D. Cal. Oct. 21, 2024) (citing *Winter*,

12   555 U.S. at 22).  Where parties "fundamentally disagree on the facts underlying the case, courts

13   routinely deny requests for preliminary injunctions." *Id.* (citation omitted).

14   **IV.    DISCUSSION**

15        Plaintiffs ask the Court to preliminarily enjoin the Attorney General of California from

16   bringing a *hypothetical* suit against Plaintiffs, *i.e.*, to enjoin the Attorney General from enforcing

17   Sections 17200 and 17500 for statements "about APR that they have made or would like to make"[2]

18   on the grounds that the postulated enforcement would violate Plaintiffs' First Amendment free

19   speech rights.[3]  Motion at 21.  For all the reasons discussed below, the Court disagrees.

20   _____

21   [2] This is an as-applied constitutional challenge.  *Kuba v. 1-A Agr. Ass'n,* 387 F.3d 850, 856 (9th Cir.

22   2004) ("An as-applied challenge alleges that the restriction on speech is unconstitutional as applied
     to the litigant's particular speech activity, even though the law may be capable of valid application to

23   others.").  Plaintiffs seek an injunction to protect them from enforcement resulting from, *inter alia*,
     statements they have not yet made but would like to make.  To the extent those statements would

24   differ in kind from the statements at issue in the State Case, it is unclear they have standing for such
     a challenge.  Out of an abundance of caution, the Court will find standing by assuming that this suit

25   is to prevent enforcement for statements already made or indistinguishable future statements.

26   [3] The Attorney General argues in his reply that the Motion is narrowly predicated on the abridgment

27   of Plaintiffs' freedom of speech argument, without implicating the other grounds for relief included
     in the Complaint (namely, free exercise of religion and due process).  Defendant's Opposition to

28

1      **A. Likelihood of Success on the Merits**

2      The likelihood of success on the merits "is a threshold inquiry and is the most important

3 factor," especially in "cases where a plaintiff seeks a preliminary injunction because of an alleged

4 constitutional violation." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). If a movant fails to

5 carry the first factor, the Court need not consider the other factors and may deny on that ground

6 alone. *Babaria v. Blinken*, 87 F.4th 963, 980 (9th Cir. 2023). In the First Amendment context, the

7 "moving party bears the initial burden of making a colorable claim that its First Amendment rights

8 have been infringed, or are threatened with infringement, at which point the burden shifts to the

9 government to justify the restriction on speech." *California Chamber of Commerce v. Council for

10 Education and Research on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (citation omitted). Put simply,

11 the Court must determine first whether Plaintiffs have met their burden of making a colorable claim

12 that their First Amendment rights have been, or are in threat of being, infringed. If so, the burden

13 shifts to the Attorney General to justify the alleged restriction. If the Attorney General meets that

14 burden, Plaintiffs fail to make the requisite showing that they are likely to succeed on the merits.

15      Plaintiffs make two claims in their Motion—one alleging that future enforcement would

16 constitute an unlawful regulation of speech and the second asserting that this future enforcement

17 would constitute viewpoint discrimination. The Court addresses each in turn.

18      **1. Unlawful regulation of speech**

19      "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. Nor

20 shall the States. *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019)

21 (recognizing incorporation of the First Amendment against the States by way of the Fourteenth

22 Amendment). First Amendment protections extend—subject to certain exceptions—to all speech,

23 including commercial speech. *Bigelow v. Virginia*, 421 U.S. 809, 819–820 (1975). However, the

24

25 _____

26 Plaintiffs' Motion ("Opposition") at 12, n. 6. The Attorney General reserved the right to ask for a
sur-reply if Plaintiffs turned to these other grounds in their reply. *Id.* Since Plaintiffs did not, and

27 instead kept the focus on the free speech argument, the Court will put aside the remaining claims in
the Complaint for the purposes of this Motion.

28

**ADD6**

1  degree of protection can vary, and indeed turns on whether the speech is commercial or not.  *Bolger*

2  *v. Youngs Drug Products Corp.*, 463 U.S. 60, 64–65 (1983) ("Thus, we have held that the

3  Constitution accords less protection to commercial speech than to other constitutionally safeguarded

4  forms of expression.").

5        In determining whether speech is commercial, courts must "give effect to a common-sense

6  distinction between commercial speech and other varieties of speech."  *X Corp. v. Bonta*, 116 F.4th

7  888, 900 (9th Cir. 2024) (citation omitted).  The inquiry is "fact-driven, due to the inherent difficulty

8  of drawing bright lines that will clearly cabin commercial speech in a distinct category."  *Id.*

9  "Where the facts present a close question, strong support that the speech should be characterized as

10  commercial speech is found where (a) the speech is an advertisement, (b) the speech refers to a

11  particular product, and (c) the speaker has an economic motivation."  *Id.* (applying the *Bolger* factors

12  from *Bolger*, 463 U.S. at 66–67 (1983)).  It is the comprehensive balance of these characteristics that

13  determines the result, and as such none are dispositive.  *Id.*  Applying the *Bolger* factors here, the

14  Court concludes that the speech at issue is commercial.[4]

15        As to the first factor, Plaintiffs concede that they intend to advertise but aver that

16  "advertisement" has a broad definition and that only advertisements "in the context of commercial

17  transactions" count as commercial.  Plaintiffs' Reply in Support of Plaintiffs' Motion ("Reply") at

18  _____

19

20  [4] Plaintiffs concede that, as a matter of state law, Sections 17200/17500 apply *only* to commercial speech.  Motion at 6 (citing *Thimes Sols., Inc. v. TP Link USA Corp.*, No. 22-56176, 2024 WL

21  1328194 (9th Cir. Mar. 28, 2024)).  That may be dispositive on the question of whether Plaintiffs' speech is commercial for purposes of a future enforcement action.  *See Am. Academy of Pain*

22  *Management*, 353 F.3d at 1106 (finding that the speech at issue is advertising and thus commercial speech in part because the statute itself "identifies that the object of its regulation is 'advertising.'").

23  California courts define commercial speech coextensively with federal courts.  *Rezec v. Sony Pictures Ent., Inc.*, 116 Cal. App. 4th 135, 140 (2004), *overruled in part on other grounds by*

24  *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133 (2019).  Therefore, the Attorney General can only (lawfully) enforce Sections 17200/17500 if the speech at issue is commercial.  Preliminarily

25  enjoining the Attorney General from enforcing the state's laws against speech that the laws do not apply to is unnecessary at best and violative of federalism at worst, as it would require the Court to

26  assume that State officials will improperly enforce state law in the future.  *Cf. Pennhurst State Sch.*

27  *& Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), *superseded by statute on other grounds* ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state

28  officials on how to conform their conduct to state law.").

**ADD7**

1    4–5 [Dkt. No. 35].  Plaintiffs further argue that their speech cannot be commercial because the APR

2    service providers do not charge for APR services.  Complaint ¶ 38.  But the Ninth Circuit in *First*

3    *Resort, Inc. v. Herrera*,[5] found that a nonprofit's advertisements to non-paying recipients were

4    nevertheless "advertisements" in the commercial sense because they were about the provision of

5    medical services rather than the "exchange of ideas."  860 F.3d 1263, 1273 (9th Cir. 2017).  So too

6    here.[6]  On this record, the Court concludes that Plaintiffs' proffered speech constitutes an

7    advertisement for APR services.

8         The second *Bolger* factor also militates strongly in favor of a finding that Plaintiffs' proffered

9    speech is commercial in nature.  Indeed, Plaintiffs do not claim that APR as a medical treatment is

10   not a product for the purposes of this inquiry.  Nor can they.  *See Am. Academy of Pain Management*

11   *v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) ("The advertising regulated relates to a specific

12   product, medical services.").

13        The Court reaches the same conclusion on the third *Bolger* factor.[7]  Plaintiffs admit that one

14   of the benefits they provide to their members is advising on APR.  Complaint ¶ 31.  That is a

15   powerful economic motivation since it is through their members that Plaintiffs raise funds.[8]  And

16   _____

17   [5] Plaintiffs argue that *First Resort* may be wrongly decided.  Memo at 12.  Unless it is overturned,

18   however, the Court is bound by this decision.

19   [6] Plaintiffs further argue that they do not provide or sell APR.  Reply at 5.  But NIFLA advertises
     and seeks to advertise APR, and some members offer, plan to offer, or would plan to offer APR

20   (including SVC).  Complaint ¶ 247 ("SVC previously planned to offer progesterone treatment to
     counter the effects of mifepristone, but the Attorney General's enforcement of the Business Fraud

21   Statutes [in the State Case] has deterred it.").

22   [7] Having found that the first two factors favor a finding of commercial speech, the Court need not
     analyze the third factor.  *See Am. Academy of Pain Management v. Joseph*, 353 F.3d 1099,

23   1108–1109 (9th Cir. 2004) ("Thus, regardless of whether LSPCs have an economic motivation in
     advertising, their regulated speech can still be classified as commercial.").  The Court nonetheless

24   does so and finds that the third factor supports the same finding.

25   [8] Plaintiffs argue that *First Resort* does not apply because the non-profit in that case "offered

26   bonuses to staff for client recruiting, thus creating an economic incentive to potentially engage in
     deceptive practices."  Memo at 12.  While it is true that this fact helped bolster support for a finding

27   of commercial speech, the finding was not solely predicated on this one fact.  Employee
     compensation was listed after the word "furthermore," meaning that the fact about bonuses was *in*

28

1    Plaintiffs do not dispute that they engage in grant fundraising based, in part, on their APR advocacy

2    and technical support.[9]  Reply at 3–5.

3        Therefore, to determine whether a hypothetical enforcement action by the Attorney General

4    under Bus. & Prof. Code Sections 17200 and 17500 predicated on Plaintiffs' commercial speech

5    would be unlawful, the Court must apply the *Central Hudson* test.  *Am. Academy of Pain*

6    *Management*, 353 F.3d at 1106 (applying *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,

7

8    _____

9    *addition* to the aforementioned usefulness of the advertisements in fundraising.  Merriam-Webster,
     *Furthermore* (last accessed Mar. 5, 2025) https://www.merriam-
10   webster.com/dictionary/furthermore).  At oral argument, Plaintiffs cited *Arixx, LLC v. NutriSearch*
     *Corp.*, 985 F.3d 1107 (9th Cir. 2021) to argue that *First Resort* was circumscribed to stand for the
11   narrow proposition that an economic incentive for employees is required for a finding of commercial
     speech in this context.  But in *Arixx* the Ninth Circuit favorably cited a case from the Third Circuit
12   that held speech was commercial due to the "general exposure of a product."  985 F.3d at 1117
     (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008)).  Putting aside the
13   economic motivation from fundraising, Plaintiffs' positive statements about APR surely serve the
     purpose of general exposure to this medical service.

14   [9] Plaintiffs at oral argument attempted to draw an analogy to *Bernardo v. Planned Parenthood*
15   *Federation of America*, 115 Cal. App. 4th 322 (2004) to argue that their speech is not commercial.
     But the finding of non-commercial speech in *Bernardo* undercuts Plaintiffs' argument.  The plaintiff
16   in *Bernardo* sought: (1) to prevent defendants from publishing statements that the weight of credible
     medical research has failed to establish a link between induced abortion and breast cancer ("ABC
17   theory"), and (2) to require defendant to provide information to former and prospective abortion
     patients that the medical research has established the veracity of the ABC theory.  *Id.* at 328.  The
18   statements defendant was making in relation to ABC theory included the proposition that "the
     [ABC] theory has not been borne out by research," summaries of and citations to research studies
19   both supporting and challenging ABC theory, and even a caveat conceding that "abortion does not
20   offer the same protection against breast cancer as a full-term pregnancy."  *Id.* at 330–335.

21       Thus, in *Bernardo*, it was clear that defendant was presenting a position on a scientific debate
     rather than promoting a particular treatment.  The statements at issue here are markedly different.
22   Plaintiffs here are encouraging the proliferation of a specific medical intervention.  *See e.g.*,
     Complaint, Ex. EE ("NIFLA Materials") ("NIFLA encourages provision of Abortion Pill Reversal")
23   [Dkt. No. 1-31].  Indeed, instead of encouraging consumers to contact a "qualified medical provider
     for personal medical evaluation and services" like in *Bernardo*, 115 Cal. App. 4th at 333, Plaintiffs
24   are directing the public to contact providers of APR or conduits that can connect people to those
     providers.  NIFLA Materials ("Contact your Medical Director and other physicians and providers in
25   your community to let them know of the successful abortion pill reversal rates…[and] [u]rge these
     medical professionals to review the research article offer [sic] this protocol as part of their
26   practices."); Complaint, Ex. GG ("SVC post May 2023") [Dkt. No. 1-33].  In short, in *Bernardo*,
27   defendant provided information for "personal education, but nothing on [the sites] constitutes a
     recommendation for medical care."  115 Cal. App. 4th at 345.  The opposite is true here.

28

9

1    447 U.S. 557, 561 (1980)).  The threshold question is whether the commercial speech is unlawful or

2    misleading, because the First Amendment does not provide any protection for such.  *Id.*  The law

3    differentiates between "inherently misleading" and "potentially misleading" speech.  *Id.* at 1106–

4    1107.  Speech is *inherently* misleading if it is "inherently likely to deceive or where the record

5    indicates that a particular form or method of advertising has been deceptive[.]"  *Id.* at 1107.

6    Inherently misleading speech is not protected by the First Amendment.  Speech is *potentially*

7    misleading when the "information may be presented in a way that is not deceptive[.]"  *Id.*  Whether

8    potentially misleading speech is protected is subject to the rest of the *Central Hudson* test.  *Id.*

9         As discussed below, the Court concludes that the statements at issue (at least on this record)

10   are inherently false and misleading.  To understand why, it is necessary to discuss briefly the theory

11   behind APR and prior litigation on this exact subject matter.

12        In 2000, the FDA preliminarily approved a two-drug medication abortion regimen that has

13   been used ever since.  Motion, Ex. B. Declaration of Susan Bane, M.D., Ph.D ("Bane Decl.") ¶ 14

14   [Dkt. No. 19-3]; Declaration of Dr. Mitchell D. Creinin ("Creinin Decl.") ¶ 15 [Dkt. No. 32].  The

15   first pill—mifepristone—binds to progesterone receptors in the uterine lining, preventing

16   progesterone molecules from binding to these receptors.  Bane Decl. ¶¶ 26, 30; Creinin Decl. ¶ 32.

17   The binding of progesterone to the receptors would result in a protein that thickens the uterine lining,

18   necessary for a healthy implantation of the embryo.  Bane Decl. ¶ 26; Creinin Decl. ¶ 34.

19   Mifepristone effectively blocks out the progesterone molecules, resulting in the breakdown of the

20   uterine lining and thereby disrupting embryo implantation and development.  Bane Decl. ¶¶ 27, 30;

21   Creinin Decl. ¶¶ 32, 34.  APR is an intervention that massively increases progesterone through

22   high-dose supplementation on the theory that an increase in progesterone will outcompete

23   mifepristone in binding to the progesterone receptors.  Complaint ¶¶ 118–120; Complaint, Ex. Y

24   ("Delgado et al. 2018") [Dkt. No. 1-25];  Complaint, Ex. Z ("Delgado & Davenport 2012") ("The

25   rationale of the proposed treatment was that higher bioavailable levels of progesterone could

26   competitively inhibit the mifepristone to prevent the induced abortion.").

27        The theory behind APR has been subjected to extensive litigation.  Those federal courts that

28   have engaged in evidentiary analysis of APR have almost uniformly found that statements regarding

1    its efficacy and safety are false and/or misleading.[10]    *Planned Parenthood of Tennessee and North*

2    *Mississippi v. Slatery, et al.*, 523 F. Supp. 3d 985, 1003–1004 (M.D. Tenn. 2021) ("The word

3    'reversal' [in the context of APR] makes the mandated message untruthful and/or misleading

4    because it promises more than progesterone therapy has even attempted to deliver…[r]equiring a

5    physician to refer patients to [abortionpillreversal.com and the corresponding hotline] is likely to

6    further mislead, and confuse patients"); *see All-Options, Inc. v. Attorney General of Indiana*, 546 F.

7    Supp. 3d 754, 767 (S.D. Ind. 2021) (finding that there is insufficient medical evidence in the record

8    to show that the statement "some evidence suggests that mifepristone's effects may be avoided,

9    ceased, or reversed" is true and not misleading); *American Medical Association v. Stenehjem*, 412 F.

10    Supp. 3d 1134, 1151 (D.N.D. 2019) (finding that statements relating to the reversal of an abortion

11    through APR are "misleading and inaccurate").[11]    These courts did not come to their respective

12    decisions lightly.  To wit:

13    • In *Planned Parenthood of Tennessee and North Mississippi, et al. v. Slatery, et al.*, Judge

14    William L. Campbell, Jr. held hearings over five days that consisted of testimony from six

15    experts (half called by plaintiff, the other half by defendant) including Dr. George Delgado

16    _____

17    [10] The APR studies analyzed by other courts are the same studies Plaintiffs reference here.  *Compare*
18    Delgado et al. 2018 and Bane Decl. ¶ 62–64 (citing to Delgado & Davenport 2012 and Delgado et al.
     2018) *with Planned Parenthood of Tennessee and North Mississippi v. Slatery, et al.*, 523 F. Supp.
19    3d 985, 996–997 (M.D. Tenn. 2021) (discussing Delgado et al. 2018 and Delgado & Davenport
     2012).  Plaintiffs do not argue that the scientific basis supporting APR in this case is stronger than
20    the bases in those cases.  Reply at 7, n. 2.  Instead, their argument is that those other cases involved
     statutes requiring the state-compelled disclosure of statements relating to the potential effects of
21    APR.  But that is a distinction without a difference vis-à-vis the question of whether the statements
     are false and/or misleading.
22

23    [11] Plaintiffs take issue with the Attorney General's omission of two cases that purportedly sided with
     Plaintiffs on this issue.  Reply at 7, n. 2.  One of those cases is irrelevant, given it involved statutes
24    different in kind and a claim premised on religious liberty not invoked in this Motion.  *See Bella
     Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189 (D. Colo. 2023).  The other case involves New
25    York statutes equivalent to the Business Fraud Statutes and a free speech claim.  *Nat'l Inst. for Fam.
     & Life Advocs. v. James*, No. 24-cv-00514-(JLS), 2024 WL 3904870 (W.D. N.Y.  Aug. 22, 2024).
26    While the latter is relevant, Plaintiffs argue that the Court should credit this one case over the three
     district court cases finding those APR statements false or misleading.  While these three district
27    court cases are not binding, the Court has reviewed them thoroughly and considers them persuasive.

28

1  ("Dr. Delgado"), one of the authors of multiple studies Plaintiffs cite in support of their

2  claims here.  Judge Campbell found that, *inter alia*, the terms "reverse" and "reversing"

3  when used in the phrase "it may be possible to avoid, cease, or even reverse the intended

4  effects of a chemical abortion utilizing mifepristone" render the phrase "untruthful and/or

5  misleading," in part because that message "suggests [APR] has reached a level of safety and

6  efficacy that is not supported by medical evidence." 523 F. Supp. 3d 985, 1003 (M.D. Tenn.

7  2021).

8  •  In *All-Options, Inc. v. Attorney General of Indiana*, Judge James Patrick Hanlon held an

9  evidentiary hearing where the defendant called Dr. Delgado (again, one of the authors of

10  multiple APR studies cited as evidence by Plaintiffs here) and the plaintiff called a Dr.

11  Courtney Schreiber.  After conducting the evidentiary hearing with expert testimony from

12  both sides, Judge Hanlon held that there was "no medical evidence in the record" to support

13  the veracity of the (somewhat watered-down) statement that "some evidence suggests that the

14  effects of Mifepristone may be avoided, ceased, or reversed if the second pill, Misoprostol,

15  has not been taken." 546 F. Supp. 3d 754, 769 (S.D. Ind. 2021).

16  •  In *American Medical Association v. Stenehjem*, then-Chief Judge Daniel L. Hovland

17  thoroughly examined extensive evidence proffered by a total of six individual experts and the

18  American College of Obstetricians and Gynecologists ("ACOG")—the "nation's leading

19  group of physicians providing healthcare to women"—and concluded that the record

20  revealed "no real, serious debate within the medical profession at the current time" regarding

21  APR. 412 F. Supp. 3d 1134, 1151 (D.N.D. 2019).  Chief Judge Hovland found that the

22  "evidence in the record does not support" the theory that it "may be possible" to "reverse a

23  medication abortion," and that "abortion reversal protocol" (APR) is "devoid of scientific

24  support, misleading, and untrue." *Id.* at 1150–1151.

25  But the Court here does not merely rely on the conclusions of other courts.  The parties have

26  submitted extensive declarations and studies, all of which the Court has reviewed and considered.

27  On the basis of this voluminous record, the Court makes the following factual findings for purposes

28  of this Motion.

1              a.   APR is not abortion reversal.

2          In making this finding, the Court relies primarily on Dr. Susan Bane's declaration and

3    rebuttal, the declaration of Dr. Mitchell Creinin, as well as the relevant underlying materials.[12]

4    Specifically, as to the phrase "abortion pill reversal" to describe what happens in APR treatment, the

5    Court finds that it is misleading.  To reverse something is to undo it or negate the effect of it.

6    *Slatery*, 523 F. Supp. 3d at 1002–1003 ("The plain and ordinary meaning of the word 'reverse' is to

7    'turn completely about in position or direction' or 'to undo or negate the effect of (something, such

8    as a condition or surgical operation.") (citing Merriam Webster, *Reverse*, (last updated March 3,

9    2025) https://www.MerriamWebster.com/dictionary/reverse).  But supplementing with large doses

10   of progesterone does nothing to undo or negate the effects of mifepristone in the body; it just

11   provides a higher concentration of progesterone, ostensibly to better the odds that these molecules

12   "outcompete" the mifepristone in binding to the progesterone receptors.  Bane Decl. ¶¶ 29–31.  Even

13   if supplementing with progesterone within 72 hours of taking mifepristone and before taking

14   misoprostol does minimally increase the chances of continued pregnancy (a highly disputed

15   outcome, as discussed below), the additional progesterone does not *reverse* mifepristone.  Plaintiffs'

16   own evidence, a 2023 article cited in support of APR, uses the phrase "abortion pill *rescue*" instead

17   of "reversal."  Complaint ¶ 137, Ex. BB ("DeBeasi 2023") ("The safety and efficacy of mifepristone

18   antagonization with progesterone to avert medication abortion, **also known as abortion pill rescue**,

19   is a subject of vigorous debate.") (emphasis added) [Dkt. No. 1-28].

20              b.   There is no credible scientific evidence that APR is safe.

21          The Court finds that statements claiming that APR is safe are (likely to be) inherently false or

22   misleading based on this limited record.  Indeed, the weight of institutional authority strongly favors

23   the position advanced by the Attorney General.  The American College of Obstetricians and

24

25   _____

26   [12] Complaint ¶ 137, Ex. BB ("DeBeasi 2023"); Delgado & Davenport 2012; Delgado et al. 2018;
     Camilleri, C., & Sammut, S., *Progesterone-mediated reversal of mifepristone-induced pregnancy*
27   *termination in a rat model: an exploratory investigation.* Sci. Rep. 13, 10942 (2023); Couzinet, B.,
     et al., *Termination of early pregnancy by the progesterone antagonist RU 486 (Mifepristone).* N.
28   Engl. J. Med. 1986 Dec. 18;315(25):1565–70.

**ADD13**

1   Gynecologists ("ACOG")—the primary professional membership organization for obstetricians and

2   gynecologists in the United States boasting more than 60,000 members[13]—has adopted in its clinical

3   guidance the position that "limited available evidence suggests that the use of mifepristone alone

4   without subsequent administration of misoprostol may be associated with an increased risk of

5   hemorrhage."  Bane Decl. ¶ 72 (citing The American College of Obstetricians and Gynecologists,

6   *Medication Abortion Up to 70 Days of Gestation Practice Bulletin No. 225* (Oct. 2020) ("ACOG

7   Bulletin")[14].  The parallel organization of Canada—the Society of Obstetricians and Gynaecologists

8   of Canada ("SOGC")—agrees, stating that "not only are [APR] treatments unproven, they can also

9   result in serious complications for the patient."  Declaration of Erica Connolly ("Connolly Decl.")

10  [Dkt. No. 30], Ex. 6 ("SOGC Statement").  Finally, a joint statement joined by the premier parallel

11  organization of the United Kingdom, the Royal College of Obstetricians and Gynaecologists

12  ("RCOG")—as well as the Royal College of Midwives, the Faculty of Sexual and Reproductive

13  Healthcare, and the British Society of Abortion Care Providers—agreed with ACOG and SOGC,

14  citing the 2020 study that was "stopped prematurely, owing to safety concerns when three of the 12

15  patients experienced 'severe bleeding requiring ambulance transport to an emergency department.'"

16  Connolly Decl., Ex. 7 ("UK Joint Statement") (citing Creinin, M.D., et al., *Mifepristone*

17  *Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*,

18  Obstet. Gynecol. 2020 Jan;135(1):158–165 ("Creinin et al. 2020")).  In short, all these authorities

19  agree that there is not enough medical evidence to suggest APR is safe.

20          In response, Plaintiffs offer the declaration of Dr. Bane, who opines that "progesterone ***can***

21  ***be safely [] utilized*** by women who change their mind after taking mifepristone to save their babies'

22  lives."  Bane Decl. ¶ 40; *see also* Reply, Ex. D Rebuttal Declaration of Susan Bane ("Bane

23  Rebuttal") ¶ 41 ("My expert opinion remains the same…[t]he currently available data…support the

24

25  _____

26  [13] Creinin Decl., Ex. B.

27  [14] Dr. Bane criticizes the reliability of ACOG bulletins in the context of this unfavorable bulletin,
    Bane Decl. ¶ 54, but in the same declaration cites approvingly to a different ACOG practice bulletin.
28  Bane Decl. ¶ 37, n. 33.

**ADD14**

statement that progesterone treatment to attempt to reverse the effects of mifepristone ***can be used
safely***…."), ¶ 76 ("***can be safely [] utilized***….") (emphasis added) [Dkt. No. 35-2].  In forming her
opinion, Dr. Bane relies on two sets of data.  First, Dr. Bane relies heavily on the safety record of
progesterone when used in contexts other than APR.  Bane Decl. ¶ 37.  She also points to a 2018
case series (authored in part by Dr. Delgado) that provided "safety-related data" and found "no
statistically significant difference [in preterm delivery or birth defects] compared to the general
population."  Bane Decl. ¶ 64 (citing Delgado et al. 2018).

Neither basis is sufficient to make the proffered point.  As Dr. Creinin notes in no uncertain
terms, there are no studies that have assessed the safety of progesterone use for APR.  Creinin Decl.
¶ 65.  Dr. Creinin's point is that the fact that progesterone has been found to be safe in other contexts
cannot be extrapolated to support a safety finding in the context of APR, especially since APR
involves (by definition) the combination of mifepristone and progesterone.  And the 2018 case series
"only looked at preterm delivery and birth defects for pregnancies in which the mifepristone was
unsuccessful in terminating the pregnancy [and indeed failed to document] any adverse effects, side
effects, or details of what happened to the pregnant women in the report for whom the pregnancy did
not continue."  *Id.* ¶ 47.  In sum and substance, there is no study or other credible evidence finding
that APR is safe, and stating otherwise is therefore likely to mislead the public.

c.  <u>There is no credible scientific evidence that APR is effective.</u>

The Court further finds, for purposes of this Motion, that statements representing APR to be
effective are also likely false or (at the very least) misleading.  Once again, the weight of authority is
against Plaintiffs' position.  *See* ACOG Statement ("Claims regarding abortion 'reversal' treatment
are not based on science and do not meet clinical standards."); SOGC Statement ("The claims
regarding so-called abortion 'reversal' treatments are not based on scientific evidence."); UK Joint
Statement ("There are no reputable national or international clinical guidelines that recommend the
use of progesterone to reverse the effect of mifepristone, and no evidence that it increases the
likelihood of continuing pregnancy, compared to expectant management alone.").

Plaintiffs' proffer to the contrary is unpersuasive.  In forming her opinion about the efficacy
of APR, Dr. Bane first relies on several research experiments conducted on animals.  Bane Decl.

15

1    ¶¶ 57–61.  Dr. Bane suggests that animal studies are valuable in that they are more amenable than

2    human studies to randomized controlled trials—the kind of study both experts agree is the most

3    probative.  *See* Bane Decl. ¶ 51 ("Randomized controlled trials are considered the best way to

4    evaluate the efficacy of a treatment because of their ability to limit and control bias.") and Creinin

5    Decl. ¶ 29 ("The gold standard for experimental research is a randomized controlled trial….").  But

6    while these animal studies are undoubtedly helpful in conducting research, they cannot be enough to

7    support a finding on effectiveness in humans.  Moreover, the studies themselves are not altogether

8    reliable.  The first study cited by Plaintiffs involved the administration of mifepristone and

9    progesterone simultaneously, which is not the same protocol as APR.  Bane Decl. ¶ 59 (citing

10   Yamabe S., et al., *[The effect of RU986 and progesterone on luteal function during pregnancy]*.

11   Nihon Naibunpi Gakkai Zasshi. 1989 May 20; 65:497–511).  And the other principal animal study

12   was clear about the material differences in gestation between pregnancies in rats and human

13   pregnancies.  Bane Decl. ¶ 61 (citing Camilleri, C. & Sammut, S., *Progesterone-mediated reversal*

14   *of mifepristone-induced pregnancy termination in a rat model: an exploratory investigation*. Sci.

15   Rep. 13, 10942 (2023)).

16          In addition to the animal studies, Dr. Bane cites a few human studies.  Again, however, these

17   studies are riddled with problems, sample size issues, and other defects.  The first human study cited

18   by Dr. Bane is a 2012 case series (authored in part by Dr. Delgado) that performed a "retrospective

19   chart review of six women who had received progesterone after taking mifepristone."  Bane Decl.

20   ¶ 62 (citing Delgado & Davenport 2012).  Aside from the obvious problem that it is a case study

21   (which Dr. Bane admits yield "lower levels of evidence[.]"  Bane Decl.  ¶ 47),[15] the study itself only

22   followed six patients—of which only four were tracked through delivery.[16]

23   _____

24   [15] As Dr. Creinin explains in more detail, "[c]ase reports and case series are ranked lower in the
     context of study design strength than other study designs because they have a lack of random
25   sampling, the absence of controls or a comparison group, heterogeneity of subjects, and associated
     bias."  Creinin Decl. ¶ 28.
26

27   [16]Another problem is each of the four women that delivered received different dosages of
     progesterone and different routes of administration.  *Id*.  ACOG issued a statement that stated in part
28

16

1    The second human study relied on by Dr. Bane fares no better.  Again, it involves a case

2    study—this one with only nine patients.  Bane Decl. ¶ 63 (citing Turner, J.V., et al., *Progesterone*

3    *after mifepristone: A pilot prospective single arm clinical trial for women who change changed their*

4    *mind after commencing medical abortion*, J. Obstet. Gynaecol. Res. 2024 Feb;50(2): 182–189

5    ("Turner et al.")).  Worse yet, the nine patients were expected to self-report mifepristone ingestion

6    and progesterone supplementation.  Creinin Decl. ¶ 49.  The authors themselves concluded that the

7    results merely "support the *need for further larger scale trials* in this field."  Bane Decl. ¶ 63

8    (emphasis added).

9    The third human study is, again, a case series; albeit one with a much larger sample size.

10    Bane Decl. ¶ 64 (citing Delgado et al. 2018).  But this 2018 study contained even more glaring

11    issues.  First among these is the fact that it fails to report on the full outcome for all patients and

12    instead excluded from the report (a) the results of 50% of patients for which the pregnancy did not

13    continue and (b) outcomes for 207 patients that had received the treatment but had either taken the

14    misoprostol before progesterone, chose to complete the abortion, or with whom Dr. Delgado lost

15    contact.  Creinin Decl. ¶ 45a, b.  Second, the process by which the authors calculated the base rate of

16    pregnancies after ingesting mifepristone is notably flawed and fails to account for the probability

17    that pregnancy continuation after mifepristone ingestion depends in part on gestational age.

18    *Id.* ¶ 45a–c, e.  Third, the ingestion of progesterone varied in myriad ways and was administered by

19    over 300 providers.  *Id.* ¶ 45d.  And fourth, the case series hardly qualifies as scientific since it was

20    not published in a peer-reviewed journal directed toward providers, but rather in a journal that deals

21    in "technical and information assistance" for "attorneys, healthcare professionals, educators, and

22    administrators on legal, medical, and ethical issues rising from healthcare decisions."  *Id.* ¶ 45f

23    (citing Creinin Decl., Ex. C).[17]

24    _____

25    "[the Delgado & Davenport 2012 case series] is not scientific evidence that progesterone resulted in

26    the continuation of the pregnancies."  ACOG Statement.

27    [17] Dr. Delgado has previously admitted to many of the shortcomings of this 2018 case series.  *See*
*Slatery*, 523 F. Supp. at 993–994 ("Dr. Delgado agreed that there is a greater possibility of bias with

28

1        The fourth study Plaintiffs rely on is the first randomized controlled trial they have presented,

2    but concededly "this study's primary focus was not to examine the effectiveness of progesterone to

3    reverse an abortion[.]" Bane Decl. ¶ 66 (citing Raymond, E.G., et al., *Effects of Depot*

4    *Medroxyprogesterone Acetate Injection Timing on Medical Abortion Efficacy and Repeat*

5    *Pregnancy: A Randomized Controlled Trial*, Obstet. Gynecol. 2016 Oct;128(4):739–45). The results

6    of the study are relevant insofar as they show that administration of injectable progestin "might

7    slightly decrease medication abortion effectiveness and increase risk for ongoing pregnancy." Bane

8    Decl. ¶ 66 (citing Kathryn M. Curtis et al., *U.S. Selected Practice Recommendations for*

9    *Contraceptive Use, 2024*, 73 Centers for Disease Control & Prevention Morbidity & Mortality

10   Weekly Report 1, 24 (2024)); Creinin Decl. ¶ 50. But that conclusion rather proves the Attorney

11   General's point. It boggles the mind to conceive of any situation where a member of the public

12   hearing, "APR is effective!" would not feel misled upon finding out that the assertion was based on

13   one 2016 study showing a "slight decrease" in the effectiveness of mifepristone following APR.

14        The last human study that Dr. Bane cites is, coincidentally, the randomized controlled trial

15   co-authored by the Attorney General's expert Dr. Creinin. Bane Decl. ¶ 67. Dr. Bane claims that

16   the results show "[p]rogesterone use for the reversal of mifepristone *in this study* was both safe and

17   effective." Bane Decl. ¶ 69 (emphasis added) (citing Creinin et al. 2020). But Dr. Creinin himself

18   says that the study "could not estimate the efficacy" of APR treatment because the sample size is too

19   small; the doctors recruited only 12 patients before halting the study due to "safety concerns."

20   Creinin Decl. ¶¶ 60–61. That reaffirms the conclusion included in the study itself. Creinin et al.

21   2020 ("We could not estimate the efficacy of progesterone for mifepristone antagonization due to

22   safety concerns when mifepristone is administered without subsequent prostaglandin analogue

23

24

_____

25   a case series than a controlled trial…Dr. Delgado admitted to excluding those women whose
pregnancies had terminated after mifepristone alone [] from the 754 women who initiated

26   progesterone therapy[,] nor did he count these excluded women as 'reversal failures'…Dr. Delgado
admitted that the characteristics of [the historical control group] did not align with those of the patients in

27   the case series [for example] patients in his case series include[ed] women with a higher gestational
age [and] Dr. Delgado agreed mifepristone becomes less effective as gestational age increases…Dr.

28   Delgado also admitted that patients in his case series received a lower dose of mifepristone…").

**ADD18**

1  treatment [i.e., misoprostol]."). Dr. Bane counters by suggesting the "authors' conclusions of their

2  own study are faulty." Bane Decl. ¶ 71. But Dr. Bane does not state that the evidence available is

3  enough to deem APR effective, rather she states that the "evidence is sufficient to support informing

4  women who regret taking mifepristone that progesterone treatment may be an option and that the

5  studies to date have shown that it ***may*** be effective." Bane Decl. ¶ 73.

6  Finally, Dr. Bane cites a couple of specific examples from her clinical experience that are

7  purportedly success stories illustrating the efficacy of APR. *Id.* ¶ 79. But anecdotal evidence cannot

8  substitute for scientific studies of the kind Dr. Bane herself seems to concede are generally preferred.

9  *See id.* ¶ 46–50.[18]

10  Even if the Court concluded that the statements are only ***potentially*** misleading, Plaintiffs

11  cannot prevail. The next part of the *Central Hudson* analysis requires the Attorney General to

12  demonstrate that the regulation on commercial speech directly advances a substantial government

13  interest. "There is no question that California has a substantial interest in protecting consumers from

14  misleading advertising by medical professionals." *Am. Academy of Pain Management*, 353 F.3d at

15  1108. While the advertising at issue here is not strictly *by* medical professionals, it is about medical

16  treatment purportedly carrying the weight of medical authorities—which is the principal concern

17  underpinning the state's interest. *Id.* (citing *In re R.M.J.*, 455 U.S. 191, 202 (1982) ("The public's

18  comparative lack of knowledge, the limited ability of the professions to police themselves, and the

19  absence of any standardization in the 'product' renders advertising for professional services

20

21  _____

22  [18] Plaintiffs cite a 2023 article by Paul L. C. DeBeasi in further support of the efficacy of APR.
    Complaint ¶ 137, DeBeasi 2023. DeBeasi reviews 16 case studies analyzed by three previous

23  articles to determine the continuing pregnancy rate after mifepristone alone, and then reviews four
    journal articles that looked at APR to determine the continuing pregnancy rate after ingesting

24  mifepristone followed by progesterone. DeBeasi 13 at 4. But the underlying articles have problems.
    One article is Delgado & Davenport 2012 that only included six patients. *Id.* Another is Delgado et

25  al. 2018, which—as discussed above—Dr. Delgado himself admitted has a plethora of issues
    affecting reliability of the conclusion. *Id.* And the third article is Dr. Creinin's that—as Dr. Bane

26  herself admits—came to a conclusion that fails to support Plaintiffs' proposition. Bane Decl. ¶ 70
    (citing Creinin et al. 2020). Not only is DeBeasi not a doctor, three of the four articles he reviewed

27  to determine the efficacy of APR are either unreliable or undermine his conclusion.

28

19

1  especially susceptible to abuses that the States have a legitimate interest in controlling.").

2      The Attorney General must then establish that the regulation directly advances the asserted

3  government interest.  *Am. Academy of Pain Management*, 353 F.3d at 1109.  The regulation need not

4  be the least restrictive means nor the perfect or single best way to achieve the desired ends, but

5  rather the fit must be reasonable and the regulation narrowly tailored to achieve the ultimate goal.

6  *Id.* at 1111; *see Yim v. City of Seattle*, 63 F.4th 783, 795–796 (9th Cir. 2023) ("In considering the fit

7  between the legislature's ends and the means chosen to accomplish those ends, the fit must not

8  necessarily be the least restrictive means, but reasonable and through a means narrowly tailored to

9  achieve the desired objective.").

10      That standard is amply met here.  Sections 17200/17500 are consumer protection statutes

11  used principally to address unfair, unlawful, and fraudulent conduct, as well as false advertising.

12  Here, the California Attorney General in the State Case is seeking to put a stop to commercial speech

13  concerning the advertising of a medical intervention that he considers to be false and misleading to

14  the public.  The "fit" is more than reasonable.  Plaintiffs argue that the Attorney General's

15  enforcement of the California Business and Professions Code in this context is not narrowly tailored

16  because there are other laws the Attorney General could utilize that more directly target the kind of

17  harm the government intends to punish.  Motion at 15 (citing California statutes covering licensed

18  medical professional advertising, licensing provisions, and human experimentation).  While that

19  *might* be true, there very well may be valid reasons why the Attorney General would choose to bring

20  suit under the Business & Professions Code rather than under a different law.  Perhaps the laws cited

21  by Plaintiffs as alternatives are not applicable to third parties.[19]  For present purposes, it is sufficient

22  to note that Sections 17200/17500 fit reasonably with the prevention of false or misleading

23  advertising related to medical treatment.[20]

24  _____

25  [19] *See e.g.*, Cal. Bus. & Prof. Code § 651(a) (applying only to "any person licensed under this
   division or under any initiative act referred to in this division.").

26

27  [20] Plaintiffs lastly argue that future enforcement actions for APR-related advertisements do not
   materially advance California's asserted interest because such enforcement would only prevent

28

20

1    In summary, Plaintiffs cannot carry their burden of showing likelihood of success on the

2    merits.  Commercial speech that is inherently false or misleading is not entitled to First Amendment

3    protection.  And even if it was potentially misleading, the Attorney General more than carries his

4    burden under *Central Hudson*.

5              **2.  Viewpoint discrimination**

6    Plaintiffs' alternative argument is that an enforcement action by the Attorney General against

7    APR-related speech would constitute selective enforcement and therefore constitute unlawful

8    viewpoint discrimination.[21]   Motion at 9 ("If [Plaintiffs] stated the oppositive viewpoint, [the

9    Attorney General] presumably would not take legal action against them. But because [the Attorney

10   General] disagrees with [Plaintiffs'] viewpoint on APR, [Plaintiffs] risk prosecution for their

11   speech.").[22]

12   "It is axiomatic that the government may not regulate speech based on its substantive content

13   or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828

14   (1995).  The government is presumed to be acting unconstitutionally when enforcing laws against

15   —————————————————

16   *medical* harm, whereas Sections 17200/17500 are meant to prevent consumers from *economic*

17   injury.  Memo at 15 (emphasis added).  Not so.  The Business & Professions Code is intended to
     prevent the dissemination of false or misleading information in commercial speech, whether the

18   resulting harm is economic or not.  *See In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) ("To
     state a claim under either the UCL or the [FAL], based on false advertising or promotional practices,

19   it is necessary only to show that members of the public are likely to be deceived.") (citation

20   omitted).

21   [21] Plaintiffs' two viewpoint discrimination arguments—that Sections 17200/17500 are viewpoint
     discriminatory as applied to statements about APR and that the selective enforcement of the statutes

22   against Plaintiffs would be viewpoint discrimination—are one in the same.  Motion at 9, 17.  Both
     essentially allege that any enforcement of these statutes against Plaintiffs regarding APR would be

23   solely because of Plaintiffs' viewpoint.  The Court does not take Plaintiffs to be arguing that
     Sections 17200/17500 are facially viewpoint discriminatory, seeing as they do not discriminate

24   "based on the specific motivating ideology or the opinion or perspective of the speaker."
     *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

25

26   [22] Here again Plaintiffs attempt to litigate the merits of the State Case. Motion at 17 ("The Attorney
     General is also acting unconstitutionally by selectively enforcing the UCL and FAL against pro-life

27   pregnancy-support organizations [in the State Case] but not abortion clinics.").  That is a legal
     conclusion that the State Case has not reached.

28

speech if "the specific motivating ideology or the opinion or perspective of the speaker is the

rationale for the [enforcement]." *Waln v. Dysart School District*, 54 F.4th 1152, 1162 (9th Cir.

2022) (citing *Rosenberger*, 515 U.S. at 829);  *Rosenbaum v. City and County of San Francisco*. 484

F.3d 1142, 1158 (9th Cir. 2007) (citing *Rosenberger*, 515 U.S. at 828).  Governments may not

circumvent the First Amendment by selectively enforcing facially viewpoint neutral laws against

certain parties because of disagreement with those parties' viewpoint.  *Hoye v. City of Oakland*, 653

F.3d 835, 851 (9th Cir. 2011).

    To prevail on a selective enforcement claim[23], the party alleging discrimination must first

show that the enforcement had a discriminatory effect, and the government was motivated by a

discriminatory purpose.  *See Rosenbaum*, 484 F.3d at 1152–53; *U.S. v. Armstrong*, 517 U.S. 456,

465–466 (1996).  If a party can carry its burden on effect and purpose, plaintiffs "seeking to enjoin

alleged selective enforcement must demonstrate the [Attorney General's alleged] misconduct is part

of a policy, plan, or a pervasive pattern." *Rosenbaum*, 484 F.3d at 1153.  "Selective enforcement

claims must clear a high hurdle." *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82

F.4th 1122, 1140 (D.C. Cir. 2023) ("Because the lawful exercise of prosecutorial discretion does not

violate the Constitution, disparate enforcement of a neutral ordinance based on viewpoint is unlawful

only when the prosecutorial factors are similar, and 'unlawful favoritism' remains the predominant

explanation for the government's targets.") (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325

(2002).

---

[23] Plaintiffs use interchangeably the phrase "selective prosecution" and "selective enforcement."
While there may be a fine line between the two and the ultimate label is probably not relevant, the
proper avenue of challenging the actions of a prosecutor on the grounds that they are selectively
enforcing laws in a discriminatory manner seems to be a claim of selective enforcement.  *See United
States v. Mumphrey*, 193 F. Supp. 3d 1040 (N.D. Cal. 2016).  Selective prosecution claims are
brought as violations of the Fourteenth Amendment's Equal Protection Clause.  *Rosenbaum*, 484
F.3d at 1152–53; *Lacey v. Maricopa County*, 693 F.3d 896, 920 (9th Cir. 2012) ("Although the
district court primarily characterized [plaintiff's] claim as one for 'selective prosecution,' on appeal
[plaintiff] calls it a claim for 'selective enforcement.' [Plaintiff's] complaint adequately supports this
characterization, although the label is probably not relevant.").

**ADD22**

1    Plaintiffs fall well short of clearing this high bar.[24]  Most notably, there is insufficient

2    evidence of a "policy plan, or pervasive pattern" of enforcement sufficient to merit an injunction.

3    The California Attorney General has filed a grand total of **one** enforcement action on this issue, and

4    that litigation is scheduled to go to trial later this year.  That the Attorney General issued two press

5    releases and made a few public appearances is of little moment when weighed against the nearly 18

6    months that have elapsed without a second action since the filing of the State Case.[25]  Indeed,

7    perhaps the strongest evidence that Plaintiffs themselves are not concerned about a "pervasive

8    pattern" or "plan" is the fact that this motion for injunctive relief was filed nearly a year after the

9    state court proceedings were initiated.

10    Plaintiffs argue that the Attorney General is engaging in viewpoint discrimination by

11    bringing the State Case but not bringing similar cases against Planned Parenthood.  Motion at 17–19.

12    What clearly distinguishes the State Case from any lack of enforcement against Planned Parenthood

13    is the undeniable fact that California's law enforcement officer views the APR statements as false

14    and injurious to public health (again, correctly in all likelihood based on the submitted evidence).

15

16

17    [24] As an aside, it is unclear whether Plaintiffs even have standing to bring a pre-prosecution selective
     enforcement challenge.  *See Hoye,* 653 F.3d at 859. ("Any resolution of [plaintiff's] paradigmatic
18    as-applied challenge could only be relevant to future applications of the Ordinance. We have
     previously declined to entertain as-applied challenges that would require us to speculate as to
19    prospective facts…as to [plaintiff's] challenge to whether Oakland may apply the Ordinance to
     situations in which doing so would prevent him from communicating his message, we conclude that
20    the success of the challenge depends on Oakland's future enforcement policy and the particular
     circumstances in which that policy may be applied. We therefore do not reach that challenge but also
21    do not preclude [plaintiff] from bringing such a challenge in the future.").

22    [25] What's more, a governmental entity "can say what it wishes and select the views that it wants to
     express"; without that ability "the government could barely function." *National Rifle Association of*
23    *America v. Vullo*, 602 U.S. 175, 187 (2024).  Each time a government entity acts, "it necessarily
     takes a particular viewpoint and rejects others," thus it need not "maintain viewpoint neutrality when
24    its officers and employees speak about that venture." *Id.*  Requiring viewpoint neutrality would be
     "paralyzing." *Matal v. Tam*, 582 U.S. 218, 234 (2017).  Of course, the State cannot abuse its power
25    by punishing disfavored expression or exert its authority to suppress viewpoints it disfavors. *Vullo*,
     602 U.S. at 188.  But it is the *application* of state power that must be scrutinized. *Id.*  Here, there is
26    no exertion.  Nor have Plaintiffs shown that the State Case is an unlawful application of that power
     as it relates to California's clear interest in preventing false and misleading commercial
27    advertisements to its consuming public.

28

23

**ADD23**

1  That should be the end of the analysis.  There is no comparable situation where the Attorney General

2  has failed to enforce the Business & Professions Code against, say, a pro-choice pregnancy center or

3  other service provider making what, according to the corpus of medical literature, are likely

4  inherently false or misleading statements.

5      The cases cited in support of Plaintiffs' position are distinguishable and reflect a very

6  different procedural posture allowing a claim to proceed past the motion to dismiss stage—a

7  relatively minor hurdle where allegations of fact by Plaintiff are taken as true.  *Waln*, 54 F.4th at

8  1163 ("Therefore, at this procedural stage, Plaintiff has plausibly alleged [her claims]….[t]aking the

9  [plaintiff's] allegations in the complaint as true, as we must,…the [defendant] cannot meet its

10 burden."); *Frederick Douglass Foundation, Inc.*, 82 F.4th 1135 (finding that plaintiff had plausibly

11 alleged its First Amendment claim when construing the complaint "liberally" and granting it "the

12 benefit of all inferences that can be derived from the facts alleged.").  Here the Court is addressing a

13 motion for preliminary injunction—a request for "an extraordinary remedy," which requires a "clear

14 showing" of justification that is not entitled to the procedural concessions of a motion to dismiss.

15     Because Plaintiffs have thus failed to establish the "threshold inquiry" of likelihood of

16 success, *Baird*, 81 F.4th at 1042 (9th Cir. 2023), the Court need not engage in an analysis of

17 irreparable harm or a balance of equities.

18 **V.    CONCLUSION**

19     For the foregoing reasons, Plaintiffs' Motion is denied.

20

21  Dated: March 6, 2025                    _____

22                                          Hernán D. Vera
                                            United States District Judge

23

24

25

26

27

28

24
**ADD24**